IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| B.C. MONEY, SR., <br> AIS # 184159 <br><br>     PETITIONER, <br><br> vs. <br><br> HENRY COUNTY, ALABAMA, <br> *Et al.,* <br><br>     RESPONDENTS. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL NO. <br> ) 1:08-CV-00228-WKW <br> ) <br> ) <br> ) <br> ) |

## ANSWER OF RESPONDENTS

Come now the Respondents, by and through the Attorney General for the
State of Alabama, and in response to this Honorable Court's Order issued March
31, 2008, make the following answer:

1. In his federal petition, B.C. Money, Sr., attacks his October 6, 1995
conviction of first-degree rape in the Henry County Circuit Court on the following
grounds:

    (1) He was denied his right to due process under law, because
        he was arrested and placed in jail without an arrest
        warrant;

    (2) The police officer who investigated the charges against him
        served as foreman of the jury during his trial;

(3)  The trial judge coerced the jury into returning a guilty
     verdict.

(Money's petition, pages 5-10)

2.  Respondents admit Money is in state custody serving a sentence of

ninety-nine years in the state penitentiary and ten years imprisonment pursuant to

his conviction of first-degree rape and first-degree sexual abuse in the Henry

County Court, but aver that Money's conviction and sentence are valid and

constitutional under the laws and treaties of the United States and the State of

Alabama.

3.  Respondents deny each and every material allegation of the petition and

demand strict proof thereof.


## PROCEDURAL HISTORY

4.  On July 29, 1994, the Henry County Grand Jury indicted B.C. Money on

three counts of raping six-year-old Amber Celeste Money, Money's

granddaughter, by forcible compulsion in violation of Alabama Code §13A-6-61

(1975), in cases CC94-065, CC94-066, and CC94-067.  (Exhibit A, 12, 75, 88)  In

CC94-068, Money was charged with first-degree sexual abuse of Amber Celeste

Money in violation of Alabama Code §13A-6-66 (1975).  (Exhibit A, 103)  In

CC94-069, Money was charged with the first-degree rape of Amanda Hadden in

violation of Alabama Code §13A-6-61 (1975).  (Exhibit A, C. 18)  In CC94-070,

2

Money was charged with first-degree sexual abuse of Amber Money in violation of Alabama Code §13A-6-66 (1975). (Exhibit A, C. 133) On motion of the State and over objection of defense counsel, cases CC94-065 through CC94-070 were consolidated for trial. (Exhibit A, C. 36-38, 41)

5. The case came to trial on October 6, 1995, whereupon the jury returned verdicts finding Money guilty of four counts of first-degree rape and two counts of first-degree sexual abuse. (Exhibit A, C. 54, 77, 91, 106, 121, 136) On October 27, 1995, the trial court sentenced Money as follows: ninety-nine years each in case numbers CC-94-065, 94-066, 94-067, 94-069, and 94-070, and ten years each in case numbers CC-94-068 and 94-070. (Exhibit A, C. 61, 83, 98, 113, 128, 143) Money appealed to the Alabama Court of Criminal Appeals on October 27, 1995. (Exhibit A, C. 66) In his appeal, Money raised one issue, that the trial court erred by coercing the allegedly deadlocked jury into convicting him. (Exhibit D)

6. On August 23, 1996, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming Money's convictions of first-degree rape and first-degree sexual abuse. (Exhibit D) Money did not file an application for rehearing. On September 10, 1996, the Alabama Court of Criminal Appeals issued a certificate of final judgment. It does not appear that Money has not filed any post-conviction collateral proceedings attacking his convictions. Money filed the instant federal petition on March 26, 2008, and this action follows.

## EXHAUSTION

7. In O'Sullivan v. Boerckel, 526 U. S. 838 (1999), the United States

Supreme Court held that, to satisfy the exhaustion requirement, a state prisoner

must present his claims to a state supreme court in a petition for discretionary

review when that review is part of the state's ordinary appellate review procedure.

Money did not file an application for rehearing, or seek certiorari review of his

claims in the Alabama Supreme Court.  Therefore, under the criteria of O'Sullivan,

Money has not exhausted his claim that the trial judge coerced the jury into

returning a guilty verdict.

## MEMORANDUM BRIEF

### One-Year Period Of Limitation Under
### Title 28 U.S.C. §2244(d)

8.  Money's petition is barred because it was not filed within the one-year

statute of limitation.  Title 28 U. S. C. §2244 (d) (1), enacted by Title I of the

Antiterrorism and Effective Death Penalty Act of 1996, pub. L. No. 104-132, 110

Stat. 1214, provides for a one-year statute of limitation applicable to a writ of

habeas corpus by a person in custody pursuant to the judgment of a state court.

This law became effective on April 24, 1996.  The section specifically provides the

following:

4

(d) (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of - -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection. (Emphasis added.)

9. On October 6, 1995, Money was convicted of four counts of first-degree rape and two counts of first-degree sexual abuse. On October 27, 1995, Money was sentenced to ninety-nine years in the state penitentiary on each count of first-degree rape, and ten years imprisonment on each count of first-degree sexual abuse. On August 23, 1996, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming Money's convictions. Certificate of final

judgment was issued on September 10, 1996. Money filed this petition on March 26, 2008.

10. The effective date of the federal habeas statute is April 24, 1996. For the purpose of the habeas corpus statute of limitation, a conviction becomes final when the time expires for a defendant to seek review in the United States Supreme Court. See: Coates v. Byrd, 211 F. 3d 1225, 1226-1227 (11th Cir. 2000). Pursuant to Coates v. Byrd, the statute of limitation began to run in Money's case on December 9, 1996, ninety days after issuance of certificate of final judgment. Under the federal statute, Money had one year from December 9, 1996 , in which to file a timely federal petition. He did not file the instant petition until March 26, 2008, more than ten years *after* the statute of limitation had run. He has not filed a Rule 32 petition that would toll the federal statute of limitation.

Accordingly, Money's petition for writ of federal habeas corpus is due to be denied as barred by the one-year statute of limitation under Title 28 U.S.C. 2244(d).

## CONCLUSION

Based upon the foregoing, Money's petition for writ of habeas corpus attacking his convictions of first-degree rape and first-degree sexual abuse and his sentences of ninety-nine years and ten years respectively, is due to be denied because the petition is barred by the federal statute of limitation.

Respectfully submitted,

Troy King (KIN047)
Attorney General
By:


s/Jean A. Therkelsen
Jean A. Therkelsen

# EXHIBITS

Exhibit A - Transcript, direct appeal, CR-95-0268.

Exhibit B – Money's brief on direct appeal, CR-95-0268.

Exhibit C – State's brief on appeal, CR-95-0268.

Exhibit D – Opinion of the Alabama Court of Criminal Appeals affirming
Money's conviction on direct appeal, CR-95-0268.

Exhibit E - Certificate of final judgment, CR-95-0268.

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>9th</u> day of May, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  <u>B. C. Money, AIS #184159, P. O.  Box 5107, Union Springs, Alabama  36089.</u>

Respectfully submitted,

s/Jean A. Therkelsen
Jean A. Therkelsen
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone:  (334)  242-7300
Fax:  (334)  242-2848
E-Mail:  JTherkelsen@ago.state.al.us

637214/120092

COURT OF CRIMINAL APPEALS NO. 95-0268

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF HENRY COUNTY, ALABAMA

CIRCUIT COURT NO. CC-94-065 thru CC-94-070

CIRCUIT JUDGE LAWSON LITTLE

Type of Conviction / Order Appealed From: Rape 1st on CC-94-065,066,067, & 069

Sentence Imposed: 99 yrs on CC-94-065; Sexual Abuse on CC-94-068 & 070 99 yrs on 066; 99 yrs on 067; 99 yrs on 069;

Defendant Indigent: [X] YES [ ] NO 10 yrs on CC-94-068; 10 yrs on CC-94-070

B. C. MONEY

NAME OF APPELLANT

William Christian Maddox          334 793-6493
(Appellant's Attorney)
P. O. Box 738                     (Telephone No.)
(Address)
Dothan          AL          36302
(City)          (State)          (Zip Code)

### V.

## STATE OF ALABAMA

(State represented by Attorney General)          NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)





EXHIBIT

A

CLERK'S INDEX

Case No. CC-94-065                                                        PAGE NO.

COMPLAINT                                                                 1

WARRANT                                                                   2

ADVICE OF RIGHTS ON INITIAL APPEARANCE                                    3

ORDER ON INITIAL APPEARANCE                                               4

SEARCH WARRANT                                                            5

AFFIDAVIT OF SUBSTANTIAL HARDSHIP & ORDER                                 6-7

AFFIDAVIT OF SUBSTANTIAL HARDSHIP & ORDER                                 8-9

CONSOLIDATED BOND                                                         10

CASE ACTION SUMMARY (District Court)                                      11

INDICTMENT                                                                12-13

REQUEST FOR PRELIMINARY HEARING                                           14

WRIT OF ARREST                                                            15

CONSOLIDATED BOND                                                         16

MOTION TO REVOKE BOND                                                     17

AMENDMENT OF RELEASE ORDER                                                18

PLEA OF NOT GUILTY & WAIVER OF ARRAIGNMENT                                19

MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND FOR
   PSYCHOLOGICAL & MEDICAL EXAMINATION OF STATE'S WITNESS                 20-21

MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE TO DEFT                   22-23

OBJECTION TO DEFT'S MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY
   AND PSYCHOLOGICAL & MEDICAL EXAMINATION OF AMANDA HADDAN AND
   AMBER CELESTE MONEY                                                    24-28

ORDER                                                                     29

ORDER                                                                     30

MOTION TO DISMISS                                                         31

MOTION TO COMPEL DHR TO PRODUCE RECORDS & REPORTS                         32-34

ORDER                                                                     35

MOTION TO CONSOLIDATE                                                     36

Clerk's Index, Continued

| | PAGE NO. |
|---|---|
| DEFT'S OBJECTION TO MOTION TO CONSOLIDATION | |
| MOTION TO CONSOLIDATE | 37 |
| MOTION TO CONTINUE | 38 |
| DEFT'S ADDITIONAL OBJECTION TO MOTION TO CONSOLIDATE | 39-40 |
| ORDER FOR SHERIFF TO TRANSPORT WITNESS | 41 |
| STATE'S REQUESTED CHARGES | 42 |
| JURY STRIKE LIST | 43-52 |
| JURY VERDICT | 53 |
| CASE ACTION SUMMARY (Circuit Court) | 54 |
| AFFIDAVIT OF SUBSTANTIAL HARDSHIP | 55-62 |
| ORDER APPOINTING COUNSEL | 63-64 |
| | 65 |
| NOTICE OF APPEAL BY TRIAL COURT CLERK | |
| DOCKETING STATEMENT | 66 |
| REPORTER'S TRANSCRIPT ORDER | 67-68 |
| | 69 |
| CC-94-066 | |
| COMPLAINT | |
| WARRANT | 70 |
| CONSOLIDATED BOND | 72 |
| CONSOLIDATED BOND | 73 |
| CASE ACTION SUMMARY (District Court) | |
| INDICTMENT | 74 |
| JURY VERDICT | 75-76 |
| CASE ACTION SUMMARY (Circuit Court) | 77 |
| | 78-83 |

Clerk's Index, Continued                              PAGE NO.

CC-94-067

COMPLAINT                                             84

WARRANT                                               85

CONSOLIDATED BOND                                     86

CASE ACTION SUMMARY (District Court)                  87

INDICTMENT                                            88-89

CONSOLIDATED BOND                                     90

JURY VERDICT                                          91

CASE ACTION SUMMARY (Circuit Court                    92-98


CC-94-068

COMPLAINT                                             99

WARRANT                                               100

CASE ACTION SUMMARY (District Court)                  101

CONSOLIDATED BOND                                     102

INDICTMENT                                            103-104

CONSOLIDATED BOND                                     105

JURY VERDICT                                          106

CASE ACTION SUMMARY (Circuit Court)                   107-113


CC-94-069

COMPLAINT                                             114

WARRANT                                               115

CASE ACTION SUMMARY (District Court)                  116

CONSOLIDATED BOND                                     117

INDICTMENT                                            118-119

CONSOLIDATED BOND                                     120

Clerk's Index, Continued                                    PAGE NO.

JURY VERDICT                                                121

CASE ACTION SUMMARY (Circuit Court)                        122-128


CASE NO. CC-94-070

COMPLAINT                                                  129

WARRANT                                                    130

CASE ACTION SUMMARY (District Court)                       131

CONSOLIDATED BOND                                          132

INDICTMENT                                                 133-134

CONSOLIDATED BOND                                          135

JURY VERDICT                                               136

CASE ACTION SUMMARY (Circuit Court)                        137-143

COURT REPORTER'S INDEX OF TRIAL EXHIBITS                   144

EXHIBITS                                                   145-163

CERTIFICATE OF COMPLETION                                  164

CLERK'S INDEX TO EXHIBITS

|                                          | PAGE NO. |
|------------------------------------------|----------|
| STATE'S EXHIBIT NO. 1 (MAGAZINES)        | 145      |
| STATE'S EXHIBIT NO. 2 (CONSENT)          | 146      |
| STATE'S EXHIBIT NO. 3 (PHOTO)            | 147      |
| STATE'S EXHIBIT NO. 4 (CARDS)            | 148      |
| STATE'S EXHIBIT NO. 5 (PHOTO)            | 149      |
| STATE'S EXHIBIT NO. 6 (PHOTO)            | 149      |
| STATE'S EXHIBIT NO. 7 (PHOTO)            | 150      |
| STATE'S EXHIBIT NO. 8 (PHOTO)            | 150      |
| STATE'S EXHIBIT NO. 9 (PHOTO)            | 151      |
| STATE'S EXHIBIT NO. 10 (SHINGLES)        | 152      |
| STATE'S EXHIBIT NO. 11 (PHOTO)           | 153      |
| DEFT'S EXHIBIT NO. 1 (COMPLAINT)         | 154      |
| DEFT'S EXHIBIT NO. 2 (COMPLAINT)         | 155      |
| DEFT'S EXHIBIT NO. 3 (COMPLAINT)         | 156      |
| DEFT'S EXHIBIT NO. 4 (COMPLAINT)         | 157      |
| DEFT'S EXHIBIT NO. 5 (COMPLAINT)         | 158      |
| DEFT'S EXHIBIT NO. 6 (COMPLAINT         | 159      |
| DEFT'S EXHIBIT NO. 7 (STATEMENT)         | 160-161  |
| DEFT'S EXHIBIT NO. 8 (STATEMENT)         | 162      |
| DEFT'S EXHIBIT NO. 9 (VCR TAPE)          | 163      |

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000267.00
OTHER CASE NBR:
DC-94-366

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED   HORNSBY CLYDE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT   B C MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

   ON OR ABOUT   OCT - DEC 31, 1993, B. C. MONEY, SR., A MALE, DID ENGAGE
IN SEXUAL INTERCOURSE WITH AMBER CELESTE MONEY, A FEMALE BY FORCEABLE
COMPULSION at a branch located behind the residence of B. C. Money, Sr., Rt 1, Columbia, AL
IN VIOLATION OF 13A-006-061                        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE      13A-006-061      F

WITNESS FOR THE STATE

HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
MONEY AMBER CELESTE/RT//COLUMBIA/36319
FLAHERTY HEATHER/515 COLUMBIA RD//ABBEVILLE/36310
AMOS TAMMY/RT 1 BOX 24/OLD RIVER ROAD/SHORTERVILLE/36373
MONEY PATRICIA E/RT 1//COLUMBIA/36319
RUSHING BETH/DHR1//ABBEVILLE/36310

OPERATOR: COB    DATE: 06/08/94

W A R R A N T

STATE OF ALABAMA                    HENRY COUNTY                    DISTRICT COURT

AGENCY NUMBER:                          WARRANT NUMBER: WR 94 000267.00
                                        OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    B C MONEY SR   AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF HENRY COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
              RAPE 1ST DEGREE   CLASS:A   TYPE:F
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE INTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
___19__ DAY OF _July_ 19__, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 08 DAY OF JUNE, 1994.

BOND SET AT: $100,000.00      BOND TYPE:

_Connie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

---

CHARGES: RAPE 1ST DEGREE      13A-006-061      F

---

NAME: B C MONEY SR                      ALIAS:
ADDRESS: RT 1                           ALIAS:
ADDRESS:
CITY: COLUMBIA            STATE: AL      ZIP: 36319 0000

EMPLOYMENT:
DOB: 03/22/22   RACE: W   SEX: M   HAIR:
EYE:      HEIGHT: 0'00"   WEIGHT: 000
SID: 000000000  SSN: 420503187

---

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ ) PLACING DEFENDANT IN THE HENRY COUNTY JAIL.

( ) RELEASING DEFENDANT ON APPEARANCE BOND

THIS ___8___ DAY OF ___JUNE___      19 94

_Lawton Ed Armstrong_
SHERIFF

_Clyde Hornsby_
BY

---

COMPLAINANT:   HORNSBY CLYDE
               C/O HENRY CO SO

               ABBEVILLE  AL  36310

OPERATOR: COB      LAST UPDATE: 060894

State of Alabama
Unified Judicial System

Form C-81    11/91

**ADVICE OF RIGHTS ON INITIAL**
**APPEARANCE BEFORE JUDGE OR MAGISTRATE**
(Felony)

Case Number

IN THE _____ *District* _____ COURT OF _____ *Henry* _____ COUNTY

☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

v. _____ *B. C. Money, Sr.* _____ , Defendant

This is a first appearance hearing. You are charged with committing the felony offense(s) of *Rape 1st Degree* in this Court in violation of *16A - 006 - 061*. The primary purpose of this hearing is to ensure that you know and understand the charge or charges against you. At this hearing, there will be no determination made about your guilt or innocence of the crime charged, but only a determination that you know and understand the charge or charges against you. If you are before the Court on a complaint following a warrantless arrest, the judge or magistrate will determine whether there is probable cause for the charge against you.

In addition, the purpose of this hearing is to determine whether bail should be set in your case, or, if it has been already set, if it should remain the same, be raised, be lowered, or whether you should be released upon your personal recognizance (that is, your promise to appear for future court proceedings) or released in the custody of some responsible person. In order to make this determination, it will be necessary for the judge or magistrate to ask you some questions concerning your ties with the community.

You are entitled to be represented by an attorney. You have a right to have your own attorney and will be given time and opportunity to retain an attorney. If you are unable to afford an attorney, one will be appointed for you by the court if you qualify for such representation. It will be necessary for you to complete an indigency questionnaire under oath in order for the court to make this determination.

You have a right to talk with your attorney, family, or friends, and if necessary, reasonable means will be provided in order to enable you to do so. You have the right to remain silent. Anything that you say may be used against you.

Because you are charged with a felony, you are entitled to demand a preliminary hearing before a judge or magistrate to determine whether there is sufficient evidence to establish that you probably committed the offense or offenses with which you are charged. You must make this demand within thirty (30) days of the date of arrest. If a hearing is demanded and one is conducted, and, if at the conclusion of the preliminary hearing the judge finds that sufficient evidence has been shown to establish that you probably committed the offense or offenses with which you are charged, the judge will then bind you over for further action by a grand jury. If, on the other hand, the judge finds that the evidence is insufficient to establish that you probably committed the crime or crimes charged, then the judge will dismiss the charge and discharge you from further custody or pre-trial obligations subject to the right of the prosecution to reinstate the charges against you at a later time.

If you are released from custody (whether personal recognizance or otherwise), you must:

1.) Appear to answer and submit to all orders and process of the Court having jurisdiction in the case.
2.) Refrain from committing any criminal offense.
3.) Not depart from the state of Alabama without the leave of the Court having jurisdiction of this case.
4.) Promptly notify the Court of any change of address or phone number.
5.) Other conditions: _____

The provisions of the Release Order may be revoked or modified by the Court for cause. The Release Order and any appearance bond executed in compliance with it will continue in force and effect until the dismissal, acquittal, or conviction on the charges, unless sooner revoked or modified by the Court. Upon report of a violation of any of the above conditions, a warrant for your arrest will be issued.

Date: *6-9-94*

_____
Judge/Magistrate

*I have read or have been advised of the matters herein set forth. I understand the explanation of procedures, rights, and information given to me at the Initial Court Appearance. I understand the conditions of my release and the penalties applicable in the event that I violate any conditions imposed herein. I also understand that failure to appear as required may subject me to additional charges in the revocation of release.*

Date: *6-9-94*

_____
Defendant

State of Alabama
Unified Judicial System

Form C-80          Rev. 11/91

**ORDER**
**ON INITIAL APPEARANCE**

Case Number
WR-94-271, 270,
269, 268, 267

IN THE ___District___ COURT OF ___Henry___ COUNTY

☑ STATE OF ALABAMA          ☐ MUNICIPALITY OF _____

v. ___B. C. Money, Sr.___ , Defendant

The above named defendant, charged with the criminal offense (s) of _Sexual Abuse 1st (2cts) + Rape 1st (3cts)_ was duly brought before the Court for Initial Appearance on ___6/8___ , 19 _94_ , at _1:50_ o'clock _P_ .m., whereupon the Court did the following, as checked in the appropriate blocks:

*(CHECK AS APPLICABLE):*

1. ☑ Name and address of defendant.

    ___ (a) Ascertained the true name and address of the defendant to be:
    ___B. C. Money, Sr. Rt 1, Box 35,___
    ___Columbia AL 36319___

    ___ (b) Amended the formal charges to reflect defendant's true name.

    ___ (c) Instructed the defendant to notify the court promptly of any change of address.

2. ☑ Informed the defendant of the charges against him/her and ensured that the defendant was served with a copy of the charges.

3. ☐ Informed the defendant of the right to be represented by counsel, that he/she would be afforded time and opportunity to retain an attorney, and further advised the defendant that, if he/she were indigent and unable to obtain counsel, an attorney would be appointed by the Court to represent him/her.

4. ☐ Informed the defendant that he/she had the right to remain silent and that anything that he/she said could be used against him/her.

5. ☑ Bail

    ___ (a) Determined that the defendant shall not be released from custody since charged with a non-bailable capital offense.

    ___ (b) Determined that the defendant shall not be released from custody pending further proceedings, subject to the mandatory conditions prescribed in Rule 7.3(a), A.R.Cr.P., and subject to the following additional conditions: 25,000   CWW

    ___ 1.) Execution of an appearance bond (recognizance) in the amount of $ _100,000_  (350,000)  25,000

    ___ 2.) Execution of a secured appearance bond in the amount of $ _____ 100,000

    ___ 3.) Other conditions (specify) _____

6. ☑ If charged with a felony offense, informed the defendant of the right to demand a preliminary hearing under Rule 5.1, A.R.Cr.P., and of the procedure by which that right may be exercised.

7. ☐ If charged with a felony offense and a preliminary hearing was demanded within 30 days of date of arrest by the above named defendant, set a preliminary hearing to be held in the District Court on _____ , 19 ___ , at _____ o'clock ___ .m.

    ___ (a) Notified the District Court that such demand was made.

    ___ (b) Defendant made no demand for a preliminary hearing at the initial appearance hearing.

8. ☐ Other: _____

Date: ___6/8/94___          ___Shirlene Vickers___
                                    ~~Judge~~/Magistrate

SEARCH WARRANT

STATE OF ALABAMA
HENRY COUNTY

TO THE SHERIFF OR DEPUTY OF HENRY COUNTY ALABAMA
GREETINGS:

Proof of affidavit having been made before me this date by Henry County Sheriff's Dept., Investigator, Clyde Hornsby, that he has probable cause to believe and does believe that Bragg Comer Money, Sr., aka B.C., a white male, whose name is to the affiant otherwise unknown and others whose names is to the affiant unknown have in their possession a red tool box containing pornographic magazine(s) in an outside building, a deck of cards with pornographic pictures on the face which should be located in a bedroom of said trailer. Also, there should be a pornographic movie entitled "Screwballs" and any other pornographic material or illegal substances or illegal contraband contrary to the law at Route 1 Box 35 Columbia, Alabama 36319. The residence is located traveling State Road 95 South to Haleburg. At Haleburg, turn left onto County Road 12 and go to County Road 97 and turn right. Go to the bottom of the hill and there will be a double wide trailer on the right. The trailer will be yellow in color with white trim. Also, there will a deck on the left end of trailer which is also painted white. There should be a Plymouth Mini Van, yellow in color, sitting in yard at driveway. There will be a light pole with no trespassing and no fishing signs posted.

You are therefore commanded in the day or night to make immediate search on the said person of Bragg Comer Money, Sr., aka B.C., a white male, whose name is otherwise unknown to the affiant and others whose names are unknown to the affiant, and in and upon said premises of the following property to wit: a red tool box containing pornographic magazine(s) in an outside building, a deck of cards with pornographic pictures on the face which should be located in a bedroom of said trailer. Also, there should be a pornographic movie titled "Screwballs" and any other pornographic material or illegal substances or illegal contraband contrary to law, and if you find the same or any part thereof, to bring it forthwith before me my office in Henry County Courthouse, Abbeville, Alabama.

THIS THE 8TH DAY OF JUNE, 1994.

_____
JUDGE, DISTRICT COURT, HENRY CO., AL.

| State of Alabama<br>Unified Judicial System<br>Form C-10    Rev 6/88 | AFFIDAVIT of SUBSTANTIAL<br>HARDSHIP and ORDER | Case Number |
|---|---|---|

IN THE _____ DISTRICT _____ COURT OF _____ HENRY _____ COUNTY

Plaintiff/State

v. Defendant  B. C. MONEY, SR.

IN THE MATTER OF:

TYPE OF PROCEEDING:                    CHARGE:

☐ CIVIL CASE--I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE (such as paternity, support, termination of parental rights) -- I request an attorney be appointed for me.

☐ CRIMINAL CASE--I am financially unable to hire an attorney and request that the Court appoint one for me.

## AFFIDAVIT

**INCOME / EMPLOYMENT**

A. Do you have a job or work for yourself?  _____ Yes  ✓ No

Employer's name and address _____

How much money do you take home each week?  + $ _none_

B. If unemployed, give month and year of last employment and amount earned per month  _March 1983_  $ _1100.00_

C. Does your husband or wife have a job?  _____ Yes  ✓ No

Employer's name and address _____

How much money does he/she take home each week?  + $ _none_

D. Do you receive money or benefits from any other source?  ✓ Yes  _____ No

(Example: retirement pay, social security, workmen's compensation, unemployment compensation, food stamps, rent payments, interest, dividends, etc.)

How much do you receive each month?  _S.S. V.A._  + $ _598.00_

**ASSETS**

A. Do you have any money in any bank, savings and loan, credit union, or any other place, including cash on hand?  _____ Yes  ✓ No

Where? _____  How much?  + $ _none_

B. Do you own anything else of value? (Land, house, boat, television, stereo, jewelry, car, truck, van, stocks, bonds, etc.)  ✓ Yes  _____ No

What? _____

Total Value  + $ _16000.00_

**DEPENDENTS**

A. Are you:  _____ Single  _M_ Married  _____ Widowed  _____ Divorced  _____ Separated?

B. Do you have any dependents?  _____ Yes  ✓ No

Who and what relationship? _____

What does it cost you to live each month?   $698.00

| | Creditor | Total Debt | Monthly Payment |
|---|---|---|---|
| **D E B T S** | Loans | $1,500 | $150.00 |
| | Charge Accounts | 00 | 00 |
| | House or rent payments | 00 | 00 |
| | Alimony | 00 | 00 |
| | Support | 00 | 00 |
| | Car payment | 00 | 00 |
| | Groceries | | 350.00 |
| | Utilities | | 132.00 |
| | INSURANCE | 1,500 | 66.00 |
| | | | 96. |

In support of this request, I have answered the above questions relating to my ability to pay. I swear that these answers are true and reflect my present financial status. I understand that a false statement or answer to any questions in this affidavit will subject me to penalties for perjury.

I further understand and acknowledge that if the Court appoints an attorney to represent me, the Court may require me to pay the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this

_10_ day of _JUNE_ , 19_94_        _B.C. Mosley_
                                   **Affiant Signature**

_Ralph Jackson_
Judge/Notary

## ORDER

IT IS ORDERED THAT THE FOREGOING REQUEST BE:

☐ GRANTED          ☑ DENIED

**APPOINTMENT OF ATTORNEY:**

IT IS THEREFORE, ORDERED AND ADJUDGED BY THE COURT THAT _____

_____ Attorney at Law, be and is hereby appointed as counsel to represent, assist and defend in this (these) case(s).

It is further ordered that the Court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the Court and paid to the appointed counsel.

DONE this _15th_ day of _June_ , 19_94_

_James Garwood_
Judge

Case 1:08-cv-00228-WKW-TFM   Document 16-2   Filed 06/09/2008   Page 14 of 108

*Filed 1-18-94*

| State of Alabama
Unified Judicial System

Form C-10   Rev  6/88 | **AFFIDAVIT of SUBSTANTIAL
HARDWARE and ORDER** | Case Number _8_

DC 94-367 |

# AFFIDAVIT of SUBSTANTIAL HARDSHIP and ORDER

IN THE ___DISTRICT___ COURT OF ___HENRY___ COUNTY

Plaintiff/State                    v. Defendant  B. C. MONEY, JR.

IN THE MATTER OF:

TYPE OF PROCEEDING:                    CHARGE:

☐ CIVIL CASE--I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE (such as paternity, support, termination of parental rights) -- I request an attorney be appointed for me.

☒ CRIMINAL CASE--I am financially unable to hire an attorney and request that the Court appoint one for me.

## AFFIDAVIT

**INCOME/EMPLOYMENT**

A. Do you have a job or work for yourself?                    ___ Yes  ✓ No

Employer's name and address _____

How much money do you take home each week?                    ÷ $ ___-o-___

B. If unemployed, give month and year of last employment and amount earned per month ___March, 1983___    $ 1100.00

C. Does your husband or wife have a job?                    ___ Yes  ✓ No

Employer's name and address _____

How much money does he/she take home each week?                    ÷ $ ___-o-___

D. Do you receive money or benefits from any other source?                    ✓ Yes  ___ No

(Example: retirement pay, social security, workmen's compensation, unemployment compensation, food stamps, rent payments, interest, dividends, etc.)
How much do you receive each month? ___S.S. & V.A.___    ÷ $ 598.00

**ASSETS**

A. Do you have any money in any bank, savings and loan, credit union, or any other place, including cash on hand?                    ___ Yes  ✓ No

Where? _____  How much? ÷ $ None

B. Do you own anything else of value? (Land, house, boat, television, stereo, jewelry, car, truck, van, stocks, bonds, etc.)                    ✓ Yes  ___ No

What? ___1985 Ford Ranger___

Total Value ÷ $ 1200.00

**DEPENDENTS**

A. Are you: ___ Single  ✓ Married  ___ Widowed  ___ Divorced  ___ Separated?

B. Do you have any dependents?                    ___ Yes  ✓ No

Who and what relationship? _____

What does it cost you to live each month?

|   | Creditor | Total Debt | Monthly Payment |
|---|---|---|---|
| **D** | Loans | $ 1500 | $ 150.00 |
| **E** | Charge Accounts | | |
| **B** | House or rent payments | | |
| **T** | Alimony | | |
| **S** | Support | | |
| | Car payment | | 350.00 |
| | Groceries | | 132.00 |
| | Utilities | | 66.00 |
| | Insurance | 1500.00 | 58.00 |

In support of this request, I have answered the above questions relating to my ability to pay. I swear that these answers are true and reflect my present financial status. I understand that a false statement or answer to any questions in this affidavit will subject me to penalties for perjury.

I further understand and acknowledge that if the Court appoints an attorney to represent me, the Court may require me to pay the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this

_14th_ day of _July_, 19_94_    _B. C. Money_
                                 **Affiant Signature**

_Karen L. Lindsay_
**Judge/Notary**

## ORDER

IT IS ORDERED THAT THE FOREGOING REQUEST BE:

☒ GRANTED          ☐ DENIED

**APPOINTMENT OF ATTORNEY:**

IT IS THEREFORE, ORDERED AND ADJUDGED BY THE COURT THAT _Richard Ramsey IV_

_____ Attorney at Law, be and is hereby appointed as counsel to represent, assist and defend in this (these) case(s).

It is further ordered that the Court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the Court and paid to the appointed counsel.

DONE this _15th_ day of _July_, 19_94_

_____
**Judge**

| State of Alabama Unified Judicial System  rm C-52   Rev 6/88 | CONSOLIDATED BOND (District Court, Grand Jury, Circuit Court) | Case Number |
| --- | --- | --- |

IN THE _____ *District* _____ COURT OF _____ *Henry* _____ COUNTY

STATE OF ALABAMA          v.   *Bragg Comer Moxey, Sr.*

We _____ *Bragg Comer Moxey, Sr.* _____ (Defendant) as principal

and we _____ as sureties
(please print)

agree to pay the State of Alabama  *$ 10,000 °°* _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date) *Aug. 16, 1994*

at (Time) *9:00* _____ or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _____

_____ *Rape - First Degree* _____

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the

amount of the above bond.  We waive the benefit of all laws exempting property from levy and sale under execu-

tion or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we espe-

cially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time

the undersigned are duly exonerated.

x *B.C. Moxey  Rt 1 Box 35 Columbia, Ala. 36319*
Signature of Defendant                Address (Print)                City

x *Ruby Moxey  Columbia  Ala  R# 1  Box 35  36919*
Signature of Surety                Address (Print)                City

x *Hiram Moxey  Rt. 1 Box 33, Columbia, Al*
Signature of Surety                Address (Print)                City

*Samuel D Moxey  PO Box 181 Columbia Al. 36319*
Signature of Surety                Address (Print)                City

x *Retta B. Bristow  Rt. 1, Box 32 B, Columbia, A*
Signature of Surety                Address (Print)                City

*July 21, 1994*                Approved By Sheriff/Judge
Date

By: Deputy Sheriff

| Defendant's Information | |
| --- | --- |
| DOB _____ | Sex *Male* |
| S. S. No. _____ | Race *White* |
| DL No. _____ State ( ) | Phone No. _____ |

☑ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND        COURT RECORD : Original  DEFENDANT : Copy        SURETY : Copy

—11—

CASE ACTION SUMMARY
DISTRICT CRIMINAL                                    CASE: DC 94 000366 00

IN THE DISTRICT COURT OF   HENRY   COUNTY                  JUDGE: CWW

STATE OF ALABAMA            VS      MONEY B C SR
                                    RT 1
CASE: DC 94 000366 00
                                            COLUMBIA              AL  36319-0000

DOB: 03/22/22  RACE: W  SEX:  M  HT:  000  WT: 000  HR:        EYE:
SSN: 420503187    ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE          CODE1:  RAP1 LIT: RAPE 1ST DEGREE TYPE: F
CHARGE2:                          CODE2:  0000                      TYPE: F
CHARGE3:                          CODE3:  0000                      TYPE: F
MORE?:         OFFENSE DATE: __/__/__   AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS: __/__/__        DATE ARRESTED: 06/08/94
DATE    INDICTED: __/__/__        DATE    FILED: 06/29/94
DATE    RELEASED: __/__/__        DATE  HEARING: __/__/__
     BOND AMOUNT:   $100,000.00        SURETIES:

DATE 1: 07/19/94  DESC: 0000    TIME:  0900 A
DATE 2: _____  DESC: 0000    TIME:  0000

DEF/ATY:                          TYPE:                          TYPE:
PROSECUTOR:

OTH CSE: 0000000000   CHK/TICKET NO:                GRAND JURY:
COURT REPORTER:           SID NO: 000000000
DEF STATUS: JAIL    JURY DEMAND:                     OPID: SAS

DATE          ACTIONS, JUDGMENTS, CASE NOTES

7-21-94  Bond is hereby reduced to $10,000.00.
         Defendant if released, shall be released
         in the custody of Mrs. B. C. Money
         and he shall remain in her custody
         until this case is finally determined.
                                    Woodham Judge

7-21-94  As a further condition of Defendant's
         release, he shall not have contact
         with the alleged victim unless
         accompanied by another adult.
                                    Woodham Judge

7-26-94  GJ

Grand Jury No. _____192_____                         Case No. _____

## INDICTMENT

The State of Alabama    }              CIRCUIT COURT
HENRY COUNTY                     TWENTIETH JUDICIAL CIRCUIT

                                        July        Term, 19 94

The grand jury of said county charge that, before the finding of the indictment,

B.C. Money, Sr.

whose name is otherwise unknown to the Grand Jury,

a male, did engage in sexual intercourse with Amber Celeste

Money, a female, by forcible compulsion, in violation of

13A-6-61 of the Code of Alabama, against the peace and dignity

of the State of Alabama.

                                        Douglas Albert Valeska
                                        District Attorney

---

THE STATE OF ALABAMA
Henry County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE
vs.
B.C. Money, Sr.

S.I.D. No.

D.O.A.

RAPE, 1ST DEGREE

Witnesses:
Amber Celeste Money
Rt
Columbia, Al  36319

Clyde Hornsby
SO
Abbeville, Al

Heather Flaherty
515 Columbia Rd
Abbeville, Al

Tammy Amos
Rt 1 Box 24 (Old River Rd)
Abbeville, Al

Patricia Money
Rt 1
Columbia, Al

(Over)

Continued Witnesses

Beth Rushing
DHR
Abbeville, Al

A TRUE BILL

Foreman of the Grand Jury

Presented to the presiding judge in open court
foreman of the Grand Jury, in the presence of
Grand Jurors and filed in open
court by order of the court on this the ____
day of _____, 19__

Clerk

INDICTMENT

NO PROSECUTOR

Upon the arrest of Defendant let him be
admitted to bail on giving bond in the sum of
_____ Thousand _____ Dollars

with security to be approved by the Sheriff.

This 29th day of July 19 94

Judge Presiding

STATE OF ALABAMA

    PLAINTIFF

VS:


B.C. MONEY

    DEFENDANT

\*
\*
\*
\*
\*
\*
\*

IN THE DISTRICT COURT OF

HENRY COUNTY, ALABAMA



CASE NO: DC 94-367


REQUEST FOR PRELIMINARY HEARING


    Comes now the Defendant in the above-styled cause, by and through

his attorney of record and requests this Honorable Court to set a preliminary

hearing at its earliest convenience.


ATTORNEY FOR DEFENDANT
RICHARD H. RAMSEY, IV
401 N ALICE STREET
DOTHAN, ALABAMA   36303
205-794-4154


Filed in Office this _2nd_

day of _Aug_ , 19 _94_

_Connie Bundeshaw_

    DISTRICT CLERK


8-2-94  Denied as moot.

Woodbin Judge

ALABAMA JUDICIAL DATA CENTER
CIRCUIT COURT OF HENRY COUNTY

WRIT OF ARREST

CC 94 000065.00
GRAND JURY #: 192

TO ANY SHERIFF OF THE STATE OF ALABAMA:

    CAPIAS HAS BEEN ORDERED AGAINST:

        MONEY B C SR
        RT 1

        COLUMBIA      AL 36319-0000

ON  07/29/94 IN THE CIRCUIT COURT OF  HENRY  COUNTY, FOR THE OFFENSE
OF:

        RAPE 1ST DEGREE
        XXXX
        XXXX

YOU ARE THEREFORE COMMANDED FORTHWITH TO ARREST SAID DEFENDANT AND COMMIT

HIM TO JAIL, UNLESS HE GIVES BAIL, AND THAT YOU RETURN THIS WRIT ACCORDING

TO LAW.

  BOND SET AT:      $25,000.00

DATE ISSUED: 08/01/94      CONNIE J BURDESHAW      BY _____
                    CLERK

---

    EXECUTED THIS  __12__  DAY OF  _AUG_  , 19_94_, BY

ARRESTING THE WITHIN NAMED DEFENDANT  _B.C. MONEY SR_

                  _S E Armstrong_
                SHERIFF
                _Clyde B Hornsby_
                DEPUTY SHERIFF

---

  DEFENDANT'S FEATURES:

  HT: 0'00"  HAIR:      DOB: 03/22/22

  WT: 000  SEX: M  EYE:    RACE: W
  SSN: 420503187

  ADDTL COMMENTS: _____

  _____

  _____

AUG 1994
RECEIVED
SHERIFF'S OFFICE
HENRY COUNTY, AL.

OPERATOR: GYE
PREPARED: 08/01/94

| State of Alabama Unified Judicial System | **CONSOLIDATED BOND** (District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|
| Form C-52    Rev 6/88 | | |

IN THE ___*Circuit*___ COURT OF ___*Henry*___ COUNTY

STATE OF ALABAMA                    v.

We ___*BRAGG COMER MONEY SR.*___ (Defendant) as principal

and we _____ as sureties
(please print)

agree to pay the State of Alabama ___*$ 25,000.00*___ Dollars

unless the above named defendant appears before the District Court of said County on (Date): ___*Oct, 5 1994*___

at (Time) ___*9:00 AM*___ or at the next session of Circuit Court of said County; there to await the action by the grand jury and from session to session thereafter until discharged by law to answer to the charge of ___*RAPE 1st degree*___

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the amount of the above bond.  We waive the  benefit of all laws exempting property  from levy and  sale under execution or other process for the collection of debt, by the Constitution and Laws of the State of Alabama,  and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is  agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

| *B.C. Money* | *RT 1 Box 35, Columbia, AL* | |
|---|---|---|
| Signature of Defendant | Address (Print) | City |
| *Frank Mason* | *Rt 1, Box 33 Columbia, al* | |
| Signature of Surety | Address (Print) | City |
| *Comer O Money* | *PO Box 181 Columbia Al.* | |
| Signature of Surety | Address (Print) | City |
| *Ruby Money* | *Columbia Ala* | |
| Signature of Surety | Address (Print) | City |
| *Roger Money* *Comer Tan* | *Columbia    AL* *Louisville   AL* | |
| Signature of Surety | Address (Print) | City |

| *8 - 12 - 94* | *Lawton Ed Armstrong* |
|---|---|
| Date | Approved by: Sheriff/Judge |
| | *Cheth. Smith* |
| | By: Deputy Sheriff |

**Defendant's Information**

| DOB ___*03-22-22*___ | Sex ___*M*___ |
|---|---|
| S. S. No. ___*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*___ | Race ___*W*___ |
| DL No. ___*0833087*___    State ( ___*AL*___ ) | Phone No. ___*696-4691*___ |

[✓] Appearance Bond - Property    [ ] Appearance Bond - Recognizance    [ ] Bail Bond    [ ] Cash Bond

CONSOLIDATED BOND    COURT RECORD : Original  DEFENDANT : Copy    SURETY : Copy

STATE OF ALABAMA          )          IN THE CIRCUIT COURT OF

VS.                       )          HENRY COUNTY, ALABAMA
                          )
B.C. MONEY                )          CASE NO. CC  94-65 thru 70

## MOTION TO REVOKE BOND

Comes now the State of Alabama, by and through the District
Attorney and moves the Court to revoke the bond heretofore set in
this matter and for cause states:

1.  The defendant has been seen on numerous occassions
riding up and down the road in front of the victims home and
family.

2.  The defendant has reportedly said that he will never go
to prison.

3.  That B.C. Money, Jr., father of the victims, fears for
the safety of his family.

WHEREFORE, the State request the Court to revoke the bond
of the defendant.

Respectfully submitted,

Douglas Albert Valeska
District Attorney

## CERTIFICATE OF SERVICE

I, Douglas Albert Valeska, District Attorney of the 20th
Judicial Circuit of Alabama, hereby certify that I have placed
a copy of the same in the U.S. mail, postage prepaid to Richard
Ramsey, IV, attorney of record for the defendant, P.O. Box 1825
Dothan, Alabama 36302 this ___17___ day of August, 1994.

Douglas Albert Valeska

STATE OF ALABAMA,  ) IN THE CIRCUIT COURT OF
                              )
VS.  ) HENRY COUNTY, ALABAMA
                              )
B. C. MONEY, SR.,  ) CASE NOS. CC-94-065,
                              ) CC-94-066, CC-94-067,
          DEFENDANT  ) CC-94-068, CC-94-069,
                              )  and CC-94-070.
                              )

## AMENDMENT OF RELEASE ORDER

This cause came on to be heard on the motion of the State of Alabama to revoke the bonds of the Defendant in the above numbered cases on the grounds therein stated, and upon oral argument of counsel for the parties made in a hearing before the Court on August 24, 1994, and upon consideration thereof, it is

**ORDERED, ADJUDGED AND DECREED** that the motion to revoke is denied; however, Defendant's release on the respective bonds is further conditioned upon the following:

    a.  Defendant shall have no contact with either of the alleged victims.

    b.  Defendant shall not traverse on foot or on vehicle the public road fronting the residence of Amber Celeste Money.

    c.  Defendant shall not leave the State of Alabama without the consent of the Court.

The Court apprised the Defendant of the above further conditions of his release in open court in the presence of his attorney and the district attorney. The Defendant acknowledged he understood these further conditions of his release.

**DONE** this the 24th day of August, 1994.

CHARLES W. WOODHAM
JUDGE



| State of Alabama<br>Uni'' ' Judicial System<br>For, Io. C-69 11/85 | PLEA OF NOT GUILTY<br>AND WAIVER OF ARRAIGNMENT | Case Number<br>CC 94 65 - 70<br>ID YR Number |
| --- | --- | --- |

IN THE _____ CIRCUIT _____ COURT OF ___ HENRY ___ COUNTY, ALABAMA

STATE OF ALABAMA vs. ___ B. C. MONEY ___

COMES NOW the Defendant in the above styled matter, and to the offense charged enters a plea of Not Guilty _____

_____

Defendant further waives the right to have an Arraignment at which the Defendant is present in person, or at which the Defendant is represented by an attorney.

But, the Defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the Court, to interpose any special pleas or additional pleadings which the Defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is ___ MARCH 22, 1922 ___. Defendant is age ___ 72 ___

The Defendant is not eligible for consideration by the Court for Youthful Offender status as provided by law.

AUGUST 25, 1994
Date                                            Defendant

AUGUST 25, 1994
Date                                            Attorney for Defendant

T' 's to certify that I am the Attorney for the Defendant in this matter, and that I have fully explained this form and all matters et fc... herein, and pertaining hereto, to the Defendant. I further state to the Court that I have explained to the Defendant his right to be Arraigned in person and his right to have me represent him at Arraignment. I further certify to the Court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY ADDITIONAL PLEADINGS OR SPECIAL PLEAS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM THAT IN THE EVENT HE FAILS TO APPEAR ON THE DATE HIS CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS BOND. I further certify to the Court that I have advised my client that he is responsible for obtaining the date his case is set for trial in this matter and that in the event he fails to appear on the date his case is set for trial all appropriate legal action will be taken by the Court against the Defendant and his bond, and I hereby certify that the Defendant knows that he is personally responsible for obtaining the date his case is set for trial and for being present in Court on that date.

AUGUST 25, 1994
Date                                            Attorney for Defendant

This is to certify that my Attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand, each and every matter set forth in this form. I further state to the Court that I do not wish to be personally present at an Arraignment in this case and that I do not want to have an Attorney represent me at an Arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS, I further state to the Court that I have received a copy of the charge against me.

AUGUST 25, 1994
Date                                            Defendant

Filed in office this date ___ 8-26-94 ___

Clerk

urt Record (White)    Defendant (Green)    Attorney (Yellow)

IN THE CIRCUIT COURT OF HENRY COUNTY, ALABAMA

STATE OF ALABAMA,                )

    PLAINTIFF,                )                                    CC-94-

VS.                              )        CASE NO.:DC-94-366   65
                                              94-367   66
B. C. MONEY,                     )            94-368   67
                                              94-369   68
    DEFENDANT.            )            94-371
                                                        70

MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND FOR
PSYCHOLOGICAL AND MEDICAL
EXAMINATION OF STATE'S WITNESS

COMES NOW, B.C. MONEY, the defendant, by and through his
attorney of record, Richard H. Ramsey, IV, and moves that his
Honorable Court order the State to disclose to the defense the
psychiatric and behavioral history of its main witness, Ms.
Amber Money, and to further order that said witness, Ms. Amber
Money undergo psychiatric and other truth-determining
examinations conducted by qualified experts. In support of
this Motion defendant shows unto this Honorable Court as
follows:

1. That defendant is charged with rape 1st degree and
sexual abuse 1st degree in the above styled cause and the
State's main witness and to the crimes charged is Ms. Amber
Money.

2. The defense is entitled to be made aware of
information which would bear upon the credibility of the
State's witness and/or be of an impeaching nature to insure
due process and the adequate preparation of a defense.

3. Ms. Amber Money psychiatric and behavioral history
and present psychological condition would have a direct, and
possible decisive, bearing on her credibility and disclose
information of an impeaching nature which may be crucial to
determining the truth of the allegations made in the above
styled cause.

4. Defendant further shows that other means of truth
determination which are scientifically accurate, such as the
polygraph or sodium pentothal, should be utilized to determine
the truth and accuracy of Ms. Amber Money's version of the
events at issue.

5. That the State of Alabama enacted a Rape Shield law
which greatly limits the Defendant's cross-examination of the
complaining prosecutrix as to character, etc.

6. The information requested in the foregoing Motion is
essential to insure the defendant's right to a fair trial, his
Right of confrontation, his right to prepare a defense in his

HARD H. RAMSEY, III
401 N  ALICE ST.
ITHAN    AMA 36302
20   4-4154

own behalf, and his right to effective assistance of counsel and due process of law guaranteed him by the Constitution of the United States and of the State of Alabama and all other rights not herein enumerated including rights provided by case law.

7.   Defendant further request that the State's witness undergo a physical and medical examination by a medical doctor at the States expense to determine whether there is any indication of sexual contact.

WHEREFORE, Defendant prays that this Honorable Court enter an order:

A.   Directing the District Attorney's office to disclose to the defense counsel disciplinary incidents in all schools or colleges which she attended, arrests by law enforcement officers whether or not they led to prosecution or conviction, and interviews with mental health personnel of any type:

B.   Directing the State's witness, Ms. Amber Money, to undergo some other scientifically accurate means of truth determination such as the polygraph or sodium pentothal;

C.   Directing the State's witness to undergo a physical and medical examination to be conducted by a medical doctor at the State's expense.   Said examination will be conducted for the purposes of determining whether there had been sexual contact.

D.   For such other and further relief as this Court deems appropriate.

Respectfully submitted,

_____
RICHARD H. RAMSEY, IV
ATTORNEY FOR DEFENDANT
401 N ALICE STREET
DOTHAN, ALABAMA   36303
205-794-4154

CERTIFICATE OF SERVICE

This is to certify that I have this ___ day of _____, 1994, served Opposing Counsel with the foregoing Motion by forwarding a copy of same, properly addressed and postage prepaid to the District Attorney, Mr. Douglas Valeska, P. O. Box 1632, Dothan, Alabama  36301.

RICHARD H. RAMSEY, III
    ALICE ST.
OTHA    ABAMA 36302
    205-794-4154

_____
OF COUNSEL

IN THE CIRCUIT COURT OF HENRY COUNTY

STATE OF ALABAMA,            *

    PLAINTIFF,               *

VS.                          *      CASE NO.:CC-94-65
                           THROUGH CC-94-70
B. C. MONEY,                 *

    DEFENDANT.               *

## MOTION FOR STATE TO DISCLOSE
## EVIDENCE FAVORABLE TO THE DEFENDANT

COMES NOW the Defendant, B.C. MONEY, by and through his undersigned attorney, RICHARD H. RAMSEY, IV, and hereby moves this Court to require the State to produce all evidence and material in their possession favorable to the Defendant either of a direct or impeaching nature, and in this regards, Defendant specifically alleges that he is entitled to be afforded with the following items, information and details, to-wit:

1.  Copies of all statements allegedly made by any witnesses, whether oral, written, taped, recorded or in whatever form that the prosecution either intends to introduce into evidence or to rely upon at the trial of the case.

2.  The total and complete list of all persons interviewed in the entire investigation and the name of the person or persons conducting such interview, together with a copy of the interview or a correct amount of same.

3.  Any officer or employee of the State, County, Sheriff's or District Attorney's Office.

4.  A complete and detailed list of all of the State's witnesses.

5.  Any and all written reports, to include all medical reports, from all doctors, specifically any and all findings regarding such examination which were done within the last six months, or any physical evidence that is in possession of the State or the prosecution relative to this case or the investigation thereof.

6.  A detailed description of all physical items other than documents and pictures which the prosecution anticipates using in the trial of the named Defendant and the exact place where and under whose custody such items are being held.

There may be other items and matters of evidence, information and data in existence that are not enumerated aforesaid and of which movant is unaware, but in any event, movant now requests and demands that he be afforded with any

ICHARD H. RAMSEY, III
40° ·′ ALICE ST.
DOTH    ABAMA 36302
4--·/94-4154

and all evidence and information, whether specifically delineated and listed herein or not, that may be materially favorable to Defendant in either a direct or impeaching manner of relevant to punishment which falls within the conteXt of <u>Brady v. Maryland</u>, 373 U.S. 83, S.Ct. 1194, 10 L.Ed.2d 215 (1968).

Defendant requests;

(a)   That an evidentiary hearing be held on this Motion in order that a proper foundation may be laid as to what evidence, information and date is in possession of the State and prosecution, and that the State be directed to make such disclosures immediately;

(b)   If all items requested are not disclosed, Defendant requests that all of the State's reports, statements, photographs, files and all other items specified herein should be properly identified, and examined in camera by the Court and that the Court turn over to defense counsel all such material which the Court finds to be favorable to the Defendant as to innocence or punishment;

(c)   That the duty of the District Attorney to disclose pursuant to his Motion shall be continuing up until and through the trial.

Dated this the ___30___ day of ___May___, 1994.

_____
RICHARD H. RAMSEY, IV
ATTORNEY FOR DEFENDANT
401 N. ALICE STREET
DOTHAN, ALABAMA   36303
205-794-4154

## CERTIFICATE OF SERVICE

This is to certify that I have this ___30___ day of ___July___, 1994, served Opposing Counsel with the foregoing Motion, by forwarding a copy of same, via United States Mail, postage prepaid, properly addressed to Mr. Doug Valeska, District Attorney, P. O. Box 1632, Dothan, Alabama 36301.

_____
OF COUNSEL

HARD H. RAMSEY, III
401  ' LICE ST.
)THAI    JAMA 36302
205-794-4154

FILED IN OFFICE
CIRCUIT CLERK
HENRY COUNTY, AL.
SEP 1994
3124

IN THE CIRCUIT COURT OF HENRY COUNTY, ALABAMA

STATE OF ALABAMA,          )

     PLAINTIFF,          )

VS.          )          CASE NO. ~~DC-94-370~~  CC94-65 through 70

B. C. MONEY,          )

     DEFENDANT.          )

### OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER CELESTE MONEY

Comes now the State of Alabama, by and through the District Attorney, and objects to defendant's motion for disclosure of psychiatric history and psychological and medical examination of Amanda Haddan and Amber Celeste Money, and for grounds says:

1. Defendant is charged with Rape, First Degree, of Amanda Haddan, who is an eight year-old child. Defendant is charged with Rape, First Degree (3 counts) and Sexual Abuse, First Degree (2 counts) of Amber Celeste Money, who is a seven year-old child.

2. Defendant has requested that these children be forced to submit to an unlimited barrage of psychiatric, psychological and medical testing. Defendant further requested that they be subjected to sodium pentothal injection or polygraph examination. Defendant's request is not proper under the law of Alabama or the Constitution of the United States. In fact, defendant has failed to

cite any legal authority in support of this extraordinary request.

3.   The law of Alabama clearly holds that the defendant's request for psychological, psychiatric and medical testing of a child is improper, and should be prohibited by the trial court.  In Barger v. State, 562 So. 2d 650 (Ala. Crim. App. 1989), the defendant sought to compel a child sexual abuse and sodomy victim to submit to psychological testing.  The defendant in Barger, like the defendant in the present case, argued that such is proper in order to impeach and disclose bias on the part of the child victim.  The Court of Criminal Appeals rejected this argument and held that because "a trial judge is without authority to require a witness to submit to an interview with defense counsel, it necessarily follows that he has no authority to order a child victim-witness to submit to a psychological examination, a much more invasive procedure." Barger, 562 So. 2d at 654-56.  The Court further held that the defendant's right to cross-examination of the child is sufficient to expose any bias.  Id. at 656.

3.   Likewise, defendant is not entitled to compel a child victim-witness to submit to a medical examination. In Lanton v. State, 456 So. 2d 873 (Ala. Crim. App. 1984), the Court held that, "It may well be doubted, in cases of rape and cognate offenses, whether the court has the

2

power to make an order compelling the inspection of the private person of a prosecutrix in the event of her refusal to submit to such examination.  If such right exists at all, we hold it to be a matter of  judicial discretion with the trial court, to be exercised only in cases of extreme necessity, and not a subject of review on appeal to the court".  (emphasis added)  The Court concluded that a defendant's mere assertion that an examination could be exculpatory is insufficient for such an extra-ordinary order.  Lanton, 456 So. 2d at 874.

4.  Defendant's request for disclosure of school disciplinary and arrest records of these two children is wholly improper.  Defendant's motion for disclosure is merely a discovery request.  As stated by the Courts of Alabama on many occasions, there is no constitutional right to discovery in a criminal case.  See, Mardis v. State, 423 So. 2d 331 (Ala. Crim. App.) (mere assertion that such is necessary for impeachment is insufficient).  In Davis v. State, 554 So. 2d 1094 (Ala. Crim. App. 1986), the Court held that a trial court's refusal to order disclosure of the criminal record of witnesses is not a violation of Brady v. Maryland.  In the present case, the defendant has not even attempted to offer a legitimate reason for the disclosure of such records, if they exist, of a seven year old girl and an eight year old girl.

3

5.  Each of of the defendant's requests are highly
intrusive on the person of the child victims.  Such probing
of physical and mental examinations of seven year-old
and eight year-old girls are clearly unnecessary in the
present case under conceivable scenairo.  The defendant's
rights are wholly protected through the right of cross-
examination and the right of confrontation of the State's
witnesses at trial.  Furthermore, the defendant's motion
is not proper under the law.  In all reported cases silmilar
to the present case, such requests by defendants have
been rejected by the courts.

Wherefore, the State of Alabama requests that this
Court deny defendant's motions for disclosure of psychiatric
histoy and for psychological and medical examination of
Amanda Haddan and Amber Celeste Money.

Douglas Albert Valeska
District Attorney



## CERTIFICATE OF SERVICE

I, Douglas Albert Valeska, District Attorney, hereby certify that I have this date served a copy of the foregoing on the Honorable Richard Ramsey IV, by placing a copy of the same in his courthouse mailbox located in the Houston County Courthouse, Dothan, Alabama on this ___1st___ day of ~~August~~, 1994.
~~Sept.~~

_____
Douglas Albert Valeska
District Attorney

FILED IN OFFICE
SEP 1994
CIRCUIT CLERK
HENRY COUNTY, Al.
3124

STATE OF ALABAMA,              )      IN THE CIRCUIT COURT OF

    PLAINTIFF,               )      HENRY COUNTY, ALABAMA

       VS.                  )

B. C. MONEY,                   )

    DEFENDANT.               )      CA NOS. CC 94-065 thru 070

ORDER

I have denied the Defendant's motion to have Amber Money subjected to a psychiatric examination and to disclose her psychiatric history.

    ORDERED August 31, 1994.

                           *Michael Crespi*
                      MICHAEL CRESPI, CIRCUIT JUDGE

*Filed*
*9-7-94*
*C Burdeshaw*
*Clerk*

STATE OF ALABAMA,            )     IN THE CIRCUIT COURT OF

     PLAINTIFF,           )     HENRY COUNTY, ALABAMA

      VS.               )

B.C. MONEY, SR.,           )

     DEFENDANT.          )   CA NOS. CC 94-065 thru 070

## ORDER

I have considered the Defendant's motion to disclose evidence favorable to the Defendant before entering this order.

1. I have denied the request for statements contained in paragraph 1 of the discovery motion, except insofar as it relates to statements of the Defendant or statements containing exculpatory information.

2. I have denied disclosure as to the matters referred to in paragraphs 2 through 4 of the Defendant's motion.

3. I have denied disclosure as to the matters set out in paragraph 5 of the Defendant's motion except insofar as they may be discoverable pursuant to Rule 16.1(d), Alabama Rules of Criminal Procedure, or insofar as they may be exculpatory in nature.

4. I have granted disclosure as to the items listed in paragraph 6 of the Defendant's motion.

5. I have denied the request for in camera inspection and for an evidentiary hearing.

ORDERED September 8, 1994.

MICHAEL CRESPI, CIRCUIT JUDGE

STATE OF ALABAMA,                )        IN THE CIRCUIT COURT OF

    PLAINTIFF,                   )        HENRY COUNTY, ALABAMA

VS.                              )

B.C. MONEY, SR.,                 )        CASE NO.:CC-94-065 THRU
                                                                070

    DEFENDANT.                   )

## MOTION TO DISMISS

    COMES NOW the Defendant and files this his Motion to Dismiss indictments dated July, 1994 and as grounds therefore would say as follows:

    1.    The dates alleged in the indictments fail to specify dates on which the alleged offenses occurred.

    2.    Without the knowledge of the specific dates the Defendant is unable to prepare a proper defense.

Respectfully submitted,

RICHARD H. RAMSEY, IV
ATTORNEY FOR DEFENDANT
401 N ALICE STREET
DOTHAN, ALABAMA  36303

## CERTIFICATE OF SERVICE

    This is to certify that I have this _12_ day of October, 1994, served Opposing Counsel with the foregoing Motion, by forwarding a copy of same, via United States Mail, postage prepaid, properly addressed to Mr. Doug Valeska, District Attorney, P. O. Box 1632, Dothan, Alabama 36301.

OF COUNSEL

94-156

RARD H. RAMSEY, III
401 N. ALICE ST.
THAN,    'AMA 36302
20    ;154

STATE OF ALABAMA,             )     IN THE CIRCUIT COURT OF

     PLAINTIFF,          )     HENRY COUNTY, ALABAMA

VS.                         )

B.C. MONEY, SR.,           )     CASES NO.:CC-94-065 THRU
                                            070

     DEFENDANT.          )

## MOTION TO COMPEL THE DEPARTMENT OF HUMAN RESOURCES TO PRODUCE RECORDS AND REPORTS

COMES NOW, the Defendant, B. C. MONEY, by and through his attorney of record, RICHARD H. RAMSEY, IV, and requests this Honorable Court to compel the reports, computer evaluations and any other documents in the possession of its agents, central agencies or in the Central Registry of Child abuse, pertaining to AMBER CELESTE MONEY, AMANDA HADDAN and/or B. C. MONEY, and shows for cause the following:

1.    That the Defendant is the Grandfather of AMBER CELESTE MONEY.  The Defendant is not related to the Complainant, AMANDA HADDAN.

2.    That all of said documents, pictures and articles are relevant, significant and constitute substantial material evidence and will be useful to the named Defendant as evidence upon his trial concerning (Rape 1st degree and Sexual Abuse, 1st degree) of the above named children.

3.    That the named Defendant cannot safely go to trial on this matter without the production of said documents and in their absence will be denied the due process of laws as guaranteed by <u>Article 1. Section VI, of the Constitution of the State of Alabama</u> and the <u>Constitution of the United States of America</u> made applicable to the States through the due process clause of the <u>Fourteenth Amendment of the United States Constitution</u>.

4.    That without the production of the documents referred to above, the Defendant's counsel will not be able to effectively represent him in the above styled matter; and thus he will be denied the right of counsel which is guaranteed to him under the provisions of <u>Article I, Section VI, of the Alabama Constitution, and the Sixth Amendment of the United States Constitution</u> made applicable to the due process clause of the <u>Fourteenth Amendment of the United States Constitution</u>

5.    That the above mentioned requested materials are in the possession of the Department of Human Resources and that the Defendant is entitled to said documents established under the Central Registry by the code of Alabama <u>(1975) 26-14-8(b)(8).</u>

HARD H. RAMSEY, III
401 N. ALICE ST.
ITHAN ·· ·ABAMA 36302
: ·-4154

WHEREFORE, the named Defendant prays:

(a) That the Department of Human Resources be required to produce all documents and other evidence referred to above.

(b) That the Department of Human Resources be required to make the above requested materials available to the Defendant's attorney, RICHARD H. RAMSEY, IV, before the commencement of the trial of the above styled matter.

(c) That if any part of said documentary evidence is not made available to the named Defendant prior to the commencement of the trial of the above styled matter, then without waiving his right to the production of said evidence prior to his trial, the Defendant respectfully moves the Court for an Order directing the Department of Human Resources to produce all such documents and evidence and to submit the same to his counsel at the trial.

(d) Without waiving the foregoing, the Defendant requests that an exact copy be made of each item which not to be presented to his counsel and that the same be sealed and included in thee record of this case for the purpose of insuring effective review of the Court's denial of the Defendant's previous request for disclosure.

(e) That the Court shall use whatever further sanctions available to the Court should the Department of Human Resources fail in part or in whole to produce the above stated.

(f) If the Court does not grant the above request, the Defendant, without waiving his right to have all said documents, pictures and other information produced for the use of his counsel in preparation for and at trial; the Defendant demands that the Trial Court conduct an in camera examination of said documents, pictures and other information to determine which the Defendant's Counsel shall be permitted to use in the preparation for trial and at trial. The defendant further demands that the Trial Court order the Department of Human Resources to produce any of documents, pictures and other information said Trial Court determines, by "in camera examination" to be favorable or exculpatory to Defendant as to the allegations in the above styled matter, or for the purpose of impeaching or questioning the fitness any witness expected to testify, prior to trial and to allow the Counsel for the defendant to reproduce or copy the same.

(g) That the duty of the Department of Human Resources to disclose pursuant to this Motion be considered as continuing, up until and through the trial and post judgment proceedings.

HARD H. RAMSEY, III
401 N. ALICE ST.
THAN, ¹'  ¹RAMA 36302
2(    !154

Respectfully Submitted,

_____
RICHARD H. RAMSEY, IV
ATTORNEY FOR DEFENDANT
401 N ALICE STREET
DOTHAN, ALABAMA   36303
205-794-4154

## CERTIFICATE OF SERVICE

This is to certify that I have this the 21st day of October, 1994 served Opposing Counsel with the foregoing Motion, by forwarding a copy of same via United States Mail, postage prepaid, properly addressed to Mr. Doug Valeska, District Attorney, P. O. Box 1632, Dothan, Alabama 36301.

_____
OF COUNSEL

'94 OCT 28  AM 9 32
FILED IN OFFICE
CIRCUIT CLERK
HENRY COUNTY ALABAMA

RICHARD H. RAMSEY, III
401 N. ALICE ST.
DOTHAN   ALABAMA 36302
205   794-4154

STATE OF ALABAMA,                )      IN THE CIRCUIT COURT OF

    PLAINTIFF,               )      HENRY COUNTY, ALABAMA

       VS.                    )

B. C. MONEY, SR.,                )

    DEFENDANT.               )      CA NOS. CC 94-065 thru 070

ORDER

The Henry County Department of Human Resources will produce its records concerning any complaints made against the Defendant in respect of either of the children named in the Defendant for _in camera_ inspection by the court on November 4, 1994, at 9:00 A.M.

ORDERED October 31, 1994.

                           MICHAEL CRESPI, CIRCUIT JUDGE

Filed 11-4-94
C. Brundeshaw

STATE OF ALABAMA,　　　　　*　　IN THE CIRCUIT COURT OF

　　　　　　　　　　　　　　　*

VS.　　　　　　　　　　　　*　　HENRY COUNTY, ALABAMA

　　　　　　　　　　　　　　　*

B.C. MONEY,　　　　　　　　*　　CC-94-65, 66, 67, 68, 69, 70

　　　　　　　　　　　　　　　*

### MOTION TO CONSOLIDATE

　　　　Comes now the State of Alabama, by and through the District

Attorney for the Twentieth Judicial Circuit, and moves this

Honorable Court pursuant to Rule 13.3(c) of the Alabama Rules of

Criminal Procedure to consolidate the above styled cases for trial

and for reason shows as follows:

　　　　1. In the above styled cases the Defendant with Rape I,

Rape, I, Rape I, Sexual Abuse I, Rape I and Sexual Abuse I.

　　　　2. The offenses are the same in character and/or,

　　　　3. The offenses are based on the same type conduct and/or,

　　　　4. The offenses were a part of a common scheme or plan.

　　　　Wherefore premises considered the State moves this Honorable

Court to consolidate the above styled cases for trial.

　　　　Submitted this the 5th day of December, 1994.

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　Charles Amos
　　　　　　　　　　　　　　　　　Assistant District Attorney

### CERTIFICATE OF SERVICE

　　　　I, Charles Amos, do hereby certify that I have this date
served a copy of the foregoing upon the Honorable Richard
Ramsey IV, by placing a copy of the same in the U.S. mail
properly addressed and postage prepaid on this the 5th day of
December, 1994.

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　Charles Amos

IN THE CIRCUIT COURT OF HENRY COUNTY, ALABAMA

STATE OF ALABAMA,                    )

    PLAINTIFF,                   )

VS.                                  ) CASE NO.:CC-94-065 THRU 070

B.C. MONEY,                          )

    DEFENDANT.                   )

## DEFENDANT'S OBJECTION TO
## MOTION TO CONSOLIDATION

COMES NOW, the Defendant, B.C. Money, by and through his undersigned attorney, Richard H. Ramsey, IV, and files this his Objection to Motion to Consolidation and as grounds therefore would say as follows:

1.    Defendant would be greatly prejudiced if the State were to be allowed to try all six cases against him simultaneously.

2.    The alleged offenses involve two separate victims.

3.    The alleged offenses according to the indictments brought against the Defendant took place at a completely different times and places.

4.    By allowing the State to proceed with all six cases against the Defendant simultaneously would subject the Defendant to the shotgun effect on the jury. The jury would be more likely to convict on any one charge if all were tried together.

Respectfully submitted,

_____
RICHARD H. RAMSEY, IV
ATTORNEY FOR DEFENDANT
401 N ALICE STREET
DOTHAN, ALABAMA  36301
205-794-4154

*Filed 12-13-94 C. Bur...*

## CERTIFICATE OF SERVICE

This is to certify that I have this the ___7___ day of December, 1994, served Opposing Counsel with the foregoing by forwarding a copy of same, via United States Mail, postage prepaid, properly addressed to Mr. Doug Valeska, District Attorney, P. O. Box 1632, Dothan, Alabama 36301.

_____
OF COUNSEL

94156

STATE OF ALABAMA,                    *     IN THE CIRCUIT COURT OF
                                     *
VS.                                  *     HENRY COUNTY, ALABAMA
                                     *
B.C. MONEY,                          *     CC-94-65, 66, 67
                                     *              68, 69, 70

## MOTION TO CONSOLIDATE

Comes now the State of Alabama, by and through the District Attorney for the Twentieth Judicial Circuit, and moves this Honorable Court pursuant to Rule 13.3(c) of the Alabama Rules of Criminal Procedure to consolidate the above styled cases for trial and for reason shows as follows:

1. In the above styled cases the Defendant is charged with four counts of rape 1st degree and two counts of sexual abuse 1st degree.

2. The offenses are the same in character and/or,

3. The offenses are based on the same type conduct and/or,

4. The offenses were a part of a common scheme or plan.

Wherefore premises considered the State moves this Honorable Court to consolidate the above styled cases for trial.

Submitted this the 2nd day of March, 1995.

_____
Charles Amos
Assistant District Attorney

MAR 1995
FILED IN OFFICE
CIRCUIT CLERK
HENRY COUNTY, AL
3124

## CERTIFICATE OF SERVICE

I, Charles Amos, do hereby certify that I have this date served a copy of the foregoing upon the Honorable Richard Ramsey IV, by placing a copy of the same in the U.S. mail properly addressed and postage prepaid on this the 2nd day of March, 1995.

_____
Charles Amos

IN THE CIRCUIT COURT OF HENRY COUNTY, ALABAMA

| | |
|---|---|
| STATE OF ALABAMA,  ) | |
| )  | |
| PLAINTIFF,  ) | |
| )  | |
| VS.  ) | CASE NOS. CC-94-065 thru 070 |
| )  | |
| B.C. MONEY, SR.,  ) | |
| )  | |
| DEFENDANT.  ) | |

## MOTION TO CONTINUE

COMES NOW the Defendant, B.C. Money, Sr., by and through his undersigned attorney and files this his Motion to Continue, and as grounds therefore would say as follows:

1. Counsel for the Defendant has this date received notice that the Defendant's cases are set for Trial on March 20th, 1995.

2. Counsel for Defendant has previously been notified that he is to appear in the Circuit Court of Geneva County, Alabama on March 20th, 1995 at 9:00 A.M. for a Criminal Trial.

3. Counsel for the Defendant anticipates that this Trial will take 2-3 days.

4. The Defendant has not previously requested a continuance in this matter.

5. Defendant's Motion for Continuance is not made to delay his Trial.

WHEREFORE, the above premises considered, Defendant respectfully requests this Court to grant his Motion to Continue his cases to the next available Henry County Criminal Court Term.

Respectfully Submitted,

Richard H. Ramsey, IV
Attorney for Defendant
401 N. Alice Street
Dothan, Alabama
(334) 794-4154

FILED IN OFFICE
MAR 1995
CIRCUIT CLERK
HENRY COUNTY, AL
3/24

RAMSEY COURT
401 N. ALICE ST.
P. O. BOX 1825
DOTHAN, ALABAMA 36302
334 794-4154

## CERTIFICATE OF SERVICE

This is to certify that I have this 3rd day of March, 1995, served Opposing Counsel with the foregoing by forwarding a copy of same, via United States Mail, postage prepaid, properly addressed to Mr. Douglas A. Valeska, District Attorney, P.O. Box 1632, Dothan, Alabama 36301.

Of Counsel

94-156

IN THE CIRCUIT COURT OF HENRY COUNTY, ALABAMA

STATE OF ALABAMA,                    )

    PLAINTIFF,                       )

VS.                                  )  CASE NO.:CC-94-065 THRU 070

B.C. MONEY,                          )

    DEFENDANT.                       )


## DEFENDANT'S ADDITIONAL OBJECTION TO MOTION TO CONSOLIDATION

COMES NOW, the Defendant, B.C. Money, by and through his undersigned attorney, Richard H. Ramsey, IV, and files this his Objection to Motion to Consolidation and as grounds therefore would say as follows:

1.  Defendant would be greatly prejudiced if the State were to be allowed to try all six cases against him simultaneously.

2.  The alleged offenses involve two separate victims.

3.  The alleged offenses according to the indictments brought against the Defendant took place at a completely different times and places.

4.  By allowing the State to proceed with all six cases against the Defendant simultaneously would subject the Defendant to the shotgun effect on the jury. The jury would be more likely to convict on any one charge if all were tried together.

Respectfully submitted,

RICHARD H. RAMSEY, IV
ATTORNEY FOR DEFENDANT
401 N ALICE STREET
DOTHAN, ALABAMA   36301
205-794-4154

MAR 1995

FILED IN OFFICE
CIRCUIT CLERK
HENRY COUNTY, AL
3:24

## CERTIFICATE OF SERVICE

This is to certify that I have this the ____ day of March, 1994, served Opposing Counsel with the foregoing by forwarding a copy of same, via United States Mail, postage prepaid, properly addressed to Mr. Doug Valeska, District Attorney, P. O. Box 1632, Dothan, Alabama 36301.

STATE OF ALABAMA         )    IN THE CIRCUIT COURT OF

                             )

VS                    )    HENRY COUNTY, ALABAMA

                             )

B. C. MONEY           )    CASE NO. CC 94-065

TO:   LAWTON ED ARMSTRONG, AS SHERIFF OF HENRY COUNTY, ALABAMA
and THE STATE OF ALABAMA, BOARD OF CORRECTIONS

It being made known to the Court that the above styled cause is set for trial in this Court on October 2, 1995, and that Todd Money (AIS 171204B107) is in the custody of the Alabama Department of Corrections, (Elmore Correctional Facility) and that his presence is necessary at the trial of this case as a witness, it is therefore,

ORDERED that the Sheriff of Henry County, Alabama, bring him under safe and secure conduct to the Circuit Court in his custody, so that he can appear at the aforesaid trial in Abbeville, Henry County, Alabama. After said witness has testified in this cause, you are requested to transport him back to the custody of the Board of Corrections, State of Alabama.

DONE AND ORDERED this 25th day of September, 1995.

_____
C. LAWSON LITTLE, CIRCUIT JUDGE
TWENTIETH JUDICIAL CIRCUIT OF
ALABAMA

Filed in office this 27th day
of _Sept._, 1995.
Connie Burdeshaw
Clerk

STATE'S REQUESTED JURY CHARGE NO. (

The force required to consumate rape in the first degree is necessarily relative.  The force required to consumate the crime against a mature female is not the standard for application in a case in which the alleged victim is a child under 13 years of age.

Pittman v. State, 460 So. 2d 232, 235 (Ala. Crim. App. 1984)

Parks v. State, 587 So. 2d 1015, 1016 (Ala. Crim. App. 1991)

_____ Given

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 2

The element of forcible compulsion may be satisfied where an implied threat serves as motivation for the victim to engage in sexual intercourse.

Smith v. State, 601 So. 2d 201, 204 (Ala. Crim. App. 1992)

_____ Given CLL

_____ Refused

STATE'S REQUESTED JURY CHARGE NO.  3

The element of forcible compulsion must be viewed in the framework of the child's age and point of view.

<u>Lee v. State</u>, 586 So. 2d 264, 266 (Ala. Crim. App. 1991)

_____ Given

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 4

To constitute rape, the degree of force used need not be such as to place the victim under such reasonable apprehension of death or bodily harm as to overpower her will, it being sufficient that she was under such duress that the act was accomplished against her consent.

Lee v. State, 586 So. 2d 264, 266 (Ala. Crim. App. 1991)

_____ Given CLC

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 5

The force necessary to be used, to constitute the crime of rape, need not be actual, but may be constructive or implied. An acquiescence to the act obtained through duress, or fear of personal violence, is constructive force, and the consummation of unlawful intercourse by the man thus obtained would be rape.

Lee v. State, 586 So. 2d 264, 266 (Ala. Crim. App. 1991)

_____ Given

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 6

The mere fact that a child makes no effort to resist a sexual confrontation does not mean that "force" is not present.

Powe v. State, 597 So. 2d 721, 725 (Ala. Crim. App. 1991)

_____ ✓ Given

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 7

The phrase "forcible compulsion" includes not only physical

force or violence, but also the act of using superior

force - physical, moral, psychological, or intellectual-

to compel a person to do a thing against that person's

volition and/or will.

Powe v. State, 597 So. 2d 721, 727 (Ala. Crim. App. 1991)

_____ Given

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 8

The totality of the circumstances may be considered in determining whether an implied threat of force existed for purpose of the element of forcible compulsion.  The factors that may be considered  include:

    (1) The age of the victim

    (2) The respective mental and physical conditions
        of the victim and accused

    (3) The location where the alleged act occurred

    (4) The atmosphere at the location where the alleged
        act occurred

    (5) The extent to which the accused may have been
        in a position of authority, domination, or
        custodial control over the victim

    (6) Whether the victim was under duress

Powe  v. State, 597 So. 2d 721 (Ala. Crim. App. 1991)

_____ ✓  Given C C C

_____  Refused

STATE'S REQUESTED JURY CHARGE NO. 9

Whether the accused was in a position of authority includes factors such as whether the accused ever disciplined the victim, whether the accused ever acted in a parental role over the victim, whether the accused ever had custody of the victim, whether a relationship of trust existed between the accused and the victim.

Powe v. State, 597 So. 2d 721 (Ala. Crim. App. 1991)

_____ Given

_____ Refused

STATE'S REQUESTED JURY CHARGE NO. 10

When a defendant who plays an authoritative role in a child's world instructs the child to submit to certain acts, an implied threat of some sort of disciplinary action accompanies the instruction.

Powe v. State, 597 So. 2d 721, 728-729 (Ala. Crim. App. 1991)

_____ Given

_____ Refused

0001 ~~CXXXXXXXX~~ O ✓
0002 ~~XXXXXXXX~~ E ✓
03 ~~XXXXXXXX~~ D ✓
(0004) BLANKENSHIP CATHY B X 6421  693-2754
(0005) BOSTICK ROGER D X  887-3372
(0006) BROOKINS BETTY J X
(0007) BURKE GWENDOLYN B X
(0008) FEGGINS WILLIAM H X
(0009) FLOYD FUTCHER M X
0010 ~~XXXXXXXX~~ L PTA
(0011) GIBBS BONNIE F X  6713
012 GLANTON CHARLIE R ✓
0013 ~~XXXXXXXX~~ ✓
0014 ~~XXXXXXXX~~ A ✓
0015 ~~XXXXXXXX~~ ✓
016 HUGHES JOSEPH V X
0017 ~~XXXXXXXX~~ B
018 ~~KERNS ROBERT L~~ ✓ DISM
019 ~~XXXXXXXX~~ B PTA
02 KNIGHT JAMES E X Alternate
021 ~~KNOWLES JENELLE G~~ Struck for cause
(022) LISENBY JASON C X  585-3187
023 ~~XXXXXXXX~~ ✓
024 ~~XXXXXXXX~~ S ✓
025 ~~XXXXXXXX~~ ✓
026 ~~XXXXXXXX~~ H
027 ~~XXXXXXXX~~ R
(028) MORING BILLY X  271|
029 MORING DANIEL S
030 OWENS BELINDA C
031 ~~PARRISH NATHAN J~~
032 PHILLIPS SARAH S

0033 PRUITT LLOYD B
0034 REYNOLDS GLORIA B
0035 ROBERTS LARRY J
0036 ROSS ROOSEVELT
0037 SEWELL LENOTA
0038 SHELLEY DANSIE L
0039 SHERROD CLIFTON III
0040 SMITH SHELIA W
0041 SPINKS BARBARA A
0042 TAYLOR LEE G
0043 THOMAS CHARLES E
0044 VICKERS ANNIE F
0045 WALKER IRMA B
0046 WHITEHEAD RONALD T
0047 WILSON DIANE H
0048 NANCE CLARENCE A

23
-12
11

| | 1. | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FE | 5 | 13 | 2 | 23 | 3 | 20 | | | | | | | | | | | | | | | | |
| | | 17 | 14 | 15 | | | | | | | | | | | | | | | | | | |



| State of Alabama Unified Judicial System | **JURY VERDICT** | Case Number |
|---|---|---|
| Form C-50      Rev 6/88 | | CC−94−065 |

**IN THE CIRCUIT COURT OF** _____ HENRY _____ **COUNTY**

**Plaintiff/State**   OF ALABAMA        **v. Defendant**   B. C. MONEY, SR.

We, the Jury, find the defendant, B. C. Money, Sr., guilty of Rape, 1st Degree,

as charged in the indictment.

_Bonnie Gibbs_
Name of Foreman (please print)

_Bonnie Gibbs_
Foreman Signature

ate filed   _Oct 6 −95_

_Connie Burdeta_
Clerk of Circuit Court                By:

-55-

ALABAMA JUDICIAL INFORMATION CENTER

CASE ACTION SUMMARY
CIRCUIT  CRIMINAL                    CASE: CC 94 000065 CO

IN THE CIRCUIT COURT OF    HENRY  COUNTY                JUDGE: M-C

STATE OF ALABAMA            VS      MONEY P C SR
                                    RT 1
CASE: CC 94 000065 00
                                    COLUMBIA              AL  36319-0000

DOB: 03/22/22  RACE: W  SEX:  M  HT:  000  WT: 000  HR:        EYE:
SSN: 420503187   ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE             CODE1: RAP1 LIT: RAPE 1ST DEGREE TYPE: F
CHARGE2:                             CODE2: 0000                      TYPE: F
CHARGE3:                             CODE3: 0000                      TYPE: F
MORE?:        OFFENSE DATE: __/__/__  AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS:                   DATE ARRESTED: 04/06/94
DATE    INDICTED: 07/27/94          DATE   FILED: 08/01/94
DATE    RELEASED: __/__/__          DATE  HEARING: __/__/__
        BOND AMOUNT:    $25,000.00         SURETIES:

DATE 1: 10/05/94 DESC: ARRO    TIME: 0900 A
DATE 2: _____ DESC: 0000    TIME: 0000

DEF/ATY:  RAMSEY, RICHARD M, IV   TYPE: A                    TYPE:
PROSECUTOR:

CTH USE: 9400034600     CHK/TICKET NO:              GRAND JURY: 192
COURT REPORTER          SID NO: 00000000
DEF STATUS: BOND    JURY DEMAND:                    OFID: RYE

    TE        ACTIONS, JUDGMENTS, CASE NOTES

8-2-94  Request for PH filed by R. Ramsey IV

8-2-94  Order denying PH as moot /s/Woodham

8-17-94  Motion to Revoke bond filed by State

8-17-94  Motion to revoke set for hearing
         on 8-19-94 at 9:00 a.m.
         Clerk to notify.            Woodham judge

8-19-94  Defendant having failed to appear at
 SO      his bond revocation, the Sheriff is
 RR IV   directed to take Defendant into custody
         and bring him before the Court
         instanter.            Woodham judge.

8-24-94  Amendment of release order filed



| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR: $25,000.00 |
| 8/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT:  RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAFIAS ISSUED                            080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOT TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEARING 8-19-94, 9 AM BY JUDGE WOODH |
| 08/17/94 | DAT2 | CASE SET ON 08/19/94 FOR  BOND HEARING |
| 08/17/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 08/19/94 | TEXT | ORDER FOR SHERIFF TO TAKE DEFT INTO CUSTODY AND |
| 08/19/94 | TEXT | BRING BEFORE COURT INSTANTER /S/ WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |

10/17/94 Motion to dismiss denied Notify Crespi, Judge

```
06/08/94   ARRS   DEFENDANT ARRESTED ON: 06/08/94
07/29/94   INDT   DEFENDANT INDICTED ON: 07/29/94
08/01/94   FILE   ON 08/01/94 FILED
 9/01/94   CHG1   CHARGE AT FILING OF: RAPE 1ST DEGREE
 1/01/94   BOND   BOND SET FOR     $25,000.00
 8/01/94   DAT1   CASE SET ON 10/05/94 FOR ARRAIGNMENT
08/01/94   ATY1   ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H., IV
08/01/94   CAFS   CAPIAS ISSUED                  080194
08/12/94   RELE   DEFENDANT RELEASED ON: 08/12/94
08/15/94   DOC1   DOCKET DATE NOTICE    SENT TO DEFENSE ATTORNEY 1
08/17/94   TEXT   MOT TO REVOKE BOND FILED BY STATE
08/17/94   TEXT   SET FOR BOND HEARING 8-19-94, 9 AM BY JUDGE WOODH
08/17/94   DAT2   CASE SET ON 08/19/94 FOR BOND HEARING
08/17/94   SUBF   WITNESS SUBPOENA ISSUED
08/19/94   TEXT   ORDER FOR SHERIFF TO TAKE DEFT INTO CUSTODY AND
08/19/94   TEXT   BRING BEFORE COURT INSTANTER /S/ WOODHAM
08/24/94   TEXT   AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM
08/26/94   TEXT   WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV
08/26/94   TEXT   MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND
08/26/94   TEXT   FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF
08/26/94   TEXT   STATE'S WITNESS FILED BY R RAMSEY IV
09/01/94   TEXT   MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE
09/01/94   TEXT   TO THE DEFENDANT FILED BY R RAMSEY IV
09/01/94   TEXT   OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE
09/01/94   TEXT   OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND
09/01/94   TEXT   MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER
09/01/94   TEXT   CELEST MONEY FILED BY D VALESKA
09/07/94   TEXT   ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI
09/09/94   TEXT   ORDER FILED /S/ CRESPI
10/13/94   TEXT   MOTION TO DISMISS FILED BY R RAMSEY IV
10/28/94   TEXT   MOTION TO COMPEL THE DEPT OF HUMAN RESOURCES TO
10/28/94   TEXT   PRODUCE RECORDS AND REPORTS FILED BY R RAMSEY IV
```

11-4-94  Order filed /S/ Crespi

11-5-94  Motion to Consolidate filed
by C. Ames

12-2-94  Motion to Suppress filed
by R. Ramsey IV

12/7/94  I have not received the files in these cases in time to
set a consolidation hearing.  I have therefore denied the
motion to consolidate  Notify _____

| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 8/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR: $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAFS | CAFIAS ISSUED                           080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOT TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEARING 8-19-94, 9 AM BY JUDGE WOODH |
| 08/17/94 | DAT2 | CASE SET ON 08/19/94 FOR BOND HEARING |
| 08/19/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 08/19/94 | TEXT | ORDER FOR SHERIFF TO TAKE DEFT INTO CUSTODY AND |
| 08/19/94 | TEXT | BRING BEFORE COURT INSTANTER /S/ WOODHAM |
| 08/24/94 | TEXT | AMENDMENT-OF-RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV — |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL THE DEPT OF HUMAN RESOURCES TO |
| 10/28/94 | TEXT | PRODUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 2/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATION |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |

12/21/94 Continued unreached exp, judge

IN THE CIRCUIT COURT OF HENRY COUNTY    JUDGE: CLE

STATE OF ALABAMA VS MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR:          $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H. IV |
| 08/01/94 | CAFS | CAFIAS ISSUED          080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE     SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOT TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEARING 8-19-94, 9 AM BY JUDGE WOODH |
| 08/17/94 | DAT2 | CASE SET ON 08/19/94 FOR  BOND HEARING |
| 08/17/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 08/19/94 | TEXT | ORDER FOR SHERIFF TO TAKE DEFT INTO CUSTODY AND |
| 08/19/94 | TEXT | BRING BEFORE COURT INSTANTER /S/ WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL THE DEPT OF HUMAN RESOURCES TO |
| 10/28/94 | TEXT | PRODUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 1/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 1/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATION |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/15/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/15/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/15/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/15/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR  TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |

3/8/95 - State's motion to consolidate is granted - Defendant
has 10 days to file an objection - Defendant's Motion to Continue is denied -
Notify - S. Phillips, Judge

CASE ACTION SUMMARY                              CASE: CC 94 000065.00

IN THE CIRCUIT COURT OF HENRY       COUNTY                    JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| | | |
|---|---|---|
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/13/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/15/95 | TEXT | DEFENDANT'S ADDITIONAL OBJECTION TO MOTION |
| 03/15/95 | TEXT | TO CONSOLIDATE FILED BY R RAMSEY IV |

3-16-95    Defendant's Additional Objection to Consolidation

RRIV      is denied.  Notify.  *Hatle, Judge*

3-21-95 Case Continue O Judge on Cont
State. *Hatle, Judge*

State of Alabama
Unified Judicial System

**CASE ACTION SUMMARY**
**CONTINUATION**

Case Number

CC-94-065
ID    YR    Number

Form C-7  Rev. 2/79

Style: B.C. Money, Sr.

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

10-6- 95

Defendant heretofore having been indicted and arraigned upon an indictment on a charge _Rape 1st Deg_ and heretofore having plead not guilty thereto, issue joined on said plea. Thereupon comes a jury of good and lawful men and women, to-wit: _Bonnie F. Hibbs_ and eleven others, who being duly empaneled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, and defendant _B.C. Money, Jr._, being in open Court with his attorney at each and every stage and during all of the proceedings in this cause, now on this the _6th_ day of _Oct_, 19 _95_; said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF _Rape 1st_ AS CHARGED IN THE INDICTMENT."

_____
JUDGE

10-6- 19 95

In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Rape 1st_ as charged in the indictment. Defendant being asked if he had anything to say why the sentence of law should not be pronounced upon him, the Defendant says nothing but pre-sentence report is requested by _Deft_

Hearing set for _10-27-_ 19 _95_ at _9:00_ A. M.

_____
JUDGE

10-27 , 19 95

The Court therefore adjudges the Defendant guilty of _Rape 1st_ The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of law should not be pronounced upon him says nothing. It is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of _99 years_ Defendant is further ordered to pay a Fine of _____ restitution in the amount of _____ to _TBD_ and a victim compensation assessment of _500.00_ Defendant is given credit for days spent incarcerated pending trial.

_____
JUDGE

Unified Judicial System
Form C-7 Rev. 2/79

CASE ACTION SUMMARY
CONTINUATION

Case Number —67

Case 1:08-cv-00228-WKW-TFM    Document 16-2    Filed 05/09/2008    Page 68 of 108

CC96 065.

ID    YR    Number

| Style: | B.C. Money, Sr. | Page Number _____ of _____ Pages |
|---|---|---|

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 11-3-95 | Chris Maddox appointed to represent deft on appeal |

State of Alabama
Unified Judicial System
Form C-10 A
Page 1 of 2          Rev. 2/95

# AFFIDAVIT of SUBSTANTIAL HARDWARE
# HARDSHIP

Case Number

_G-94-065-070_

IN THE ___Circuit___ COURT OF ___Henry Co.___ ALABAMA
(Circuit, District, or Municipal)          (Name of County or Municipality)

STYLE OF CASE: ___State of Alabama___ v. ___B.C. Money___
Plaintiff(s)                              Defendant(s)

TYPE OF PROCEEDING: _____ CHARGE(s) (if applicable): _____

- [ ] CIVIL CASE-- I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.
- [ ] CIVIL CASE--(such as paternity, support, termination of parental rights, dependency) - I am financially unable to hire an attorney and I request that the Court appoint one for me.
- [✓] CRIMINAL CASE--I am financially unable to hire an attorney and request that the Court appoint one for me.
- [ ] DELINQUENCY/NEED OF SUPERVISION - I am financially unable to hire an attorney and request that the Court appoint one for my child/me.

---

## SECTION I.                    A F F I D A V I T

1. **IDENTIFICATION**
   Full Name ___Bragg Comer Money Sr___          Date of Birth ___3/22/22___
   Spouse's Full Name (if married) ___Ruby W. Money___
   Complete Home Address ___Rt 1 Box 35 Columbia AL 36319___

   Number of People Living in Household ___2___
   Home Telephone No. ___896-4651___
   Occupation/Job ___Retired___          Length of Employment _____
   Driver's License Number _____          * Social Security Number _____
   Employer ___N/A___          Employer's Telephone No. _____
   Employer's Address _____

2. **ASSISTANCE BENEFITS**
   Do you or anyone residing in your household receive benefits from any of the following sources? (if so, please check those which apply.)

   - [ ] AFDC     - [ ] Food Stamps     - [ ] SSI     - [ ] Medicaid     - [ ] Other _____

3. **INCOME/EXPENSE STATEMENT**

   Monthly Gross Income:

   | | |
   |---|---|
   | Monthly Gross Income | $ 403 |
   | Spouse's Monthly Gross Income (unless a marital offense) | 258 |
   | Other Earnings: Commissions, Bonuses, Interest Income, etc. | |
   | Contributions from Other People Living in Household | |
   | Unemployment/Workmen's Compensation, | |
   | Social Security, Retirement, etc. | |
   | Other Income (be specific) ___V.A___ | 253 |

   **TOTAL MONTHLY GROSS INCOME**          $ 914.00

   Monthly Expenses:

   | | |
   |---|---|
   | A. Living Expenses | |
   | Rent/Mortgage | $ |
   | Total Utilities: Gas, Electricity, Water, etc. | 150.00 |
   | Food | 350.00 |
   | Clothing | 95.00 |
   | Health Care/Medical | 65.00 |
   | Insurance | |
   | Car Payment(s)/Transportation Expenses | 150.00 |
   | Loan Payment(s) | |

* OPTIONAL

Form C-64

Page 2 of 2          Rev. 2/95

# AFFIDAVIT OF SUBSTANTIAL HARDSHIP

Monthly Expenses: (cont'd from page 1)

Credit Card Payment(s)          _____

Educational/Employment Expenses   _____

Other Expenses (be specific)  Lowes        25.00

_____

Sub-Total                                    A  $ _____

B.   Child Support Payment(s)/Alimony        $ _____

Sub-Total                                    B  $ _____

C.   Exceptional Expenses              $  50.00

TOTAL MONTHLY EXPENSES (add subtotals from A & B monthly only)   $ 815.00

Total Gross Monthly Income less total monthly expenses:

DISPOSABLE MONTHLY INCOME                    $ _____

4.   LIQUID ASSETS:

Cash on Hand/Bank (or otherwise available such as stocks, bonds,
certificates of deposit)                $  0

Equity in Real Estate (value of property less what you owe)     0

Equity in Personal Property, etc. (such as the value of motor vehicles, stereo,
VCR, furnishings, jewelry, tools, guns less what you owe)   560.00 ?

Other (be specific) Do you own anything else of value? ☐ Yes ☐ No
(land, house boat, TV, stereo, jewelry) _____

If so, describe _____

TOTAL LIQUID ASSETS                          $ _____

## Affidavit/Request

I swear or affirm that the answers are true and reflect my current financial status. I understand that a false statement or answer to any question in the affidavit may subject me to the penalties of perjury. I authorize the Court or its authorized representative to attain records or information pertaining to my financial status from any source in order to verify information provided by me. I further understand and acknowledge that, if the Court appoints an attorney to represent me, the Court may require me to pay all or part of the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this

27 day of ____ , 19 95        _____
                                  Affiant's Signature

_____
Judge/Clerk/Notary

_____
Print or Type Name

State of Alabama
Unified Judicial System

Form C-10 B    Rev. 2/95

# ORDER APPOINTING
# COUNSEL

Case Number

CC 94 - 065
070

IN THE ___Circuit___ COURT OF ___Henry County___ ALABAMA
(Circuit, District, or Municipal)                    (Name of County or Municipality)

STYLE OF CASE: ___State of Al___ v. ___BC Money, Sr.___
                        Plaintiff(s)                              Defendant(s)

TYPE OF PROCEEDING: _____ CHARGE(s) (if applicable): ___Rape I & Sexual Abuse___
                                                                                          1st

---

IT IS THEREFORE, ORDERED AND ADJUDGED BY THIS COURT AS FOLLOWS:

☐ Affiant is not indigent and request is DENIED.

☐ Affiant is partially indigent and able to contribute monetarily toward his defense; therefore, defendant is ordered to pay $ _____
   toward the anticipated cost of appointed counsel. Said amount is to be paid to the Clerk of Court or as otherwise ordered and disbursed
   as follows: _____
   _____

☑ Affiant is indigent and request is GRANTED.

☐ The prepayment of docket fees is waived.

IT IS FURTHER ORDERED AND ADJUDGED that ___Chris Maddox___, is hereby appointed as counsel to represent affiant.

IT IS FURTHER ORDERED AND ADJUDGED that the Court reserves the right and may order reimbursement of attorney's fees and expenses,
approved by the Court and paid to the appointed counsel, and costs of court.

Done this ___31st___ day of ___Oct___, 19_95_.

_____
Judge

# NOTICE OF APPEAL TO THE
## ALABAMA COURT OF CRIMINAL APPEALS
## BY THE TRIAL COURT CLERK

B. C. MONEY
_____
APPELLANT (As Appears on Indictment)

v.

STATE OF ALABAMA
_____
APPELLEE

CIRCUIT COURT OF _____HENRY_____ COUNTY, ALABAMA

CIRCUIT COURT NUMBER __CC-94-065 thru CC-94-070__

CIRCUIT JUDGE __Lawson Little__

CONVICTION OR ORDER APPEALED FROM: Rape 1st on CC-94-065, 066, 067 & 069
Sexual Abuse on CC-94-078 & 070

DATE OF JUDGMENT OR CONVICTION: __10/06/95__

SENTENCE: __99 yrs on CC-94-065; 99 yrs on 066; 99 yrs on 067; 99 yrs on 069__
__10 yrs on CC-94-068; 10 yrs on CC-94-070__

DATE OF SENTENCING: __10/27/95__

DATE OF NOTICE OF APPEAL: __10/27/95 (Oral)__
(Notice of Appeal must be given within 42 days from date of
sentencing or from order overruling a post conviction motion).

DATE MOTION FOR NEW TRIAL FILED: __N/A__

DATE MOTION FOR NEW TRIAL DENIED: __N/A__

INDIGENT: ☒ YES ☐ NO

NAME AND COMPLETE ADDRESS OF:

1. COURT REPORTER:

   William Moeglin
   _____
   P. O. Drawer 6406          Dothan      AL        36302
   (Address)                  (City)      (State)   (Zip Code)

2. APPELLANT'S COUNSEL ON APPEAL:

   William Christian Maddox                    334 793-6493
   _____(Telephone No.)
   P. O. Box 738              Dothan      AL    36302
   (Address)                  (City)      (State)   (Zip Code)

3. APPELLANT, IF PRO SE APPEAL:

                                          AIS No:
   _____
   _____
   (Address)                  (City)      (State)   (Zip Code)

4. APPELLEE, IF CITY APPEAL:

   _____
   _____
   (Address)                  (City)      (State)   (Zip Code)

I certify that I have served a copy of this
Notice of Appeal on all parties to this
action on this ___3rd___ day of

_November_____, 19 _95_ .

_Connie Burdeshaw_
CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>95 . 0268 |
|---|---|---|

**GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF    Henry                          COUNTY

B.C. Money                                                                          , Appellant

V.  ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC 94-065 thru CC 94-070 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>October 6, 1995 |
|---|---|---|
| Number of Days of Trial/Hearing<br>1         Days | Date of Notice of Appeal<br>Oral: October 27, 1995              Written: | |

Indigent Status Requested:  ☒ Yes  ☐ No            Indigent Status Granted:  ☒ Yes  ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☒ Appointed  ☐ Retained.        If no attorney, will appellant represent self?   ☐ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>William C. Maddox | Telephone Number<br>(334) 793-3610 | |
|---|---|---|
| Address<br>P.O. Box 1748 | City<br>Dothan | State<br>AL            Zip Code<br>36302 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☒ State Conviction      4 ☐ Pretrial Order        7 ☐ Juvenile Transfer Order      10 ☐ Other (Specify)
2 ☐ Post-Conviction Remedy  5 ☐ Contempt Adjudication  8 ☐ Juvenile Delinquency
3 ☐ Probation Revocation   6 ☐ Municipal Conviction  9 ☐ Habeas Corpus Petition

*(circular stamp: FILED CIRCUIT CLERK HENRY COUNTY, AL NOV 1995)*

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____        6 ☐ Trafficking in Drugs - § _____      11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____              7 ☐ Theft - § _____                    12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____               8 ☐ Damage or Intrusion                  13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful                    to Property - § _____             14 ☐ Traffic - Other - § _____
     Imprisonment - § _____         9 ☐ Escape - § _____                   15 ☒ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____       10 ☐ Weapons/Firearms - § _____             Rape 1st · § 13A-6-61

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?    ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?   ☒ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. __November 9, 1995__
                                                                                                        (Date)
   If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

| Form ARAP-26 (back)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |
|---|---|

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

The undersigned attorney is a newly appointed attorney and as such does not know enough to give the nature of the case.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

The undersigned attorney is a newly appointed attorney and cannot yet state the anticipated issues on appeal.

**K. SIGNATURE:**

11/9/95
Date

*William C. Maddox*
Signature of Attorney/ Party Filing this form

State of Alabama
Unified Judicial System

Form ARAP-1C    8/91

REPORTER'S TRANSCRIPT ORDER -- CRIMINAL

See Rules 10(c) and 11(b) of the
Alabama Rules of Appellate Procedure (A.R.App.P.)

Criminal Appeal Number

95 - 0268

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF   Henry   COUNTY

B.C. Money , Appellant

v.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number | Date of Judgment/Sentence/Order |
|---|---|
| CC 94-065 thru CC 94-070 | October 6, 1995 |

| Date of Notice of Appeal | Indigent Status Granted: |
|---|---|
| Oral: October 27, 1995 Written: | ☒ Yes   ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

| Signature | Date | Print or Type Name |
|---|---|---|
| | | |

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)
Gwen Cooper

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

P.O. Box 6406
Dothan, Alabama 36302

B. ☒ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. _____ | | |
| E. _____ | | NOV 995 FILED IN OFFICE CIRCUIT CLERK HENRY COURT, AL 3124 |
| F. _____ | | |
| G. _____ | | |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| William C. Maddox | 11/9/95 | William C. Maddox |
|---|---|---|
| Signature | Date | Print or Type Name |

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript

ALABAMA JUDICIAL INFORMATION SYSTEM

\* \* \* IN THE DISTRICT COURT OF HENRY COUNTY \* \* \*

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000268.00
OTHER CASE NBR: DC-94-367

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED    HORNSBY CLYDE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    B C MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

    ON OR ABOUT OCT - DEC 1993, B. C. MONEY, SR., A MALE, DID ENGAGE
IN SEXUAL INTERCOURSE WITH AMBER CELESTE MONEY, A FEMALE BY FORCEABLE
COMPULSION, IN THE RESIDENCE OF B. C. MONEY, SR., RT 1, COLUMBIA, AL
IN VIOLATION OF 13A-006-061                OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_Clyde Hornsby_
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_Onnie Bardeshar_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE        13A-006-061        F

WITNESS FOR THE STATE

HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310

OPERATOR: COB    DATE: 06/08/94

W A R R A N T

STATE OF ALABAMA              HENRY COUNTY                    DISTRICT COURT

AGENCY NUMBER:                         WARRANT NUMBER: WR 94 000268. 00
                                       OTHER CASE NBR:

.0 ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST   B C MONEY SR   AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF HENRY COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
              RAPE 1ST DEGREE   CLASS:A   TYPE:F
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
___19_th_ DAY OF _July_ 19_94_, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 08 DAY OF JUNE, 1994.

BOND SET AT: _100,000.00_   BOND TYPE:

_Connie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

---

CHARGES: RAPE 1ST DEGREE        13A-006-061       F

---

NAME: B C MONEY SR                      ALIAS:
ADDRESS: RT 1                           ALIAS:
ADDRESS:
CITY: COLUMBIA            STATE: AL        ZIP: 36319 0000

EMPLOYMENT:
DOB: 03/22/22   RACE: W   SEX: M   HAIR:
EYE:      HEIGHT: 0'00"   WEIGHT: 000
SID: 000000000  SSN: 420503187

---

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ ) PLACING DEFENDANT IN THE HENRY COUNTY JAIL

( ) RELEASING DEFENDANT ON APPEARANCE BOND

---

THIS _8 th_ DAY OF _JUNE_                    19 _94_

_Lawton Ed Armstrong_
SHERIFF
_Clyde Hornsby_
BY

---

COMPLAINANT:  HORNSBY CLYDE
              C/O HENRY CO SO

              ABBEVILLE  AL  36310

 :RATOR: COB        LAST UPDATE: 060894

| State of Alabama<br>Unified Judicial System<br><br>Form C-52      Rev 6/88 | **CONSOLIDATED BOND**<br>(District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|

IN THE _____ Circuit _____ COURT OF _____ HENRY _____ COUNTY

STATE OF ALABAMA          v.

We _____ BRAGG COMER MONEY SR. _____ (Defendant) as principal
and we _____ BEATRICE BRISTO _____
(please print) _____ as sureties

agree to pay the State of Alabama _____ $ 25,000.00 _____ Dollars
unless the above named defendant appears before the District Court of said County on (Date) _____ OCT. 5, 1994
at (Time) _____ 9:00 AM _____ or at the next session of Circuit Court of said County; there to await the action by the grand
jury and from session to session thereafter until discharged by law to answer to the charge of _____ RAPE 1ST
DEGREE _____

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the
amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execu-
tion or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we espe-
cially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time
as the undersigned are duly exonerated.

| x B. C. Money | RT 1 BOX 35, COLUMBIA, AL | |
|---|---|---|
| Signature of Defendant | Address (Print) | City |
| Retta B. Bristow | RT 1 BOX 32-B COLUMBIA AL | |
| Signature of Surety | Address (Print) | City |
| | | |
| Signature of Surety | Address (Print) | City |
| | | |
| Signature of Surety | Address (Print) | City |
| | | |
| Signature of Surety | Address (Print) | City |

8-12-94
Date

Lawton El Armstrong
Approved by Sheriff/Judge

Chester Smith
By: Deputy Sheriff

**Defendant's Information**

DOB _____ 03-22-22 _____           Sex _____ M
S. S. No. _____ 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 _____           Race _____ W
DL No. _____ 0833087 _____ State ( AL )    Phone No. _____ 696-4691

☑ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND      COURT RECORD : Original  DEFENDANT : Copy      SURETY : Copy

| State of Alabama<br>Unified Judicial System<br><br>Form C-52        Rev 6/88 | **CONSOLIDATED BOND**<br>(District Court, Grand Jury, Circuit Court) | Case Number |
| --- | --- | --- |

IN THE _____ *District* _____ COURT OF _____ *Henry* _____ COUNTY

STATE OF ALABAMA        v.        *Bragg Comer Money, Sr.*

We _____ *Bragg Comer Money, Sr.* _____ (Defendant) as principal

and we _____ as sureties

(please print)

agree to pay the State of Alabama        $ *10,000 00* _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date): *Aug. 16, 1994*

at (Time) _____ *9:00* _____ or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _____

*Rape - 1st degree*

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the
amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execu-
tion or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we espe-
cially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time
as the undersigned are duly exonerated.

X *B. C. Money R I Box 35 Columbia, Ala. 36319*
Signature of Defendant                          Address (Print)                          City

X *Ruly Money Columbia Ala R#1 Box 35  36319*
Signature of Surety                          Address (Print)                          City

X *Frank Money Rt.1 Box 33, Columbia, Al.*
Signature of Surety                          Address (Print)                          City

*James O Money Po Box 181 Columbia Al 36319*
Signature of Surety                          Address (Print)                          City

*Rita B. Bristow, Rt. 1 Box 32 B Columbia, Al. 36319*
Signature of Surety                          Address (Print)                          City

*July 21, 1994*
Date

_____ *D. E. Crews* _____
Approved by: Sheriff/Judge

By: Deputy Sheriff

| Defendant's Information | |
| --- | --- |
| DOB _____ | Sex _____ *M* |
| S. S. No. _____ | Race _____ *W* |
| DL No. _____ State ( ) | Phone No. _____ |

☑ Appearance Bond - Property        ☐ Appearance Bond - Recognizance        ☐ Bail Bond        ☐ Cash Bond

CONSOLIDATED BOND        COURT RECORD : Original   DEFENDANT : Copy        SURETY : Copy

CASE ACTION SUMMARY
DISTRICT CRIMINAL

CASE: DC 94 000367 00

IN THE DISTRICT COURT OF   HENRY   COUNTY                    JUDGE: CWW

STATE OF ALABAMA                    VS        MONEY B C SR
                                              RT 1
CASE: DC 94 000367 00
                                              COLUMBIA            AL  36319-0000

DOB: 03/22/22   RACE: W   SEX:   M   HT:  000   WT: 000   HR:            EYE:
SSN: 420503187   ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE          CODE1: RAP1 LIT: RAPE 1ST DEGREE  TYPE: F
CHARGE2:                          CODE2: 0000                       TYPE: F
CHARGE3:                          CODE3: 0000                       TYPE: F
MORE?:          OFFENSE DATE:  __/__/__   AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS: __/__/__        DATE ARRESTED: 06/08/94
DATE    INDICTED: __/__/__        DATE    FILED: 06/29/94
DATE    RELEASED: __/__/__        DATE  HEARING: __/__/__
     BOND AMOUNT:  $100,000.00         SURETIES:

DATE 1: 07/19/94  DESC: 0000      TIME:  0900 A
DATE 2: _____   DESC: 0000      TIME:  0000

DEF/ATY:                          TYPE:                           TYPE:
PROSECUTOR:

OTH CSE: 0000000000    CHK/TICKET NO:              GRAND JURY:
COURT REPORTER             SID NO: 000000000
DEF STATUS: JAIL    JURY DEMAND:                      OPID: SAS

   DATE          ACTIONS, JUDGMENTS, CASE NOTES

07-21-94 | Bond is hereby reduced to $10,000.00. Defendant, if
         | released, is released in the custody of Mrs. B. C. Money,
         | and he shall remain in her custody until this case is
         | finally determined. As a further condition of Defendants
         | release, he shall not be in the presence of any of the
         | alleged victims unless accompanied by another adult
         | person.
         |
         |            CHARLES W. WOODHAM, JUDGE
         |
7-26-94  PG

Grand Jury No. ___193___                                    Case No. _____

---

ᵀNDICTMENT

The State of Alabama  }                    CIRCUIT COURT
HENRY COUNTY                      TWENTIETH JUDICIAL CIRCUIT

July       Term, 19 94

The grand jury of said county charge that, before the finding of the indictment,

B.C. Money, Sr.

whose name is otherwise unknown to the Grand Jury,

a male, did engage in sexual intercourse with Amber Celeste

Money, a female, by forcible compulsion, in violation of

13A-6-61 of the Code of Alabama, against the peace and dignity

of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Henry County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE

vs.

B.C. Money, Sr.

S.I.D. No.

D.O.∩.

RAPE, 1ST DEGREE

Witnesses:    Amber Celeste Money
              Rt
              Columbia, Al

              Clyde Hornsby
              SO
              Abbeville, Al

# A TRUE BILL

_Mildred Willis_
Foreman of the Grand Jury

Presented to the presiding Judge in open court foreman of the Grand Jury, in the presence of Grand Jurors and filed in open court by order of the court on this the _8th_ day of _July_, 19 _94_

_Bruce Buckaloo_
Clerk

# INDICTMENT

## NO PROSECUTOR

Upon the arrest of Defendant let him be admitted to bail on giving bond in the sum of _Twenty Five Thousand_ _____ Dollars with security to be approved by the Sheriff.

This _24th_ day of _July_ 19 _94_

_O. W. Windham_
Judge Presiding

| State of Alabama Unified Judicial System | JURY VERDICT | Case Number |
|---|---|---|
| Form C-50      Rev 6/88 | | CC-94-066 |

IN THE CIRCUIT COURT OF _____ HENRY _____ COUNTY

**Plaintiff/State** OF ALABAMA        **v. Defendant**  B. C. MONEY, SR.

We, the Jury, find the Defendant, B. C. Money, Sr., guilty of Rape, 1st Degree,
as charged in the Indictment.

_Bonnie Gibbs_
Name of Foreman (please print)

_Bonnie Gibbs_
Foreman Signature

Date filed _Oct 6 - 95_

_Connie Burden_                    By:
Clerk of Circuit Court

CASE ACTION SUMMARY
CIRCUIT CRIMINAL                    CASE: CC 94 000066 00

IN THE CIRCUIT COURT OF    HENRY COUNTY              JUDGE: ~~~~ MC

\TE OF ALABAMA                VS      MONEY B C SR
                                      RT 1
CASE: CC 94 000066 00
                                      COLUMBIA        AL  36319-0000

DOB: 03/22/22  RACE: W  SEX:  M  HT:  000  WT: 000  HR:        EYE:
SSN: 420503187   ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE             CODE1: RAP1 LIT: RAPE 1ST DEGREE TYPE: F
CHARGE2:                             CODE2: 0000                      TYPE: F
CHARGE3:                             CODE3: 0000                      TYPE: F
MORE?:            OFFENSE DATE:  __/__/__   AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS:    /  /          DATE ARRESTED: 06/08/94
DATE     INDICTED: 07/27/94        DATE    FILED: 08/01/94
DATE     RELEASED:  __/__/__       DATE  HEARING:  __/__/__
     BOND AMOUNT:    $25,000.00        SURETIES:

DATE 1: 10/05/94 DESC:  ARRG      TIME:  0900 A
DATE 2:          DESC:  0000      TIME:  0000

DEF/ATY:   RAMSEY, RICHARD H, IV    TYPE: A                    TYPE:
PROSECUTOR:

OTH CSE: 9400056700    CHK/TICKET NO:                GRAND JURY: 193
COURT REPORTER              SID NO: 000000000
DEF STATUS: BOND    JURY DEMAND:                     GPID: GYE

   DATE         ACTIONS, JUDGMENTS, CASE NOTES

IN THE CIRCUIT COURT OF    HENRY COUNTY    JUDGE: M-C

STATE OF ALABAMA  VS   MONEY B C SR

| | | |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR           $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED              080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BY JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |

9-7-94    Order filed

10/14/94    Motion to dis mtgs denied. Notify cnsr, Judge

STATE OF ALABAMA   VS   MONEY B C SR

| Date | Code | Description |
|------|------|-------------|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR              $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR   ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT:  RAMSEY, RICHARD H., IV |
| 08/01/94 | CAPS | CAPIAS ISSUED                    080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE        SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BY JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT |    FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT |    STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT |    TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT |    OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL |
| 09/01/94 | TEXT |    AND MEDICAL EXAMINATION OF AMANDA HADDAN AND |
| 09/01/94 | TEXT |    AMBER CELESTE MONEY FILED BY J VALESKA |
| 09/02/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT |    DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |

11-4-94  Order filed /S/ Crespi

12-5-94  Motion to consolidate filed
         by C Amos

12-2-94  Motion to suppress filed by
         R Ramsey IV

12/7/94   I have not received the files in these cases in time to set
a consolidation hearing.  I have therefore denied the motion
to consolidate.  Notify. crspi, judge

12/21/94 Continued  unreached  crspi, judge

IN THE CIRCUIT COURT OF   HENRY   COUNTY                    JUDGE: CLL

STATE OF ALABAMA  VS  MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR          $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAFS | CAPIAS ISSUED                 080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE       SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BY JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT |    FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT |    STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT |    TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT |    OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL |
| 09/01/94 | TEXT |    AND MEDICAL EXAMINATION OF AMANDA HADDAN AND |
| 09/01/94 | TEXT |    AMBER CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT |    DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT |    FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR  TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |

3/9/95 - State's motion to consolidate is granted -
Defendant's motion for continuance is denied - Notify -
S Little, Judge.

CASE ACTION SUMMARY

CASE: CC 94 000066.00

IN THE CIRCUIT COURT OF HENRY COUNTY                    JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| | | |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR        $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H. IV |
| 08/01/94 | CAPS | CAPIAS ISSUED        080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE  SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BY JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT |   FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT |   STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT |   TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT |   OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL |
| 09/01/94 | TEXT |   AND MEDICAL EXAMINATION OF AMANDA HADDAN AND |
| 09/01/94 | TEXT |   AMBER CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT |   DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT |   FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |
| 03/08/95 | TEXT | MOTION TO CONSOLIDATE GRANTED; MOTION TO CONTINUE |
| 03/08/95 | TEXT |   DENIED /S/ LITTLE |
| 03/09/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/15/95 | TEXT | DEFENDANT'S ADDITIONAL OBJECTION TO MOTION |
| 03/15/95 | TEXT |   TO CONSOLIDATE FILED BY R RAMSEY IV |

3-16-95 DV  Defendant's Additional Objection to Consolidation is
RRW
        denied. Notify. _Little, Judge_

3-21-95 _Case continued for deft +_
_St - J Little Judge_

State of Alabama
Unified Judicial System

**CASE ACTION SUMMARY**
**CONTINUATION**

Form C-7  Rev. 2/79

Case Number

CC 94 066.
ID   YR   Number

Style:  B.C. Money, Sr.

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

10-6-          1995

Defendant heretofore having been indicted and arraigned upon in indictment on a charge of _Rape 1st_ and heretofore having plead not guilty thereto, issue joined on said plea, thereupon comes a jury of good and lawful men ta-women, to-wit. _Bonnie F. Gibbs_ and eleven others, who being duly empanelled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant _B.C. Money, Sr._, being in open Court with his attorney at each and every stage and during the progress of this cause now on this the _6th_ day of _Oct_, 19_95_ said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF _Rape 1st_ AS CHARGED IN THE INDICTMENT"

_____
JUDGE

10-6-          1995

In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Rape 1st_ as charged in the indictment. Defendant being asked if he had anything to say why the sentence of law should not be pronounced upon him, the Defendant says nothing but pre-sentence report is requested by _Deft_.

Hearing set for _10-27-_ 19_95_ at _9:00_ A. M.

_____
JUDGE

10-27          1995

The Court therefore adjudges the Defendant guilty of _Rape 1st_

The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of Law should not be pronounced upon him says nothing. It is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of _99 Years_

Defendant is further ordered to pay a Fine of _____, restitution in the amount of _____ to _TBA_ and a victim compensation assessment of $ _500.00_ Defendant is given credit for days spent incarcerated pending trial.

_____
JUDGE

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER::

WARRANT NUMBER: WR 94 000269.00
OTHER CASE NBR: Dc-94-368 "

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT     B. C. MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

    ON OR ABOUT MAR 1994 - APR 1994, B. C. MONEY, SR., A MALE DID ENGAGE
IN SEXUAL INTERCOURSE WITH AMBER CELESTE MONEY, A FEMALE, BY FORCEABLE
COMPULSION AT THE FALLS LOCATED BEHIND THE RESIDENCE OF B. C. MONEY, SR.,
IN VIOLATION OF 13A-006-061                        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE      13A-006-061      F

WITNESS FOR THE STATE

_____
_____
_____
_____

OPERATOR: COB     DATE: 06/08/94

W A R R A N T

STATE OF ALABAMA                 HENRY COUNTY                    DISTRICT COURT

AGENCY NUMBER:                              WARRANT NUMBER: WR 94 000269.00
                                            OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST   B. C. MONEY SR   AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF HENRY COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
              RAPE 1ST DEGREE   CLASS:A   TYPE:F
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE INTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_19th_ DAY OF _July_ 19_94_, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 08 DAY OF JUNE, 1994.

BOND SET AT: $100,000.00      BOND TYPE:

_Connie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE        13A-006-061        F

NAME: B. C. MONEY SR                    ALIAS:
ADDRESS: RT 1                           ALIAS:
ADDRESS:
CITY: COLUMBIA           STATE: AL        ZIP: 36319 0000

EMPLOYMENT:
DOB: 03/22/22   RACE: W   SEX: M   HAIR:
EYE:     HEIGHT: 0'00"   WEIGHT: 000
SID: 000000000  SSN: 420503187

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ )  PLACING DEFENDANT IN THE HENRY COUNTY JAIL

(   )  RELEASING DEFENDANT ON APPEARANCE BOND


THIS _8th_ DAY OF _June_ 19 _94_

                        _Lawton Ed Armstrong_
                        SHERIFF

                        _Clyde Hornsby_
                        BY

OPERATOR: COB      LAST UPDATE: 060894

| State of Alabama Unified Judicial System | CONSOLIDATED BOND (District Court, Grand Jury, Circuit Court) | Case Number |
| --- | --- | --- |
| Form C-52          Rev 6/88 | | |

IN THE _____ *District* _____ COURT OF _____ *Henry* _____ COUNTY

STATE OF ALABAMA          v.          *Bragg C. Money, Sr.*

We _____ *Bragg C. Money, Sr.* _____ (Defendant) as principal

and we _____ as sureties

_____ (please print)

agree to pay the State of Alabama $ *10,000.00* _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date) *Aug. 16, 1994*

at (Time) *9:00* or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _____

*Rape 1st degree* _____

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execution or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

x *B. C. Money Rt 1 Box 35 Columbia, Ala 36319*
Signature of Defendant                 Address (Print)                         City

x *Ruby Money Columbia Ala Rt 1 Box 35 36319*
Signature of Surety                    Address (Print)                         City

x *Travis Money Rt. 1 Box 33, Columbia, Al.*
Signature of Surety                    Address (Print)                         City

*James Money P O Box 481 Columbia Al 36319*
Signature of Surety                    Address (Print)                         City

*Retta B. Bristow, Rt. 1 Box 32-B, Columbia, Al. 36319*
Signature of Surety                    Address (Print)                         City

*July 21, 1994*
Date

Approved by: Sheriff/Judge

By: Deputy Sheriff

**Defendant's Information**

| | | |
| --- | --- | --- |
| DOB _____ | Sex *M* |
| S. S. No. _____ | Race *W* |
| DL No. _____ State ( ) | Phone No. _____ |

☑ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND      COURT RECORD : Original  DEFENDANT : Copy      SURETY : Copy

CASE ACTION SUMMARY
DISTRICT CRIMINAL                          CASE: DC 94 000368 00

| IN THE DISTRICT COURT OF HENRY COUNTY | JUDGE: CWW |

STATE OF ALABAMA                VS        MONEY B C SR
                                          RT 1
C  E: DC 94 000368 00

                                          COLUMBIA          AL  36319-0000

DOB: 03/22/22   RACE: W   SEX:  M   HT:   000   WT: 000   HR:        EYE:
SSN: 420503187    ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE              CODE1: RAP1 LIT: RAPE 1ST DEGREE TYPE: F
CHARGE2:                             CODE2: 0000                      TYPE: F
CHARGE3:                             CODE3: 0000                      TYPE: F
MORE?:        OFFENSE DATE:   /  /   AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS:    /  /            DATE ARRESTED: 06/08/94
DATE    INDICTED:    /  /            DATE   FILED: 06/29/94
DATE    RELEASED:    /  /            DATE  HEARING:   /  /
        BOND AMOUNT:   $100,000.00   SURETIES:

DATE 1: 07/19/94  DESC:  0000    TIME:   0900 A
DATE 2:           DESC:  0000    TIME:   0000

DEF/ATY:                             TYPE:                     TYPE:
PROSECUTOR:

OTH CSE: 0000000000    CHK/TICKET NO:               GRAND JURY:
COURT REPORTER          SID NO: C00000000
DEF STATUS: JAIL    JURY DEMAND:                    OPID: SAS

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |

07-21-94 | Bond is hereby reduced to $10,000.00.  Defendant, if
         | released, is released in the custody of Mrs. B. C. Money,
         | and he shall remain in her custody until this case is
         | finally determined.  As a further condition of Defendants
         | release, he shall not be in the presence of any of the
         | alleged victims unless accompanied by another adult
         | person.

CHARLES W. WOODHAM, JUDGE

7-26-94

Grand Jury No. _____194_____        Case No. _____

INDICTMENT

The State of Alabama
HENRY COUNTY                        }

CIRCUIT COURT
TWENTIETH JUDICIAL CIRCUIT

July        Term, 19 94

     The grand jury of said county charge that, before the finding of the indictment,

  B.C. Money, Sr.

whose name is otherwise unknown to the Grand Jury,

   a male, did engage in sexual intercourse with Amber Celeste

   Money, a female, by forcible compulsion, in violation of

   13A-6-61 of the Code of Alabama, against the peace and dignity

   of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Henry County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE
vs.
B.C. Money, Sr.

S.I.D No.

D.O.A.

RAPE, 1ST DEGREE

Witnesses:   Amber Celeste Money
Rt
Columbia, Al

Clyde Hornsby
SO
Abbeville, Al

-89-

A TRUE BILL

_Milton Willis_
Foreman of the Grand Jury

Presented to the presiding Judge in open court
foreman of the Grand Jury, in the presence of
court by order of the court on this the _____
day of _____, 19____. Grand Jurors and filed in open
day of _July_ , 19____.

_Ernest Buchanan_
Clerk

## INDICTMENT

### NO PROSECUTOR

Upon the arrest of Defendant let him be
admitted to bail on giving bond in the sum of
_Twenty Five Thousand_
_____ Dollars
with security to be approved by the Sheriff.

This _29th_ day of _July_, 1977

_Cecil Worden_
Judge Presiding

| State of Alabama Unified Judicial System | CONSOLIDATED BOND (District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|
| Form C-52    Rev 6/88 | | |

IN THE _____Circuit_____ COURT OF _____HENRY_____ COUNTY

STATE OF ALABAMA          v.

We _____BRAGG COMER MONEY SR_____ (Defendant) as principal

and we _____ as sureties

_____ (please print) _____

agree to pay the State of Alabama _____$ 25,000. 00_____ Dollars

unless the above named defendant appears before the District Court of said County on (Date): _OCT. 5, 1994_

at (Time) _9:00 AM_ or at the next session of Circuit Court of said County; there to await the action by the grand jury and from session to session thereafter until discharged by law to answer to the charge of _RAPE 1ST DEGREE_

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execution or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

x _B. C. Money_          _RT 1 BOX 35, COLUMBIA, AL_
Signature of Defendant          Address (Print)          City

_Fannie Money_          _Rt 1, Box 33 COLUMBIA, AL_
Signature of Surety          Address (Print)          City

_James O Money_          _PO Box 181 Columbia AL 36319_
Signature of Surety          Address (Print)          City

_Ricky Money_          _Columbia Ala_
Signature of Surety          Address (Print)          City
          _Columbia AL 36319_
_Jennie Fen_          _RT Box1 Louisville, AL 36048_
Signature of Surety          Address (Print)          City

_8-12-94_          _Lawton Ed Armstrong_
Date          Approved by Sheriff/Judge
          _Christi W Smith_
          By: Deputy Sheriff

| Defendant's Information | |
|---|---|
| DOB _03-22-22_ | Sex _M_ |
| S. S. No. _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_ | Race _W_ |
| DL No. _0833087_    State ( _AL_ ) | Phone No. _696-4691_ |

☑ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND     COURT RECORD: Original   DEFENDANT: Copy     SURETY: Copy

| State of Alabama Unified Judicial System | **JURY VERDICT** | Case Number |
|---|---|---|
| Form C-50      Rev 6/88 | | CC-94-067 |

IN THE CIRCUIT COURT OF _____ HENRY _____ COUNTY

**Plaintiff/State**  OF ALABAMA              **v. Defendant**  B. C. MONEY, SR.

---

We, the Jury, find the defendant, B. C. Money, Sr., guilty of Rape, 1st Degree,
as charged in the Indictment.

_Bonnie G. BIBS_
Name of Foreman (please print)

_Bonnie Gibb_
Foreman Signature

Date filed _Oct 6 - 95_

_Connie Burdeshaw_                    By:
Clerk of Circuit Court

CASE ACTION SUMMARY
CIRCUIT CRIMINAL                         CASE: CC 94 000067 00

IN THE CIRCUIT COURT OF    HENRY   COUNTY                 JUDGE: SEJ MC

STATE OF ALABAMA                    VS      MONEY B C SR
                                            RT 1
    BE: CC 94 000067 00
                                            COLUMBIA        AL 36319-0000

DOB: 03/22/22   RACE: W   SEX:  M  HT:  000   WT: 000  HR:      EYE:
SSN: 420503187    ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE            CODE1: RAP1 LIT: RAPE 1ST DEGREE TYPE: F
CHARGE2:                            CODE2: 0000                     TYPE: F
CHARGES:                            CODES: 0000                     TYPE: F
MORE?:        OFFENSE DATE: __/__/__   AGENCY/OFFICER: 0070000HORNSBY

DATE WAR/CAP ISS: __/__/__          DATE ARRESTED: 06/06/94
DATE   INDICTED: 07/27/94           DATE   FILED: 08/01/94
DATE   RELEASED: __/__/__           DATE   HEARING: __/__/__
    BOND AMOUNT:   $25,000.00           SURETIES:

DATE 1: 10/05/94  DESC: ARRG    TIME: 0900 A
DATE 2: _____  DESC: 0000    TIME: 0000

DEF/ATY:  RAMSEY, RICHARD H, IV     TYPE: A                    TYPE:
PROSECUTOR:

OTH CSE: 94000366(0)   CHK/TICKET NO:              GRAND JURY: 194
COURT REPORTER          SID NO: 00000000
DEF STATUS: BOND    JURY DEMAND:                   OPID: GYE

    DATE           ACTIONS, JUDGMENTS, CASE NOTES

| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR        $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV    080194 |
| 08/01/94 | CAPS | CAPIAS ISSUED |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94    SENT TO DEFENSE ATTORNEY 1 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |

10/14/94    Motion to dismiss denied. Crispi, Judge

STATE OF ALABAMA   VS   MONEY B C SR

| | | |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR         #25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED              080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE        SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT |   FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT |   STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT |   TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT |   PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT |   MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT |   CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPELL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT |   DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |

11-4-94   Order filed by Crespi

12-5-94   Motion to Consolidate
          filed by C. Amos

12-2-94   Motion to Suppress
          filed by R. Ramsey IV

12/7/94   I have not received the files in these cases in time to set
          a consolidation hearing. I have therefore denied the motion
          to consolidate. Notify. Crespi, Judge.

STATE OF ALABAMA  VS  MONEY B C SR



| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR        $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H., IV |
| 08/01/94 | CAFS | CAPIAS ISSUED                080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPELL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |

1/21/95 Continued unreached cxp; Ag

OCS125                          ALABAMA JUDICIAL CENTER                    -96-
                                    CASE ACTION SUMMARY
                                                              CASE: CC 94 000067.00

IN THE CIRCUIT COURT OF    HENRY        COUNTY                    JUDGE: CLL

    STATE OF ALABAMA  VS  MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR            $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED              080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE       SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CLLEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPELL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR  TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |

3/8/95 = State's Motion to Consolidate granted - Defendant's
Motion to Continue is denied - notify: L Little, Judge

IN THE CIRCUIT COURT OF HENRY COUNTY                          JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| Date | Code | Description |
|------|------|-------------|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR            $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED                 C80194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE        SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | TO THE DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA MADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPELL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |
| 03/08/95 | TEXT | MOTION TO CONSOLIDATE GRANTED; MOTION TO CONTINUE |
| 03/08/95 | TEXT | DENIED /S/ LITTLE |
| 03/09/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/15/95 | TEXT | DEFENDANT'S ADDITIONAL OBJECTION TO MOTION TO |
| 03/15/95 | TEXT | CONSOLIDATE FILED BY R RAMSEY IV |

3-16-95 DV RRW   Defendant's Additional Objection to Consolidation
is denied. Notify. /s/ Little, Judge

3-21-95   Case Continued for deft & state
/s/ Little Judge

State of Alabama
Unified Judicial System

**CASE ACTION SUMMARY**
CONTINUATION

Form C-7  Rev. 2/79

Case Number

CC 94 067
ID    YR    Number

Style:    B.C. Money, Jr.

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

10-6- 19 95

Defendant heretofore having been indicted and arraigned upon
an indictment on a charge of _Rape 1st_
and heretofore having pleaded not guilty thereto, issue joined on
said plea. Thereupon comes a jury of good and lawful men and
women, to-wit: _Bonnie F. Gibbs_
and eleven others, who being duly empanelled, sworn and
charged by the Court according to law before whom the trial
of this cause was entered upon and continued from day to
day and from time to time and indicted _B. C._
_Money, Jr._, being in open Court with his attorney at each
and every stage and saying all proceedings in this cause,
now on this the _6th_ day of _Oct._, 19 95
said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF
_Rape 1st_
AS CHARGED IN THE INDICTMENT."

_____
JUDGE

10-6- 19 95

In accordance with the verdict of the jury, Defendant is
hereby adjudged guilty of _Rape 1st_
as charged in the indictment. Defendant being asked if he
had anything to say why the sentence of law should not be
pronounced upon him, the Defendant says nothing but pre-
sentence report is requested by _Dept._
Hearing set for _10-27-_ 19 95 at ____. 10-27 19 95

_____
JUDGE

____. The Court therefore adjudges the Defendant guilty of
_Rape 1st_

The Defendant and his Attorney being in open Court and
being asked by the Court if he has anything to say why the
sentence of Law should not be pronounced upon him says
nothing. It is therefore considered by the Court and it is the
judgement and sentence of the Court that this Defendant be
imprisoned in the penitentiary of the State of Alabama for
a period of _99 years_
Defendant is further ordered to pay a fine of
restitution in the amount of _____ to _TBD_
and a victim compensation assessment of _500.00_
Defendant is given credit for days spent incarcerated pending
trial.

_____
JUDGE

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000270.00
OTHER CASE NBR: DC-94-369 "

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED  HORNSBY CLYDE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    B C MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

DID ON OR ABOUT  06/06/94 , B. C. MONEY, SR., SUBJECT AMBER CELEST MONEY
TO SEXUAL CONTACT BY FORCIBLE COMPULSION OR HE/SHE BEING SIXTEEN YEARS OF
AGE OR OLDER, DID SUBJECT TO SEXUAL CONTACT AMBER CELEST MONEY_____,
WHO IS LESS THAN TWELVE YEARS OF AGE,
IN VIOLATION OF 13A-006-066,                        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: SEXUAL ABUSE 1ST DEG  13A-006-066      F
_____

WITNESS FOR THE STATE

HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
MONEY AMBER CELESTE/RT//COLUMBIA/36319
FLAHERTY HEATHER/515 COLUMBIA RD//ABBEVILLE/36310
AMOS TAMMY/RT 1 BOX 24/OLD RIVER ROAD/SHORTERVILLE/36373
MONEY PATRICIA E/RT 1/COLUMBIA/36319
RUSHING BETH/DHR1//ABBEVILLE/36310

OPERATOR: COB    DATE: 06/08/94

W A R R A N T

STATE OF ALABAMA                    HENRY COUNTY                    DISTRICT COURT

AGENCY NUMBER:                              WARRANT NUMBER: WR 94 000270.00
                                            OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    B C MONEY SR   AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF HENRY COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
                    SEXUAL ABUSE 1ST DEG   CLASS:C   TYPE:F
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN   THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
___19th___ DAY OF __July__ 19_92_, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 08 DAY OF JUNE, 1994.

BOND SET AT: _$25,000.00_     BOND TYPE:

_Connie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

---

CHARGES: SEXUAL ABUSE 1ST DEG   13A-006-066        F

NAME: B C MONEY SR                          ALIAS:
ADDRESS: RT 1                               ALIAS:
ADDRESS:
CITY: COLUMBIA            STATE: AL      ZIP: 36319 0000

EMPLOYMENT:
DOB: 03/22/22    RACE: W    SEX: M    HAIR:
EYE:        HEIGHT: 0'00"   WEIGHT: 000
SID: 00000000  SSN: 420503187

---

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( L ) PLACING DEFENDANT IN THE HENRY COUNTY JAIL

( ) RELEASING DEFENDANT ON APPEARANCE BOND

THIS ___8 TH___ DAY OF ___JUNE___ 19 _94_

_Lawton Ed Armstrong_
SHERIFF

_Clyde Hornsby_
BY

---

COMPLAINANT:   HORNSBY CLYDE
               C/O HENRY CO SO

               ABBEVILLE   AL   36310

OPERATOR: COB      LAST UPDATE: 060894

CASE ACTION SUMMARY
DISTRICT CRIMINAL                                    CASE: DC 94 000369 00

| IN THE DISTRICT COURT OF HENRY COUNTY | JUDGE: CWW |

STATE OF ALABAMA                        VS         MONEY B C SR
                                                   RT 1
CASE: DC 94 000369 00
                                                   COLUMBIA        AL  36319-0000

DOB: 03/22/22   RACE: W   SEX:   M   HT:   000   WT: 000   HR:          EYE:
SSN: 420503187   ALIAS NAMES:

CHARGE1: SEXUAL ABUSE 1ST           CODE1:  SXA1  LIT: SEXUAL ABUSE 1ST TYPE: F
CHARGE2:                            CODE2:  0000                        TYPE: F
CHARGE3:                            CODE3:  0000                        TYPE: F
MORE?:          OFFENSE DATE: 06/06/94    AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS: __/__/__          DATE ARRESTED: 06/08/94
DATE     INDICTED: __/__/__         DATE    FILED: 06/29/94
DATE    RELEASED:                   DATE  HEARING: __/__/__
     BOND AMOUNT:     $25,000.00            SURETIES:

DATE 1: 07/19/94  DESC:  0000    TIME:   0900 A
DATE 2: _____  DESC:  0000    TIME:   0000

DEF/ATY:                             TYPE:                    TYPE:
PROSECUTOR:

OTH CSE: 0000000000      CHK/TICKET NO:                GRAND JURY:
COURT REPORTER            SID NO: 000000000
DEF STATUS: JAIL    JURY DEMAND:                        OPID: SAS

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 07-21-94 | Bond is hereby reduced to $5,000.00.  Defendant, if released, is released in the custody of Mrs. B. C. Money, and he shall remain in her custody until this case is finally determined.  As a further condition of Defendants release, he shall not be in the presence of any of the alleged victims unless accompanied by another adult person. |

CHARLES W. WOODHAM, JUDGE

7-26-94 GQ

| State of Alabama<br>Unified Judicial System<br><br>Form C-52  Rev 6/88 | **CONSOLIDATED BOND**<br>(District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|

IN THE _____ *District* _____ COURT OF _____ *Henry* _____ COUNTY

STATE OF ALABAMA  v.  *Bragg Comer Morey, Sr.*

We _____ *Bragg Comer Morey, Sr.* _____ (Defendant) as principal

and we _____ as sureties

_____

(please print)

agree to pay the State of Alabama _____ $5,000 00 _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date): *Aug. 16, 1994*

at (Time) *9:00* _____ or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _____

*Sexual Abuse 1st Degree*

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execution or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

x *B. C. Morey Rt 1 Box 35 Columbia, Ala. 36319*

Signature of Defendant / Address (Print) / City

x *Ruby Morey Columbia Ala Rt 1 Box 35 36319*

Signature of Surety / Address (Print) / City

x *H. Jane B Morey Rt. 1 Box 33, Columbia, Al.*

Signature of Surety / Address (Print) / City

*James P Morey PO Box 181 Columbia Al. 36319*

Signature of Surety / Address (Print) / City

*Retta B. Gristad, Rt. 1 Box 32-B Columbia, Al. 36319*

Signature of Surety / Address (Print) / City

*July 21, 1994*

Date

Approved by Sheriff/Judge

By: Deputy Sheriff

| **Defendant's Information** | |
|---|---|
| DOB _____ | Sex *Male* |
| S. S. No. _____ | Race *White* |
| DL No. _____  State ( ) | Phone No. _____ |

☒ Appearance Bond - Property  ☐ Appearance Bond - Recognizance  ☐ Bail Bond  ☐ Cash Bond

CONSOLIDATED BOND  COURT RECORD : Original  DEFENDANT : Copy  SURETY : Copy

Grand Jury No. ___195___                                    Case No. _____

---

## INDICTMENT

The State of Alabama }                    CIRCUIT COURT
HENRY COUNTY                        TWENTIETH JUDICIAL CIRCUIT

July        Term, 19 94

The grand jury of said county charge that, before the finding of the indictment,

B.C. Money, Sr.

whose name is otherwise unknown to the Grand Jury,

he being sixteen years of age or older, did subject to sexual

contact Amber Celeste Money, who is less than twelve years of

age, in violation 13A-6-66 of the Code of Alabama, against the

peace and dignity of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Henry County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE
vs.
B.C. Money, Sr.

I.D. No.

O.:

SEXUAL ABUSE 1ST DEGREE

Witnesses:      Amber Celeste Money
                Rt
                Columbia, Al

                Clyde Hornsby
                SO
                Abbeville, Al

                Heather Flaherty
                515 Columbia Rd
                Abbeville, Al

                Tammy Amos
                Rt 1 Box 24
                Shorterville, Al   36373

                Patricia Money
                Rt 1
                Columbia, Al

                (Over)

Continued Witnesses

Beth Rushing
DHR
Abbeville, Al

## A TRUE BILL

_____
Foreman of the Grand Jury

Presented to the presiding Judge in open court foreman of the Grand Jury, in the presence of Grand Jurors and filed in open court by order of the court on this the ___ day of _____, 19 __.

_____
Clerk

## INDICTMENT

### NO PROSECUTOR

Upon the arrest of Defendant let him be admitted to bail on giving bond in the sum of _____ Thousand _____ Dollars

with security to be approved by the Sheriff.

This 26th day of July, 19 94

_____
Judge Presiding

| State of Alabama<br>Unified Judicial System<br><br>Form C-52    Rev 6/88 | **CONSOLIDATED BOND**<br>**(District Court, Grand Jury, Circuit Court)** | Case Number |
|---|---|---|

IN THE ___Circuit___ COURT OF ___Henry___ COUNTY

STATE OF ALABAMA    v.

We ___Bragg Comer Money SR___ (Defendant) as principal

and we _____

_____ as sureties
(please print)

agree to pay the State of Alabama ___$ 10,000.00___ Dollars

unless the above named defendant appears before the District Court of said County on (Date); ___Oct 5, 1994___

at (Time) ___9:00 AM___ or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of ___Sexual___

___Abuse 1st Degree___

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the

amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execu-

tion or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we espe-

cially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time

as the undersigned are duly exonerated.

| | | |
|---|---|---|
| ___B. C. Money___ | ___RT 1 Box 35, Columbia, AL___ | |
| Signature of Defendant | Address (Print) | City |
| ___Frank Moore___ | ___Rt 1, Box 33 Columbia, al___ | |
| Signature of Surety | Address (Print) | City |
| ___Samuel Money___ | ___PO Box 181 Columbia, Al.___ | |
| Signature of Surety | Address (Print) | City |
| ___Ruby Money___ | ___Columbia Ala.___ | |
| Signature of Surety | Address (Print) | City |
| ___Rose Mays___ | ___Columbia AL___<br>___Louisville AL.___ | |
| Signature of Surety | Address (Print) | City |

___8-12-94___
Date

___Lawton Ed Armstrong___
Approved by: Sheriff/Judge

___Christy Smith___
By: Deputy Sheriff

| **Defendant's Information** | |
|---|---|
| DOB ___03-22-22___ | Sex ___M___ |
| S. S. No. ___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___ | Race ___W___ |
| DL No. ___0833087___    State ( ___AL___ ) | Phone No. ___696-4691___ |

☑ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND    COURT RECORD: Original    DEFENDANT: Copy    SURETY: Copy

| State of Alabama Unified Judicial System | **JURY VERDICT** | Case Number |
|---|---|---|
| Form C-50        Rev 6/88 | | CC-94-068 |

IN THE CIRCUIT COURT OF _____ HENRY _____ COUNTY

Plaintiff/State    OF ALABAMA        **v. Defendant**   B. C. MONEY, SR.

We, the Jury, find the defendant, B. C. Money, Sr., guilty of Sexual Abuse, 1st degree, as charged in the Indictment.

_Bonnie Gish_
Name of Foreman (please print)

_Bonnie Gish_
Foreman Signature

Date filed _oct 6 – 95_

_Connie Burlask_
Clerk of Circuit Court                              By:

ALABAMA JUDICIAL INFORMATION CENTER
CASE ACTION SUMMARY
CIRCUIT CRIMINAL

CASE: CC 94 000068 00

| IN THE CIRCUIT COURT OF HENRY COUNTY | JUDGE: M-C |

STATE OF ALABAMA                    VS         MONEY B C SR
                                               RT 1

CASE: CC 94 000068 00

                                               COLUMBIA         AL 36319-0000

DOB: 03/22/22  RACE: W  SEX: M  HT: 000  WT: 000  HR:        EYE:
SSN: 420503187    ALIAS NAMES:

CHARGE1: SEXUAL ABUSE 1ST              CODE1: SXA1 LIT: SEXUAL ABUSE 1ST TYPE: F
CHARGE2:                               CODE2: C000                       TYPE: F
CHARGE3:                               CODE3: C000                       TYPE: F
MORE?:        OFFENSE DATE: 06/06/94   AGENCY/OFFICER: 037000 HORNSBY

DATE WAR/CAP ISS:                      DATE ARRESTED: 06/08/94
DATE    INDICTED: 07/29/94             DATE    FILED: 08/01/94
DATE    RELEASED:                      DATE    HEARING:    /  /
     BOND AMOUNT:    $10,000.00        SURETIES:     /  /

DATE 1: 10/05/94  DESC: ARRG  TIME: 0900 A
DATE 2:           DESC: 0000  TIME: 0000

DEF/ATY:  RAMSEY, RICHARD H, IV   TYPE: A              TYPE:
PROSECUTOR:

OTH CSE: 9400036900     CHK/TICKET NO:              GRAND JURY: 195
COURT REPORTER            SID NO: 000000000
DEF STATUS: BOND    JURY DEMAND:                       OPID: GYE

   DATE          ACTIONS, JUDGMENTS, CASE NOTES

| 06/06/94 | OFDT | OFFENSE DATE OF:            06/06/94 |
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON:  06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON:  07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR        $10,000.00 |
| 08/01/94 | YOOF | DEFENDANT YOUTHFUL OFFENDER NOT APPROVED |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT:  RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED                080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE       SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |

10/14/94  motion to dismiss denied Crespi judge

STATE OF ALABAMA  VS  MONEY B C SR

| 06/06/94 | OFDT | OFFENSE DATE OF: 06/06/94 |
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 8/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR $10,000.00 |
| 08/01/94 | YOOF | DEFENDANT YOUTHFUL OFFENDER NOT APPROVED |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED 080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |

11-4-94  Order filed by Crespi

11-5-94  Motion to Consolidate

filed by C. Amos

12-2-94  Motion to Suppress

filed by R. Ramsey IV

12/7/94  I have not received the files in these cases in time to set
a consolidation hearing.  I have therefore denied the motion
to consolidate.  Notify. crespi, judge

STATE OF ALABAMA VS MONEY B C SR

| | | |
|---|---|---|
| 06/06/94 | OFDT | OFFENSE DATE OF: 06/06/94 |
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR $10,000.00 |
| 08/01/94 | YOOF | DEFENDANT YOUTHFUL OFFENDER NOT APPROVED |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAFS | CAPIAS ISSUED 080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 2/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 2/13/94 | TEXT | FILED BY R RAMSEY IV |

12/21/94 Continued unreached Crespi, judge

IN THE CIRCUIT COURT OF HENRY COUNTY                          JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/06/94 | OFDT | OFFENSE DATE OF: 06/06/94 |
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR $10,000.00 |
| 08/01/94 | YOOF | DEFENDANT YOUTHFUL OFFENDER NOT APPROVED |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED 080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |

3/2/95 - State's Motion to Consolidate is granted -
Defendant's Motion to Continue is granted Denied - Notify - S. Little,
Judge

JUDICIAL DATA CENTER - 712-
CASE ACTION SUMMARY CONTINUATION
CASE: CC 94 000068.00

IN THE CIRCUIT COURT OF HENRY COUNTY                    JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/06/94 | OFDT | OFFENSE DATE OF: 06/06/94 |
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR        $10,000.00 |
| 08/01/94 | YOOF | DEFENDANT YOUTHFUL OFFENDER NOT APPROVED |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED               080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE        SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELEST MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 1/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |
| 03/08/95 | TEXT | MOTION TO CONSOLIDATE GRANTED; MOTION TO CONTINUE |
| 03/08/95 | TEXT | DENIED /S/ LITTLE |
| 03/09/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/15/95 | TEXT | DEFENDANT'S ADDITIONAL OBJECTION TO MOTION TO |
| 03/15/95 | TEXT | CONSOLIDATE FILED BY R RAMSEY IV |

3-16-95  DV  Defendant's Additional Objection to Consolidation
RRIV     is denied. Notify J. Little, Judge

3-21-95  Case Continued for deft
         & State - J. Fitts, Judge

State of Alabama
Unified Judicial System

# CASE ACTION SUMMARY
## CONTINUATION

Form C-7  Rev. 2/79

Case Number

LC 94 - 068
ID  YR  Number

Style: B. C. Money, Sr.

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| | _10-6-_ 19 _95_ |
| | Defendant heretofore having been indicted and arraigned upon an indictment on a charge of _Sexual Abuse 1st_ and heretofore having plead not guilty thereto, issue joined on said plea. Thereupon comes a jury of good and lawful men and women, to-wit, _Bonnie J. Gibbs_ and eleven others, who being duly empaneled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant, _B. C. Money, Sr._, being in open Court with his attorney, at each and every stage and during all the proceedings in this cause, now on this the _12th_ day of _Oct._ 19 _95_ said jurors upon their oaths do say: |
| | "WE, THE JURY, FIND THE DEFENDANT GUILTY OF _Sexual Abuse 1st_ AS CHARGED IN THE INDICTMENT." |
| | JUDGE |
| | _10-6-_ 19 _95_ |
| | In accordance with the verdict of the jury, Defendant is hereby adjudged guilty of _Sexual Abuse 1st_ as charged in the indictment. Defendant being asked if he had anything to say why the sentence of law should not be pronounced upon him, the Defendant says nothing but presentence report is requested by _Deft_ |
| | Hearing set for _10-27-_ 19 _95_ at _9:00_ A. M. |
| | JUDGE |
| | _10-27_ 19 _95_ |
| | The Court therefore adjudges the Defendant guilty of _Sexual Abuse_ The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of Law should not be pronounced upon him says nothing. It is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of _10 years_ Defendant is further ordered to pay a Fine of _____ restitution in the amount of _____ to _TBD_ and a victim compensation assessment of $ _500.00_ Defendant is given credit for days spent incarcerated pending trial. |
| | JUDGE |

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000274.00
OTHER CASE NBR: DC-94-370

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF HENRY COUNTY, ALABAMA, PERSONALLY APPEARED   HORNSBY CLY
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR BELIEVING, AND DOES BELIEVE THAT    B. C. MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

DID ON OR ABOUT SEP 1993 - DEC 1993, A MALE, ENGAGE IN SEXUAL INTERCOURSE WITH   AMANDA HADDAN              , A FEMALE, BY FORCIBLE COMPULSION, BEHIND A TOOL SHED ON THE PROPERTY OF B. C. MONEY, SR.
IN VIOLATION OF 13A-006-061            OF THE CODE OF ALABAMA, AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 09 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE      13A-006-061      F

WITNESS FOR THE STATE

HORNSBY CLY////00000
HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
MONEY AMBER CELESTE/RT//COLUMBIA/36319
FLAHERTY HEATHER/515 COLUMBIA RD//ABBEVILLE/36310
AMOS TAMMY/RT 1 BOX 24/OLD RIVER ROAD/SHORTERVILLE/36373
MONEY PATRICIA E/RT 1//COLUMBIA/36319

OPERATOR: COB    DATE: 06/09/94

W A R R A N T

STATE OF ALABAMA          HENRY COUNTY                    DISTRICT COURT

AGENCY NUMBER:                          WARRANT NUMBER: WR 94 000274.00
                                        OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST   B. C. MONEY SR   AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF HENRY COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
            RAPE 1ST DEGREE   CLASS:A  TYPE:F
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
___19th___ DAY OF _July__ 19_94_, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 09 DAY OF JUNE, 1994.

BOND SET AT: $100,000 eww   BOND TYPE:

_Connie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE        13A-006-061      F

NAME: B. C. MONEY SR                    ALIAS:
ADDRESS: RT 1                           ALIAS:
ADDRESS:
CITY: COLUMBIA          STATE: AL       ZIP: 36319 0000

EMPLOYMENT:
DOB: 03/22/22   RACE: W    SEX: M    HAIR:
EYE:     HEIGHT: 0'00"   WEIGHT: 000
SID: 000000000  SSN: 420503187

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ )   PLACING DEFENDANT IN THE HENRY COUNTY JAIL

(   )   RELEASING DEFENDANT ON APPEARANCE BOND


THIS ___9th___ DAY OF _____JUNE_____ 19 _94_

                        SHERIFF _Lawton Ed Armstrong_

                        BY

COMPLAINANT:   HORNSBY CLY

            AL   00000

 ERATOR: COB      LAST UPDATE: 060994

-116-

ALABAMA JUDICIAL INFORMATION CENTER

CASE ACTION SUMMARY
DISTRICT CRIMINAL                          CASE: DC 94 000370 00

IN THE DISTRICT COURT OF     HENRY   COUNTY                    JUDGE: CWW

S _TE  OF ALABAMA              VS          MONEY R. C. SR
                                           RT 1
CASE: DC 94 000370 00
                                           COLUMBIA           AL  36319-0000

DOB: 03/22/22   RACE: W   SEX:  M   HT:  000   WT: 000   HR:        EYE:
SSN:420503187    ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE               CODE1: RAP1 LIT:RAPE 1ST DEGREE TYPE:F
CHARGE2:                               CODE2: 0000                     TYPE:F
CHARGE3:                               CODE3: 0000                     TYPE:F
MORE?:          OFFENSE DATE: __/__/__  AGENCY/OFFICER: 0370000SULLIVAN

DATE WAR/CAP ISS: __/__/       DATE ARRESTED: 06/09/94
DATE     INDICTED: __/__/       DATE    FILED: 06/29/94
DATE    RELEASED: __/__/       DATE  HEARING: __/__/
     BOND AMOUNT:    $100,000.00   SURETIES:

DATE 1: 07/19/94  DESC:  0000     TIME:  0900 A
DATE 2: _____ DESC:  0000     TIME:  0000

DEF/ATY: RAMSEY,RICHARD,IV              TYPE:                        TYPE:
PROSECUTOR:

OTH CSE: 0000000000     CHK/TICKET NO:                  GRAND JURY:
COURT REPORTER                    SID NO:00000000
DEF STATUS: JAIL    JURY DEMAND:                            OPID: SAS

     DATE          ACTIONS, JUDGMENTS, CASE NOTES

7.21.94 | Bond is hereby reduced to $10,000.00.
        | Defendant, if released, shall be released
        | in the custody of Mrs. B. C. Money,
        | and he shall remain in her
        | custody until this case is finally
        | determined.
        |                    Woodham Judge

7.21.94 | As a further condition of his
        | release, Defendant shall have no
        | contact with the alleged victim
        | without being accompanied by another
        | adult.
        |                    Woodham Judge

7-26-94 | FJ

| State of Alabama Unified Judicial System | **CONSOLIDATED BOND** (District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|
| Form C-52    Rev 6/88 | | |

IN THE _____ *District* _____ COURT OF _____ *Henry* _____ COUNTY

STATE OF ALABAMA    v. *Bragg Comer Money, S.*

We _____ *Bragg Comer Money, Sr.* _____ (Defendant) as principal

and we _____ as sureties

(please print)

agree to pay the State of Alabama _____ $ *10,000* ⁰⁰ _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date) *Aug. 16, 1994*

at (Time) *9:00* or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _____

_____ *Rape 1ˢᵗ degree* _____

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the

amount of the above bond.  We waive the benefit of all laws exempting property from levy and sale under execu-

tion or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we espe-

cially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time .

as the undersigned are duly exonerated.

X *B.C. Money* *Rt 1 Box 35 Columbia Ala 36319*

Signature of Defendant    Address (Print)    City

X *Ruby Money Columbia Ala Rt 1 Box 35 36319*

Signature of Surety    Address (Print)    City

X *Frank Money* *Rt. 1 Box 33, Columbia, Al.*

Signature of Surety    Address (Print)    City

X *James O Money* *PO Box 181 Columbia Al. 36319*

Signature of Surety    Address (Print)    City

*Rittie B. Ariston, Rt. 1 Box 33-B Columbia Al. 36319*

Signature of Surety    Address (Print)    City

*July 21, 1994*

Date

Approved by: Sheriff/Judge

By: Deputy Sheriff

| Defendant's Information | |
|---|---|
| DOB _____ | Sex *M* |
| S. S. No. _____ | Race *W* |
| DL No. _____ State ( ) | Phone No. _____ |

[X] Appearance Bond - Property    [ ] Appearance Bond - Recognizance    [ ] Bail Bond    [ ] Cash Bond

CONSOLIDATED BOND    COURT RECORD : Original  DEFENDANT : Copy    SURETY : Copy

Grand Jury No. _____196_____                                    Case No. _____

## INDICTMENT

The State of Alabama $\Big\}$                  CIRCUIT COURT

HENRY COUNTY                  TWENTIETH JUDICIAL CIRCUIT

July        Term, 19 94

The grand jury of said county charge that, before the finding of the indictment,

B.C. Money, Sr.

whose name is otherwise unknown to the Grand Jury,

a male, did engage in sexual intercourse with Amanda Haddan, a

female, by forcible compulsion, in violation of 13A-6-61 of the

Code of Alabama, against the peace and dignity of the State of

Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Henry County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE

vs.

B.C. Money, Sr.

S.I.D. No.

D.O.A.

RAPE, 1ST DEGREE

Witnesses:        Amanda Haddan

Clyde Hornsby
SO
Abbeville, Al

Amber Money
Rt
Columbia, Al

Heather Flaherty
515 Columbia Rd
Abbeville, Al

Patricia Money
Rt 1
Columbia, Al

A TRUE BILL

_Mildred Williams_
Foreman of the Grand Jury

Presented to the presiding Judge in open court
foreman of the Grand Jury, in the presence of
Grand Jurors and filed in open
court by order of the court on this the ___
day of _July_ 19 ___
19 ___

_Chones Bradford_
Clerk

## INDICTMENT

NO PROSECUTOR

Upon the arrest of Defendant let him be
admitted to bail on giving bond in the sum of
_Twenty Five_
_Thousand_ _____ Dollars
with security to be approved by the Sheriff.

This _29th_ day of _July_ 19 _54_

_O. W. Walker_
Judge Presiding

| State of Alabama<br>Unified Judicial System<br><br>Form C-52        Rev 6/88 | **CONSOLIDATED BOND**<br>(District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|

IN THE _____ _Circuit_ _____ COURT OF _____ _HENRY_ _____ COUNTY

STATE OF ALABAMA                v.

We _BRAGG  COMER  MONEY  SR_ _____ (Defendant) as principal

and we _____

_____ (please print) _____ as sureties

agree to pay the State of Alabama _____ _$25,000.00_ _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date): _OCT 5 1994_

at (Time) _9:00 AM_ or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _RAPE 1ST_

_DEGREE_

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the

amount of the above bond.  We waive the  benefit of all laws exempting property  from levy and  sale under execu-

tion or other process for the collection of debt, by the Constitution and Laws of the State of Alabama,  and we espe-

cially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is  agreed and understood that this is a continuing bond which shall remain in full force and effect until such time

as the undersigned are duly exonerated.

X _B. C. Money_ _____ _RT 1 BOX 35, COLUMBIA, AL_ _____
Signature of Defendant                Address (Print)                City

_Frank Money_ _____ _Rt Box 33  Columbia al_ _____
Signature of Surety                Address (Print)                City

_Janice Money_ _____ _Po Box 181  Columbia Al._ _____
Signature of Surety                Address (Print)                City

_Ruby Money_ _____ _Columbia, Al_ _____
Signature of Surety                Address (Print)                City

_Roger Money_ _____ _Columbia , AL_
_____ _____ _Louisville , AL._
Signature of Surety                Address (Print)                City

_8-12-94_ _____ _Lawton A Armstrong_
Date                Approved by: Sheriff/Judge

_Chris Smith_
By: Deputy Sheriff

| Defendant's Information | |
|---|---|
| DOB _03-22-22_ | Sex _M_ |
| S. S. No. _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_ | Race _W_ |
| DL No. _0833087_    State ( _AL_ ) | Phone No. _626-4691_ |

☑ Appearance Bond - Property        ☐ Appearance Bond - Recognizance        ☐ Bail Bond        ☐ Cash Bond

CONSOLIDATED BOND        COURT RECORD : Original   DEFENDANT : Copy        SURETY : Copy

| State of Alabama<br>Unified Judicial System | JURY VERDICT | Case Number |
|---|---|---|
| Form C-50     Rev 6/83 | | CC-94-069 |

IN THE CIRCUIT COURT OF _____ HENRY _____ COUNTY

**Plaintiff/State**   OF ALABAMA     **v. Defendant**   B. C. MONEY, SR.

---

We, the Jury, find the defendant, B. C. Money, Sr., guilty of Rape, 1st Degree, as charged in the Indictment.

Date filed ___Oct 6 - 95___

_Bonnie Gibbs_
Name of Foreman (please print)

_Bonnie b. Gibbs_
Foreman Signature

_Connie Bordelon_     By: ____
Clerk of Circuit Court

-128-

CASE ACTION SUMMARY
CIRCUIT CRIMINAL

CASE: CC 94 000069 00

IN THE CIRCUIT COURT OF · HENRY COUNTY          JUDGE: MC

STATE OF ALABAMA          VS          MONEY B C SR
                                      RT 1

CASE: CC 94 000069 00

                                      COLUMBIA          AL 36319-0000

DOB: 03/22/22   RACE: W   SEX:   M   HT:   000   WT: 000   HR:        EYE:
SSN: 420503187   ALIAS NAMES:

CHARGE1: RAPE 1ST DEGREE          CODE1: RAP1 LIT: RAPE 1ST DEGREE TYPE: F
CHARGE2:                          CODE2: 0000                      TYPE: F
CHARGE3:                          CODE3: 0000                      TYPE: F
MORE?:          OFFENSE DATE:   __/__/__   AGENCY/OFFICER: 0370000SULLIVAN

DATE WAR/CAP ISS:   __/__/__      DATE ARRESTED: 06/09/94
DATE    INDICTED: 07/27/94        DATE    FILED: 03/01/94
DATE    RELEASED:                 DATE  HEARING: __/__/__
       BOND AMOUNT:      $25,000.00      SURETIES:

DATE 1: 10/05/94 DESC:  ARRG      TIME:  0900 A
DATE 2: _____ DESC:  0000      TIME:  0000

DEF/ATY:     RAMSEY, RICHARD H, IV    TYPE: A                      TYPE:
PROSECUTOR:

OTH CSE: 9400037000     CHK/TICKET NO:               GRAND JURY: 196
COURT REPORTER          SID NO: CC0000000
DEF STATUS: BOND     JURY DEMAND:                     OPID: GYE

   DATE          ACTIONS, JUDGMENTS, CASE NOTES

| 06/09/94 | ARRS | DEFENDANT ARRESTED ON: 06/09/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR           $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED                    080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | OF STATE'S WITNESS |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |

R/V
10/14/94 Motion to dismiss denied. Crespi, Judge

| 06/09/94 | ARRS | DEFENDANT ARRESTED ON: 06/09/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 8.01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H. IV |
| 08/01/94 | CAPS | CAPIAS ISSUED 080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | OF STATE'S WITNESS |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |

11-4-94 order filed /s/ Crespi

11-5-94 motion to consolidate

filed by C. Amos

12-2-94 motion to suppress

filed by R. Ramsey IV

12/7/94 I have not received the files in these cases in time to set a consolidation hearing. I have therefore denied the motion to consolidate. Notify. Crespi, Judge

STATE OF ALABAMA  VS  MONEY B C SR

| 06/09/94 | ARRS | DEFENDANT ARRESTED ON: 06/09/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR        $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT:  RAMSEY, RICHARD H, IV |
| 08/01/94 | CAFS | CAPIAS ISSUED                  080194 |
| 09/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | OF STATE'S WITNESS |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |

12/21/94 Continued unreached Crops, Judge

IN THE CIRCUIT COURT OF HENRY COUNTY                                    JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| | | |
|---|---|---|
| 06/09/94 | ARRS | DEFENDANT ARRESTED ON: 06/09/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR          $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED          080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE       SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT |   FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT |   OF STATE'S WITNESS |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT |   TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT |   PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT |   MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT |   CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT |   DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT |   FILED BY RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR  TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |

3/8/55 - State's Motion to Consolidate is Granted
Defendant's Motion to Continue is denied. notify -
/S/ Little, Judge.

CASE ACTION SUMMARY

CASE: CC 94 000069.00

IN THE CIRCUIT COURT OF HENRY COUNTY                    JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| | | |
|---|---|---|
| 06/09/94 | ARRS | DEFENDANT ARRESTED ON: 06/09/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: RAPE 1ST DEGREE |
| 08/01/94 | BOND | BOND SET FOR          $25,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED          080194 |
| 08/12/94 | RELE | DEFENDANS RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT OF RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | OF STATE'S WITNESS |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE OF |
| 09/01/94 | TEXT | PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 2/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 2/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |
| 03/08/95 | TEXT | MOTION TO CONSOLIDATE GRANTED; MOTION TO CONTINUE |
| 03/08/95 | TEXT | DENIED /S/ LITTLE |
| 03/09/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/15/95 | TEXT | DEFENDANT'S ADDITIONAL OBJECTION TO MOTION TO |
| 03/15/95 | TEXT | CONSOLIDATE FILED BY R RAMSEY IV |

3-16-95  DV
RRIV        Defendant's Additional Objection to Consolidation
            is denied.  Notify.  Little, Judge

3-21-95   Case Continued for deft &
          State - L. Little, Judge

State of Alabama
Unified Judicial System

Form C-7  Rev. 2/79

# CASE ACTION SUMMARY
## CONTINUATION

Case Number

CC 94 069
ID   YR   Number

Style: B. C. Money, Li.

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

10-6 , 19 95

Defendant heretofore having been indicted and arraigned upon
an indictment on a charge of Rape 1st Deg
and heretofore having plead not guilty thereto, issue joined on
said plea, thereupon comes a jury of good and lawful men and
women, to-wit, Bonnie F. Fields
and eleven others, who being duly empanelled, sworn and
charged by the Court according to Law, before whom the trial
of this cause was entered upon and continued from day to
day and from time to time, said Defendant B C
Money Li, being in open Court with his attorney at each
and every stage and during all the proceedings in this cause,
now on this the 6 day of Oct , 19 95 ;
said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF

Rape 1st

AS CHARGED IN THE INDICTMENT."

JUDGE

10-6 , 19 95

In accordance with the verdict of the jury, Defendant is
hereby adjudged guilty of Rape 1st
as charged in the indictment. Defendant being asked if he
has anything to say why the sentence of law should not be
pronounced upon him, the Defendant says nothing but pre-
sentence report is requested by Deft

Hearing set for 10-27 , 19 95 at 9:00 A. M.   10-27 , 19 95

JUDGE

The Court therefore adjudges the Defendant guilty of
Rape 1st
The Defendant and his Attorney being in open Court and
being asked by the Court if he has anything to say why the
sentence of Law should not be pronounced upon him says
nothing. It is therefore considered by the Court and it is the
judgement and sentence of the Court that this Defendant be
imprisoned in the penitentiary of the State of Alabama for
a period of 99 years
Defendant is further ordered to pay a fine of
restitution in the amount of _____ to TBD
and a victim compensation assessment of $500.00
Defendant is given credit for days spent incarcerated pending
trial

JUDGE

ALABAMA JUDICIAL INFORMATION SYSTEM

\* \* \* IN THE DISTRICT COURT OF HENRY COUNTY \* \* \*

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000271.00
OTHER CASE NBR: DC-94-371

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    B. C. MONEY MONEY
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

ON OR ABOUT   OCT - DEC 1993, B. C. MONEY, SR., DID SUBJECT AMBER MONEY
TO SEXUAL CONTACT BY FORCIBLE COMPULSION OR HE/SHE BEING SIXTEEN YEARS OF
AGE OR OLDER, DID SUBJECT TO SEXUAL CONTACT ____AMBER MONEY_____,
WHO IS LESS THAN TWELVE YEARS OF AGE,
IN VIOLATION OF 13A-006-066                          OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_Clyde Honey_
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_Orrin Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: SEXUAL ABUSE 1ST DEG   13A-006-066       F

WITNESS FOR THE STATE

OPERATOR: COB     DATE: 06/08/94

# W A R R A N T

STATE OF ALABAMA                HENRY COUNTY                    DISTRICT COURT

AGENCY NUMBER:                          WARRANT NUMBER: WR 94 000271 00
                                        OTHER CASE NBR:

J ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    B. C. MONEY MONEY    AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF HENRY COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
                    SEXUAL ABUSE 1ST DEG   CLASS:C  TYPE:F
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
____19th____ DAY OF __July__ 19_94_, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 08 DAY OF JUNE, 1994.

BOND SET AT: $25,000.00     BOND TYPE:

_Connie Surdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

---

CHARGES: SEXUAL ABUSE 1ST DEG  13A-006-066        F

---

NAME: B. C. MONEY MONEY                      ALIAS:
ADDRESS: RT 1                                ALIAS:
ADDRESS:
CITY: COLUMBIA              STATE: AL        ZIP: 36319 0000

EMPLOYMENT:
DOB: 03/22/22   RACE: W   SEX: M   HAIR:
EYE:      HEIGHT: 0'00"   WEIGHT: 000
SID: 000000000  SSN: 420503187

---

## E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ )  PLACING DEFENDANT IN THE HENRY COUNTY JAIL

( )  RELEASING DEFENDANT ON APPEARANCE BOND

---

THIS ___8 th___ DAY OF ___JUNE___ 19 _94_

                              _Lawton Ed Armstrong_
                       SHERIFF

                              _Clyde Hornsby_
                       BY

---

ERATOR: COB       LAST UPDATE: 060894

ALABAMA JUDICIAL INFORMATION CENTER

## CASE ACTION SUMMARY
## DISTRICT CRIMINAL

CASE: DC 94 000371 00

| IN THE DISTRICT COURT OF HENRY COUNTY | JUDGE: CWW |

STATE OF ALABAMA                    VS        MONEY B C MONEY SR
                                              RT 1
CASE: DC 94 000371 00
                                              COLUMBIA        AL  36319-0000

DOB: 03/22/22   RACE: W   SEX:   M   HT: 000   WT: 000   HR:        EYE:
SSN:420503187   ALIAS NAMES:

CHARGE1: SEXUAL ABUSE 1ST              CODE1: SXA1 LIT:SEXUAL ABUSE 1ST TYPE:F
CHARGE2:                               CODE2: 0000                      TYPE:F
CHARGE3:                               CODE3: 0000                      TYPE:F
MORE?:         OFFENSE DATE: ___/___/___   AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS: ___/___/___          DATE ARRESTED: 06/08/94
DATE    INDICTED: ___/___/___          DATE    FILED: 06/29/94
DATE    RELEASED: ___/___/___          DATE  HEARING: ___/___/___
     BOND AMOUNT:     $25,000.00            SURETIES:

DATE 1: 07/19/94  DESC: 0000    TIME:  0900 A
DATE 2:           DESC: 0000    TIME:  0000

DEF/ATY:                                TYPE:                    TYPE:
PROSECUTOR:

OTH CSE: 0000000000   CHK/TICKET NO:                  GRAND JURY:
COURT REPORTER:            SID NO:000000000
DEF STATUS: JAIL     JURY DEMAND:                     OPID: SAS

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |

07-21-94 | Bond is hereby reduced to $5,000.00. Defendant, if released, is released in the custody of Mrs. B. C. Money, and he shall remain in her custody until this case is finally determined. As a further condition of Defendants release, he shall not be in the presence of any of the alleged victims unless accompanied by another adult person.

CHARLES W. WOODHAM, JUDGE

7-26-94  DO

| State of Alabama Unified Judicial System | **CONSOLIDATED BOND** (District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|
| Form C-52      Rev 6/88 | | |

IN THE _District_ COURT OF _Henry_ COUNTY

STATE OF ALABAMA        v.    _Bragg Comer Money, Sr._

We _Bragg Comer Money, Sr._ (Defendant) as principal

and we _____ as sureties
(please print)

agree to pay the State of Alabama _$ 5,000 00_ Dollars

unless the above named defendant appears before the District Court of said County on (Date) _Aug. 16, 1994_

at (Time) _9:00_ or at the next session of Circuit Court of said County; there to await the action by the grand

jury and from session to session thereafter until discharged by law to answer to the charge of _Sexual Abuse 1st Degree_

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execution or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

X _B. C. Money  Rt 1 Box 35 Columbia, Ala 36319_
Signature of Defendant        Address (Print)        City

X _Ruby Money  Columbia Ala R#1 Box 35  36319_
Signature of Surety        Address (Print)        City

X _Frank Money  Rt. 1 Box 33 Columbia Al_
Signature of Surety        Address (Print)        City

_James D. Money  Po Box 181 Columbia Al 36319_
Signature of Surety        Address (Print)        City

_Retha G. Griston  Rt 1 Box 32-B, Columbia, Al. 36319_
Signature of Surety        Address (Print)        City

_July 21, 1994_
Date

_____
Approved by Sheriff/Judge

By: Deputy Sheriff

| Defendant's Information | |
|---|---|
| DOB _____ | Sex _Male_ |
| S. S. No. _____ | Race _White_ |
| DL No. _____ State ( ) | Phone No. _____ |

☐ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND        COURT RECORD : Original    DEFENDANT : Copy        SURETY : Copy

Grand Jury No. _____197_____    Case No. _____

## INDICTMENT

The State of Alabama

HENRY COUNTY }

CIRCUIT COURT

TWENTIETH JUDICIAL CIRCUIT

July    Term, 19 94

The grand jury of said county charge that, before the finding of the indictment,

B.C. Money, Sr.

whose name is otherwise unknown to the Grand Jury,

he being sixteen years of age or older, did subject to sexual

contact Amber Money, who is less than twelve years of age, in

violation 13A-6-66 of the Code of Alabama, against the peace and

dignity of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Henry County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE

vs.
B.C. Money, Sr.

S.I.D. No.

D.C. ..

SEXUAL ABUSE 1ST DEGREE

Witnesses:

Amber Money

Clyde Hornsby
SO
Abbeville, Al

A TRUE BILL

_Milburn Williams_
Foreman of the Grand Jury

Presented to the presiding Judge in open court by the foreman of the Grand Jury, in the presence of the Grand Jurors and filed in open court by order of the court on this the ___ day of _July_, 19___.

_Morris Buckalew_
Clerk

INDICTMENT

NO PROSECUTOR

Upon the arrest of Defendant let him be admitted to bail on giving bond in the sum of _____ Dollars with security to be approved by the Sheriff.

This _29th_ day of _July_ 19 _54_

_E. W. Wallace_
Judge Presiding

| State of Alabama Unified Judicial System<br><br>Form C-52    Rev 6/88 | **CONSOLIDATED BOND**<br>(District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|

I THE _____ Circuit _____ COURT OF _____ HENRY _____ COUNTY

STATE OF ALABAMA                v.

We _BRAGG COMER MONEY SR._ _____ (Defendant) as principal

and we _____ as sureties
(please print)

agree to pay the State of Alabama _____ $10,000.00 _____ Dollars

unless the above named defendant appears before the District Court of said County on (Date) _OCT 5, 1994_

at (Time) _9:00 AM_ or at the next session of Circuit Court of said County; there to await the action by the grand jury and from session to session thereafter until discharged by law to answer to the charge of _SEXUAL_ _ABUSE 1ST DEGREE_

or any other charge. We hereby severally certify that we have property over and above all debts and liabilities to the amount of the above bond. We waive the benefit of all laws exempting property from levy and sale under execution or other process for the collection of debt, by the Constitution and Laws of the State of Alabama, and we especially waive our rights to claim exempt our wages or salary, that we have under the laws of Alabama.

It is agreed and understood that this is a continuing bond which shall remain in full force and effect until such time as the undersigned are duly exonerated.

_B. C. Money_      _RT 1 BOX 35, Columbia, AL_
Signature of Defendant          Address (Print)          City

_Frank Money_      _Rt 1, Box 33 Columbia, AL_
Signature of Surety          Address (Print)          City

_James O Money_      _PoBox 181 Columbia AL_
Signature of Surety          Address (Print)          City

_Ruby Money_      _Columbia Ala_
Signature of Surety          Address (Print)          City

_Roger Money_      _Columbia, AL_
_Donna Tim_      _Louisville, AL_
Signature of Surety          Address (Print)          City

_8-12-94_
Date

_Lawton Ed Armstrong_
Approved by: Sheriff/Judge

_Chuck Smith_
By: Deputy Sheriff

| **Defendant's Information** | |
|---|---|
| DOB _03-22-22_ | Sex _M_ |
| S.S. No. _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_ | Race _W_ |
| DL No. _0833087_  State ( _AL_ ) | Phone No. _696-4691_ |

☑ Appearance Bond - Property    ☐ Appearance Bond - Recognizance    ☐ Bail Bond    ☐ Cash Bond

CONSOLIDATED BOND    COURT RECORD : Original  DEFENDANT : Copy    SURETY : Copy

| State of Alabama<br>Unified Judicial System | JURY VERDICT | Case Number |
|---|---|---|
| Form C-50    Rev 6/88 | | CC-94-070 |

IN THE CIRCUIT COURT OF _____ HENRY _____ COUNTY

Plaintiff/State   OF ALABAMA          v. Defendant   B. C. MONEY, SR.

We, the Jury, find the Defendant, B. C. Money, Sr., guilty of Sexual Abuse, 1st

Degree, as charged in the Indictment.

*Bonnie Gibbs*
Name of Foreman (please print)

*Bonnie Gibbs*
Foreman Signature

Date filed _Oct 6 - 95_

*Connie Burdado*
Clerk of Circuit Court                    By:

ALABAMA JUDICIAL INFORMATION CENTER

CASE ACTION SUMMARY
CIRCUIT CRIMINAL

CASE: CC 94 000070 00

IN THE CIRCUIT COURT OF    HENRY    COUNTY

JUDGE: M-C

STATE OF ALABAMA                VS        MONEY B C SR
                                          RT 1
FILE: CC 94 000070 00
                                          COLUMBIA               AL  36319-0000

DOB: 03/22/22   RACE: W   SEX:   M   HT:   000   WT: 000   HR:        EYE:
SSN: 420503187    ALIAS NAMES:

CHARGE1: SEXUAL ABUSE 1ST            CODE1: SXA1 LIT: SEXUAL ABUSE 1ST TYPE: F
CHARGE2:                             CODE2: 0000                      TYPE: F
CHARGE3:                             CODE3: 0000                      TYPE: F
MORE?:          OFFENSE DATE:   /  /     AGENCY/OFFICER: 0370000HORNSBY

DATE WAR/CAP ISS:                DATE ARRESTED: 06/08/94
DATE   INDICTED: 07/29/94        DATE   FILED: 08/01/94
DATE   RELEASED:   /  /          DATE   HEARING:   /  /
       BOND AMOUNT:   $10,000.00        SURETIES:   /  / ;

DATE 1: 10/05/94 DESC:  ARRG      TIME:  0900 A
DATE 2:          DESC:  0000      TIME:  0000

DEF/ATY:   RAMSEY, RICHARD H, IV      TYPE: A                      TYPE:
PROSECUTOR:

OTH CSE: 9400037100    CHK/TICKET NO:                    GRAND JURY: 197
COURT REPORTER              SID NO: 00000000
DEF STATUS: BOND      JURY DEMAND:                            OFID: GYE

     DATE          ACTIONS, JUDGMENTS, CASE NOTES

IN THE CIRCUIT COURT C.    HENRY COUNTY                    JUDGE: M-C

STATE OF ALABAMA  VS  MONEY B C SR

| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR          $10,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H. IV |
| 08/01/94 | CAPS | CAPIAS ISSUED                        080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE        SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT TO RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |

DY
RRIV  10/14/94  Motion to dismiss denied. Crespi, Judge

IN THE CIRCUIT COURT OF    HENRY COUNTY

JUDGE: M-C

STATE OF ALABAMA  VS  MONEY B C SR

| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR        $10,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED          080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE     SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT TO RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |

11-1-94    Order filed by Crespi

12-5-94    Motion to Consolidate

          filed by C Amos

12-2-94    Motion to Suppress

          filed by R Ramsey IV

12/7/94   I have not received the files in these cases in time to set
          a consolidation hearing. I have therefore denied the motion
DV
RRIV      to consolidate. Notify _____

IN THE CIRCUIT COURT OF HENRY COUNTY                    JUDGE: M-C

STATE OF ALABAMA VS MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR          $10,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H, IV |
| 08/01/94 | CAPS | CAPIAS ISSUED              080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE        SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT TO RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/18/94 FOR TRIAL |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |

12/21/94  Continued unreached insp. judge

OCS105         A L A B A M A   J U D I C I A L   D A T A   C E N T E R
CASE ACTION SUMMARY
CASE: CC 94 000070.00

IN THE CIRCUIT COURT OF HENRY COUNTY                       JUDGE: CLL

STATE OF ALABAMA VS MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CH01 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR          $10,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H., IV |
| 08/01/94 | CAPS | CAPIAS ISSUED                    080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE          SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT TO RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT | FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT | STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT | TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT | OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT | MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT | CELESTE MONEY FILED BY D VALESKA |
| 09/02/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT | DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/18/94 FOR TRIAL |
| 11/18/94 | DAT1 | CASE SET ON 12/19/94 FOR TRIAL |
| 1/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 2/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT | FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/06/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |

3/8/95 - State's Motion to Consolidate is granted
Defendant's motion to Continue is denied / notify - J.
Little, Judge

OCS105          A L A B A M A   J U D I C I A L   D A T A   C E N T E R
                            CASE ACTION SUMMARY

                                                      CASE: CC 94.000070.00

IN THE CIRCUIT COURT OF   HENRY       COUNTY                    JUDGE: CLL

     STATE OF ALABAMA  VS  MONEY B C SR

| Date | Code | Description |
|---|---|---|
| 06/08/94 | ARRS | DEFENDANT ARRESTED ON: 06/08/94 |
| 07/29/94 | INDT | DEFENDANT INDICTED ON: 07/29/94 |
| 08/01/94 | FILE | ON 08/01/94 FILED |
| 08/01/94 | CHG1 | CHARGE AT FILING OF: SEXUAL ABUSE 1ST |
| 08/01/94 | BOND | BOND SET FOR        $10,000.00 |
| 08/01/94 | DAT1 | CASE SET ON 10/05/94 FOR  ARRAIGNMENT |
| 08/01/94 | ATY1 | ATTORNEY FOR DEFENDANT: RAMSEY, RICHARD H. IV |
| 08/01/94 | CAPS | CAPIAS ISSUED              080194 |
| 08/12/94 | RELE | DEFENDANT RELEASED ON: 08/12/94 |
| 08/15/94 | DOC1 | DOCKET DATE NOTICE      SENT TO DEFENSE ATTORNEY 1 |
| 08/17/94 | TEXT | MOTION TO REVOKE BOND FILED BY STATE |
| 08/17/94 | TEXT | SET FOR BOND HEAR ON 8-19-94 BEFORE JUDGE WOODHAM |
| 08/24/94 | TEXT | AMENDMENT TO RELEASE ORDER FILED /S/ WOODHAM |
| 08/26/94 | TEXT | WAIVER OF ARRAIGNMENT FILED BY R RAMSEY IV |
| 08/26/94 | TEXT | MOTION FOR DISCLOSURE OF PSYCHIATRIC HISTORY AND |
| 08/26/94 | TEXT |   FOR PSYCHOLOGICAL AND MEDICAL EXAMINATION OF |
| 08/26/94 | TEXT |   STATE'S WITNESS FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | MOTION FOR STATE TO DISCLOSE EVIDENCE FAVORABLE |
| 09/01/94 | TEXT |   TO DEFENDANT FILED BY R RAMSEY IV |
| 09/01/94 | TEXT | OBJECTION TO DEFENDANT'S MOTION FOR DISCLOSURE |
| 09/01/94 | TEXT |   OF PSYCHIATRIC HISTORY AND PSYCHOLOGICAL AND |
| 09/01/94 | TEXT |   MEDICAL EXAMINATION OF AMANDA HADDAN AND AMBER |
| 09/01/94 | TEXT |   CELESTE MONEY FILED BY D VALESKA |
| 09/07/94 | TEXT | ORDER DENYING DEFT'S MOTION OF 08/26/94 /S/CRESPI |
| 09/09/94 | TEXT | ORDER FILED /S/ CRESPI |
| 09/12/94 | DOCK | DOCKET NOTICE MAILED ON 09/12/94 |
| 10/13/94 | TEXT | MOTION TO DISMISS FILED BY R RAMSEY IV |
| 10/28/94 | TEXT | MOTION TO COMPEL DEPT OF HUMAN RESOURCES TO PRO- |
| 10/28/94 | TEXT |   DUCE RECORDS AND REPORTS FILED BY R RAMSEY IV |
| 11/04/94 | TEXT | ORDER FILED /S/ CRESPI |
| 11/18/94 | DAT1 | CASE SET ON 12/18/94 FOR  TRIAL |
| 1/18/94 | DAT1 | CASE SET ON 12/19/94 FOR  TRIAL |
| 11/21/94 | DOCK | DOCKET NOTICE MAILED ON 11/21/94 |
| 12/02/94 | TEXT | MOTION TO SUPPRESS FILED BY R RAMSEY IV |
| 12/05/94 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 12/05/94 | SUBP | WITNESS SUBPOENA ISSUED |
| 12/13/94 | TEXT | DEFENDANT'S OBJECTION TO MOTION TO CONSOLIDATE |
| 12/13/94 | TEXT |   FILED BY R RAMSEY IV |
| 12/21/94 | TEXT | CONTINUED UNREACHED |
| 02/24/95 | DAT1 | CASE SET ON 03/20/95 FOR  TRIAL |
| 03/01/95 | DOCK | DOCKET NOTICE MAILED ON 03/02/95 |
| 03/02/95 | TEXT | MOTION TO CONSOLIDATE FILED BY C AMOS |
| 03/04/95 | TEXT | MOTION TO CONTINUE FILED BY R RAMSEY IV |
| 03/08/95 | TEXT | MOTION TO CONSOLIDATE GRANTED; MOTION TO CONTINUE |
| 03/08/95 | TEXT |   DENIED /S/ LITTLE |
| 03/09/95 | SUBP | WITNESS SUBPOENA ISSUED |
| 03/15/95 | TEXT | DEFENDANT'S ADDITIONAL OBJECTION TO MOTION TO |
| 03/15/95 | TEXT |   CONDOLIDATE FILED BY R RAMSEY IV |

3-16-95  D      Defendant's Additional Objection to Consolidation
    RRV         is denied.  Notify.  Little, Judge

3-21-95    Case Continued for deft
           + State - Little, Judge

State of Alabama
Unified Judicial System

Form C-7 Rev. 2/79

**CASE ACTION SUMMARY**
CONTINUATION

Case Number

CC 94 070.
ID    YR    Number

Style: B.C. More, Jr.

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

_____ 10-6 _____, 19 95

Defendant heretofore having been indicted and arraigned upon an indictment on a charge of *Sexual Abuse, 1st*, defendant having plead not guilty thereto, issue joined on same plea, thereupon comes a jury of good and lawful men and women, to-wit, _Bennie F. Giddens_ and eleven others, who being duly empanelled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said defendant, B.C. Moren Jr. , being in open Court with his attorney at each and every stage and during all the proceedings in this cause, now on this the _6_ day of _Oct_ , 19 95 : said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF *Sexual Abuse 1st*

AS CHARGED IN THE INDICTMENT"

_____
JUDGE

_____ 10-6 _____, 19 95

In accordance with the verdict of the jury, Defendant is hereby adjudged guilty of *Sexual Abuse 1st* as charged in the indictment. Defendant being asked if he had anything to say why the sentence of law should not be pronounced upon him, the Defendant says nothing but pre-sentence report is requested by _Deft_

Hearing set for _10-27-_ 19 95 _@ 9 a.m._ M.

_____
JUDGE

_____ 10-27 _____, 19 95

The Court therefore adjudges the Defendant guilty of *Sexual Abuse 1st* The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of Law should not be pronounced upon him says nothing. It is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of _10 years_

Defendant is further ordered to pay a fine of _____ restitution in the amount of _____ to _TBD_ and a victim compensation assessment of _500.00_

Defendant is given credit for days spent incarcerated pending trial.

_____

COURT REPORTER'S INDEX OF TRIAL EXHIBITS (ARAP Rule 11e)

IN THE CIRCUIT COURT OF _HENRY_ COUNTY

_ABBEVILLE_ ALABAMA — COUNTY SEAT

APPELLANT: _B. C. MONEY_

VS.                                                                                        appellant

STATE OF ALABAMA - or -

ACTION (Case)
No. _CC94-065-070_
[X] State Criminal
[ ] Civil (Law)
[ ] City Appeal (Crim.)
[ ] Civil (Equity)

                                                                                  appellee

TO:   (name) _CONNIE BURDESHAW_ ◄━ CIRCUIT COURT OF _HENRY_ COUNTY.

FROM: (name) _WILLIAM R. MOEGLIN_ COURT REPORTER OF 20TH JUDICIAL CIRCUIT OF ALABAMA

**REPORTER'S INDEX TO EXHIBITS**

The following **EXHIBITS** were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This index includes **all** exhibits (herein assembled or separately housed - or - other, as indicated) and further indicates those offered, admitted or not admitted into evidence, etc...:

[NOTE: (✓) check appropriate]

| Party | Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | (✓) Admitted Yes / No | Iden. Only (✓) | Witho drawn (✓) | Released By Court To Pmtf (✓) | Original Restored By Copy (✓) | In File (✓) | In Container (✓) | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|
| S | 1 | MAGAZINES (2) | X | | | | | | | |
| | 2 | CONSENT | X | | | | | | | |
| | 3 | PHOTO | X | | | | | | | |
| | 4 | CARDS (2) | X | | | | | | | |
| | 5 | PHOTO | X | | | | | | | |
| | 6 | PHOTO | X | | | | | | | |
| | 7 | PHOTO | X | | | | | | | |
| | 8 | PHOTO | X | | | | | | | |
| | 9 | PHOTO | X | | | | | | | |
| | 10 | SHINGLES | X | | | | | | | |
| | 11 | PHOTO | X | | | | | | | |
| D | 1 | COMPLAINT | X | | | | | | | |
| | 2 | '' | X | | | | | | | |
| | 3 | '' | X | | | | | | | |
| | 4 | '' | X | | | | | | | |
| | 5 | '' | X | | | | | | | |
| | 6 | '' | X | | | | | | | |
| | 7 | STATEMENT | X | | | | | | | |
| | 8 | STATEMENT | X | | | | | | | |
| | 9 | VCR TAPE | X | | | | | | | |

NOTE: ARAP RULE 11(e) ... Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice of Appeal in Criminal and Civil Actions, assembled in a flat file (not chuck) and if incapable then assembled in a suitable container ... with index.

| 1) ABOVE INDEX RECEIVED & FILED _3rd November_ 19 _96_ | DATED THIS _3_ DAY OF _November_, 19 _96_ |
|---|---|
| 2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted) | |
| /S/ _Connie Burdeshaw_ | /S/ _William R Moeglin_ |
| CLERK - REGISTER - or - AUTHORIZED ASS'T. | COURT REPORTER |
| CLERK'S OFC. [ ] — REGISTER'S OFC. [ ] | 20TH JUDICIAL CIRCUIT |

State's Exhibit No. 1 (Magazines) is of such size and bulk as to

be impracticable to be included in this transcript, but will

forward to Court of Criminal Appeals if requested to do so.

**Henry County**
**Sheriff's Department**

Lawton Ed Armstrong
Sheriff

585-3131 or 693-5678
585-5571

P.O. Box 298
Abbeville, Alabama 36310

DATE: 06 / 13 / 94                    TIME: 1334

I, PATRICIA A. MONEY _____ DO HEREBY DECLAIR THAT I HAVE

FREELY AND WILLINGLY GIVE MY CONSENT FOR DEPUTIES OF THE HENRY COUNTY

SHERIFF DEPARTMENT AND OR ANY OTHER LAW ENFORCEMENT OFFICER OF ANY LAW

ENFORCEMENT AGENCY OF THE STATE OF ALABAMA WHO MAY BE ASSISTING THE HENRY

COUNTY SHERIFF DEPARTMENT THE RIGHT TO SEARCH MY ~~RESIDENCE~~ BARN, LOCATED AT

RT 1 BOX 35-B COLUMBIA AL _____

THIS 13 DAY OF JUNE , 19 94 .

I DO ALSO DECLAIR THAT I HAVE BEEN ADVISED OF MY RIGHTS AND I DO

UNDERSTAND THAT I DO NOT HAVE TO CONSENT TO THE SEARCH AND I DO WAIVE MY

RIGHTS AND CONSENT TO A SEARCH OF MY VEHICLE FOR _____

SIGNED: X Patricia Ann Money

WITNESS: CB Harris

WITNESS: Beth Rushing

COMMENTS _____



SX#3

State's Exhibit No. 4 (decks of cards) is of such size and bulk

as to be impracticable to be included in this transcript, but

will forward to Court of Criminal Appeals if requested to do so.



SX #5
M



SX #6
M





SX #9

State's Exhibit No. 10 (Shingles) is of such size and bulk as to
be impracticable to be included in this transcript, but will
forward to Court of Criminal Appeals if requested to do so.



SX #11

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:                                WARRANT NUMBER: WR 94 000267.00
                                              OTHER CASE NBR:
                                                              DC-94-366

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED   HORNSBY CLYDE
WHO BEING DULY SWORN DEFOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    B C MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT

    ON OR ABOUT  OCT - DEC 31, 1993, B. C. MONEY, SR., A MALE, DID ENGAGE
IN SEXUAL INTERCOURSE WITH AMBER CELESTE MONEY, A FEMALE BY FORCEABLE
COMPULSION at a branch located behind the residence of B. C. Money, Sr., Rt 1, Columbia, Al
IN VIOLATION OF 13A-006-061                        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

                                         _Clyde Hornsby_
                                         COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_Tonnie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE          13A-006-061      F
-------------------------------------------------------------------

WITNESS FOR THE STATE

HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
MONEY AMBER CELESTE/RT//COLUMBIA/36319
FLAHERTY HEATHER/515 COLUMBIA RD//ABBEVILLE/36310
AMOS TAMMY/RT 1 BOX 24/OLD RIVER ROAD/SHORTERVILLE/36373
MONEY PATRICIA E/RT 1//COLUMBIA/36319
RUSHING BETH/DHR1//ABBEVILLE/36310

OPERATOR: COB    DATE: 06/08/94

DX#1

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000268.00
OTHER CASE NBR: DC-94-367

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED   HORNSBY CLYDE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT   B C MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

     ON OR ABOUT OCT - DEC 1993, B. C. MONEY, SR., A MALE, DID ENGAGE
IN SEXUAL INTERCOURSE WITH AMBER CELESTE MONEY, A FEMALE BY FORCEABLE
COMPULSION, IN THE RESIDENCE OF B. C. MONEY, SR., RT 1, COLUMBIA, AL
IN VIOLATION OF 13A-006-061                    OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE        13A-006-061        F

WITNESS FOR THE STATE

HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
-------------------------------------------------------
-------------------------------------------------------
-------------------------------------------------------
-------------------------------------------------------

OPERATOR: COB     DATE: 06/08/94

DX #2

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:                          WARRANT NUMBER: WR 94 000269.00
                                        OTHER CASE NBR: Dc-94-368

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    B. C. MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

    ON OR ABOUT MAR 1994 - APR 1994, B. C. MONEY, SR., A MALE DID ENGAGE
IN SEXUAL INTERCOURSE WITH AMBER CELESTE MONEY, A FEMALE, BY FORCEABLE
COMPULSION AT THE FALLS LOCATED BEHIND THE RESIDENCE OF B. C. MONEY, SR.,
IN VIOLATION OF 13A-006-061                     OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE        13A-006-061        F

WITNESS FOR THE STATE

OPERATOR: COB    DATE: 06/08/94

DX #3

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000270.00
OTHER CASE NBR: DC-94-369 "

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED   HORNSBY CLYDE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    B C MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT

DID ON OR ABOUT 06/06/94 , B. C. MONEY, SR., SUBJECT AMBER CELEST MONEY
TO SEXUAL CONTACT BY FORCIBLE COMPULSION OR HE/SHE BEING SIXTEEN YEARS OF
AGE OR OLDER, DID SUBJECT TO SEXUAL CONTACT AMBER CELEST MONEY_____,
WHO IS LESS THAN TWELVE YEARS OF AGE,
IN VIOLATION OF 13A-006-066                    OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: SEXUAL ABUSE 1ST DEG  13A-006-066      F

WITNESS FOR THE STATE

HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
MONEY AMBER CELESTE/RT//COLUMBIA/36319
FLAHERTY HEATHER/515 COLUMBIA RD//ABBEVILLE/36310
AMOS TAMMY/RT 1 BOX 24/OLD RIVER ROAD/SHORTERVILLE/36373
MONEY PATRICIA E/RT 1//COLUMBIA/36319
RUSHING BETH/DHR1//ABBEVILLE/36310

OPERATOR: COB    DATE: 06/08/94

DX #4
M

\* \* \* IN THE DISTRICT COURT OF HENRY COUNTY \* \* \*

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000274.00
OTHER CASE NBR:
DC-94-370

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED   HORNSBY CLY
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    R. C. MONEY SR
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

DID ON OR ABOUT SEP 1993 - DEC 1993, A MALE, ENGAGE IN SEXUAL INTERCOURSE
WITH   AMANDA HADDAN                    , A FEMALE, BY FORCIBLE COMPULSION,
BEHIND A TOOL SHED ON THE PROPERTY OF R. C. MONEY, SR.
IN VIOLATION OF 13A-006-061                    OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_Clyde Hornsby_
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 09 DAY OF JUNE, 1994.

_Connie Burdeshaw_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: RAPE 1ST DEGREE        13A-006-061        F

WITNESS FOR THE STATE

HORNSBY CLY////00000
HORNSBY CLYDE/C/O HENRY CO SO//ABBEVILLE/36310
MONEY AMBER CELESTE/RT//COLUMBIA/36319
FLAHERTY HEATHER/515 COLUMBIA RD//ABBEVILLE/36310
AMOS TAMMY/RT 1 BOX 24/OLD RIVER ROAD/SHORTERVILLE/36373
MONEY PATRICIA E/RT 1//COLUMBIA/36319

OPERATOR: COB    DATE: 06/09/94

DX #5

M

* * * IN THE DISTRICT COURT OF HENRY COUNTY * * *

AGENCY NUMBER:

WARRANT NUMBER: WR 94 000271.00
OTHER CASE NBR: DC-94-371

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
HENRY COUNTY, ALABAMA, PERSONALLY APPEARED
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    R. C. MONEY MONEY
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINTANT

    ON OR ABOUT   OCT - DEC 1993, B. C. MONEY, SR., DID SUBJECT AMBER MONEY
TO SEXUAL CONTACT BY FORCIBLE COMPULSION OR HE/SHE BEING SIXTEEN YEARS OF
AGE OR OLDER, DID SUBJECT TO SEXUAL CONTACT ____AMBER MONEY____
WHO IS LESS THAN TWELVE YEARS OF AGE,
IN VIOLATION OF 13A-006-066                      OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_____
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 08 DAY OF JUNE, 1994.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: SEXUAL ABUSE 1ST DEG  13A-006-066      F

WITNESS FOR THE STATE

_____
_____
_____
_____

OPERATOR: COB    DATE: 06/08/94





SOUTHEASTERN PEDIATRIC ASSOCIATES, P.A.
Confidential information.
Redisclosure strictly prohibited.
Please destroy copies after use.

AMANDA K. HADDAN    #3509-7
06-17-94:    7 3/4 yrs.    51½ in.    70 lbs.    BP 102/76
Diagnosis:    Alleged Sexual Abuse
Procedure:    Initial Office Visit    Exp.

Amanda Haddan is a 7 3/4 year old white female who presents to my office this morning accompanied by her mother.   The appointment was made by Beth Rushing, DHR worker for Henry County.   I asked Amanda why she was here today and she would not talk to me initially.   I then asked mom why she was here and mom stated that Amanda, she thought, had been sexually abused.   I advised mother that I knew at least preliminary details from Ms. Rushing but that I needed to get Amanda to tell me in her own words what had happened.   This took some time but Amanda did talk to me and tell me what had happened. Amanda tells me that about a month before the end of school she went home one afternoon with her friend, Amber Money.   They stopped at Amber's grandmother and grandfather's house to get something to eat and something to drink.   Amanda says that after they had something to eat and a coke to drink that Amber's grandfather, Mr. B.C. Money, Sr., took them outside to a shed that was in the back of the property.   Amanda says that Mr. Money took some tar paper and put it out on the floor in the shed.   He then pulled her pants down and her underpants.   He then asked her to lie down on the black paper.   She said this was paper like you put on a roof before you put a roof on it.   Amanda said that he then got on top of her.   She said that he put his hand on her private part before he got on top of her.   Amanda then said that he tried to put his private parts inside of her. She told me that it hurt.   She doesn't know how long he stayed on top of her.   She states that her friend, Amber, was there in the shed watching.   After Mr. Money got off the top of her, Amanda states that he told both her and Amber not to tell anyone about this.   They all three then left the shed and Amanda and Amber went back to the house and then Amanda states that she and Amber went to Amber's home.   I asked Amanda if anything like this had happened to her before and she stated that it had not and she stated that nothing had happened since then.   Amanda's mother tells me that this episode became known when Amber told an older friend who is 13 about this episode and also related three episodes where Mr. Money had by history sexually molested her.   The friend, Heather, then told her mother who reported this to DHR.   Again, according to Ms. Haddan, DHR then had Mr. Money arrested and he is presently in jail awaiting arraignment this summer.   Ms. Haddan tells me that she has understood that Mr. Money's daughter was sexually abused by Mr. Money, or at least she has admitted that at this point.

Past Medical History reveals that Amanda has been in good health.   She has had no hospitalizations, no prior surgeries.   She is allergic to no medicines.   Immunizations are up-to-date.

Family History reveals that mother lives in Columbia.   Mother is 46.   There are two adults and four children in the family.   They live in a mobile home.   There is city water.   There is a positive family history of heart disease.   Mother, father, and grandparents are smokers.

Neonatal:   The child was 7 lbs. at birth with no neonatal problems.   Growth and development have been normal to date.

Physical Exam reveals a well nourished, well developed, somewhat frightened 7 3/4 year old.   Vital signs – weight 70 pounds, height 51½ inches, blood pressure 102/76, temp 97, pulse 82, respirations 22.   The pharynx and TM's are clear.   Pupils are reactive to light.   Extraocular muscles are intact.   Neck is supple.   Chest is clear. Cardiovascular – Normal sinus rhythm, no murmurs.   Breasts are stage 0.   The abdomen is supple, no masses or megaly.   External genitalia are prepubertal as well, stage 0.   No pubic hair is present.   I examined her genitalia in both the supine and knee/chest

(OVER)

position. My exam revealed no significant redness of the labia. There was no abrasion of the labia. The periurethral areas look normal. I did not see enlargement of the hymenal area. I think the hymen is intact. No perirectal redness. No perirectal abrasion. No fissures that are obvious. I did proceed today with a wet prep, with a gram stain for GC, and blood was drawn for VDRL and HIV.

**Impression:** Alleged sexual abuse.

**Plan:** I will file a copy of this with Beth Rushing, DHR, Henry County.

TED A. WILLIAMS, M.D., F.A.A.P.

TAW/kt

cc: Ms. Beth Rushing, Henry County DHR

06-17-94: 7½ yrs. 50 # in. 55 lbs. SOUTHEASTERN PEDIATRIC ASSOCIATES, P.A.

Case 1:08-cv-10228-WKW-TFM Document 16-3 Filed 05/09/2008 Page 60 of 163

Confidential information.
Redisclosure strictly prohibited.
Please destroy copies after use.

Procedure: Initial Office Visit Det.; CBC w/Diff; Wet Prep; Gram Stain

Amber is a 7½ year old white female I am seeing for the first time today. She is here today, brought by her mother, at the recommendation of DHR for evaluation of possible sexual abuse. I asked Amber why she was here today and she said she was here today because her granddaddy tried to have sex with her. I asked her if she could to describe the situations where this occurred. She stated that the first time it happened was before this past November. She states that he was lying in a hammock on the front porch at his house where she visited often. He asked her to come over to the hammock and he took his pants down. She said that he tried to put his private part in her private parts. I asked her if she felt any pain and she said that it didn't hurt. She asked him to not do it and apparently walked away. The second episode occurred a few months later. Amber tells me that she was down at the branch, which apparently is a creek that runs behind the grandparents' property. She said that he took down his pants and underpants and took down her pants and tried to put his private part into hers while they were both standing up. The third episode that she relates occurred while she was staying with the grandparents again. Apparently the grandmother had left and he took her into a small bedroom and again took his pants and underwear down and took her pants and underwear down. She says that he was sitting on the bed and had her come stand up next to him and again tried to put his private part into hers. She apparently did not tell anyone about this until the Tuesday which was election day when she related this information about this sexual contact to a 13 year old cousin. The 13 year old cousin then told mother who notified DHR and the following day the grandfather, Mr. Money, was arrested.

Past Medical History reveals that this child was born at Medical Center, 5 lbs. 13 oz. at birth. She has been in good health. She has no drug allergies and no immunizations. There have been no previous hospitalizations and no previous surgery. She has just completed the 1st grade at Columbia Elementary School. She is accompanied to the office by her mother.

Physical Exam reveals a well nourished, well developed, somewhat nervous seven year old whose weight and height are 75th and 90th percentile respectively. Vital signs are stable with a blood pressure of 108/56, pulse 84, respirations are 22. The pharynx and TM's are clear. The pupils are reactive to light. Extraocular muscles are intact. The neck is supple. The chest is clear. Cardiovascular – Normal sinus rhythm, no murmurs. She has no breast development. Breasts are stage 0. The abdomen is supple, no masses or megaly. External genitalia – Again, no secondary sexual development or pubic hair is present. I did examine her vaginal area both in the supine position and in the knee/chest position. In the knee/chest position the hymen appears intact to me. There is no redness, abrasion, or laceration of the labia. No change in the periurethral area. There is no perirectal tearing, no unusual perirectal redness. Neurologic is appropriate.

Impression: Alleged sexual abuse.

Plan: We'll proceed with a VDRL and HIV test as well and we'll do a gram stain and a wet prep per labial swab.

DX #8
MS

TED A. WILLIAMS, M.D., F.A.A.P.

TAW/kt

cc: Ms. Beth Rushing, DHR, Abbeville, Alabama

Deft's Exhibit No. 9 (VCR Tape) is of such size and bulk as to

be impracticable to be included in this transcript, but will

forward to Court of Criminal Appeals if requested to do so.

164

## CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

B. C. MONEY
_____
Appellant

V.

State of Alabama
Appellee

TO: The Clerk of the Court of
    Criminal Appeals of Alabama

Case No. ____CC-94-065 thru CC-94-070____

Date of Notice of Appeal __10/27/95__

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (____3____ volumes of 200 pages each and one volume of __145__ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ____23rd____ day of ____May____, 19_96_.

_Connie Burdeshaw_
_____
Circuit Clerk

Henry
_____
County

State of Alabama
Unified Judicial System

Form ARAP-1C    8/91

REPORTER'S TRANSCRIPT ORDER -- CRIMINAL

See Rules 10(c) and 11(b) of the
Alabama Rules of Appellate Procedure (A.R. App.P.)

Case Number

95 - 0268

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF    Henry    COUNTY

B.C. Money    , Appellant

V.    ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number | Date of Judgment/Sentence/Order |
| CC 94-065 thru CC 94-070 | October 6, 1995 |

Date of Notice of Appeal
Oral: October 27, 1995 Written:

Indigent Status Granted:  ☒ Yes  ☐ No

PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

Signature _____    Date _____    Print or Type Name _____

PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED. Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)

~~Gwen Cooper~~ WILLIAM R. MOEGLIN
P.O. Box 6406
Dothan, Alabama 36302

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☒ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. *SENTENCING HEARING* | | GWEN COOPER |
| E. | | FILED IN OFFICE CIRCUIT CLERK HENRY COUNTY, AL. 3124 |
| F. | | |
| G. | | |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

William C. Maddox    11/9/95    William C. Maddox
Signature    Date    Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript

<u>REPORTER'S INDEX TO THE TESTIMONY</u>

CAPTION                                    3

JURY STRUCK                                4

JURY SWORN                                 4

JURY INSTRUCTIONS                          4

MOTION TO SUPPRESS                         7

     State's Evidence

1.  <u>Clyde Hornsby</u>

    Direct                                 7

    Cross                                 17

    Examination By The Court  22

COLLOQUY BETWEEN PARTIES                  23

RULING OF THE COURT                       29

COLLOQUY BETWEEN PARTIES                  31

JURY INSTRUCTIONS                         35

OPENING STATEMENTS                        38

     State's Evidence

1.  <u>Amanda Catherine Hadden</u>

    Direct                                40

    Cross                                 90

    Redirect                             127

2.  <u>Amber Celest Money</u>

    Direct                               132

BOND HEARING                             174

    Direct Continued                     179

JURY INSTRUCTIONS                        181

## REPORTER'S INDEX TO THE TESTIMONY CONTINUED

COLLOQUY BETWEEN PARTIES          185

    Amber Celest Money Continued

      Cross                          187

      Redirect                       225

3.  Clyde Hornsby (Recalled)

      Direct                         233

      Cross                          254

      Redirect                       276

STATE RESTS                       280

MOTION FOR ACQUITTAL              282

RULING OF THE COURT               282

COLLOQUY BETWEEN PARTIES          282

    Defendant's Evidence

1.  Ted A. Williams, M. D.

      Direct                         285

      Cross                          299

      Redirect                       209

      Recross                        312

2.  Patricia Ann Money

      Direct                         314

      Cross                          315

      Redirect                       327

      Examination By The Court 338

<u>REPORTER'S INDEX TO THE TESTIMONY CONTINUED</u>

3.  <u>Ruby Money</u>

      Direct                   342

      Cross                    348

      Redirect              361

      Recross               364

      Further Redirect     368

      Further Recross      369

COLLOQUY BETWEEN PARTIES     370

4.  <u>Elbert Bristow</u>

      Direct                   373

      Cross                    376

5.  <u>Cynthia Chambers</u>

      Direct                   379

      Cross                    382

6.  <u>Dora Money</u>

      Direct                   388

      Cross                    390

COLLOQUY WITH A JUROR        392

COLLOQUY BETWEEN PARTIES     396

7.  <u>B. C. Money, Sr.</u>

      Direct                   399

      Cross                    437

      Redirect              483

      Recross               484

REPORTER'S INDEX TO THE TESTIMONY CONTINUED

DEFENDANT RESTS                          485

COLLOQUY BETWEEN PARTIES                 485

    State's Rebuttal Evidence

1.  Ruby Money Robertson

    Direct                             489

STATE RESTS                              492

TESTIMONY CONCLUDED                      492

CLOSING ARGUMENTS                        493

ORAL CHARGE OF THE COURT                 494

JURY QUESTION                            514

COLLOQUY BETWEEN PARTIES                 515

DELIBERATION CONTINUED                   524

COLLOQUY WITH A JUROR                     525

ADDITIONAL ORAL CHARGE                    527

DELIBERATION CONTINUED                   530

JURY QUESTION                            531

COLLOQUY BETWEEN PARTIES                 532

DELIBERATIONS CONTINUED                  544

COLLOQUY BETWEEN PARTIES                 546

EXCEPTIONS TO ADDITIONAL CHARGE          552

DELIBERATIONS CONTINUED                  553

ADDITIONAL ORAL CHARGE                    554

JURY VERDICT                             560

JURY POLLED                              561

## REPORTER'S INDEX TO THE TESTIMONY CONTINUED

JURY DISCHARGED                    561

SENTENCING HEARING REQUESTED    563

BOND HEARING                      563

RULING OF THE COURT               564

PROCEEDINGS CONCLUDED             565

REPORTER'S CERTIFICATE            566

CERTIFICATE OF COMPLETION         567

REPORTER'S INDEX TO THE EXHIBITS

| PARTY: | DESCRIPTION: | MARKED: | RECEIVED: |
|---|---|---|---|
| State #1 | 2 Magazines | 13 | 29 |
| #2 | Waiver | 13 | 29 |
| #3 | Photo | 14 | 29 |
| #4 | 2 Decks of Cards | 23 | 29 |
| #5 | Photo | 30 | 67 |
| #6 | Photo | 30 | 67 |
| #7 | Photo | 30 | 67 |
| #8 | Photo | 30 | 247 |
| #9 | Photo | 30 | 249 |
| #10 | Shingles | 31 | 67 |
| #11 | Photo | 130 | 165 |
| Defendant #1 | Complaint | 258 | 266 |
| #2 | Complaint | 258 | 266 |
| #3 | Complaint | 258 | 266 |
| #4 | Complaint | 258 | 266 |
| #5 | Complaint | 258 | 266 |
| #6 | Complaint | 258 | 266 |
| #7 | Report | 287 | 299 |
| #8 | Report | 297 | 299 |
| #9 | VCR Movie | 424 | 427 |

IN THE CIRCUIT COURT

OF HENRY COUNTY

ALABAMA

STATE OF ALABAMA       *
                     *
                     *
                     *
VS                    *      CASE NOS. CC94-065-070
                     *
                     *
                     *
B. C. MONEY, SR.       *

A P P E A R A N C E S:

FOR THE STATE:                  HON. DOUGLAS A. VALESKA
                              HON. BRAD E. MENDHEIM
                              District Attorneys Office
                              Dothan, Alabama

FOR THE DEFENDANT:             HON. RICHARD H. RAMSEY, IV
                              Attorney At Law
                              Dothan, Alabama

       Beginning on October 2, 1995, at approximately

10:00 o'clock A. M., the above styled and numbered

causes came up for trial on four counts of Rape,

First Degree and two counts of Sexual Abuse, First

Degree before the Honorable C. Lawson Little as

Presiding Judge. After the Jury Venire had been

qualified by the Court and Voir Dired by the

Attorneys of Record, the Trial Jury was struck and placed in the Jury Box and were sworn in by the Circuit Clerk.  After that, the following proceedings were held in the Second Floor Court Room of the Henry County Courthouse, Abbeville, Alabama, to-wit:

THE COURT:  Ladies and Gentlemen of the Jury Panel, you are the Jury for the case of the State of Alabama Vs. B. C. Money. At this time, before I read the indictments to you and give you some general instructions, we are going to recess, actually, until 1:30 this afternoon. There are some preliminary matters that the Court needs to take up before that time.  So, we will actually start the case and the Opening Statements and the testimony at 1:30.  Let me say this before you recess for lunch.  Even though you have not heard any evidence in this case, I will instruct you, every time we take a break, as to this:  Do not discuss this case among yourselves, even what you have heard on Voir Dire this morning, which was no evidence whatsoever.  Do not

discuss this matter among yourselves. If you return home, do not discuss this case with your family members and do not let anyone discuss this case with you. Do not read any radio, do not read any newspapers; I don't think that it has been reported yet, but this will be an instruction to you in the future if we do recess tonight; do not listen to any radio, television accounts or read any type of newspapers in this particular matter. I will give you general instructions later at 1:30, but with that, we will be at recess until 1:30. We have the Jury Room in the back here and my bailiff will direct you to that if you return to that room, rather than the Court Room, and that is where you will be at 1:30. Thanks again for your service and patience in this matter and we will begin the case at 1:30. Thank you.

(Thereupon, the Trial Jury proceeded to their lunch with the above instructions

6

from the Court and the

following proceedings were

held out of the presence

and hearing of the said

Trial Jury, to—wit:)


THE COURT:  I believe we have a Motion To

Suppress, at this time.  Are there any

comments before we call any witnesses

or anything?

MR. RAMSEY:  No, sir.

THE COURT:  Okay.

<u>STATE'S EVIDENCE</u>

Thereupon,

<u>CLYDE HORNSBY</u>

was called as a witness in behalf of the
State of Alabama, and after having been first duly
sworn to testify to the truth, the whole truth,
and nothing but the truth, took the stand and
testified as follows, to-wit:

<u>DIRECT EXAMINATION</u>

BY MR. VALESKA:

Q     You have been sworn in?

A     Yes, sir.

Q     You are Clyde Hornsby of the Sheriff's Department?

A     Yes, sir.  I am.

Q     You are the investigator assigned to work the case
      of the State of Alabama Vs. B. C. Money, Sr.,
      Rape in the First Degree and Sexual Abuse in the
      First Degree?

A     Yes, sir.

Q     I am taking out two magazines as well as two decks
      of playing cards for a total of four exhibits in
      front of you.  I have left the shingles in the

bottom of this white bag, roofing shingles. Do you recognize these four items? (Produces the items in question for examination.)

A   (Witness studies the exhibits in question as requested.) Yes, sir. I do.

Q   Tell Judge Little how these four items came in your possession?

A   Amber Money described some books with nude photographs of men and women in them. And also some playing cards that were in Mr. Money's house. And, I interviewed her about the barn and she said her grandfather laid her and her little friend on some type of material that goes on a roof and stuck his penis in them in the hog barn.

Q   Is this Amanda Celeste Money?

A   Yes.

Q   Okay. And, you are talking also about Amanda Hadden? Is that correct?

A   Yes, sir.

Q   Would you tell Judge Little the property in front of you, the four exhibits, the two magazines and the two decks of cards with pictures on them, were they found in Henry County?

A   Yes, sir. They was.

Q   Were they found, what close proximity to B. C. Money,

Sr.'s trailer in Henry County?

A    The cards was found inside his bedroom in the top

chest of drawers drawer.  The two books were in the

tool box out by the barn.  The roofing material was

in one of the stalls in the barn.

Q    Tell Judge Little the two magazines that are up

there, they are not marked, if I could, for the

purpose of this hearing, ask that they be marked as

State's Exhibit Number 1.  There are four items and

I will identify them for the Record, if I could,

judge.  State's Exhibit 1, we will get them marked

in a minute and I will refer you to the two

magazines that I want to ask you about, Mr. Hornsby,

not the two decks of cards.  State's Exhibit 1, the

two magazines, where were they recovered,

specifically?

A    In the red tool box in the barn.

Q    Okay.  On whose property?

A    Mr. Money.

Q    B. C. Money, Sr.?

A    I believe it is his property.  Yes, sir.  Or, it

might be Patricia Money's.

Q    What is Patricia's husband's name?

A    B. C.

Q    Okay.  Would you tell the judge, the tool box,

how did you gain access to the tool box?

A    I believe the lock was cut off.  The key was in the jail with Mr. Money.

Q    Did you have consent to open up the tool box?

A    Yes, sir.  On the property of Mr. B. C. Money, Jr.

Q    Junior or Senior?

A    Junior.

Q    All right.  You said B. C. Money, Jr., the Defendant's son, did he own this property or was he renting that property?

A    As far as I know, he owns it.

Q    You know the trailer that Amanda Celeste Money lived in in relationship to the box where the trailer was?

A    You mean Mr. B. C. Money, Sr.'s trailer?

Q    The trailer Amber was living in, did you ever go to that trailer?

A    No, sir.

Q    Okay.  Is there a pond or small pond or body of water which the hog barn was around or where this property was?

A    Yes, sir.  A little fish pond.

Q    Is there a dirt road that goes up to that area?

A    Yes.

Q    Do you know whose tool box it was?

A      I assume — — —

        MR. RAMSEY:  We object to any assumption.

        THE COURT:  Okay.   Sustain.

BY MR. VALESKA:

Q      Who did you ask permission to open the tool box?

A      I asked B. C., Jr.;  Comer, Jr.  He did not have a
key to it.

Q      How did you gain access?

A      The lock was broken.

Q      When you broke the lock, what did you find inside
of the box?

A      These two magazines.

Q      That was in Henry County, Alabama?

A      Yes, sir.

Q      When you say the two magazines, did you show them
to B. C. Money, Sr., the Defendant in this Court
Room today?

A      I believe I did.  Yes, sir.

        MR. RAMSEY:  We object, unless he knows
           whether he did or not.

        THE WITNESS:  I can go back over the statement

and find out.

BY MR. VALESKA:

Q    Go ahead and refresh your recollection and tell
     me the best you know.

A    (Witness refers to his records.)  Okay.  After
     reading the statement, I recall that the magazine
     and the cards and the stuff was in my office and I
     showed them to him.

Q    You showed them to the Defendant, B. C. Money, Sr.?

A    Yes, sir.  He said that he had these magazines to
     get some kind of article out of there and order
     some stuff in the back of them.

Q    Tell Judge Little, did you have consent or did you
     get a verbal or written consent from Patricia Money
     that allowed you to open up the box?

A    Written consent.

Q    Do you have that?

A    Yes, I do.

Q    Go ahead and get that out.

A    (Witness refers to records and produces same.)

Q    Is that the consent?

A    Yes.

Q    Okay.  Hand that to the Court Reporter and let

him mark those.

                    (Thereupon, State's Exhibit
                    Numbers 1 and 2 were marked
                    for identification by the
                    Court Reporter.  After
                    that, the following
                    proceedings were had to-wit:)


BY MR. VALESKA:


Q    Okay.  State's Exhibit Number 2, is that the
     original waiver — — — I have showed Mr.
     Ramsey — — — marked for the purpose of the hearing
     on June 13, 1994, that you got from Patricia A.
     Money, Route 1, Box 35, Columbia, Alabama, on
     June 13, to search the barn located on that
     property?

A    Yes, sir.  It is.

Q    Is that where the box was, the red box?

A    Yes, sir.

Q    Did you take pictures of it?

A    I believe I did.  Let me see on the case file.
     (Refers to his records.)

Q    All right.

A       (Witness produces the photographs in question as
        requested.)

Q       All right.  Mark that as Number 3.

                        (Thereupon, State's Exhibit
                        Number 3 was marked for
                        identification by the
                        Court Reporter.  After that,
                        the following proceedings
                        were had, to-wit:)


BY MR. VALESKA:


Q       I show you State's Exhibit Number 3, for
        identification purposes.  Can you see that, Mr.
        Ramsey?  What is Exhibit Number 3, tell Judge
        Little.  (Produces the exhibit in question for
        examination.)

A       (Witness studies the exhibit in question as
        requested.)  The tool box that the magazines were
        in.

Q       Is that the property on B. C. Money, Sr.'s property?

A       No.  It is on Patricia A. Money's.

Q       Did you force the lock, cut it?

A       Yes, sir.

Q    Did you find State's Exhibit Number 1, which are the two magazines that have been marked as one; were they found in there?

A    Yes, they was.

Q    And, State's Exhibit Number 1, which is also the two sets of cards, and I will refer to one, for identification purposes, what does it say on it?

A    Lips.

Q    The other cards that are red do not have any writing on the cards themselves, on the red side? Is that correct?

A    No, sir.

Q    They were found in the Defendant's residence?

A    Yes, sir.

Q    Did you have a search warrant for that?

A    Yes, sir.

Q    Who was that search warrant from?

A    Judge Charles Woodham signed the search warrant.

Q    Did you have information after talking to the victims where these cards were inside the Defendant's house in Henry County?

A    Yes, I did.

Q    And, then did you execute the search warrant?

A    Yes, sir.

Q    Did you find these?

A    Yes, sir.

Q    One, which is the two decks of cards and one says Lips and the other is red?

A    Yes, sir.

Q    And, after talking with the victims, once again in the white bag, are these some of the shingles that you found in the hog barn that you took pictures of, where they said the alleged rape of Amanda took place?

A    Yes, sir.

Q    And, State's Exhibit Number 2, the waiver form, consent, excuse me, is that the original or a copy?

A    That is a copy there.

Q    Where is the original?

A    That would be the one in the case file.

Q    We need to pull out the original.  But, the copy, to the best of your knowledge, truly and accurately depicts the original?

A    Yes.

Q    When we find the original, we will submit it.  Did the Defendant, B. C. Money, Sr., admit those were his magazines?

A    Yes, sir.  He did.

Q    Do you know Tommy Money?

A No, sir.  I don't know him.

  MR. VALESKA:  That is all.  Pass the witness.

  THE COURT:  Okay.

  MR. VALESKA:  I offer the search warrant in

   evidence, too.

  MR. RAMSEY:  I would not have an objection,

   assuming that they come up with the

   original.


    <u>CROSS EXAMINATION</u>


BY MR. RAMSEY:


Q Clyde, these items you obtained, is there anything

 illegal about any of those?

A No, sir.

Q Do they depict any type of child pornography?

A No, sir.  They don't.

Q Any of the cards or the magazines?

A No, sir.

Q Is that the type of magazine that is commonly sold

 in convenience stores throughout Southeast Alabama

 and Henry County?

A I assume so.  Yes, sir.

Q    Nothing about the sale of those?

A    No, sir.

Q    Okay.  Do you know who owns the property on which that red tool chest was located?

A    I guess B. C. Money, Jr.

Q    If I told you it was Tommy Lee Money, would you have any reason to disbelieve that?

        MR. VALESKA:  I will stipulate it is Tommy Money's.  B. C. Money, Jr. was renting a trailer on his property at the end of the dirt road.

        THE COURT:  Okay.

BY MR. RAMSEY:

Q    And, is Patricia Ann Money, do you know whether or not that is Tommy Lee Money's wife?

A    There are two Patricia Moneys.

Q    Patricia Ann Money is what I said.  That is who you got the signed search warrant from, excuse me, the waiver?

A    That would be the other Mr. Money's wife.

Q    So, you don't know whether or not Patricia, whose wife Patricia Ann Money is?

A    I was told the land belonged to Mr. B. C. Money, Jr.

Q    If I told you that Patricia Ann Money was Tommy Lee

Money's wife, would you have any reason to differ?

MR. VALESKA:  I will stipulate that is true.

THE WITNESS:  No, sir.  Both of them have the

same name and it is kind of confusing.  I

don't know which one you are talking

about.

BY MR. RAMSEY:

Q    There is only one Patricia Ann Money, that is what

I am talking about.

A    I can look at them and tell you which one is which.

Q    Would you do that, please?

MR. VALESKA:  Is that it — — —

BY MR. RAMSEY:

Q    There is a Patricia Money who is the Defendant's

wife.  But, I am not talking about her. I am

talking about Patricia Ann Money, and that is who

you got to sign the consent, waiver?  Is that

correct?

A    I can look at them and tell you which one signed
     it?

Q    Why did you get her to sign it?

A    I assumed that her husband owned the land.

Q    You assumed that?

A    That is what I was told.

Q    You assumed, but you didn't really know, did you?

A    I didn't go check the deeds.  No, sir.

Q    In fact, it turned out that B. C. Money, Jr. didn't
     own that land?  Isn't that correct?

A    I am not sure.

Q    Okay.  But, you have no reason to differ if I told
     you that Tommy Lee Money owned the property?

          MR. VALESKA:  I stipulate.  I have personal
               knowledge that Tommy Lee Money owns the
               property and B. C., Jr. was renting the
               trailer down the dirt road, past the pond,
               on Tommy Lee Money's property.


BY MR. RAMSEY:


Q    Now, B. C. told you that he owned the magazines?

A    Yes, sir.  He said that.

Q   That was in the statement?

A   He was going to order some stuff out of them.   Yes, sir.

Q   Did you read him his Miranda Rights prior to that statement?

A   Yes, I did.

Q   Where was the cards found, specifically?

A   In the bedroom of Mr. Money's residence.

Q   Weren't they in a chest of drawers?

A   Yes, sir.

Q   They weren't laying out in the bedroom, were they?

A   No, sir.

Q   As a matter of fact, they were under some stuff in the drawer in the chest of drawers?   Is that not correct?

A   Yes, sir.

Q   Under some socks or some type of apparel like that?

A   Yes, sir.

Q   So, they weren't anywhere in the open, were they?

A   No, sir.

Q   And, in fact, these magazines were locked in the tool box, were they not?

A   Yes, sir.

Q   And, you have already testified you had to break

the lock to enter that tool box?  Is that correct?

A    Yes.

Q    All right.

        MR. RAMSEY:  That is all I have.

        THE COURT:  Anything else?

        MR. VALESKA:  No more questions.

        THE COURT:  Let me see if I have this

           straight, now.  Tommy Money owns the

           property?  Is that correct?

        THE WITNESS:  Yes, sir.

        THE COURT:  And, B. C. Money, Jr., rents a

           portion of that property?

        THE DEFENDANT:  No, sir.

        MR. RAMSEY:  Not according to my client, Your

           Honor.

        MR. VALESKA:  That is the testimony you have,

           Judge.

        THE COURT:  That is the testimony I have heard

           so far.  All right.  The barn, so to

           speak that we are talking about where the

           tool box was found, was that a portion of

           the rented land or not, if you know?

        THE WITNESS:  From what I understand, it was.

        MR. RAMSEY:  We object to any understanding.

Either he knows or he doesn't.

THE COURT:  Okay.  Do you know?

THE WITNESS:  No.  I didn't go to the deed

office and find out.  No, sir.  That is

what I was told by the people.

THE COURT:  Okay.  Anything else?

MR. VALESKA:  Not right now.

MR. RAMSEY:  No, sir.

THE COURT:  Okay.  All right.  You may step

down.

(Witness excused.)


MR. VALESKA:  Let's remark the cards.


(Thereupon, the two decks

of cards were remarked as

State's Exhibit Number 4

for identification purposes.

After that, the following

proceedings were had,

to—wit:)


MR. VALESKA:  I submit that there is no

standing from the Defendant for objecting

to the search.  There has been no

testimony given that it was the Defendant's
property in any manner or fashion.  The
evidence was that it was not his property.
B. C. Money, Jr.'s son was renting
property at the end of the dirt road where
his trailer was and this property is
found next to some dog pens close to the
hog pens where the alleged rapes or one
of the rapes of one of the victims
occurred.  That is the information
that Clyde got and that is why they
went there.  The victims will
testify that this Defendant showed
them the magazines and that property,
Mr. Ramsey is correct, is Tommy Lee
Money's property.  Actually the
ownership and the deed would show that,
it is not B. C. Money, Sr.'s property.
It stops at the bottom of the road down
there and his son was renting part of the
property, not particularly, as I
understand, where these magazines were
found in this red box.  But, once again,
he has no standing.  It is not his
property.  And, these are where the

alleged crimes occurred and the victims

will testify that they were shown these

magazines by the Defendant, B. C. Money,

Sr., as well.  And, one or both will

testify about the cards.  Even without

that, he has no standing to object.  It

was not his property.

THE COURT:  Okay.  Mr. Ramsey?

MR. RAMSEY:  That is not the basis of the

motion, Your Honor.  The motion is quite

simple.  Deputy Hornsby testified there

is nothing illegal about these cards,

nothing illegal about these magazines.

And, it depicts no child pornography.

The whole point, the state wants to get

these introduced to inflame the Jury.

It is highly inflammatory and not

relevant to the charges at hand as to

whether B. C. Money committed Rape in

the First Degree or Sexual Abuse in the

First Degree on these two victims.  It

is highly inflammatory and designed to

inflame the Jury and get this before the

Jury that this man had this type of − − −

THE COURT:  You are asking more for a Motion

In Limine than you are a Motion To Suppress.  Is that what you are asking for, too?

MR. RAMSEY:  Well, it goes along the lines of a Motion In Limine, Your Honor.  The point is originally, I thought these, when I filed the Motion back in November, before Judge Crespi, I thought these were illegally obtained and I did not know there was a search warrant.  I found out through discovery there was a search warrant.  I have not filed another motion, but the gist of the argument is that the highly inflammatory nature of this evidence outweighs any probative value, what, if any, probative value that they might have.

THE COURT:  As I understand the evidence, from what the District Attorney said, the girls described books in which these things were depicted.  They may not have described them in detail or the name of the books - - -

MR. RAMSEY:  What does that have to do, Your Honor, with whether or not the Defendant

committed the crime that he is charged with.

MR. VALESKA: Judge, I can answer it real simply. These magazines were shown to these little girls and they show hard penises and vaginas and sexual acts and what this is is sexual arousal of these little girls to get them to commit these alleged-type acts. It goes to, it is relevant in this case, Rape in the First Degree and Sexual Abuse, they were shown that, the same as the cards. I disagree that those magazines are not bought across the counter in Henry County; Swank. You can buy Playboys and if you will look at those magazines, that is hard core sexual intercourse, sodomy, sexual abuse, touching in relationship to adults in those cases. They were shown to these little girls under twelve as a part of a continuing series of transactions in relationship to performing sexual acts upon them. It is definitely relevant.

MR. RAMSEY: If they could prove that they

were, indeed, shown by the Defendant,

then I might even withdraw my motion.

But, there has been no evidence of that

and I don't expect there will be any

evidence of – – –

MR. VALESKA:  The girls will testify.

THE COURT:  That is for the Jury to weigh

the evidence and the inference to make.

MR. VALESKA:  The little girls will identify

the magazines and the cards shown to them.

It corroborates what they said as well

as the movie we plan to offer for the

Jury to view or watch, in relationship

to Screwballs.  This man is showing

sexually explicit movies or acts to

little girls, particularly his own,

Amber Money, Celeste Money, in relationship

to having sexual acts, the movie

Screwballs.  Mr. Ramsey is correct;

Screwballs is not illegal.  People of

legal age showing that to children and

also corroborates the sexual acts as,

what they occurred, as well as the

cards, the magazine Swank and the

location, and the roofing materials all

in close proximity down to where Mr. Hornsby called it a hog pen; it is a hog or goat pen in relationship to where the crimes occurred in Henry County.

THE COURT: Anything else?

MR. RAMSEY: No, sir. Just the argument that the inflammatory nature outweighs the probative value and it is not relevant.

THE COURT: That particular motion or motions will be denied. I believe the search warrant was entered in evidence; do you have any objections to the search warrant?

MR. RAMSEY: No, sir. We don't object to the search warrant.

THE COURT: All right. Let them be admitted, then.

(Thereupon, State's Exhibit Numbers 1 through 4 were received in evidence. After that, the following proceedings were had, to-wit:)

THE COURT: We will be at recess until 1:30.

(Thereupon, a recess was
called and taken by all
parties.  Upon completion
of said recess, all
parties returned to the
presence and hearing of
the Court Room and the
following proceedings were
held out of the presence
and hearing of the Trial
Jury, to-wit:)

THE COURT:  Go ahead and mark those.

(Thereupon, State's Exhibit
Numbers 5, 6, 7, 8, and 9
were marked for identification
by the Court Reporter.
After that, the following
proceedings were held,
to-wit:)

MR. VALESKA:  Go ahead and mark that.

(Thereupon, State's Exhibit

Number 10 was marked for
identification by the Court
Reporter.  After that, the
following proceedings were
had, to—wit:)

MR. RAMSEY:  All right.  There is one other
matter.

MR. VALESKA:  Hold the Jury.

THE COURT:  Just a minute.

MR. RAMSEY:  In regard to the order of
October 31, 1994 of last year, there was
an order in response to a motion I filed,
Your Honor.  The previous judge granted
my motion insofar as in camera
inspection of the Henry County
Department of Human Resources File.
Just for the Record, I don't know what
that in camera inspection revealed.  I
don't know if it revealed any exculpatory
information or not.  But, I have not
been privy to any results of that in
camera inspection.

THE COURT:  I don't know what you are
talking about.  Mr. Valeska, do you?

MR. RAMSEY: I have a copy of the order, Your

Honor, right here, if I may? (Produces

the order in question for examination.)

THE COURT: (Studies the order in question.)

MR. VALESKA: I show September 8, 1994.

MR. RAMSEY: This is the order of October 31,

'94.

THE COURT: The Defense made that motion for

the judge to examine the record in camera?

MR. RAMSEY: Yes, sir. And granted, insofar

as that order is reflected.

THE COURT: Assuming if the judge found

anything.

MR. RAMSEY: This is more for the Record than

anything else. My point is I have not

seen anything one way or the other.

THE COURT: I am assuming if he did, there

will be an order reflecting any matter

that might be favorable to the Defendant.

MR. VALESKA: I certainly have no problem,

since the state seeks to send Mr. Money

to the penitentiary for many, many years,

if he is convicted, I think the best way

is to make sure as the trial progresses

for the file to be turned over to you

and that you have the opportunity to see
them.  Since Crespi is no longer on the
Bench I want to make sure it was done and
if it was not, to make sure that you have
the opportunity and that way the Defense
would know, for sure, if you had a chance
to review the files yourself, as to any
exculpatory material.

MR. RAMSEY:  That is my point.  I have no
way of knowing if they have been examined
or not.

THE COURT:  I don't have the file.

MR. VALESKA:  I understand that, Your Honor.
I think the Human Resources are here and
I will make sure they provide it to you.
I don't expect the trial to end today in
any manner or fashion and we will go into
tomorrow.  Chief Deaton, will you make
sure that the Department of Human
Resources people do not leave with the
Records, the file, if they don't have
to go get them, so the entire file can
be presented to the judge for review.

THE COURT:  Well, I think I would have to look
at them before trial.

MR. VALESKA:  Judge, we are in a quandary,
then.  I have no problem with it then
and we will have to recess.  That is
fine.

THE COURT:  I want to know why this was
brought up this late.

MR. RAMSEY:  Well, Your Honor, I should have
brought it up – – –

THE COURT:  If this order – – –

MR. RAMSEY:  In reviewing the file, I realized
it had not been done during trial
preparation.

THE COURT:  I will look at the files in the
next recess, whenever that will be.  Are
they out there?

MR. VALESKA:  Yes, sir.

THE COURT:  Bring the Jury.

> (Thereupon, the Trial Jury
> was returned to their
> places in the Jury Box and
> the following proceedings
> were held in the presence
> and hearing of said Trial
> Jury, to-wit:)

THE COURT:  Ladies and Gentlemen of the Jury, just for some preliminary instructions to you at this time, I will read the Indictments to you.  There are six Indictments and basically four of the Indictments are worded the same and two Indictments of Sexual Abuse in the First Degree, the wording is the same, basically with the name of the victims that will change.  I need to read those to you, at this time.

> (Thereupon, the Court reads the Indictments to the Trial Jury.  After that, the following proceedings were had, to-wit:)

THE COURT:  Just to give you some general instructions at this time, of course, that is what the Indictments are.  These Indictments are not to be considered by you as evidence of anything in this case. This is just the formal method by which this Defendant is brought to trial.

They are not evidence in this case. The
Defendant is presumed to be innocent and
the burden is on the State of Alabama to
prove him guilty, beyond a reasonable
doubt, on each Indictment. It is not up
to him to prove his innocence. In fact,
the presumption of innocence is evidence
and you must take it with you and
consider it until the State convinces
you, beyond a reasonable doubt, that the
Defendant is guilty in each Indictment
here. The opinions, the statements, and
opinions and so forth given to you by the
attorneys are not to be considered by you
as evidence. The only thing you consider
as evidence in this case is what you hear
from the Witness Stand and the things
that I allow in evidence to be seen by
you in the Jury Room. The progression
of the trial in this case is that the
attorneys will both give you Opening
Statements in this case. The State of
Alabama, since it has the burden of proof
in this case, goes first and Mr. Valeska
will tell you what he expects the

COURT OF CRIMINAL APPEALS NO. ___95-0268___

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

## CIRCUIT COURT OF HENRY _____ COUNTY, ALABAMA

### CIRCUIT COURT NO. CC-94-065 thru CC-94-070

### CIRCUIT JUDGE   LAWSON LITTLE

Type of Conviction / Order Appealed From: Rape 1st on CC-94-065,066,067, & 069

Sentence Imposed: 99 yrs on CC-94-065; Sexual Abuse on CC-94-068 & 070
99 yrs on 066; 99 yrs on 067; 99 yrs on 069;
Defendant Indigent:  [X] YES   [ ] NO 10 yrs on CC-94-068; 10 yrs on CC-94-070

B. C. MONEY

NAME OF APPELLANT

| William Christian Maddox | 334 793-6493 |
|---|---|
| (Appellant's Attorney) | (Telephone No.) |
| P. O. Box 738 | |
| (Address) | |
| Dothan     AL | 36302 |
| (City)     (State) | (Zip Code) |

V.

## STATE OF ALABAMA

(State represented by Attorney General)

NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

27199



EXHIBIT

A

PENGAD 800-631-6989

evidence to show in this case. Mr. Ramsey,
representing the Defendant in this case,
will give his Opening Statement and tell
you what he expects the evidence to be in
the case. At that time, and since the
burden is on the State of Alabama to
prove the charges beyond a reasonable
doubt, they have that burden, and that is
why they go first and present their
witnesses. When they conclude with the
State's Witnesses, the State will rest
and then the Defendant presents what
testimony or evidence that he wants to
at that time. However, let me say this;
he is presumed innocent. He does not
have to show you anything or prove
anything to you or present any evidence.
But, he may. If he does, than he would
do that after the State rests. Then,
the State has the opportunity to come
back and rebut any testimony, if they
so desire. And, if the State elects to
present anymore testimony. At the end
of that, then we will have Closing
Arguments. At this time, the attorneys

will come up before you and tell you
what they think the evidence has shown
in this case and argue their case to
you.  At the conclusion of those
arguments, the Court will charge you as
to the law in the case.  I have already
read the Indictments to you and each of
those Indictments contain elements of
law.  My job is to explain exactly what
the law in the State of Alabama says as
to the elements in the Indictments.  Okay,
Mr. Valeska.

MR. RAMSEY:  I may have a witness in here.

MR. VALESKA:  We need The Rule.

THE COURT:  Okay.  If there are any witnesses
in the Court Room for the State of
Alabama or B. C. Money, Sr. — — — okay.
Mr. Valeska.

MR. VALESKA:  States the State's Opening
Statement to the Jury.

THE COURT:  Thank you, Mr. Valeska.  Mr.
Ramsey.

MR. RAMSEY:  Thank you, Your Honor.  May it
please the Court.  (States the Defendant's

(Case to the Jury.)

THE COURT:  Thank you, Mr. Ramsey.  Call your

first witness.

MR. VALESKA:  Amanda Hadden.


STATE'S EVIDENCE

Thereupon,


AMANDA CATHERINE HADDEN

was called as a witness in behalf of the State

of Alabama, and took the stand and testified as

follows, to-wit:


MR. VALESKA:  Judge, she hasn't been sworn.

I need to ask her some questions.

THE COURT:  Okay.

MR. VALESKA:  I want you to answer some

questions for me.  Okay?

THE COURT:  She has been sworn?

MR. VALESKA:  She has not.

THE COURT:  Okay.


(Thereupon, the witness was

sworn to testify to the

truth, the whole truth, and

nothing but the truth, and

the following proceedings

were had, to-wit:)


<u>DIRECT EXAMINATION</u>


BY MR. VALESKA:


Q    That microphone, that chair won't slide up.  Sit on
     the front part and speak up and it will pick you up,
     so don't scream and blows my ears out, okay?  Tell
     the Jury your name.

A    Amanda Catherine Hadden.

Q    How old are you, right now?

A    Nine.

Q    When is your birthday?

A    August 10.

Q    What year?

A    '85.

Q    What is your mama's name?

A    Veneva.

Q    Do you see Veneva in the Court Room?

A    (Witness nods her head to the affirmative.)

Q    Where is she?  Point her out.

A    (Witness indicating toward a lady.)

MR. VALESKA:  Let the Record reflect that she

has pointed out her mother.


BY MR. VALESKA:


Q     Now, can you tell me and the Ladies and Gentlemen

      of the Jury do you go to school now?

A     (Witness nods her head to the affirmative.)

Q     Where do you go to school?

A     Columbia.

Q     What grade are you in?

A     Fourth.

Q     Now, if I ask you, do you know about telling the

      truth or a lie or a story, do you know what I am

      talking about?

A     Yes, sir.

Q     Is it good to tell the truth or bad?

A     It is good.

Q     Have you ever told a lie or a story before?

A     Yes, sir.

Q     Did you get in trouble?

A     Yes, sir.

Q     Who did you get in trouble with?

A     My mother.

Q     All right.  What happened to you for telling a

story or lie or fib?

A    Got punished.

Q    Now, can you tell the Ladies and Gentlemen of the Jury what your teacher's name is in school, now?

A    Miss Aplin.

Q    What grade were you in last year?

A    Third.

Q    Where did you go to school last year?

A    Columbia.

Q    What was your teacher's name?

A    Miss Watson.

Q    Did you promote up, graduate, move up from the class you were in to the next class this year?

A    Yes, sir.

Q    Now, could you tell the Ladies and Gentlemen of the Jury, you can write, can't you?

A    Yes, sir.

Q    You can read, too, can't you?

A    Yes, sir.

Q    Now, can you tell the Ladies and Gentlemen of the Jury where you live?

A    I live in Haleburg.

Q    Okay.  What county is that in?

A    Houston County.

Q    Houston County?

A       Henry County.

Q       Okay.  Henry County.  What state do you live in?
        Do you know what state you live in?

A       Alabama.

Q       Now, can you tell the Ladies and Gentlemen of the
        Jury, the lady I am pointing to right here, do you
        know who that is?

A       Yes, sir.

Q       Who is the lady I am pointing to?

A       Mrs. Pat.

Q       Pat?  What is her last name?

A       Money.

Q       Does she have a daughter or cousin or someone you
        know?

A       Yes, sir.

Q       What is her daughter's name?

A       Amber.

Q       Is Amber older or younger than you?

A       Younger.

Q       Okay.  If I ask you some questions, can you
        promise to tell me the truth about what occurred?

A       Yes, sir.

Q       All right.

                MR. VALESKA:  I ask you to declare her to be

competent, at this time, judge.

        THE COURT:  Any objections?

        MR. RAMSEY:  No, sir.

        THE COURT:  Let the witness be qualified.

        MR. VALESKA:  Thank you.

BY MR. VALESKA:

Q     When you were in school, last year, did you ever go home with Amber Money?

A     I might have, but I can't remember real sure.

Q     Okay.  Could you tell the Ladies and Gentlemen of the Jury do you know what kind of house she was living in, if you went home to visit her?

A     (No response.)

Q     What did it look like where she lived before they moved?  What did she live in, was it a house?

A     It was a trailer.

Q     Now, the trailer, to get to her trailer, you turn off of a road?  Right?

A     (Witness nods her head to the affirmative.)

Q     When you turned off of that road, was that road dirt or was it paved?

A     Dirt.

Q     When you went down that dirt road, would you pass

anything on the right or left as you went up toward her house?  What could you see?

A    A house.

Q    Okay.  Who lived in that house?

A    Mr. B. C.

Q    And, was that a house or a trailer?

A    Trailer.

Q    After you turned and went past his house and went up the dirt road, would you come by any other building?

A    Yes, sir.  An old pen.

Q    Now, by the old pen, was there anything by the old pen on the other side of the road that you could see?

A    A pond.

Q    And, where that pen and the pond was, did you keep on going straight and would you eventually come to the trailer that Amber Money was living in, at that time?

A    Yes, sir.

Q    Now, how did you get to Amber's house the time that you went to visit?  Do you remember when something happened to you?

A    How did I get there?

Q    How did you get to her house that day?

A      I got off the school bus with her.

Q      Now, did you go to school that day?

A      Yes, sir.

Q      When you got off of the school bus, where did you and Amber go?

A      We went to Mr. B. C.'s house.

Q      Who was at Mr. B. C.'s house, if you remember, if anybody?

A      Him and his wife.

Q      Are you related, by blood, if you know, to B. C.? If you know? B. C. Money, Sr.? If you know?

A      Yeah. I know them.

Q      Are you related in the family by cousins or some way, if you know?

A      Yes, sir.

Q      What about Amber? Is she related to B. C. Money, Sr.?

A      Yes.

Q      How? Can you tell the Jury? If you know?

A      It is her granddaddy.

Q      Now, do you see Amber's mother in the Court Room?

A      Yes.

Q      Where is she?

A      Right there. (Witness indicating toward a lady in the Court Room as requested.)

Q    Okay. Do you know Amber's father's name? If you
     know?

A    Yes, sir.

Q    What is his name?

A    Mr. Comer.

Q    Okay. And, would you tell the Ladies and Gentlemen
     of the Jury, could you please tell them the time
     you went to visit with Amber and went to B. C.
     Money, Sr.'s trailer, did something happen to you
     that day?

A    Yes, sir.

Q    Was that in Henry County, Alabama?

A    Yes, sir.

Q    Now, could you tell the Jury, I will ask you if
     you remember going to visit; do you remember the
     exact day that was? What day of the week it was?

A    No.

Q    Can you tell me the days of the week?

A    (Witness laughing.)

Q    Tell me.

A    Monday, Tuesday, Wednesday, Thursday, Friday,
     Saturday, Sunday.

Q    Saturday and Sunday, do you go to school those days?

A    No, sir.

Q    So, after school, you are sure it was a Monday,

Tuesday, Wednesday, Thursday, or Friday you went
with Amber to B. C. Money, Sr.'s house and
something happened to you?

A    Yes, sir.

Q    Positive?

A    (No response.)

Q    What grade were you in then?

A    Second.

Q    How old were you?

A    Seven.

Q    Now, could you tell the Ladies and Gentlemen of
the Jury, do you remember the clothing you were
wearing, the exact clothing, what you had on that
day?

A    No, sir.

Q    Do you know if it was like it is kind of now, I
guess it is kind of hot, or was it cold?

A    It was hot.

Q    Do you remember what month it was?  In other words,
do you know the exact month?

A    No, sir.

Q    Do you know what month you start school in,
normally?

A    Not exactly.  But, I think it was in August when
we started.

Q    Okay. Then what is the next holiday after you
     start school, big holiday? Do you know?

A    (No response.)

Q    When you get out, you are out of school?

A    No, sir.

Q    Who comes in the red suit and brings gifts in
     December?

A    Santa Clause.

Q    Okay. What is the day you have turkey on? What
     do you call that?

A    Thanksgiving.

Q    Okay. Now, school started in August, you said,
     the best you could remember? Right?

A    (Witness nods her head to the affirmative.)

Q    Do you go to Columbia now, right?

A    Yes, sir.

Q    Do you go all year now or do you go all year like
     you used to, start in August or do you go all of
     the time, now?

A    We are out three weeks, now.

Q    Did you used to be out that way when something
     happened to you or did you go to school in August
     and go all the time until May and get out for the
     summer? Does that refresh you recollection?

A    (Witness nods her head to the affirmative.)

Q    Tell the Ladies and Gentlemen of the Jury, do
     you remember how you were supposed to get home
     that day, after you went to visit Amber?  How
     were you going to get home?

A    Amber's mother would come and get us and we would
     go to their house and her, Amber's mother, or my
     mother would come get me.

Q    Let's go to that day when you got off of the bus
     and went to Amber's and B. C. Money, Sr.'s trailer,
     did you stay in the trailer the whole time and
     never leave?

A    No.

Q    Did you go in the trailer?

A    Yes.

Q    What did you do inside the trailer, if you remember?

A    We got something to eat and drink.

Q    Do you know, I know that it has been a long time,
     but do you remember what you got to drink?

A    No, sir.

Q    Do you remember what Amber was wearing, the
     clothes, the colors, things she had on?

A    No, sir.  But, I know she had shorts on.

Q    What about what you were wearing in relationship,
     how would you describe your clothing?  Do you
     remember?  Not the color, but what kind of clothing

did you have on, if you remember?

A    I had shorts on and a shirt-sleeve shirt.

Q    Now, with your shorts on, did you have anything on underneath your shorts?

A    Yes.

Q    What did you have on?

A    Underwear.

Q    Is there a name for those?

A    Yes, sir.

Q    What do you call them?

A    Panties.

Q    Now, can you tell the Ladies and Gentlemen of the Jury, after you had something to eat and something to drink inside B. C. Money, Sr.'s trailer in Henry County, tell the Jury did you leave the trailer?

A    Yes, sir.

Q    Did you go home to your mama's house, then?

A    No, sir.

Q    Did you go up to Amanda's trailer and stay there with her mom?

A    You mean Amber?

Q    Amber.  I am sorry.

A    No, sir.

Q    Did something happen in between before you left

that night and after you left the trailer?

A    Yes, sir.

Q    Tell the Ladies and Gentlemen of the Jury, who
     left the trailer?

A    Me, Amber and Mr. B. C.

Q    How did you and Mr. B. C. and Amber leave the
     trailer when you went outside, where did you go?

A    We went to that old pen.

Q    Okay.  The old pen thing?  Describe that for the
     Jury.  What did it look like, what was it made of?

A    It was made of – – – I don't know what it is
     called, but – – –

Q    Okay.  What was it made of?  What was the building
     made of?  Was it all brick?

A    No.

Q    What was it made of?

A    Some of it was a fence.

Q    Okay.

A    But, I don't know what the stuff was on the roof.

Q    Had a roof on it?

A    Yes.

Q    Anything inside the building itself?  Describe
     what it looked like inside, the best you can
     remember.

A    It had old stuff in there like, it had an old

door in there.

Q    Okay.  Any kind of animals or pets been in there, anything you could tell, anything to feed those animals?

A    Yes, sir.

Q    What kind, if you know?

A    It looked like a pen feeder or something like that.

Q    Can you tell the Ladies and Gentlemen of the Jury, did you go inside that building in Henry County?

A    Yes, sir.

Q    Who went inside with you?

A    Amber and Mr. B. C.

Q    From the house, the trailer, how did you get down there on that occasion?  Did you walk?

A    We were on the back of Mr. B. C.'s truck.

Q    Now, did Mr. B. C. or his wife go down there with you?

A    No, sir.

Q    When you got down there, was there any other adults besides B. C. Money, Sr., and yourself and Amber?

A    No, sir.

Q    When you got inside the shed that you described, could anybody see exactly where you were standing

from the outside?

A    No, sir.

Q    Was there any bushes or trees around there?

A    Yes, sir.

Q    Was it low growth or high growth, the bushes?  How tall were the bushes, vines, or weeds?

A    They were high.

Q    Now, any animals inside?

A    No, sir.

Q    When you got inside, which room did you go in?  You described some pens, is what you said;  first, second, third, fourth, which one did you go in, if you remember?

A    (No response.)

Q    First one, second one – – –

A    First one.

Q    Anything inside that room besides the walls and roof?  What else was in there that you could see?

A    There were shingles in there.

Q    Shingles?  Did you look inside or outside, if you remember, in that room?

A    Yes.

Q    What did you look in or out of?

A    A window.

Q    Okay.  Was the window up or down?

A    Down.

Q    You said shingles, what color were the shingles,
     if you remember?

A    Black and light brown.

Q    Did someone have you do anything with those shingles?

A    Yes, sir.

Q    Who?

A    Mr. B. C.

Q    What did he tell you to do with them?

A    To lay them down on the ground.

Q    Who laid the shingles down on the ground?  Tell
     the Jury.

A    Me and Amber and him.

Q    And, would you tell the Ladies and Gentlemen, this
     pen, this area, it is big and wide and as long as
     this Jury Box or is it shorter and smaller?

A    (No response.)

Q    Look at this Jury Box.  Was it as big as this, the
     room that you were in?

A    It might be as long as it, but it is a little
     wider.

Q    Was there a door to go in or out?

A    Yes.

Q    An entrance way?  Was there another door on the back
     side to get out of it or just one way to get in or

|   |   |
|---|---|
|   | out? |
| A | Just one way. |
| Q | Now, would you tell the Ladies and Gentlemen of the Jury when you were inside and the shingles were put down, was somebody blocking the door?  Was somebody standing in the door? |
| A | Yes. |
| Q | Who? |
| A | Mr. B. C. |
| Q | Mr. B. C. Money, Sr.?  Is that correct? |
| A | Yes, sir. |
| Q | Not Comer Money, B. C. Money, not that man?  Right? |
| A | (No response.) |
| Q | Would you tell the Ladies and Gentlemen of the Jury, you had your shorts on? |
| A | Yes, sir. |
| Q | Who was stronger, Mr. B. C. Money, Sr., physically, strength-wise;  you or him? |
| A | Him. |
| Q | Who was taller? |
| A | Him. |
| Q | Who weighed more? |
| A | Him. |
| Q | Who was the oldest person in that room, in that shed, that little pen, you said;  Amber, you, or |

B. C. Money, Sr.?

A      Mr. B. C.

Q      Related to you by blood?  Correct?

A      Yes.

Q      Related also to Amber, her grandfather?  Is that right?

A      (Witness nods her head to the affirmative.)

Q      Would you tell the Ladies and Gentlemen of the Jury, did he tell you to do something, Amanda?

A      (No response.)

Q      Take your time.

A      Yes, sir.

Q      Okay.  How old were you then?  Tell the Jury.

A      Seven.

Q      Was Amber older or younger?

A      Younger.

Q      Was she in the pen or the room there with you?

A      Yes, sir.

Q      Were you afraid, at that time?

A      Yes, sir.

Q      Who were you afraid of?

A      Mr. B. C.

Q      What did he – – – take your time.  Tell the Jury what he told you to do or what did he do?

A      First we put the shingles down.

Q       Okay.

A       And then, he told me to pull my pants down.

Q       Did you take your pants down?

A       Yes, sir.

Q       Did you scream out or yell for help, then?

A       No, sir.

Q       Why not?

A       I was afraid.

Q       Who were you afraid of? Were you afraid of Amber?

A       No, sir.

Q       Who were you afraid of in that room in Henry County?

A       Mr. B. C.

Q       Now, would you tell the Ladies and Gentlemen of
        the Jury, I want to go back or, I will come back,
        okay? I want to you to take your time. Tell the
        Ladies and Gentlemen of the Jury when you left
        B. C. Money's trailer in Henry County, Haleburg?
        Is that correct?

A       Yes, sir.

Q       Or is it Haleyburg?

A       Haleburg.

Q       Tell the Jury when you got off of the truck and
        Amber got out and B. C. Money got out, did he
        show you anything else before he got you into the
        room you were describing and he told you to take

your pants off?

A    He showed some magazines.

Q    How many magazines?  Could you remember, could you
     tell the Jury?

A    I don't remember.

Q    If I hold up this, how many is this?

A    One.

Q    Was it more than one?

A    Yes, sir.

Q    And, did anybody hold it while you and Amber were
     there with B. C. Money?

A    Yes, sir.

Q    Who was the one that produced the magazines?  Did
     you take them down there with you?

A    No.

Q    Did Amber take them down there with her?

A    No, sir.

Q    Where did the magazines come from?  Tell the Jury.

A    From the little box.

Q    Okay.  Was that box locked or unlocked, if you
     know?

A    Locked.

Q    Who had the key?

A    Mr. B. C.

Q    When that was unlocked and he took the magazines

out, were they of men and women or were they animals?

A    Men and women.

Q    Do you see men and women in the Jury Box?  Don't you?

A    Yes.

Q    Were they pictures of men and women like are in the Jury Box?

A    No.

Q    What was different?  Tell the Jury.

A    They were showing their private parts.

Q    Okay.  Were the men and women in those pictures, were they completely dressed like I am or did they have some of their clothes on or off?

A    They were off.

Q    Their private parts?  Would you tell the Jury, do you have any brothers?

A    Yes, sir.

Q    Older or younger?

A    Older.

Q    Okay.  A lot older or just a little bit?

A    Just a little bit.

Q    Let's go back to when you were a tiny, little girl; did your mom ever bathe y'all together?

A    Yes, sir.

Q    All right.  Was your brother's private part
     different from your private part?

A    Yes, sir.

Q    Now, tell the Ladies and Gentlemen of the Jury,
     these men and women that showed their private parts,
     were they touching or doing something that you
     could see in those pictures?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury,
     if I showed you some magazines, would you remember
     what those pictures looked like?

A    Yes, sir.

Q    Before I do that, can you tell our Jury — — — let's
     do this.  Let me show you State's Exhibit Number 10.
     Watch out, there is a nail or a tack right up here.
     I am showing you State's Exhibit Number 10 and I
     want to show you State's Exhibit Number 5.  I am
     showing you State's Exhibit Number 5, for
     identification purposes — — — well, we have to ask
     this question.  Okay?  Do you see State's Exhibit 5?
     Do you recognize that picture?  (Produces the
     exhibits in question for examination.)

A    (Witness studies the exhibits in question as
     requested.)  Yes, sir.

Q    I need to step away from you because you talk real

soft.  Tell the Jury what that is a picture of, if anything, number 5?

A    It is shingles.

Q    Shingles where?  Could you tell the Jury?

A    On the ground.

Q    On the ground in what type of building?

A    A pen.

Q    That pen or building, did Mr. B. C. Money do anything to you, two different things?  Is that the same place?

A    Yes, sir.

Q    That picture shows you the shingles and I am showing you State's Exhibit Number 10 up here.  I don't want to get it on you.  Is that the type of shingle that you placed on the ground in State's Exhibit 5?  Is that the exact color with the black and the brown as you said?

A    Yes, sir.

Q    Does this shingle appear to be marked or changed or different except it has writing on the back, SX and a slash and M, that is for Moe, the Court Reporter, in blue pen.  Was that blue writing on there, if you remember?

A    I don't remember.

Q    Okay.  But, on this side, is that the way it

looked?  State's Exhibit Number 5, is that the

way it looked prior to something happening

to you?

A    Yes, sir.

Q    Doesn't appear to be changed in any way?

A    No.

Q    Before I offer it, I want to show you a couple of

other pictures.  Okay?  I want to show you State's

Exhibit Number 7 first.  I am showing you State's

Exhibit 7, do you recognize what 7 is?  (Produces

the exhibit in question for examination.)

A    (Witness studies the exhibit in question as

requested.)  Yes, sir.

Q    What is Number 7?

A    It is inside the pen.

Q    Is that what the building was made of, that you

told me had a roof and was made of other things?

Is that what it was made of?

A    Yes.

Q    Is that the way it looked on that occasion when

B. C. Money and you were in there with Amber in

Henry County?

A    Yes, sir.

Q    All right.  And, once again, you can't tell us the

exact date?

A    No, sir.

Q    But, you said it was hot? Is that right?

A    Yes.

Q    After school started in August? Right?

A    Yes.

Q    You know Christmas time in January and February, does it get cold then, compared to May or April or August or September? Is it colder then, usually, in January and February?

A    Yes, sir.

Q    Was it cold enough that you needed a jacket?

A    No, sir.

Q    Now, is this the way it looked, the best you can recall?

A    Yes, sir.

Q    Same conditions, correct? Except for that blue writing? Is that correct?

A    Yes, sir.

Q    Let's go to State's Exhibit Number 6, for identification purposes. I will show you State's Exhibit 6. What is Number 6 compared to State's Exhibit 7 and State's Exhibit 5? Can you tell us?

A    It has weeds around the pen.

Q    Is that the way the pen looked with the weeds?

A    Yes, sir.

Q     And the growth, what it was made of with the roof,
      as well as the wood?

A     Yes, sir.

Q     Same substantial condition, as best you can recall?

A     (Witness nods her head to the affirmative.)

Q     Correct?

A     Yes, sir.

Q     Let me ask you about the bushes.  You didn't
      measure how tall the bushes were, did you?

A     No.

Q     Do you remember if they were green or brown, one
      hundred percent at that time, do you?

A     No, sir.

Q     Okay.  Would this be from the inside or the
      outside, looking into the building or looking out
      of it on Number 6?

A     Outside.

Q     Now, let me show you State's Exhibit Number 3.
      (Produces the exhibit in question for
      examination.)

A     (Witness studies the exhibit in question as
      requested.)

Q     Now, you told the Jury about a box that these
      magazines were in.  State's Exhibit 3, does that
      look like the box, if you recall?

A    Yes, sir.

Q    Appear to be changed in any way, except there is
     a lock on it in that picture?  Is that correct?

A    Yes.

Q    Does that look like where it was when it was
     unlocked by B. C. Money, Sr.?

A    Yes, sir.

Q    Okay.  Let me ask you some questions.  State's
     Exhibit Number 6 and State's Exhibit Number 7 and
     State's Exhibit Number 5 and Exhibit 10, my
     shingles, is that the same place the box was with
     the magazines or was that a different location?

A    It was a different place.

Q    Different place?  Let's say on this occasion, you
     tell me this day, you came out of B. C. Money's
     house and you got on the back of the truck, you and
     Amber, and rode with him headed toward the shed?
     Is that right?

A    Yes, sir.

Q    Before you got to the shed, did you stop?

A    (No response.)

Q    Before you got to the shed, did y'all stop
     somewhere or did you walk somewhere else before you
     went to the shed?

A    Yes, sir.

Q   Okay. What did you walk to that was different from the shed? Was there another location?

A   Yes, sir.

Q   Describe what that looked like for me.

A   It was where the dog pen was.

Q   Okay. Looking at State's Exhibit Number 3 to the left up here, do you see some pens up there?

A   Yes, sir.

Q   Is that the place?

A   Yes, sir.

Q   Okay.

MR. VALESKA: I offer State's Exhibit Numbers 5, 7, 6, and 10 in evidence.

MR. RAMSEY: No objections.

THE COURT: Let them be admitted.

(Thereupon, State's Exhibit Numbers 5, 6, 7, and 10 were received in evidence. After that, the following proceedings were had, to-wit:)

THE COURT: You may publish them to the Jury.

BY MR. VALESKA:

Q    Now, let me ask you a few more questions, if I

could?  Okay?  Let's go back to State's Exhibit

Number - - - did you ever see any cards, playing

cards, with diamonds and hearts on them in any way?

A    No, sir.

Q    Okay.  Now, could you tell the Ladies and Gentlemen

of the Jury on State's Exhibit Number 3, which is

also in evidence - - -

   MR. VALESKA:  State's Exhibit Number 3, I offer

    it in evidence.

   THE COURT:  Any objections?

   MR. RAMSEY:  I don't know what it is.

   MR. VALESKA:  The red box pictured.

   MR. RAMSEY:  No objections.

   THE COURT:  Let it be admitted.

       (Thereupon, State's Exhibit

       Number 3 was admitted in

       evidence to the trial proper

       in addition to the Motion

       Hearing and the following

       proceedings were had,

to—wit:)

MR. VALESKA:  Publish?

THE COURT:  Yes.

MR. VALESKA:  Thank you, Your Honor.


BY MR. VALESKA:


Q     The box B. C. Money, Sr. had the key to unlock, I

      want to show you what has been marked for

      identification purposes as State's Exhibit Number 1,

      okay?  It has two parts to it.  Okay?  I am showing

      you these and do you recognize these?  (Produces

      the exhibit in question for examination.)

A     (Witness studies the exhibit in question as

      requested.)  Yes, sir.

Q     Okay.  How do you know, how do you recognize those?

      Can you tell me?

A     Because we saw them.

Q     Who showed them to you?

A     Mr. B. C.

Q     Can you see the pictures in front of you?

A     Yes, sir.

Q     Okay.  Can you tell the Ladies and Gentlemen of

      the Jury, you told them the way I have got them

right now, you said there were pictures of men and
women and do you see men and women in the pictures
I am showing you?

A    Only women.

Q    So, there are other pictures inside? Would that
be correct?

A    Yes, sir.

Q    (Opening the exhibit in question.) Is that men and
women?

A    Yes, sir.


        MR. RAMSEY: We will stipulate there is men
            and women in those magazines.

        MR. VALESKA: Judge, I think I have a right
            to show my victim, to show what they − − −

        MR. RAMSEY: Fine. We will stipulate, but if
            Mr. Valeska wants to go through it, that
            is his prerogative.

        THE COURT: All right.


BY MR. VALESKA:


Q    That is men and women?

A    Yes.

Q    Those are the pictures in the magazine that B. C.

Money showed you?

A    Yes.

Q    They appear to be changed in any way, except they have got some writing on there, SX1—2/M, the Court's identification, and do they appear to be the same?

A    Yes.

Q    Okay.

        MR. VALESKA:  I offer State's Exhibit Number 1, which is two exhibits in evidence.

        THE COURT:  Any objections?

        MR. RAMSEY:  Yes, sir.  We would renew our original objection.

        THE COURT:  Overruled.

        MR. VALESKA:  May I publish?

        THE COURT:  Yes, sir.  Let them be admitted.

                (Thereupon, State's Exhibit Number 1 was received in evidence to the trial proper in addition to the Motion Hearing.  After that, the following proceedings were had, to—wit:)

MR. RAMSEY:  For the Record, Your Honor, it
was not an objection, we are objecting
to the same grounds as previously.

THE COURT:  That is what I understood and
that is denied.

BY MR. VALESKA:

Q    I want to go back and ask you a few more questions.
I know that the Jury is looking, but they can
listen, too.  Okay?  Tell me how old you are, right
now?

A    Nine.

Q    Now, let's go to your inside, you identified the
pictures of the shed where B. C. Money, Sr. told
you to take your pants off.  Did you take them off
or did he take them off or do you remember?

A    I did.

Q    What about your panties?

A    (No response.)

Q    What did he tell you to do about your panties, if
anything?

A    Pull them down, too.

Q    Were you afraid, at that time?

A    Yes,

Q    Is there any way that you could run out and get away at that point in time when you were in that room?

A    No.

Q    Who prevented you from leaving the room?

A    Mr. B. C.

Q    Now, was Amber also in the same room?

A    Yes, sir.

Q    Any way she could get out?

A    No, sir.

Q    Why didn't you go out the window?

A    It was shut.

Q    You were afraid?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury, could you hear any other cars, at that time?

A    No, sir.

Q    Could you hear any other adults or people, children, living human beings at all, at that time?

A    No, sir.

Q    At that point in time, what did B. C. Money, Sr., tell you to do when you pulled down your pants and underpants?  What did he tell you to do next?

A    To lay down.

Q    What did you lay down on?  Tell the Jury.

A    Shingles.

Q    Was that the same shingles like Exhibit 10 and
the pictures?

A    Yes, sir.

Q    When you laid down, were you pants and underpants
completely off the lower part of your body, from
here down?  Were they completely pulled down?

A    No, sir.

Q    Where were they?

A    About to my knees.

Q    Okay.  From your knees up to your waist, like I am
showing you, you had no clothing on in between?
Is that correct?

A    (Witness nods her head to the affirmative.)

Q    When you laid down on the shingles, could you tell
the Jury, this shingle right here, what part of
your body laid on the shingle, first, when you laid
down?

A    My back.

Q    On your back, does that also include your buttocks?

A    Yes.

Q    Was it soft or hard on your little skin?

A    Hard.

Q    Would you tell the Ladies and Gentlemen of the Jury
when you were laying down, did somebody touch you

on your private part, in your vagina?

A    Yes, sir.

Q    Who touched you, first?

A    Mr. B. C.

Q    Were you under twelve years of age, at that time?

A    Yes, sir.

Q    Were you afraid?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury when he first touched you first, what part of his body, the first time?

A    His hand.

Q    He put his hand on what part of your body?

A    My private part.

Q    All right.

        MR. VALESKA:  Judge, could she come down, with the Court's permission?

        THE COURT:  Sure.  Go ahead.

BY MR. VALESKA:

Q    Come on down here in front of the Jury.

A    (Witness leaves the Witness Stand and goes before the Jury Box as requested.)

Q    Stand right here.  Okay.  You are doing fine.  Look
     at the Jury.

A    (Witness does as requested.)

Q    Okay.  Now, I want you to look this way, turn
     around this way and I want you to point to the
     Ladies and Gentlemen of the Jury, your private
     part where he put his hand and show them.

A    Here.  (Witness indicating.)

Q    Show them.  Don't hold your hands together.  Okay?


          MR. RAMSEY:  Your Honor, could the Record
               reflect I was not able to see?  I assume
               I know, but — — —

          THE COURT:  Let her demonstrate again.

          MR. VALESKA:  Just stand right here, please,
               and show Mr. Ramsey.

          THE WITNESS:  (Demonstrating again.)

          MR. RAMSEY:  I don't mean to embarrass her.
               I just — — —

          MR. VALESKA:  I don't think that, Mr. Ramsey.
               You have a right to see.

          MR. RAMSEY:  Okay.

BY MR. VALESKA:

Q      Show Mr. Ramsey with your hand, where he touched
       you.

A      (Witness indicating.)

              MR. RAMSEY:  Okay.  That is fine.  I saw it.
              MR. VALESKA:  Okay.  Get back up there.
              THE WITNESS:  (Returns to the Witness Stand
                  as requested.)

BY MR. VALESKA:

Q      Would you tell the Ladies and Gentlemen of the Jury,
       when he touched you on your private part, is that
       your buttocks or your front?

A      My front.

Q      Okay.  And, is there a name for that private part,
       have you come to learn what that is?  Do you know,
       yes or no?

A      No, sir.

Q      Did he put his hand inside your private part when
       he touched you?

A      (No response.)

Q      On your private part?

Case 1:08-cv-00228-WKW-TFM    Document 16-4    Filed 05/09/2008    Page 43 of 201

A    (No response.)

Q    Yes or no?

A    (No response.)

Q    Take your time.

A    (No response.)

Q    Did he touch you on your stomach, up here?

A    No.

Q    Did he touch you on your knees down here?

A    No, sir.

Q    Did he touch you on your thighs, right here?

A    No, sir.

Q    Did he touch you back here at that time, on your
     buttocks?

A    No.

Q    What did he put his hand on, what part of your
     body?

A    Private part.

Q    And, was that down where your private part, an
     example, like when you sit on the toilet and go
     to the bathroom and your legs come apart, is that
     where your private part is?

A    Yes, sir.

Q    Is that where he put his hand?

A    Yes, sir.

Q    Were you afraid, at that time?

A     Yes, sir.

Q     Was Amber saying anything, would you tell the Jury?

A     No, sir.

Q     Did you know how old B. C. Money, Sr. was, at that time?  If you know?

A     No, sir.

Q     Was he older than you?

A     Yes, sir.

Q     Were you or Amber either able to drive his truck?

A     No, sir.

Q     Would you tell the Ladies and Gentlemen of the Jury when he touched you then, were his pants on or off?

A     On.

Q     Did he do anything with his pants?  Tell the Jury.

A     Yes, sir.

Q     In Henry County, in the shed we have pictures of, on that property, what did he do to his pants? Take your time, Amanda.

A     He pulled them down.

Q     When he pulled them down, could you determine whether he was wearing anything under his pants?

A     Yes, sir.

Q     What was that?

A     Shorts.

Q     Okay.  Describe what those shorts looked like.

Can you?

A    They looked like boxers.

Q    Your brother, how old is your brother, now?

A    Eleven.

Q    Okay.  Does he wear those kind of shorts or does he wear jockey-type?  If you know?

A    I don't know.

Q    Okay.  Is that the type he wears or do you know?

A    (No response.)

Q    You may not know.  I am just asking.

A    No, sir.

Q    Okay.  When Mr. Money, B. C. Money, Sr. took down his pants with the boxer shorts on, did he take those down and take anything out of those boxer shorts?

A    Yes, sir.

Q    Did he take them all the way down?

A    No, sir.

Q    To where?

A    About his knees.

Q    Could you see his private part?

A    Yes, sir.

Q    Was it different from yours?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury,

Q    at that time, that point in time, you were lying
down and he touched you with his hand and what did
he do next?

A    (No response.)

Q    Take your time and tell this Jury what B. C. Money,
Sr. did to you in that shed in Henry County,
Alabama, next.

A    He got on top of me.

Q    When he got on top of you, did he move his body in
any way?

A    Yes, sir.

Q    How did he move it?  Just tell the Jury.  Take your
time.

A    Up and down.

Q    Tell the Ladies and Gentlemen of the Jury your
private part, his private part, did he put it
inside your private part?

A    Yes, sir.

Q    Did it hurt?

A    Yes, sir.

Q    Did you tell him to stop?

A    No, sir.

Q    Did he stop?

A    No, sir.

Q    Was he saying anything to you, at that time?

A    No, sir.

Q    Were you afraid?

A    Yes, sir.

Q    Could you see Amber, at that point in time, when he was on top of you?

A    Yes, sir.

Q    Was she close to you?

A    Yes, sir.

Q    All right.  Was she crying, at that time, if you know?

A    No, sir.

Q    Was she saying anything?

A    No, sir.

Q    While this was occurring, how long did it last, if you know?  Could you tell us?

A    A short time.

Q    Would you tell the Ladies and Gentlemen of the Jury did something cause him to get off you or jump up in any way?

A    Yes, sir.

Q    Tell the Jury what that was.

A    Miss Pat was coming.

Q    Who is Miss Pat?

A    Amber's mother.

Q    Show us Miss Pat.

A    Right there.  (Witness indicating.)

Q    Do you know her voice?

A    Yes, sir.

Q    Could you hear her voice?

A    No, sir.

Q    Okay.  When B. C. Money, Sr. jumped up, did he
     tell you and Amber anything then?

A    (Witness nods her head to the affirmative.)

Q    What did he say?

A    He told us not to tell anybody.

Q    And, did he pull his pants up and leave?

A    Yes, sir.

Q    What did you do to your pants or your underwear,
     please?

A    I pulled them up.

Q    Would you tell the Ladies and Gentlemen of the
     Jury where did you and Amber go next?

A    We went to, with Miss Pat.

Q    Are you sure you went with Miss Pat or did you ride
     on the back of the truck?

A    The back of the truck.

Q    Did Miss Pat ride with you?

A    No, sir.

Q    And, who drove the truck?

A    Mr. B. C.

Q    Where did you drive to, if you remember?

A    Back to his house.

Q    Did you see Miss Pat again, then?

A    Yes, sir.

Q    Now, did you tell Miss Pat, when she got down
     there, what had happened to you?

A    No, sir.

Q    Why didn't you tell?

A    Because I was afraid.

Q    Who were you afraid of?

A    Mr. B. C.

Q    Now, would you tell the Ladies and Gentlemen of
     the Jury, if you recall, did you ever go back to
     visit and be alone with Amber and B. C. Money, Sr.,
     again after that, if you remember?

A    No, sir.

Q    Now, can you tell the Jury, did you write down the
     date when this occurred to you?

A    No, sir.

Q    Do you remember the exact date?

A    No, sir.

Q    How old were you when this happened to you?

A    Sir?

Q    How old were you when this happened to you?

A    Seven.

Q    You are sure?

A    Yes, sir.

Q    You are sure these things happened to the Jury that you just told them?

A    Yes, sir.

Q    Didn't make them up?

A    No, sir.

Q    Now, tell the Jury — — — you finally told someone what happened to you, did you not?

A    Yes, sir.

Q    Someone asked you and who did you tell, if you remember, first?

A    I told my mother and my aunt.

Q    Now, would you — — — were you present or did you go with them when they went to talk to Amber's mother?

A    (No response.)

Q    If you remember?  You may not, just tell us.

A    No, sir.

Q    Now, I want you to go, if you could, to June 17, 1994.  Do you remember that date?

A    Yes, sir.

Q    Did you write that date down anywhere?

A    No, sir.

Q    Tell the Jury why you remember June 17, 1994,

that date, that month, that year?

A    Because I had to go talk to Miss Beth or Mr. Clyde.

Q    Did you go see somebody else, too, then?

A    (No response.)

Q    Did you ever go see a doctor?

A    Yes, sir.

Q    Okay.  Did you see the doctor that day?

A    Yes, sir.

Q    Did you write that down on anything in anything like a diary or a little book?

A    No.

Q    Would you tell the Ladies and Gentlemen of the Jury, had you ever been to see a doctor before?

A    (No response.)

Q    From the date you were born until this date, had you ever visited a doctor for anything?

A    Yes, sir.

Q    Like a cold, shot, or something?  Would that be fair to say?

A    Yes, sir.

Q    On June 17, 1994, did you go to see Dr. Ted Williams, a doctor in Dothan?  Do you remember that?

A    Yes, sir.

Q    And, when Dr. Williams asked you what happened,

do you remember him asking you that?

A    Yes, sir.

Q    Were you able to tell him everything and talk about it real easy?

A    No, sir.

Q    Why?

A    Because, it was long ago and I didn't remember everything.

Q    Were you afraid or nervous?

A    Yes, sir.

Q    Had you ever talked to Dr. Ted Williams before, that you remember?

A    No, sir.

Q    When you saw Dr. Ted Williams on this occasion, did he give you an examination?  Did he look at you, could you tell us, Amanda?

A    Yes.

Q    Did he have you lay down on a table?

A    Yes, sir.

Q    Did he have you raise your knees or legs up some, too?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury, they took your temperature?  Or, did they, if you remember?

A    I don't remember.

Q    Did they measure your height and put you on some

     scales and weigh you that day?  Do you remember

     doing that?

A    Yes.

Q    Do you remember seeing his nurses?

A    Yes.

Q    And, when he had you lay down and raise up your

     knees, would you tell this Jury, did he look at

     some particular part of your body then?

A    Yes.

Q    Did he put anything inside your private parts to

     examine you?

A    Yes, sir.

Q    Do you remember that?

A    Yes, sir.

Q    Did that hurt?

A    Yes, sir.

Q    He looked at your private part?  Is that right?

A    Yes, sir.

Q    Now, would you tell the Ladies and Gentlemen of

     the Jury, please, I asked you about a man that

     touched you in your private part, by force, in

     Henry County and you were under twelve and about a

     man that took his private part and put it inside

your private part, your vagina, and you were under

twelve, by force, in Henry County, those two things

I asked you about, do you remember testifying?

A    Yes.

Q    I want you to tell these Ladies and Gentlemen of

the Jury, did you see the man that did that to

you with the sexual abuse and the rape, do you see

him in the Court Room?

A    Yes, sir.

Q    Would you point that man out for the Jury?

A    (Witness indicating toward the Defendant as

requested.)

Q    Which man over there?

A    B. C.

        MR. VALESKA:  Let the Record reflect that

            she has pointed out the Defendant,

            B. C. Money, Sr., and referred to him

            as Mr. B. C.  Pass the witness.  Mr.

            Ramsey has some questions.  Thank you.

        THE COURT:  You may Cross Examine.

<u>CROSS EXAMINATION</u>

BY MR. RAMSEY:

Q     Amanda, my name is Mr. Ramsey and I am going to ask
      you a few questions.  Is that okay?

A     Okay.

Q     I will try to be as brief as possible.  How many
      times — — — you call him Mr. B. C.?  Is that right?

A     Right.

Q     How many times have you ever been to Mr. B. C.'s
      trailer?

A     I don't know how many times.

Q     Would it be more than once?

A     Yes, sir.

Q     Okay.  More than five times?

A     I don't know.

Q     Okay.  You just don't remember?  Have you ever been
      there without Amber?

A     No, sir.  Not that I know of.

Q     Every time you went to Mr. B. C.'s house, Amber was
      with you?  Is that correct?

A     Yes, sir.

Q     Okay.  How old are you, now?

A     Nine.

Q    What is your birthday?

A    August 10.

Q    What year?

A    '85.

Q    '85?

A    '86.

Q    '86?  Okay.  That is right.  You were born
     August 10 of '86, so you turned nine this past
     August?

A    Yes.

Q    You are in the fourth grade?

A    Yes, sir.

Q    And you go to school at Houston County?

A    Yes, sir.

Q    Are you and Amber good friends?

A    Yes, sir.

Q    You were good friends a couple of years ago, too,
     weren't you?

A    Yes, sir.

Q    Would you consider her your best friend?

A    Yes, sir.

Q    Okay.  You still play and go places with Amber?

A    Yes, sir.

Q    Okay.  How long have you been best friends with
     Amber?

A    Oh, I don't know.

Q    Quite a few years, since you were a little, bitty
     girl?  Is that right?

A    Yes, sir.

Q    Where did you live back when this incident you
     told the Jury about happened?

A    I lived in Haleburg.

Q    Okay.  Who did you live with?

A    My mother.

Q    Anybody else live there?

A    Yes, sir.

Q    Tell me who that was.

A    My brother and my mother's boyfriend.

Q    Okay.  Didn't your mother's boyfriend have two
     sons, boys, that lived there, too?

A    Yes, sir.

Q    What is their name?

A    Jimmy and Kevin.

Q    How old was Kevin?

A    He was fifteen, I believe.

Q    Fifteen then, so he would be, if that was two years
     ago, he would be about seventeen, now?

A    (Witness nods her head to the affirmative.)

Q    How old was Jimmy, then?

A    Twelve or thirteen.  I think twelve.

Q    Twelve or thirteen, so he would be about fourteen, fifteen, now?  Is that right?

A    Right.

Q    And, your brother lived there?

A    Right.

Q    What is his name?

A    Chuck.

Q    Okay.  How old is Chuck?

A    He is eleven.

Q    Did you have your own bedroom where you lived there?

A    Yes, sir.

Q    Okay.  Where did the two boys sleep?  Where did they stay, excuse me?

A    Jimmy and my brother, they had a room together. And, Kevin had his own room.

Q    Okay.  What did you live in, a house?

A    Trailer.

Q    A trailer?  How many bedrooms did the trailer have?

A    Four.

Q    Four bedrooms?  And, your mother lived in the other bedroom with her boyfriend?  Is that correct?

A    (Witness nods her head to the affirmative.)

Q    How many times had you been to Mr. B. C.'s house before this incident you told us about happened?

A       (No response.)

Q       If you remember?

A       I don't remember.

Q       More than once?

A       Yes, sir.

Q       Okay.  What did you do when you went there on previous occasions?

A       Sometimes I would just go in the house with Amber and we would just sit there and watch T.V.

Q       Okay.  How long did you ever stay there?  What was the longest you ever stayed there?  Let me ask you that.

A       Whenever I got off the school bus with her.

Q       Okay.  How long was it before you left, the longest you ever stayed there, how long would that be?

A       I don't remember.

Q       Okay.  Weren't you just really waiting for a ride to get home when you went there?

A       Yes, sir.

Q       On this date, weren't you really waiting for a ride to get back home?

A       Yes, sir.

Q       Okay.  Who usually came to pick you up and take you home?

A       Miss Pat.

Q     That is Amber Money, excuse me, Amber's mother?

A     Yes, sir.

Q     Okay.  Now, would Amber ride with you when you would go home?

A     Yes.

Q     How many times has Miss Pat come and picked you up?

A     I don't remember.  I don't know how many times.

Q     Okay.  How far does Amber live from her granddaddy?

A     Probably not even a mile away.

Q     Could you see — — —

A     No, sir.

Q     — — — Amber's from Mr. B. C.'s or vice versa?

A     (Witness shakes her head to the negative.)

Q     You can't see to each house?

A     (Witness shakes her head to the negative.)

Q     How far do you live from Amber?

A     (No response.)

Q     Or, did you live at the time from Amber, is what I meant to ask.

A     About three miles from her.  Three or four miles.

Q     Why would the school bus let you off at Mr. B. C.'s?

A     Because my mother was at work and I didn't have nobody else to stay with.

Q     Okay.  So, that was instructions from your mother to get off there with Amber?  Is that correct?

A    Yes, sir.

Q    Why wouldn't you get off at Amber's house?

A    Well, because there was nobody there, either.

Q    Nobody there either?  Where was Amber's mother?  Did she work?

A    Yes, sir.

Q    Okay.  When she would pick you up, what time would it usually be that she would come get you?  Do you recall?

A    Well, she gets off — — — she got off at 3:30 and — — —

Q    Would come directly from work to get you?

A    Yes, sir.

Q    All right.  What time, if you know, did you usually get off the school bus?

A    I don't know what time.

Q    What time did you get out of school?

A    2:48.

Q    Okay.  Would it be fair to say somewhere around 3:00, somewhere thereabouts?  And, it took you ten or fifteen minutes to get on the bus and leave?  Wouldn't it take about that long?

A    Yes.

Q    Would it take you another ten, fifteen, twenty minutes to get off of the bus?

A    Yes, sir.

Q    Would it be fair to say that sometime around 3:30
     is when you usually got off of the bus?

A    Yes, sir.

Q    How long would it take, if you know, Miss Pat to
     come from work to get you?

A    I don't know.

Q    You don't know?  Would you have any reason to
     believe that would take more than fifteen, twenty
     minutes?

A    It might, because she might want to stop by the
     store or something.

Q    Okay.  If she stopped by the store.  But, if she
     didn't stop or do anything, would she normally get
     there fifteen, twenty minutes after she got off
     work at 3:30?

A    Yes, sir.

Q    Would that be a regular occasion?

A    Yes, sir.

Q    Would she ever come pick you up at 5:00 o'clock?

A    No, sir.

Q    Would she ever come pick you up at 4:30?

A    No, sir.

Q    What was the latest she ever got there to come
     pick you up?

A    I don't know.

Q    Okay.  Now, where would she pick you up when she came to get you?

A    At Mr. B. C.'s house.

Q    Where would you usually be waiting?

A    In the house or on the porch.

Q    Somewhere around?  How far from Mr. B. C.'s house is this pen that we are talking about?

A    I don't really know.

Q    Can you see it?  As a matter of fact, you can see it from Mr. B. C.'s house, can't you?

A    Yes, sir.

Q    It is easily within sight, is it not?

A    (Witness nods her head to the affirmative.)

Q    You took the truck down there on this particular day to the pen?  Is that correct?

A    Yes, sir.

Q    Now, didn't you stop and feed the dogs on the way?

A    I don't know if we fed the dogs.

Q    Didn't Mr. B. C. say:

        Come on, I have got to go check on the dogs.
Didn't he say come on and didn't he actually go look at the dogs;  whether or not he fed them?  Do you recall that?

A    I don't know.

Q    You don't remember?  Do you remember going by the dog pen?  Do you know where that is?

A    Yes, sir.

Q    Do you remember going by there on the way to this other pen?

A    Yes.

Q    Okay.  Do you remember seeing the dogs?

A    Yes, sir.

Q    As a matter of fact, there were some puppies there, weren't there?

A    Yes, sir.

Q    Do you remember getting out and looking at the puppies?

A    No, sir.

Q    You don't remember doing that?  What, did you see the puppies from the truck?

A    We had got out of the truck and we were beside the dog pen.

Q    Right beside it?  And, you didn't get in the pen with the dog, but you saw them?

A    (Witness nods her head to the affirmative.)

Q    You were about from me to you as to the puppies, real close?

A    Yes, sir.

Q    How long did you stay there at the dog pen, if you

recall?

A     About five or ten minutes.

Q     Five or ten minutes?  Now, would it be fair to say
      that on this day you got off of the school bus at
      about 3:30, like you normally did?

A     Yes.

Q     Was there anything unusual on this day that made
      you get off of the school bus any later?

A     No, sir.

Q     Okay.  Now, would Mr. B. C. be there when Miss
      Pat – – – strike that.  Let me ask you this.  I
      think you already testified that your mother would
      sometimes come pick you up, is that right?  Or
      maybe I didn't hear you say that, I don't recall.

A     Well, well, Miss Pat is the one that really takes
      me home.

Q     Okay.  Would you ever get home any other way other
      than Miss Pat taking you home?

A     No, sir.  Not that I know of.

Q     Okay.  So, Miss Pat has taken you home a lot of
      times?  Is that correct?  Is that fair to say?

A     Yes, sir.

Q     Now, but, you are not sure how many times you have
      been to Mr. B. C.'s house?  Is that right?

A     Yes.

Q    Would she ever pick you up, would Miss Pat ever
     pick you up anywhere other than Mr. B. C.'s house?

A    No, sir.

Q    Okay.  If that is that case, you have been to Mr.
     B. C.'s house a lot of times?

A    Yes.

Q    Way more than five or ten?  Right?  I am just asking,
     because I don't really know.

A    I don't know how many times.

Q    Okay.  I am not asking you the times, but you have
     been picked up a lot of times by Miss Pat at Mr.
     B. C.'s?

A    Yes.

Q    So then, I guess it is safe to say that you have
     been to Mr. B. C.'s a lot of times?

A    Yes, sir.

Q    So, you have been there quite a few times before
     whenever this happened?

A    Yes.

Q    Now, do you remember when you originally talked
     to Mr. Clyde, as you called him, Mr. Clyde Hornsby,
     the Deputy Sheriff here in Henry County, the
     Investigator;  do you remember talking to him?

A    Yes, sir.

Q    Do you remember talking to him?

A      Yes.

Q      Do you remember telling him this incident took place

       sometime between September of '93 and December of '93?

       Do you remember ever telling him that?

A      No, sir.

Q      So, you don't know where that would have come from

       in the warrant, those dates, September of '93 and

       December of '93?

A      No, sir.

Q      Okay.  And, you have already told us you don't

       remember when this was, do you?

A      No, sir.

Q      Do you know if it was before Christmas?

A      Yes, sir.

Q      Do you know whether it was before Thanksgiving?

A      I don't know if it was before Thanksgiving or not.

Q      Just don't remember?  Now, after, as you said, you

       stayed at the dog pen for five or ten minutes and

       what did you do next?

A      We went to the little pen—thingee, the little house.

Q      The pen that we talked about that the Jury has seen

       the pictures and you testified that there is nothing

       in this pen?  Is that right?

A      No, sir.

Q      Where were these shingles?  Were they in the pen?

A    Yes.

Q    As a matter of fact, there was a stack of shingles
     sitting there, wasn't it?

A    Yes, sir.  About four, five of them.

Q    Four or five stacks?

A    No.  Four or five shingles.

Q    By shingles, now, are you talking about four or
     five of these, right here?  (Produces the exhibit
     for examination.)

A    (Witness looks at the exhibit in question as
     requested.)  Yes, sir.

Q    It was not a stack bigger than that, about this
     high out there?  (Indicating.)

A    It was not bigger than that.

Q    Okay.  What was the floor made of?  Was it a dirt
     floor or - - -

A    It was a dirt floor.

Q    All right.  Was there anything on the floor at all,
     besides dirt;  any hay, grass, anything like that?

A    No, sir.

Q    Just strictly dirt?

A    And there is some wood on the floor in the big part
     of it.

Q    But, you were not in that part, right?

A    Right.

Q    The room that you described as being about the
     length of the Jury Box and a little wider, that had
     a separate entrance or was that the same entrance as
     the rest of the building?

A    It was separate.

Q    Separate entrance to that little room?  Right?

A    It is a door that you go in, but the door was not
     on it.

Q    The door was not on it?

A    The door, it was just an opening.

Q    Where a door could be placed or had been placed
     previously?  Right?

A    (No response.)

Q    Now, you said that there was a window in there?
     Right?

A    Yes, sir.

Q    How many windows?

A    One or two.  All I know, I saw one of them.

Q    Do you recall whether or not they were open or closed?

A    They were closed.

Q    Had you ever been down to this pen before this day?

A    No, sir.

Q    Did you ever go to the dog pen before this day?

A    Yes, sir.

Q    Okay.  How many times had you been down to the dog

pen before?

A    I don't know.

Q    Who had you been with?

A    Amber.

Q    Did Mr. B. C. ever go down there with you?

A    Yes, sir.  We went down there one time to feed the dogs.

Q    One time before this?

A    Yes, sir.

Q    So, you have in the dog pen with Mr. B. C. before?

A    Yes, sir.

Q    Just one time?  Is that right?

A    (Witness nods her head to the affirmative.)

Q    Was that one day after school?

A    I don't know.

Q    Did you ever go over there on the weekend when you weren't in school or in the summer?

A    Yes, sir.

Q    What did you do when you went over there?

A    Played around.  But, most of the time, we were at her house.

Q    Okay.  By her house, you mean Amber's house?

A    Yes, sir.

Q    We will get to that in a little while.  What I am asking you about is did you ever go over to Mr.

B. C.'s house when you weren't getting off the school bus and waiting for Miss Pat to pick you up and take you home?

A    Yes, sir.

Q    Would you go over there on the weekends?

A    Yes, sir.

Q    Would you go over there, like I said, during the summer, when you weren't in school?

A    I don't know.

Q    You just don't remember?

A    (No response.)

Q    What would you do when you went over there?

A    We played around in the yard or watched T.V.

Q    Okay.  You watched T.V. with Mr. B. C.?

A    Yes.  Miss Ruby was there, too.

Q    That is Mr. B. C.'s wife?

A    (Witness nods her head to the affirmative.)

Q    Did you watch T.V. with them?

A    Yes, sir.

Q    Did you ever watch any rented movies, videos with them?

A    No, sir.

Q    You never watched any video movies?

A    No, sir.

Q    Okay.  When was the first time that you ever saw

those magazines?

A When we, before we went to the little house, the little house-thingee.

Q You had never seen those magazines at Mr. B. C.'s house up in the closet before?

A No.

Q Where his grandson used to live?

A (No response.)

Q That was the first time that you saw them that day?

A Yes.

Q Now, wasn't that tool box unlocked that day?

A No, sir.

Q How do you remember it being unlocked?

A We were over there when we were at the pen.  We were over there by the box and he had opened it with a key.

Q He opened it previously or opened it while you were standing there?

A He opened it when we were standing there.

Q Okay.  And, he showed you the magazines himself?

A Yes, sir.

Q Did he hand them to you or just show them to you?

A He showed them to us.

Q Did he let you hold them?

A I don't remember.

Q    Do you remember looking at the pictures?

A    Yes, sir.

Q    Did it scare you when he did that?

A    Yes, sir.

Q    Did you tell him that was scaring you, that you didn't want him to be doing that?

A    No, sir.

Q    Why not?

A    Because I was scared of – – –

Q    What were you scared of?

A    Him.

Q    What did you think he might do?

A    I don't know.

Q    Had Mr. B. C. ever done anything to you before this day?

A    No, sir.

Q    Had he ever hit you or scared you in any way?

A    No, sir.

Q    What happened when he showed you these magazines?

A    We went to the little house.

Q    How far is the tool box from the little, the shed, we will call it?  Is  that fair to say a shed, a barn;  I think that is what everybody has been calling it.  Is that what it is, a barn?

A    I don't know.

Q    Did you drive or just walk over there?

A    We rode in the truck.

Q    Did Mr. B. C. tell you to get in the car, we are going to the barn or how did that happen?  How did that come about?

A    He told us that we were going to go over there and we got in the back of the truck.

Q    Did he tell you what you were going over there for?

A    No, sir.

Q    Now, how long did he show you these magazines?

A    I don't know.

Q    Okay.  Did he show them to Amber, too?

A    Yes, sir.

Q    Do you recall if he let Amber hold them?

A    I don't know.

Q    Did he put them back in the tool box?

A    Yes, sir.

Q    You saw him do that?

A    Yes, sir.

Q    Did he say anything to you when he showed you these magazines?

A    No, sir.

Q    Didn't say anything at all?

A    No, sir.

Q    Just handed you the magazines or opened them up or

110

how did that come about?

A    We just rode over there and he just opened them up
     and took them out.

Q    Took them out and never said a word?

A    No, sir.

Q    But, he was showing them to you and there was no
     doubt in your mind that he was showing them to you?

A    Yes.

Q    Did he say hey, girls, look at this, or anything like
     that?

A    No, sir.

Q    Nothing like that?  Now, how many shingles, like
     this, did you put on the ground when you got to the
     shed?

A    I don't know.

Q    You see this one right here, that Mr. Valeska showed
     you, was it more than just that one?

A    Yes, sir.

Q    Would it have been two or three or do you have
     any idea?

A    Two or three.

Q    Two or three.  And, you put them on the ground and
     I think you said that Mr. B. C. and Amber helped you
     put them on the ground?

A    Yes.

Q      You put them on the ground because Mr. B. C. asked you to do it?

A      Yes.

Q      Did he tell you why he wanted you to put them on the ground?

A      No, sir.

Q      Did you wonder?

A      Yes, sir.

Q      Did you ask him?

A      No, sir.

Q      Why not?

A      I don't know.

Q      You just didn't?

A      Yes, sir.

Q      Did you lie down on those shingles?

A      Yes, sir.

Q      Because Mr. B. C. asked you to?

A      Yes, sir.

Q      What did he say to you?

A      He told me to lay down.

Q      On the shingles?

A      Yes, sir.

Q      Was Amber there?

A      Yes, sir.

Q      Did he tell Amber to do anything?

A    No, sir.

Q    Did he say anything at all to Amber?

A    No, sir.

Q    Where was Amber?

A    She was right beside us.

Q    Right there?  She saw everything that was going on as far as putting the shingles and she heard her grandfather tell you  - - - did he tell you to pull your pants down first?

A    Yes, sir.

Q    Okay.  Then he told you to lay down on the shingles?

A    Yes, sir.

Q    Okay.  Did you think he ought not be telling you to pull your pants down?

A    Yes, sir.

Q    Did you think he ought not to be telling you to lie down on the shingles?

A    Yes.

Q    Did you ever tell him no, I am not going to do that?

A    No, sir.

Q    And, that was because you were scared?

A    Yes, sir.

Q    Afraid of what he might do to you?

A    (Witness nods her head to the affirmative.)

Q    Did he hurt you?  Did Mr. B. C. hurt you?

A     No, sir.

Q     Did he put his finger in your private part?  I hate
      to ask these questions and I am not trying to
      embarrass you.  We need to know and the Jury needs
      to know.  I apologize for the nature of the questions,
      but did he put his finger in your private parts?

A     Yes, sir.

Q     All the way?

A     No, sir.

Q     Did he put his private part in your private part?

A     Yes, sir.

Q     All the way?

A     No, sir.

Q     This didn't hurt you?

A     Yes, sir.

Q     It did hurt you?

A     Yes, sir.

Q     Did you tell Mr. B. C. this was hurting you?

A     No, sir.

Q     Why not?

A     I was afraid.

Q     Okay.  Did Amber scream or holler or try to run
      away or anything while this was going on?

A     No, sir.

Q     I know you don't know what Amber was thinking, but

114

she was not being restrained in any fashion, was
she?

A    No.

Q    She wasn't tied up or held in any manner or fashion,
was she?

A    No.

Q    And, she could have gotten out the door if she
wanted to, couldn't she?

        MR. VALESKA:  I object to the mental conclusion,
            mental fright, hysteria, can't testify.

        THE COURT:  Okay.  Okay.


BY MR. RAMSEY:


Q    Was there anything to prevent Amber from running out
that door?  Anything that would have stopped her?

A    Yes, sir.

Q    What was that?

A    Mr. B. C.

Q    Okay.  But, Mr. B. C. was on top of you during this
time, wasn't he?

A    Yes, sir.

Q    Other than Mr. B. C. on top of you, was there
anything to prevent her from walking or running out

the door?

A    No, sir.

Q    Okay.  Did you hear Miss Pat pulling up the entrance way to the barn?

A    No, sir.

Q    Where was Miss Pat when you first saw her?

A    She was walking up to — — — she was about right at the dog pen, walking up.

Q    Okay.  How far — — — as far as this Court Room goes, tell the Ladies and Gentlemen of the Jury how far she was when you first saw her?

A    About to the end of the thing, right there.  (Witness indicating.)

Q    The bar, right here?  (Indicating.)

A    Yes, sir.

Q    To the bar?

A    Yes.

Q    What, fifteen, maybe twenty feet?

A    (No response.)

Q    And, is that just right outside the building where you were in the barn?

A    Yes, sir.

Q    All right.  Was Mr. B. C. still on top of you right before that?

A    No, sir.

Q    How long had Mr. B. C. gotten off of you before you saw Miss Pat?

A    About to that bar.

Q    How long had it been, if you recall?  Was it a minute, two minutes, five minutes?

A    I don't know.

Q    You just don't know?  Okay.  Had you pulled your panties back up?

A    Yes, sir.

Q    And, you had your pants back on?

A    Yes.

Q    Did Mr. B. C. tell you to do that?

A    No, sir.

Q    What did he do when he got off of you?

A    He put his pants up.

Q    Okay.  He made you lay down on the shingle, roofing material?  Is that right?

A    Yes, sir.

Q    Did you have anything on your buttocks, anything covering your buttocks or the back of your legs?

A    No, sir.

Q    Did you have anything covering the back of your arms?

A    No, sir.  But, it hit about here.  (Witness indicating.)

Q    Okay.  You had a shirt on and it was a short sleeve
     shirt?  Is that right?

A    Right.

Q    And, below the shirt-part, you didn't have anything
     on your arms?

A    (Witness shakes her head to the negative.)

Q    Did you have anything covering the back of your
     thigh?

A    No, sir.

Q    Your pants, I believe you testified, were pulled
     down to your knees as well as your panties?  Right?

A    Yes, sir.

Q    It was nothing between the roofing material and
     your skin?  Is that correct?

A    (No response.)

Q    And, Mr. B. C. got on top of you and, as you
     testified, went up and down?  Is that correct?

A    Yes, sir.

Q    Did that roofing material cause any scrapes or
     abrasions or cuts on you?

A    No, sir.

Q    None at all?

A    (Witness shakes her head to the negative.)

Q    Did it cause any irritation at all?

A    No, sir.

Q    None at all? How long would you say you laid on it?

A    I don't know.

Q    Wasn't long, you said? Is that right?

A    (No response.)

Q    Now, we already know you didn't tell anybody about this happening on that date, did you?

A    No, sir.

Q    You didn't tell Miss Pat when you saw her right after? Is that correct?

A    (No response.)

Q    When did you tell somebody about this?

A    When Amber had told her mother.

Q    Okay. Okay. Word got out that Amber had already told her mother and your mother heard about it and then she come asked you about it?

A    Well, we were at my aunt's, and they had asked me about it and I told them.

Q    Who is they? Who asked you about it, is what I mean?

A    My aunt, Sister-Lou.

Q    I am sorry?

A    Aunt Sister-Lou.

Q    Your aunt, Sister-Lou?

A    Yes.

Q    What is her last name?

A    I don't know.

Q    Okay.  Where did you tell them – – – where were
     you when you told them?

A    In her bedroom.

Q    Where did she live, at the time?

A    I don't know.

Q    You don't remember where it was that you told them?

A    It was in her trailer.

Q    Okay.  Did she live around here?

A    No, sir.

Q    Okay.  You don't know where aunt Sister–Lou lives?

A    But, she lives in Alabama, though.

Q    Okay.  Somewhere in Alabama.  Were you gone
     there – – – were you visiting her for a reason, just
     on a trip, or why were you there?

A    Me and my mother was, me, my mother, and my brother,
     we were at the Pack and Sack and JD had came and
     told my mother about it.

Q    Who did?

A    JD.

Q    JD?  And, is that an initial J and D?

A    Yes, sir.  That is his name.

Q    Who is JD?

A    He is John's father.

Q    Okay.  Who is John?

A    His son.

Q    Okay.  Did you know JD?

A    Yes, sir.

Q    Before this?

A    Yes, sir.

Q    Did your mother know JD?

A    Yes, sir.

Q    You were at the Pack and Sack with your mother?

A    Yes.

Q    What Pack and Sack was that?

A    In Columbia.

Q    In Columbia?  And, JD comes up to your mother or
     to you or to the car?  Were you sitting in the
     car?

A    No.  We were walking out of the store and JD told
     my mother that, to come, and he told her about it.

Q    Your mother told you about that later?

A    Well, when this lady told her about it, that is
     why we went to Aunt Sister—Lou's.

Q    That is why you went to Aunt Sister—Lou's?  Is
     that right?  Because of what JD had just told your
     mother?

A    Yes.

Q    And, you left from the Pack and Sack in Columbia

    to go to your Aunt Sister-Lou's?

A    Yes, sir.

Q    And, that is when you told Aunt Sister-Lou and your mother what happened on the day that you described?

A    Yes.

Q    Now, when was that that you told them?  Do you recall?

A    I don't remember.  I don't want to bring up memories of that day.

Q    Okay.  Do you remember talking to Miss Beth Rushing that works for the Henry County Department of Human Resources?

A    Yes, sir.

Q    Did you talk with her on June of last year, '94?  Do you remember that?

A    Yes, sir.

Q    Okay.  Did you talk to her after you had already told Aunt Sister-Lou and your mother about this happening?

A    Yes.

Q    How long was it?

A    I don't know.

Q    Was it a matter of a few days, shortly thereafter?

A    Yes, sir.  I believe so.

Q    Okay.  And, you told Miss Beth that it happened just like you told us today?  Is that right?

A    Yes.

Q    Did you ever tell anybody else?

A    No, sir.  I told, I told my mother and Aunt Sister-Lou.  Then after I told them, Amber had came back, because she was with my cousin and we had went in my cousin's room and talked about it.

Q    Okay.  Did you and Amber see each other the next day at school?

A    Yes, sir.

Q    Did you get a ride to Mr. B. C.'s that day?

A    No, sir.  I don't know.

Q    Okay.  Did you ever go back to Mr. B. C.'s after that day and wait for your mother to come get you?

A    I don't know.

Q    You just don't remember ever going back there?  You could have gone and you just don't remember?

A    Well, I don't believe I did.

Q    You don't believe you did?  After that day, how did you start getting home?

A    By bus.

Q    By your bus?

A    Yes, sir.

Q    Okay.  Is that because your mother was at home

then and would allow you to be dropped off there
or what was the reason for that?

A    I don't know.

Q    But, now, your mother didn't know about this for
some months after this happened, did she?

A    No.

Q    As a matter of fact, it was a few months before
you told anybody about it, wasn't it?

A    Yes.

Q    You didn't tell anybody about it until June of '94,
did you?

A    Yes, sir.

Q    Okay.  By your own testimony, this happened
some time before December, before Christmas of
'93?  Is that right?  So, that is at least six
months?  Is that right?

A    Yes.

Q    How did you get home in that six months, is what
I need to know?

A    I don't know.

Q    Okay.  Did you - - - you already testified that
you don't remember going back to Mr. B. C.'s?

A    No, sir.

Q    Do you know if Amber went back to Mr. B. C.'s?

A    I don't know.

Q    Okay.  But, your mother was still working the next
     day after this happened, wasn't she?

A    Yes, sir.  I believe so.

Q    She wouldn't let you be dropped off at home
     because no one was there?  Is that right?

A    Yes, sir.

Q    Okay.  So, like the next day, there was no one at
     home, was there?

A    No, sir.

Q    What about the next week?  Would there have been
     anyone at home the next week?

A    I don't know.

Q    Okay.  You just don't really remember how you got
     home after that?

A    No.

Q    Okay.  Who is Heather Flaraty?

A    No, sir.  Unless it is Dave's daughter.

Q    Okay.  Do you know Tammy Amos?

A    No, sir.  Unless it is my aunt's daughter.


          MR. RAMSEY:  Your Honor, may I have a moment
               with my client?

          THE COURT:  Yeah.


                         (Thereupon, an off the

Record discussion was held
between the Defendant and
his Attorney of Record, the
Honorable Richard H. Ramsey,
IV.  After that, the
following proceedings were
had, to-wit:)

BY MR. RAMSEY:

Q     Did you and Amber ever talk about what happened on
      that day?

A     Not until we went to our aunt's and they found out.

Q     Okay.  Did you know that what Mr. B. C. was doing
      to you was wrong?

A     No, sir.

Q     You didn't know that, at that time?

A     No, sir.

Q     Do you now know that what you are claiming he did
      to you was wrong?

A     Yes, sir.

Q     Okay.  So, you had no reason to discuss this with
      Amber or it was just never brought up?

A     It was never brought up.

Q     Who is Jimmy Loggin?

A    Jimmy Loggin, that is my mother's boyfriend, his son.

Q    Have you ever told Amber that you had sex with Jimmy Loggin?

A    No, sir.

Q    Never told her that?  You are sure?

A    (No response.)

Q    Jimmy Loggin ever messed with you?

A    Yes, sir.

Q    Have you ever told your mother about that?

A    Yes, sir.

Q    When did you tell her that?

A    After they had, after they went back to the room.

Q    He messed with you while you were living with him, didn't he?

A    Yes, sir.

Q    Did his brother ever mess with you?

A    Yes, sir.

Q    Kevin?

A    Yes.

Q    Did you tell your mother that?

A    Yes, sir.

Q    Did they mess with you before or after you claim Mr. B. C. did?

A    I don't know.

Q    Did you ever tell anybody that Kevin and Jimmy

     messed with you before you told anybody that Mr.

     B. C. messed with you?

A    I don't know.  I don't know if I told anybody, my

     mother, before or after.

Q    You just don't recall?

A    (No response.)


          MR. RAMSEY:  Thank you, Amanda.  That is all

               I have.


                  REDIRECT EXAMINATION


BY MR. VALESKA:


Q    Let me ask you, if I could;  Mr. Ramsey asked you

     about some other people that messed with you.  Do

     you remember him asking you that?

A    Yes, sir.

Q    Do you remember him asking you before you claim

     Mr. B. C. Money, Sr., messed with you;  would you

     tell the Jury, did he mess with you or not, B. C.

     Money, Sr.?

A    Yes, sir.

Q    Now, would you tell the Ladies and Gentlemen of

the Jury, if you could, did you tell your mother what those other boys did to you?

A    Yes, sir.

Q    Would you tell this Jury those other individuals that messed with you, done things to you, were they as old as B. C. Money or were they under sixteen years of age?

A    They were under sixteen.

        MR. VALESKA:  That is all.

        MR. RAMSEY:  Your Honor, I object to that on
            relevance, as far as what does it
            matter – – –

        THE COURT:  Asked and answered.  Overruled.

        MR. RAMSEY:  All right, sir.

        MR. VALESKA:  That is all I have.  Thank you,
            Amanda.  Can she step down?

        MR. RAMSEY:  Wait a minute, if I may?

        MR. VALESKA:  Hold on.  He has another
            question.  Okay?

        MR. RAMSEY:  Nothing further.

        THE COURT:  Okay.  Anything else?

        MR. VALESKA:  No, sir.  She can step down.
            Thank you.

        THE COURT:  All right.  You may be excused.

(Witness excused.)

THE COURT:  Let's take about a ten minute
break, at this time.  Y'all may go get
you a coke or something like that.

(Thereupon, the Trial Jury
proceeded to their break
with the above instructions
from the Court and a recess
was called and taken by
all parties.  Upon
completion of said recess,
all parties returned to the
presence and hearing of the
Court Room and the
following proceedings were
had, to-wit:)

THE COURT:  Bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings

were held in the presence

and hearing of said Trial

Jury, to—wit:)


MR. VALESKA:  I need this marked.


(Thereupon, State's Exhibit

Number 11 was marked for

identification by the

Court Reporter.  After that,

the following proceedings

were had, to—wit:)


THE COURT:  Before we get started, I failed

to ask you at the break, of course, it

looks like this case will go 'til

tomorrow and I will ask you at this time

does anybody have any commitment, say

after 4:30;  need to pick somebody up,

go to a ball game, got kids to pick up

or anything?

A JUROR:  5:00 o'clock.

THE COURT:  5:00 o'clock?  Anybody got, other

than this lady here, got commitments at

5:00?

A JUROR:  (Raises her hand.)

THE COURT:  What are you doing at 5:00 o'clock?

A JUROR:  My daughter, nine months old.

THE COURT:  Okay.  We will quit before then.
       So, we will anticipate going until
       about, say 4:30, fifteen to 5:00 o'clock.
       Call your next witness.

MR. VALESKA:  Call Amber Money to the Witness
       Stand.

Thereupon,

                    AMBER CELEST MONEY

       was called as a witness in behalf of the
State of Alabama, and the following proceedings
were had, to—wit:


MR. VALESKA:  Have you been sworn please,
       ma'am, to tell the truth?

THE WITNESS:  Yeah.

MR. VALESKA:  Who swore you in?

THE WITNESS:  (No response.)

MR. VALESKA:  Did someone put you under oath,
       ask you to raise your right hand?  They
       haven't, have they?

THE WITNESS:  (No response.)

THE COURT:  Let me swear her in.

(Thereupon, the above named
witness was sworn in and
the following proceedings
were had, to-wit:)


## DIRECT EXAMINATION


BY MR. VALESKA:


Q    Tell the Jury your name.

A    Amber Celest Money.

Q    How old are you, now?

A    Eight and a half.

Q    Now, tell me how tall you are.  Do you know?

A    No, sir.

Q    How much do you weigh?

A    Fifty-five.

Q    What grade are you in, now?

A    Third.

Q    Where do you go to school?  Please tell the Jury.

A    Columbia.

Q    Who is your teacher?

A    Miss Baker.

Q    You saw when the judge asked you to raise your
     right hand and tell the truth, so help you God?

Correct? Judge Little asked you that? Correct?

A    Correct.

Q    Is it good to tell the truth or bad?

A    Good.

Q    Have you ever told a lie, story, fib, whatever you want to call it, before in your life time?

A    Yes, sir.

Q    Did you get in trouble?

A    Yes, sir.

Q    Is it good to tell lies?

A    No, sir.

Q    Now, tell the Ladies and Gentlemen of the Jury what your mother's name is?

A    Patricia Ellen Money.

Q    What is your father's name?

A    Brad Comer Money, Jr.

Q    And, would you tell the Ladies and Gentlemen of the Jury, do you have any other brothers and sisters?

A    I have four brothers, I mean four sisters and two brothers.

Q    Are they older or younger?

A    Older.

Q    Now, please tell the Ladies and Gentlemen of the Jury, if you could, do you know Amanda Hadden?

A    Yes, sir.

Q    How do you know Amanda Hadden?

A    She is my cousin.

Q    Do you know her mother?

A    Yes, sir.

Q    Do you see her mother in the Court Room?

A    Yes, sir.

Q    Point her out.  Point her out, for me.

A    (Witness indicating as requested.)


MR. VALESKA:  Let the Record reflect that she

has pointed out Mrs. Hadden.


BY MR. VALESKA:


Q    Do you see your mother in the Court Room?

A    Yes, sir.

Q    Point her out.

A    (Witness indicating as requested.)

Q    Now, would you tell the Ladies and Gentlemen of

the Jury, B. C. Money, Sr., do you know that man?

A    Yes, sir.

Q    You know that man?

A    He is my granddaddy.

Q    Now, could you tell the Ladies and Gentlemen of

the Jury, has he ever touched you with his hand on

your private parts before?

A     Yes, sir.

Q     Where did that occur, what part of your body?

A     My vagina.

Q     Would you tell the Ladies and Gentlemen of the Jury, was that inside your clothes or outside your clothes?

A     Outside.

Q     Would you tell the Ladies and Gentlemen of the Jury, where do you live, now?

A     Henry County.

Q     Okay.  What state do you live in?

A     Alabama.

Q     And, do you read and write?

A     Yes, sir.

         MR. VALESKA:  Judge, I ask that you declare
             her competent to testify in relationship
             to the facts of this case.

         THE COURT:  Okay.  Any objections?

         MR. RAMSEY:  No.

         THE COURT:  Let her be qualified, then.

         MR. VALESKA:  Thank you, Your Honor.

BY MR. VALESKA:

Q      Let me go back, if I could, to the time your
       grandfather, B. C. Money, Sr., ever touched you
       with his hand inside or outside your clothing, on
       your vagina, was that at a house or a trailer?

A      Trailer.

Q      How long has he lived in that trailer, if you
       know, approximately?  How long, long time or short
       time?

A      Long time.

Q      Who lives in the trailer with him?

A      My granny.

Q      What is your granny's name?

A      Ruby Mae.

Q      Would you tell the Ladies and Gentlemen of the Jury,
       the first time your grandfather ever touched you,
       that you said with his hand on your vagina, inside
       or outside your clothes, was that in Henry County?

A      (Witness nods her head to the affirmative.)

Q      When was the first time that he touched you?  Where
       were you, in the house, out in the woods, where?

A      At the branch.

Q      Tell the Ladies and Gentlemen of the Jury where
       B. C. Money lives as you come off of the paved

road by his trailer, okay?  You come off the road,
turn and go by his trailer and what kind of road
comes off of the paved road or the highway, what
is that road made of?

A    Dirt.

Q    As you turn off of the paved road, went up the
dirt and kept going and kept going and kept going,
would you come to some location where you lived,
at that time?

A    Our trailer would be there.

Q    How long did you live in this trailer in Henry
County, if you know?

A    About two years.

Q    And, whose land was that trailer on?

A    My uncle's.

Q    And, what is your uncle's name?

A    Tom Lee Money.

Q    Tell the Ladies and Gentlemen of the Jury, Tommy
Lee Money, did he have any fixtures, houses,
buildings, on his property behind B. C. Money, Sr.'s
property?

A    He had a hog barn back there.

Q    A hog barn?  Did it have a top on it?

A    It had a top on it.

Q    This hog barn, was anything on the other side of

Q    the hog barn, past the dirt road on the other side?

A    (No response.)

Q    What was on the opposite side? You had the hog barn here, the dirt road, and what was on the other side?

A    His dog pen.

Q    Okay. Do you fish?

A    I do, sometimes.

Q    Okay. When you go fishing and you throw your line or hook into what?

A    The water.

Q    I will ask you do you know by that dirt road across from the hog barn, away from the dog pen, is there a pond there?

A    Yes, sir.

Q    Is that close to the dog pen or as you refer to it, the hog pen?

A    The hog pen.

Q    Now, as you were standing at the dog pen in Henry County, could you see B. C. Money, Sr.'s trailer? If you looked real hard, can you see part of it?

A    No, sir.

Q    Why couldn't you see it real well?

A    There is woods right there.

Q    If you stood out on the dirt road and looked down
     the dirt road, could you see, maybe part of the
     trailer or maybe where he parks his truck or car?
     Could you see that?

A    Yes, sir.

Q    If all of the leaves are down, it is winter time
     when the bushes have died down, could you then
     see the trailer from the dog pen?

A    No, sir.

Q    Not at all?

A    Oh, yes.

Q    Okay.  Now, tell the Ladies and Gentlemen of the
     Jury, if you could, your friend, Amanda Hadden,
     did she ever come home with you from school one
     time when you went to your grandfather's, B. C.
     Money's house?

A    Yes, sir.

Q    I want to limit it to particularly something
     happening to Amanda that you saw.  That is what I
     want to ask you about.  Okay?  Do you know about
     that time?

A    Yes, sir.

Q    Now, did Amanda ever come to visit you before that,
     Amber?

A    At my granny's house.

Q    Did she ever come after that, that you can remember?

A    No.

Q    Now, you know what day of the week it was when this happened?

A    No.

Q    Do you know what month it was?

A    No, sir.

Q    Now, you were in what grade, then?

A    First.

Q    First grade?  Where?

A    Columbia.

Q    You are in what grade, now?

A    Third.

Q    Okay.  You just started?  Right?

A    Right.

Q    Back in what August, you started a new-type system where you go in the county and you will go to school and you are off for three weeks and then you will go to school again?

A    Uh-huh.  (Affirmative response.)

Q    During this time, did you go from August to May and then get out for three months in the summer time?

A    Yes, sir.

Q    All right.  Now, how old were you when this occurred?

Q When Amanda, something happened to Amanda, if anything?

A Seven.

Q How old are you, now?

A Eight and a half.

Q Now, would you tell the Ladies and Gentlemen of the Jury when y'all got off of the school bus, where did you and Amanda go that day?

A Went in the house, first.

Q What did you do in the house?

A We laid down our book bag.

Q What did you do next?

A Went outside.

Q Did you do anything inside before you went outside?

A No, sir.

Q Did you have anything to eat?

A Well, maybe a snack, cookies.

Q Anything to drink?

A Tea.

Q Now, when you went outside the trailer, did granny go with you or did she stay inside?

A She stayed inside.

Q When you went outside, who went with you?

A Amanda and granddaddy.

Q Granddaddy, that is B. C. Money, Sr.?

A     Yes, sir.

Q     Would you tell the Ladies and Gentlemen of the Jury,
      did y'all leave his back part of the trailer and
      go somewhere then?

A     We went to the hog barn.

Q     Straight to the hog barn?

A     Yes, sir.  No.  We went to the dog pen.

Q     How did you get to the dog pen?

A     (No response.)

Q     Did you walk?

A     He rode the truck out there.

Q     Where did you and Amanda ride?

A     Rode on the back.

Q     When you got to the dog pen, is that the same place
      as the hog pen or different?

A     It is different.

Q     When you got to the dog pen, would you tell the
      Ladies and Gentlemen of the Jury, did he show you
      and Amanda anything there?

A     He had some nasty books.

Q     How many books do you remember?

A     Two.

Q     And, those nasty books, what was in those books, if
      you know?

A     Naked people.

Q    All of their clothes on?

A    They had them off.

Q    Men, women, all men, all women?  Do you remember?

A    There was one book that had all women and the other one had both.

Q    What were they doing?

A    Some of them were showing their private parts.

Q    Tell the Ladies and Gentlemen of the Jury did Amanda see that in your presence?

A    The books?

Q    Uh-huh.  (Affirmative response.)

A    Yes.

Q    Who showed you those books?

A    My granddaddy.

Q    Where did he get the books from?

A    I don't know.

Q    Did anything ever fall on his head and cut his head while he was out there?

A    No, sir.

Q    Did you ever pull down your pants on this occasion, run around and show your private part to your granddaddy?

A    No, sir.

Q    Did you and Amanda ever run through the woods or branch on this occasion?

A       When?

Q       On this occasion.

A       We went across it.

Q       Was he following you?

A       Yes, sir.

Q       Now, would you tell the Ladies and Gentlemen of the
        Jury when you left the dog pen area, where did you
        go?

A       To the hog barn.

Q       Now, can you see inside the hog barn, completely,
        from the road?

A       No, sir.

Q       If you were inside the hog barn, can you see outside
        though, different parts?  If you were inside, can
        you see any part around the shed, in or out?

A       Well, you could see out, because there was a – – –

Q       A what?

A       There is an opening right there.

Q       What was it made of?

A       (No response.)

Q       What was the hog barn made of?  What is it built
        and made of, if you know?

A       Boards.

Q       Have a roof on it?

A       Yes, sir.

45

Q     Do you see any windows in the Court Room?

A     Yes, sir.

Q     Were there any windows in that building, the hog barn?

A     Yes.

Q     Same kind as those?

A     No, sir.

Q     What is different about the windows here versus there?

A     They were small.

Q     And, were they up or down?

A     They were closed.

Q     With the window raised up, could you go in and out or was it closed down or do you remember?

A     It was raised up.

Q     Are you sure?  How many windows?

A     I think there was one in that room.

Q     Okay.  Now, let's talk about that room.  How would you get in or out of that room?

A     There was a gate that opened right there.

Q     Okay.  Once you get inside that room, is there any way to get out but the window?

A     (Witness shakes her head to the negative.)

Q     You have to go back out the same way that you came in?

A    Yes, sir.

Q    Let's talk about looking at the hog barn, as you
     call it.  How did you know that it was a hog barn?

A    Because hogs used to stay in there.

Q    Were there hogs there on this occasion, though?

A    No, sir.

Q    Anything for the hogs to eat out of on this
     occasion?

A    No, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury
     when you were looking at the hog barn, when you
     went in, was it kind of like this Court House;  all
     neat, the bushes all neat and trim?

A    No, sir.

Q    What was growing around the hog barn, if anything?

A    Weeds.

Q    Tall, small, real tall, bushy – – –

A    Tall.

Q    Now, tell the Ladies and Gentlemen of the Jury
     when you got into the hog barn, would you tell them
     did your grandfather, B. C. Money, Sr., have you or
     Amanda do anything about something that was inside
     the barn?

A    Yes.  He had us lay the shingles down.

Q    When the shingles were laid down, did he talk or

say something to somebody else, anybody else?

A    He told Amanda to lay down on the shingles.

Q    Before he told her to lay down, did he tell her to
do anything with her clothing?

A    Yes, sir.

Q    What did he tell her to do about her clothing?

A    He didn't tell her nothing, but he pulled down her
pants.

Q    Now, when he pulled down her pants, what was under
her pants, if anything?

A    (No response.)

Q    He pulled down her pants and what did she have on
under there?

A    Panties.

Q    What did he do?

A    He pulled them down, too.

Q    All the way off?

A    No.

Q    Where.

A    Down to her knees.

Q    Now, did you run out, at that time?

A    No, sir.

Q    Why not?  Why didn't you run out and scream and
yell for help?

A    I was afraid.

Q    Who were you afraid of?

A    Him.

Q    Would you tell the Ladies and Gentlemen of the Jury,
     had he touched you before that, yourself?

A    Yes, sir.

Q    Touched you on your private parts?

A    Yes, sir.

Q    You were under twelve years of age?

A    Yes, sir.

Q    He used force to touch you?

A    Yes, sir.

Q    And, when he touched you on your private parts, is
     that inside or outside your clothes?

A    Inside.

Q    Now, going back - - -

A    I mean outside.

Q    Going before this, please tell the Jury, had you
     ever been down with him to the branch area?

A    Yes, sir.

Q    What happened to you down in the branch area of
     Henry County when you were under twelve years of
     age and he was at least sixteen years old or older?

A    He tried to stick his penis in me.

Q    Did he put his penis inside your private part?

A    Half way.

Q    Actually go inside, though, you are sure?

A    Not really.

Q    But, inside a little bit?

A    Yes.

Q    How old were you?

A    I was, the first time I was six years old.

Q    How many times did he do that to you down at the branch?

A    About four.

Q    Were you, once again, under eight years old every time?

A    Yes, sir.

Q    Was he at least older than sixteen?

A    Yes.

Q    How old was he, if you know?

A    I think he was seventy-two.

Q    Would you tell the Ladies and Gentlemen of the Jury on each one of those occasions, every time it happened in Henry County, down at the branch, behind the hog barn or the dog pen or his house?

A    It was behind his house.

Q    Now, did anything ever occur to you in the trailer, in his house?

A    My — — — we were inside and my granny went to my aunt Dora's house and we went to the bedroom.

Q    How many bedrooms are in the trailer?

A    Three.

Q    Tell me how you know about those bedrooms?  Tell
     the Jury how you would describe them, who slept
     in what bedroom?

A    You are talking about the ones that he and granny
     slept in?

Q    Tell the Jury about the bedrooms, how you would
     describe them.  That is one bedroom, right?  Was
     there another bedroom other than the one that he
     and granny slept in?

A    Yes.

Q    What bedroom was that?

A    The little room that has a little bed in it and had
     a table and it had a lamp.

Q    Any other bedroom?

A    The one beside their room that had a big bed in it.

Q    Who slept in that bed?

A    Nobody.  A guest.

Q    Did granny ever get hurt, something happen to her?

A    Not by him.

Q    Did she sleep in another room?

A    One time she did, because she had an operation on
     her knee.

Q    And, did she sleep in the same room you told the

Jury that he and she had slept in in the past?

A    After her knee was better.

Q    Before?

A    Yes, sir.

Q    Did she sleep in a different bedroom?

A    She slept with him before hurting the knee.

Q    When the knee was hurt, where did she sleep?

A    In that little bedroom.

Q    Now, tell the Jury did he ever do anything to you inside the bedroom in Henry County, in the trailer where he lived?

A    He, he — — —

Q    Yes or no.

A    Yes, sir.

Q    Which bedroom?

A    The little bedroom.

Q    Is that the one he and his wife slept in, your grandmother?

A    No, sir.

Q    What did he do to you in that bedroom;  have you take your clothes off?

A    He had me pull down my pants.

Q    What about your panties?

A    My panties, too.

Q    Then what did he do to his clothing?

A    He unzipped his pants and pulled his penis out.

Q    And, did he put that penis inside your private
     part in that bedroom in Henry County, Alabama?

A    Yes, sir.

Q    You were under twelve years of age?

A    Yes, sir.

Q    Was he, in your opinion, at least seventy years old
     or at least older than sixteen?

A    Yes, sir.

Q    Did he force himself on you?

A    Yes, sir.

Q    Were you afraid of him?

A    Yes, sir.

Q    Would you tell the Jury why you were afraid of him?
     What caused you to be afraid of him?

A    One time he whipped me and put a mark on my leg.

Q    Tell the Jury why he whipped you?

A    Because I wouldn't dance for him.

Q    Then when he whipped you, when your mother came
     to get you, did you tell your mother or show her
     the marks?

A    Yes, sir.

Q    Now, was that whipping before any touching or felt
     of you like you told the Jury or any sexual
     intercourse by force that you told them about?

Did that come first?

A    Yes, sir.

Q    Now, tell the Ladies and Gentlemen of the Jury the first time that he put his private part inside your vagina, your private part in Henry County, was that at the branch, at the house, where was it?

A    At the branch.

Q    How many times at the branch?

A    Four.

Q    How many times at the house?

A    One.

Q    Now, tell the Ladies and Gentlemen of the Jury any of those times did you tell your mother or father what he did to you?

A    No, sir.

Q    Any time what occurred to you in his trailer in Henry County when you were under twelve, did you tell your mother and father what he did then?

A    No.

Q    Did you ever tell your mother and father that he had felt of you outside of your clothes, with his hand on your private part, rubbed you and did that when you were under twelve and he was over sixteen?

A    No.

Q    Tell the Jury why you didn't tell them?

A    I was afraid of him. I was afraid that he would try to hurt me.

Q    Now, would you tell the Ladies and Gentlemen of the Jury when you got into the hog barn, as you called it, was there a roof on it?

A    Yes, sir.

Q    When Amber was inside, you were inside with Amanda, how did Amanda react, that you could see, when he told her to take her pants down? Was she afraid?

A    I don't know.

Q    Did she cry?

A    No, sir.

Q    Did she try to run?

A    No, sir.

Q    Who was taller, you and Amanda or B. C. Money, Sr.?

A    B. C. Money, Sr.

Q    Who was stronger, physically, strength-wise?

A    B. C. Money, Sr.

Q    Who weighed more in pounds versus body size, who was taller, weighed more, was heavier?

A    B. C. Money, Sr.

Q    Whose grandfather was it?

A    Mine.

Q    Was he related, also to Amanda?

A       Yes, sir.

Q       Now, when Amanda had her pants off and her panties, what did B. C. Money do then?

A       Tried to stick his penis in her.

Q       Before he did that, did he try to touch her?

A       He tried to touch her vagina.

Q       Did he touch her?

A       Yes.

Q       What did he touch her vagina with before he tried to put his private part, what part of his body?

A       His hand.

Q       Was she laying on anything there?

A       Laying on the shingles.

Q       Do you remember what color the shingles were?

A       Black.  Blackish—brown.

Q       Would you tell the Ladies and Gentlemen of the Jury, do you know how old she was?

A       She was eight.

Q       How old were you?

A       I was six.  No.  She was seven and I was six.

Q       Would you tell the Ladies and Gentlemen of the Jury then, did he get on top of her?

A       Yes.

Q       When he got on top, could you describe what you observed, what you saw him do when he was on top

of her?  What was he doing?

A    He was moving around.

Q    Did she say anything, in any way?

A    No, sir.

Q    Why didn't you run out through the door, then?  What
     prevented you from running out?

A    I didn't want to.

Q    Were you afraid?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury,
     did you come to hear, see or know someone was
     coming at that point in time, shortly after that?

A    Yes, sir.

Q    Before that, could you hear anybody?

A    No.

Q    Could you hear any cars or any trucks?

A    No.

Q    Did you hear any voices?

A    No, sir.

Q    Did you hear granny calling or looking for you?

A    No, sir.

Q    Could you hear any of your family that was looking
     for you, right when you first got in there and he
     did those things when you first got in there and
     she took her clothes off and he did that;  did you

hear anybody right away?

A    No, sir.

Q    Now, can you tell the Ladies and Gentlemen of the
     Jury inside that hog barn, as you described it,
     can you see B. C. Money, Sr.'s trailer once you are
     inside?

A    No, sir.

Q    When you are inside the trailer, if you are out
     there on the dirt road looking at the hog barn — — —

A    Uh—huh.   (Affirmative response.)

Q    — — — with the ponds behind you, looking straight
     through, can you see what is occurring inside that
     room from the outside?

A    No, sir.

Q    From where your trailer was, would you tell the
     Ladies and Gentlemen of the Jury if you had come
     out of the hog barn, taken an immediate right and
     gone down the dirt road to the top of the hill and
     take a left and go back in that direction, is that
     where your trailer was?

A    Yes, sir.

Q    What is in between the dirt road, the hog barn
     and where your trailer is?  What all is out
     there, what was it made up of, what was growing
     out of the ground?

A    Weeds.

Q    Okay.  Trees?  Woods?

A    Yes.

Q    Now, at the very top of the hill, where your
     trailer was, what does the top of the hill look
     like up by your trailer?

A    Grass.

Q    Was that being plowed or grown, things grown up
     at that time such as peanuts or cotton?

A    No, sir.

Q    Was it a field?

A    No.

Q    It wasn't wooded, was it?

A    No, sir.

Q    Now, who came and approached the hog barn when
     B. C. Money was on top of Amanda?

A    My mother.

Q    What did B. C. Money tell you or Amanda when you
     could hear your mother and knew someone was coming?
     What did he say?

A    He told us not to tell anybody.

Q    Would you tell the Ladies and Gentlemen of the
     Jury when you went outside, did you tell anybody
     right then?

A    No, sir.

Q    It was your own mother?  Right?

A    Right.

Q    Did Amanda tell anybody?

A    No, sir.

Q    What did you do next?  You and Amanda?

A    After we got out of the hog barn when my mother came, we sat on the back of the truck.

Q    Did your mother ask him anything, at that time, if you remember?

A    No, sir.

Q    Did he look different from when he went in the hog barn?

A    (No response.)

Q    Describe - - - did he look any different?

A    I don't remember.

Q    Was it hot or cold?

A    Hot.

Q    You weren't wearing a jacket?

A    Right.

Q    Do you know the exact date?

A    No, sir.

Q    Do you know the exact month?

A    No.

Q    Let's go to Christmas;  was it before or after Christmas, the best you can remember.

A       Before.

Q       Let's go to the next holiday which was Thanksgiving,
        turkey day, okay?  Was it after turkey day and
        before Christmas or before turkey day, if you
        know, the best you can remember?

A       After Thanksgiving.

Q       Okay.  Now, could you tell the Ladies and Gentlemen
        of the Jury, you said he had sexual intercourse
        with you four times at the branch?

A       Yes, sir.

Q       You were under twelve and that was here in Henry
        County and every time would you take off your
        clothes completely or did you take off your clothes?

A       Not all the way.

Q       Would there be anybody else around?

A       No, sir.

Q       Had you told Amanda he had done these things to
        you before she came home to visit that day from
        school?

A       No, sir.

Q       Now, you talked to Clyde Hornsby?  Right?

A       Right.

Q       You have talked to me, haven't you?

A       Yes, sir.

Q       You talked to our investigator, haven't you?

A    Yes, sir.

Q    You talked to Mr. Mendheim, our District Attorney, haven't you?

A    Yes, sir.

Q    You talked to your mom, haven't you?

A    Yes, sir.

Q    Talked to your dad?

A    Yes, sir.

Q    You talked to another Human Resource worker, haven't you?

A    Yes, sir.

Q    Have you talked to many, many people about this?

A    (No response.)

Q    You have, haven't you?  People have asked you what occurred to you?

A    Yes, sir.

Q    You have talked to the Grand Jury, too, didn't you?

A    Yes, sir.

Q    Now, I want to show you a picture, if I could, please?  Before I do that, let me ask you — — — at B. C. Money, Sr.'s trailer, did he ever show you anything in the trailer, the house?  I say the house, the trailer he lived in?

A    Yes, sir.

Q      Did he ever show you any type of pictures?

           MR. RAMSEY: We object to the leading. I

                understand that he can lead the witness,

                but I think it is going too far.

           MR. VALESKA: I will withdraw and ask it

                this way, Your Honor.

BY MR. VALESKA:

Q      Let me show you State's Exhibit Number 4, for

identification purposes. Those are two items and

stick them in front of you and ask you if B. C.

Money, Sr. ever showed you those? (Produces the

exhibit in question for examination.)

A      (Witness studies the exhibit in question as

requested.) He showed me these.

Q      Okay. Which ones? Reach up and grab them for

me so I can see.

A      (Witness picks up a deck of cards.)

Q      The one with the box?

A      Yes.

Q      You can read, can't you?

A      Yes.

Q      Read what that says.

A      Taste me.  Lips.

Q      Now, did he show you the actual things inside here?

A      No, sir.

Q      Inside the card?

A      He showed me some pictures.  He didn't show me
       all of them.

Q      The pictures, were they of men?

A      No, sir.

Q      What were they pictures of?

A      Naked women.

Q      Would you tell the Ladies and Gentlemen of the Jury
       do you see the back of it?

A      Yes, sir.

Q      What is on the back?

A      Naked women.

Q      Are these children or older women, if you know?

A      Older women.

Q      I am showing you some of these pictures, are these
       some of the pictures that you saw with the girls
       in the poses like they are in?

A      Yes, sir.

Q      Was his wife around when he showed you those?

A      No, sir.

Q      Any of his other family members, besides you, there?

A      No, sir.  Well, my granny was in the kitchen and

we was in his room.

Q     Did you tell your granny he had showed you those?

A     No, sir.

Q     This other deck, the red deck I am showing like this with no pictures that you can see, did he ever show you those?

A     No, sir.

Q     So, you don't know what type of pictures are on this side at all, do you?

A     No.

Q     If any?  Correct?

A     No.

Q     Okay.  So, I will show you State's Exhibit Number 11, the one that I had showed Mr. Ramsey.  State's Exhibit Number 11, for identification purposes, it is not in, would you tell the Jury what that is? (Produces the exhibit in question for examination.)

A     (Witness studies the exhibit in question as requested.)  The hog barn.

Q     Is that the barn that you described, about how it looked with the window and the growth or the grass and how it looked on this occasion when he raped and sexually abuse Amanda?

A     Yes, sir.

Q     Appear to be marked in any way, changed, except for

the Court's number, the best that you can tell?
Is that the way it looked?

A    Yes, sir.

Q    Same with the roof?  Correct?

A    Yes, sir.  Well, the weeds have grown a little bit
around it.

Q    Okay.  Besides that, the building is the same,
isn't it?

A    Yes, sir.

Q    You described it, you said it was made of wood?

A    Yes.

Q    Had a roof on it?

A    Right.


        MR. VALESKA:  I offer State's Exhibit 11.

        THE COURT:  Any objections?

        MR. RAMSEY:  No objections.

        THE COURT:  Let it be admitted.


                (Thereupon, State's Exhibit
                Number 11 was received in
                evidence.  After that, the
                following proceedings were
                had, to-wit:)

BY MR. VALESKA:

Q    I want to ask you, if I could, please, Amber, can
     you tell the Ladies and Gentlemen of the Jury how
     far is this from your grandfather's house?  You
     are sitting right here in the Witness Stand today
     and can you see outside the Court Room there?

A    Yes, sir.

Q    You see that window, do you see those trees way
     out there?  (Indicating.)

A    Yes, sir.

Q    Is it further than that or closer from your
     grandfather's trailer to where what you call the
     hog barn is?

A    (No response.)

Q    What I am asking you is from your seat in the
     Witness Stand all the way out the Court Room, you
     see the trees with the truck way out there?  Right?

A    Right.

Q    Okay.  Then what I asked you was looking at this
     picture from where the hog barn and where your
     grandfather's trailer was in Henry County, is that
     about the same distance, closer, tell me.

A    From right here?

Q    Right.

A      To about that first tree right there.  (Witness indicating.)

Q      The tree out the window?  Right?

A      Right.

Q      Okay.  Is that the pecan tree on the left or the pear tree way further in the middle?

A      The pecan tree.

Q      Now, can you tell the Ladies and Gentlemen of the Jury, this is in Henry County?

A      Yes, sir.

Q      You are sure?

A      I am sure.

Q      Now, let me show you a few other pictures, if I could?  I am showing you State's Exhibit Number 6.  You can still look at Exhibit 11.  This is State's Exhibit 6;  do you recognize that?  That is in evidence.  What building is that?  (Produces the exhibit in question for examination.)

A      (Witness studies the exhibit in question as requested.)

Q      You can use Exhibit 11 to help you.

A      The same building.

Q      Okay.  Does that show the growth or the poles in relationship to looking at the corner of it?

A      Yes, sir.

Q    Let's look at State's Exhibit Number 7, which is
     in evidence.  What is Exhibit 7?  (Produces the
     exhibit in question for examination.)

A    (Witness studies the exhibit in question as
     requested.)  That is where the back, that
     is – – – that is the room.

Q    Okay.  What I want you to do is take my – – – take
     that blue pen and I want you to put an X on the
     room, if you can, on State's Exhibit 7, that you
     went in where this happened with Amanda, where it
     is, if you can see on there;  if you can tell?

A    I can't tell.

Q    You can't tell?  That is fine.  Is that the inside
     of the barn, showing as you go around the corner,
     look right here on State's Exhibit 11, as you go
     around the corner – – – let Mr. Ramsey see it.  This
     direction I am referring to, is that what it looks
     like when you get inside?

A    Yes, sir.

Q    This first room right here – – –

A    That is the room that you go in to get there.

Q    Okay.  When you go inside that door there, does that
     go inside where it occurred, you said the pen,
     where it happened to Amanda?

A    No, sir.

Q    Look at State's Exhibit Number 8 that has been
     admitted.  What is that?  (Produces the exhibit in
     question for examination.)

A    (Witness studies the exhibit in question as
     requested.)  Shingles.

Q    Is that the room?

A    (No response.)

Q    If you can tell?

A    I can't tell.

Q    Okay.  Let me ask you, if I could, you said that
     you left that trailer and went to the dog pens
     first?  Is that right?

A    Right.

Q    He showed you the magazines that you referred to?
     Correct?

A    Correct.

Q    What were they in before he showed them to you, if
     you know?

A    A red box.

Q    Locked or unlocked?

A    Locked.

Q    Who had the key?

A    My granddaddy.

Q    I show you State's Exhibit Number 3 and Number 9
     that are admitted in evidence.  Do you recognize

Exhibits 3 and 9?  (Produces the exhibits in question for examination.)

A   (Witness studies the exhibits in question as requested.)  Yes, sir.

Q   What are they?

A   The box.

Q   Okay.  I am referring to Number 9, pointing to a building further down here, right?  Do you see that building?  (Produces the exhibit in question for examination.)

A   (Witness studies the exhibit in question as requested.)  Yes, sir.

Q   What building is that on Exhibit 9?

A   That is his shed.

Q   Okay.  Do you see the red box on here?

A   Yes, sir.

Q   Is that the box where he got the magazines out?

A   Yes, sir.

Q   State's Exhibit Number 5, that has been admitted in evidence.  Does that help you as to the room where you testified what happened to Amanda?  Does that look like the shingles?  (Produces the exhibit in question for examination.)

A   (Witness studies the exhibit in question as requested.)  Yes, sir.

Q    Let me show you State's Exhibit Number 10 that has
     been admitted in evidence, the shingles themselves.
     Do you recognize them?  (Produces the exhibit in
     question for examination.)

A    (Witness studies the exhibit in question as
     requested.)  Yes, sir.

Q    Is that the color of the type of shingles?

A    Yes, sir.

Q    Point out the man that took his hand and touched
     you outside your private parts, used force against
     your will when you were under twelve and he was at
     least sixteen years older than you, older than
     sixteen in Henry County, can you see him in the
     Court Room?  If you see him, point him out.

A    (Witness indicating toward the Defendant as
     requested.)

Q    Which one, the first or second man?

A    (No response.)

Q    What color coat?

A    Brown.


          MR. VALESKA:  Let the Record reflect that she
               has pointed out the Defendant, B. C.
               Money, Sr.

BY MR. VALESKA:

Q      I want you to point out to the Ladies and

       Gentlemen of the Jury the man that you testified on

       four occasions took his private part and put it

       inside your vagina, his penis in Henry County when

       you were under twelve and he was at least sixteen

       years old or older and used force to do that.  Point

       him out.

A      (Witness indicating toward the Defendant as

       requested.)

Q      What color coat?

A      Brown.


              MR. VALESKA:  Let the Record reflect that she

                   has pointed out the Defendant, B. C.

                   Money, Sr.


BY MR. VALESKA:

Q      The last question I want to ask you is, I want you

       to tell these Ladies and Gentlemen of the

       Jury - - - two questions.  State's Exhibit Number 2,

       are these the books that he showed you and Amanda?

       If you need to look through them - - -

A       Yes, sir.  That is the books.

Q       Are these the pictures?

A       Yes, sir.

Q       I won't show you any more, but they show the
        private parts of men and women on there?

A       Yes, sir.

Q       What does the magazines say on the outside, on
        the cover?  Swank?

A       Yes, sir.

Q       Free phone sex it says?

A       Yes.

Q       Point out the man that showed you those magazines,
        he is related to you and your family, here in the
        Court Room.

A       (Witness indicating toward the Defendant as
        requested.)

Q       What color coat does he have on?

A       Brown.


            MR. VALESKA:  Let the Record indicate that she
                said brown.  B. C. Money, Sr.  That is
                all I have.  Pass the witness.  They get
                to ask you some questions.
            THE COURT:  Just a minute.  Okay.  I have got
                a couple of things to take up with the

attorneys at this time.  If y'all would,

go back to the Jury Room for two or

three minutes.  I would appreciate it.

      (Witness excused.)

      (Thereupon, the Trial Jury

      proceeded to the Jury Room

      with the above instructions

      from the Court and the

      following proceedings were

      held out of the presence

      and hearing of the said

      Trial Jury, to-wit:)

THE COURT:  Okay.  I think this is probably

    a pretty good time to take off.  I don't

    think we need to resume for your Cross.

MR. RAMSEY:  I anticipate at least forty-five

    minutes, Your Honor.

MR. VALESKA:  Could I ask your indulgence;

    I need to ask her a couple of more

    questions.

THE COURT:  That will be fine.

MR. VALESKA:  You said a quarter of 5:00 and

    then I understand that Mr. Ramsey will

have a long Cross Examination.  I

apologize.  I could wait and do it on

Redirect, but I think we need to go

ahead now.

THE COURT:  Of course, the last Cross

Examination was about an hour and a

half.

MR. RAMSEY:  Was it that long?

THE COURT:  It was that long.  That is what

I am saying, forty-five minutes, we may

could go ahead, but if it is like last

time — — —

MR. RAMSEY:  Well, I anticipate it will be

as — — — I didn't realize it was that

long.

THE COURT:  It was pretty long.

MR. VALESKA:  Can I just bring them back and

ask her a few questions and then recess?

THE COURT:  Well, what I want to talk to

you about at this time is the bond in

the case.  I don't know what the bond is

at;  do you know what the bond, Mr.

Ramsey, is?

MR. RAMSEY:  It is considerable.  I think it

is over one hundred thousand dollars,

Your Honor.

THE COURT:  Well, I have been looking through
the file and it seems like it was reduced
at one point.

MR. VALESKA:  It was reduced by one of the
judges.

THE COURT:  That is what I want to find out,
what the bond is now.  I am not really
sure.

MR. VALESKA:  Can we get the Clerk in here?

MR. RAMSEY:  Your Honor, Mr. Money has ties
to this area all of his life.  He is a
life-long resident of Henry County and
he has no intention of going anywhere.

THE COURT:  I understand that.  But, also I
have heard the evidence in this case and
as far as I am concerned, it is very
convincing.  I don't know if it is true
or not, that is up to the Jury.  But, if
I was hearing the Preliminary Hearing
and setting the bond, I would set it
pretty high.  These young girls here, I
don't want any intimidation here with
them or their family or anything else.
If the bond is high enough, fine.  If it

is not, I am going to raise it.

MR. RAMSEY:  So, Your Honor will know, he

has been ordered to stay away from any

contact with the victims to this point.

THE COURT:  I understand that.  But, we are

also in the middle of a trial where,

again, the Jury decides the facts, but

in my mind, there is a great likelihood

that he will be convicted from what I

have heard on this stand.  There is a

possibility of not only what I said about

the intimidation of a witness, there may

be a danger of flight in this case,

plus the danger to the community of

having somebody on the street that did

this kind of stuff like this.

MR. RAMSEY:  Your Honor, he is innocent until

he is found guilty by the Jury.

THE COURT:  I understand that.  The judge can

set what he wants to, also.

MR. RAMSEY:  Yes, sir.  I understand that.

THE COURT:  And, as I understand, previously,

and I am at a disadvantage as I was not

the judge on this case to start with,

but I understand at one time he went to

Texas and you don't know where he was at.
Is that correct?

MR. RAMSEY:  No, sir.  That is not correct.
He went to North Carolina one time.

THE COURT:  Okay.  Well, I am going to look
at the bond.

MR. RAMSEY:  Well, he has been out of town
a couple of times, but we have always
asked for and received permission on
each and every occasion.

THE COURT:  I am not saying I will raise it,
Mr. Ramsey.  If it is high enough, you
know, fine.  I have just got a feeling
that it may not be.  Until I find out,
it will be doing a disservice to
everybody.  (Referring to the Case
File.)

THE CLERK:  One hundred and twenty thousand
dollars total.

THE COURT:  One hundred and twenty?  Is that
a property bond?

THE CLERK:  Yes, sir.

THE COURT:  All right.  Okay.  In my opinion,
that is not high enough for this
particular case.  Does the DA have a

                    recommendation?

        MR. VALESKA:  No, sir.

        THE COURT:  Okay.  Bond is raised to two

                    hundred and fifty thousand dollars with

                    surety.  I will not take any property

                    bonds.

        MR. VALESKA:  Can we get the Jury back?

        THE COURT:  Yes, sir.  Bring them back.

                            (Thereupon, the Trial Jury

                            was returned to their

                            place in the Jury Box and

                            the witness was returned

                            to the Witness Stand and

                            the following proceedings

                            were had, to-wit:)

        MR. VALESKA:  Just a few more questions.

        THE COURT:  Go ahead.

                    DIRECT EXAMINATION CONTINUED

BY MR. VALESKA:

Q       I want to go back and ask you, if I could, let's

180

go to the hog barn on this occasion, this date,
when you and Amanda were in there, Amber, with
B. C. Money, Sr.  Do you remember what type of
clothing Amanda was wearing?

A     No, sir.

Q     Okay.  Do you remember what kind of clothing you
were wearing?

A     No, sir.

Q     Were you wearing big heavy coats?

A     No, sir.

Q     Okay.  I want you to tell the Ladies and Gentlemen
of the Jury, if you could, as your grandfather,
B. C. Money, Sr., has he ever shown you any VCR
movies before?  Yes or no?

A     Yes, sir.

Q     How many different types of movies, can you tell
me?  Many, one, two, few, a lot?

A     One.

Q     That one VCR movie that he showed you, what was
the name of it?

A     Screwballs.

Q     Would you tell the Ladies and Gentlemen of the
Jury, in that movie Screwballs, that VCR movie,
what occurred during that movie that he showed
you?

A      In one part, there was a man and woman having sex in a car.

Q      Do you remember how the movie starts off?  I know it has been a long time;  do you remember?

A      No, sir.

Q      Was anybody else present when he showed you that movie?

A      Talking about in there with me?

Q      Uh—huh.  (Affirmative response.)

A      My brother.

Q      Did he point out or talk about the part about sex that was occurring between a man and a woman?

A      No, sir.

Q      Was he in there with you?

A      My granddaddy?

Q      Uh—huh.  (Affirmative response.)

A      Yes, sir.

      MR. VALESKA:  That is all.  Thank you, Your Honor.

      THE COURT:  Okay.  I think, gentlemen, this will be a good time to stop for the day.  Is that correct?

      MR. RAMSEY:  Fine.  Whatever you say.

      THE COURT:  We have a Juror that needs to

leave in about fifteen minutes.  So,

rather than get into the Cross Examination

of this witness, we will save that for

tomorrow.  Okay.  Ladies and Gentlemen

of the Jury, at this time, you will be

dismissed or recessed until tomorrow

morning at 9:00 o'clock.  If you would,

remember the instructions that I gave

you before and do not listen to any

TV or radio accounts of this particular

trial.  I don't know if there will be

any or not, but please do not listen

to those, do not read any newspaper

accounts of this particular trial.  There

will be newspaper coverage, because

there is someone here, right now, from

the Dothan Eagle that has reported this

particular trial.  Do not read those

accounts.  Again, do not discuss this

case among yourselves, with any family

member, or any friends.  And certainly,

don't let anybody discuss this case with

you.  And, you need to remember this,

because it is an important case and at

some point, the attorney may ask me to

pole the Jury and ask you whether or not

anybody has discussed the case with you

or whether or not you have read or listened

to any type of media coverage of this

event.  But, anyway, until 9:00 o'clock

you will be recessed and come back to

the Jury Room.  Don't come out here,

because there will be other Jurors

coming out here.  So, if you will, go

back in here and be sequestered there

until 9:00 o'clock until we start

testimony again in this case.  Thank

you.

            (Witness excused.)


            (Thereupon, the Trial Jury

            was released for the

            evening with the above

            instructions from the

            Court and a recess was

            called and taken by all

            parties.  Upon completion

            of said recess, all

            parties returned to the

            presence and hearing of

the Court Room and the

following proceedings were

held out of the presence

and hearing of the Trial

Jury, to-wit:)


THE COURT:  Let me say this for the Record.

On the request for the in camera

inspection of the Record, Mr. Ramsey,

you requested yesterday — — —

MR. RAMSEY:  Yes, sir.

THE COURT:  The Court did look at that

yesterday and I don't see anything

significant that you need, at this

time.

MR. RAMSEY:  All right, sir.

MR. VALESKA:  I want to ask something, I want

to make sure he had open file discovery

of everything that I had.  The file was

turned over to the Defendant.

MR. RAMSEY:  Not the Department of Human

Resources File.  I never saw that.

MR. VALESKA:  But, we did have in our records,

the District Attorney File, many reports

and statements in our files.  There are

copies of the interview with Human

Resources.  I understand what Mr. Ramsey

is saying, I don't have all the files,

but you have the records supplied to me

by Beth Rushing and the other Human

Resource workers in our files.  I am

asking weren't you given those files?

MR. RAMSEY:  I have portions of the Department

of Human Resource File.

THE COURT:  Were the statements of the two

victims to the Department of Human

Resources, were they given?

MR. RAMSEY:  That is all I have.

THE COURT:  That is basically what is in these

files, statements that were given to

DHR and statements given to investigators

in the case about the evidence in the

file.

MR. VALESKA:  It is the regular process of

the District Attorney to give them

open-file discovery, which includes the

Human Resource Records given to us.  I

agree with Mr. Ramsey, I don't know what

is in the Human Resource File of Beth

Rushing and the others.  I am trying to

put Money in the penitentiary and I
think that they should have every
opportunity.  That is all I am saying,
that we had given open-file discovery
of our stuff and he clarified if there
was something else in the Human Resource
File, which you have, which I haven't
seen.

THE COURT:  All right.  Bring in the Jury.
Are there any witnesses in the Court
Room?

MR. VALESKA:  We do ask for the Rule.

MR. RAMSEY:  Yes, sir.  I have a couple.

THE COURT:  All right.  You need to go in
the back.

MR. RAMSEY:  Judge, my understanding is
there are more witnesses.

THE COURT:  Okay.  All witnesses in the
Court Room need to go in the back.  Any
more witnesses in this particular case.

(Thereupon, the Court
Room was cleared of
witnesses and the Trial
Jury was returned to

their places in the Jury

Box.  At that point the

witness was returned to

the Witness Stand and the

following proceedings were

held in the presence and

hearing of the Trial Jury,

to—wit:)


THE COURT:  Okay.  Let's see, did you have

more questions, Mr. Valeska?

MR. VALESKA:  No, sir.  I believe I finished

yesterday, Your Honor.

THE COURT:  All right.  Mr. Ramsey.

MR. RAMSEY:  Thank you, judge.


CROSS EXAMINATION


BY MR. RAMSEY:


Q     Amber, my name is Mr. Ramsey and I am your

granddaddy's lawyer.  I need to ask you some

questions.  Is that okay?

A     Yes, sir.

Q     Okay.  Now, I don't mean to embarrass you in

| | |
|---|---|
| | any way and if I do, will you forgive me? |
| A | Yes, sir. |
| Q | Okay.  Thank you.  How old are you, Amber? |
| A | Eight and a half. |
| Q | What is your date of birth? |
| A | Talking about the year? |
| Q | Do you know what your date of birth is, the month, day, and year? |
| A | December 27, 1986. |
| Q | Okay.  What grade are you in? |
| A | I am in the third. |
| Q | Where do you go to school? |
| A | Columbia. |
| Q | Where do you live, now? |
| A | Haleburg. |
| Q | Who do you live with? |
| A | My mother and my father. |
| Q | Okay.  That is your granddaddy's son, B. C.? |
| A | Yes, sir. |
| Q | They call him Comer?  Is that right? |
| A | Yes, sir. |
| Q | Anybody else live in the house with you? |
| A | No, sir. |
| Q | Now, would you say Amanda is your best friend? |
| A | Yes, sir. |

189

Q     Do you and Amanda do a lot of things together?

A     Yes, sir.

Q     Is Amanda in the same grade as you or a grade
      ahead of you?

A     A grade ahead of me.

Q     How long has she been your best friend?

A     I don't know.

Q     So long as you can remember?

A     It has been a long time.

Q     A long time, anyway?

A     Yes, sir.

Q     That is fine.  Now, how do you get to school?

A     School bus.

Q     How did you get to school back in the fall of 1993,
      about two years ago?

A     I rode a school bus.

Q     You would have been in the first grade then?  Is
      that right?

A     That is right.

Q     Okay.  And, you were, you are eight and a half now,
      so you would have been six and a half then?  Is
      that right?

A     Right.

Q     How did you get home from school?

A     I rode the school bus.

Q    Where did you go?

A    I went to my granny's.

Q    Is that your granddaddy's house?

A    Yes, sir.

Q    And, your granny is Ruby?  Is that right?

A    Right.

Q    Miss Ruby.  Did you do that everyday or pretty
     much everyday?

A    Yes, sir.

Q    Okay.  Would Amanda do that with you?

A    She did one time.

Q    Just one time?

A    Yes, sir.

Q    Okay.  Do you know how Amanda got home from school,
     other than this one time?

A    She would ride the school bus home, too.

Q    And, the driver let her off at her house?

A    Yes, sir.

Q    Do you know whether or not anybody would be home,
     at that time?

A    Nobody would be at home.

Q    I mean at her house, I mean home at Amanda's
     house?

A    No.  No, sir.

Q    Nobody would be there?

A    (Witness shakes her head to the negative.)

Q    Have you ever been to Amanda's house?

A    Yes, sir.

Q    Who lived with Amanda back then?

A    James and Veneva.

Q    Was there a Jimmy Logan living there?

A    He did, I think.

Q    You think he did back then?  Okay.  Don't you also think Kevin Logan lived there, too, at that time?

A    Yes, sir.

Q    And, Amanda's brother lived there, too?

A    Yes.

Q    Would they be at home after school when the school bus would drop Amanda at home?

A    No.  They all come home together.

Q    They all come home together?

A    Uh-huh.  (Affirmative response.)

Q    All ride the same bus?

A    Yes, sir.

Q    Okay.  So, Kevin and Jimmy and Amanda would get to the house at the same time from school?

A    And, Chuck.

Q    And Chuck, too?  Okay.  There weren't any adults home at that time, were there?

A    No, sir.

Q   But, the school bus would drop you off at your
    grandmother's?

A   Yes, sir.

Q   Why wouldn't it drop you off at your house?

A   My mother was at work.

Q   There was nobody home to take care of you?  Is
    that right?

A   No, sir.

Q   How many times have you been to Amanda's house?
    Quite a few times?

A   Yes.

Q   Does Amanda live in the same place now as she did
    then?

A   Yes, sir.

Q   Do you still go to Amanda's house, now?

A   Yes, sir.

Q   Do Kevin and Jimmy still live there?

A   No, sir.

Q   How long have they been gone from the house, if
    you know?


        MR. VALESKA:  Objection.  Irrelevant.

        THE COURT:  Overruled.

        THE WITNESS:  I don't know.

BY MR. RAMSEY:

Q     You don't know?  Okay.  But, Amanda only went
      to - - - what do you call your granddaddy?

A     Granddaddy.

Q     Granddaddy?  Okay.  Amanda only went to your
      granddaddy's house one time?  Is that right?

A     That time when my sister was down here, Amanda
      and Chuck would get off at my house.

Q     So, she may have been one time before that?  All
      right.  But, no more than that, no more than one
      or two times?

A     (Witness shakes her head to the negative.)

Q     What did you do on this day when Amanda and you
      went to your granddaddy and grandmother's house
      when you got off the bus?

A     We went inside and laid our back packs down and
      got some cookies and something to drink.  Then we
      went outside to the dog pen and granddaddy opened
      his red box up and got the nasty books out.

Q     Okay.  You have been to, obviously to your
      granddaddy and grandmother's house a lot of times?
      Right?

A     Yes.

Q     Who is James Ernest Amos?

A     (No response.)

Q     Do you know?

A     He is my first cousin.

Q     First cousin?  That is your granddaddy's grandson, isn't it?

A     Yes, sir.

Q     Now, do you remember when James Ernest used to live with your granddaddy?

A     No, sir.

Q     You don't remember that?

A     No.

Q     Okay.  Do you know whether or not James Ernest had a bedroom at your granddaddy's trailer?

A     Yes, sir.

Q     How do you know that?

A     I know he slept there.

Q     You know he stayed there one time, at least a little while?  Is that right?

A     Yes.

Q     Didn't you find a bunch of magazines up in the closet of the bedroom that James Ernest used to stay in, one time?

A     Yes, sir.

Q     And, it was a box of dirty magazines, wasn't it?

A     Right.

Q    And, your grandmother caught you looking at them, didn't she?

A    Yes.

Q    She told you to put them up?

A    Yes, sir.  She let us look at them a few minutes and then she took them away.

Q    She let you look at them for a few minutes and then took them away?  All right.  All right. Your granddaddy wasn't there then, was he?

A    No, sir.

Q    And, who was with you when you found these magazines?

A    My cousin, Kevin.

Q    Okay.  So, you and Kevin found these magazines in a box in the bedroom where James Ernest used to stay?

A    Yes.

Q    Was James Ernest still living there, then?

A    I don't think so.

Q    Okay.  Now, did you find these magazines before all this happened that you are telling us that your granddaddy did?

A    Yes, sir.

Q    Do you remember when it was, would have been that you found these magazines?

A    No, sir.

Q    About how old were you then?

A    I was about six and a half.

Q    About six then?  Okay.  Now, you found them at
     your granddaddy's trailer?  Is that right?

A    Yes.

Q    What did your grandmother tell you when she caught
     you looking?

         MR. VALESKA:  Object to what the grandmother
             said.

         THE COURT:  All right.  Sustained.

         MR. VALESKA:  Let him call the grandmother.


BY MR. RAMSEY:


Q    Did your grandmother do anything when she found
     you looking at them?

A    Put them in the closet, up at the top of the
     closet.

Q    Did she get on you in any way for looking?

A    No, sir.

Q    Did you know that you shouldn't be looking at
     that type of stuff?

A    Yes, sir.

Q    And, it was you and Kevin, you said?

A       Right.

Q       Is that, was that Kevin Logan?

A       No, sir.

Q       Who was that?

A       Kevin Money.

Q       Kevin Money?  Who is Kevin Money?

A       He was uncle Billy Gene's son.

Q       How old was he, at the time?

A       I don't know.

Q       Okay.  Is he older than you?

A       Yes, sir.

Q       A couple of years older than you?

A       Yes, sir.

Q       Now, on this day when Amanda went with you to your
        granddaddy's house, did your mother pick you up
        that day?

A       Yes.

Q       What time?

A       (No response.)

Q       Do you remember what time she came to get you?

A       No, sir.

Q       Where did she come pick you up at, exactly?

A       At the hog barn.

Q       Did she drive all the way down to the hog barn?

A       No, sir.

Q    Where did she leave her car?

A    At granny's house.

Q    She came down to the hog barn?

A    Yes.

Q    How did she know you were down at the hog barn?

A    I think granny told her.

Q    Your grandmother knew you were going down to the
     hog barn that day? As a matter of fact, your
     granddaddy told your grandmother he was going down
     there?

A    Uh-huh.  (Affirmative response.)

Q    She knew you would be going to feed the dogs on the
     way?

              MR. VALESKA:  I object to what she knew.

              THE COURT:  Sustained.

              MR. RAMSEY:  I will withdraw that question.


BY MR. RAMSEY:


Q    Did you go by and feed the dogs on the way?

A    No.

Q    You didn't feed them, but you went back and looked
     at them?

A    Yes.

Q       There was a bunch of puppies there;  one of the
        dogs just had a litter?

A       Right.

Q       Now, you don't know what time of year this was,
        you just think it was in the fall?  Is that right?

A       Right.

Q       Okay.  Who is Jimmy Bowden?

A       My brother.

Q       Okay.  Have you ever talked with Jimmy about sex?

                MR. VALESKA:  Objection.

                MR. RAMSEY:  What grounds?

                THE COURT:  What is the relevance, Mr. Ramsey?

                MR. RAMSEY:  Your Honor, may I approach?

                THE COURT:  Yes, sir.

                        (Thereupon, an off the
                        Record discussion was held
                        between the Court and the
                        Attorneys of Record.  Upon
                        completion of said
                        discussion, the following
                        proceedings were had,
                        to-wit:)

MR. VALESKA:  I withdraw my objection.

THE COURT:  Go ahead, Mr. Ramsey.

BY MR. RAMSEY:

Q     Have you ever talked with Jamie about sex?

A     No, sir.

Q     Okay.  Now, you told the Ladies and Gentlemen of
      the Jury about the time that your grandfather
      whipped you?

A     Yes, sir.

Q     Okay.  Was that before all this happened?

A     Yes, sir.

Q     Did that whipping make you mad?

A     Yes, sir.

Q     Had your grandfather ever talked about you or
      whipped you or as a matter of fact, you or anybody
      before that day?

A     No, sir.

Q     It made you really mad, didn't it?

A     Yes.

Q     And, you were mad enough to tell your mother about
      that?  Weren't you?

A     Yes, sir.

Q     You went home and told your mother about that

whipping that very day?

A    Yes, sir.

Q    You didn't scare or weren't scared of your
grandfather at that time, were you?

A    No, sir.

Q    He just whipped you?

A    Yes, sir.

Q    Now, how long before all this happened was that
whipping?

A    A long time.  I don't remember.

Q    And, you are telling us that the only reason he
whipped you is because you didn't dance with your
grandmother?

A    For her.

Q    For your grandmother?  Wasn't any other reason
at all?

A    No, sir.

Q    What did you ever tell your grandfather about
that?  What I am saying is did you ever say anything
about that?

A    No, sir.

Q    Did he ever whip you or spank you or anything like
that after that time?

A    No, sir.

Q    Now, let me get back to these magazines you found.

Didn't you, after your grandmother told you to put those back up and don't be looking at those, didn't you get back in there again?

    MR. VALESKA:  I object to what the grandmother said.  Let him call the grandmother.

    MR. RAMSEY:  I intend to, Your Honor.

    THE COURT:  Okay.  Sustained.

    MR. RAMSEY:  Mrs. Money will take the stand.

BY MR. RAMSEY:

Q    Whatever your grandmother told you, regardless, after you put them up the first time, didn't you get back in the magazines again?

A    Yes, sir.

Q    And, you got caught again?

A    Yes, sir.

Q    So, you knew that you, you knew if the first time that you weren't supposed to be looking at them and you got back in there, was that the same day or later?

A    It was later.

Q    Wasn't even the same day, it was another trip to the house, wasn't it?

A      Yes, sir.

Q      Now, do you know whether or not your grandfather

       ever took those magazines and got them out of

       there and took them to burn them?

A      I think he burned some and then he saved two.

Q      Okay.  Why do you think that?


            MR. VALESKA:  I object to her testifying why

                 the grandfather saved two or burned

                 them.

            THE COURT:  Okay.  Sustained.

            MR. RAMSEY:  Your Honor, she just testified

                 and I just want to know why she made

                 that statement.  I think I am allowed,

                 if she knows.

            MR. VALESKA:  She testified that he burned

                 some and saved two.  She can't testify

                 why B. C. Money did this, that is a

                 mental conclusion only he can testify to.

            THE COURT:  Only way she knows that is if he

                 told her something.  That would be

                 hearsay.  Sustained.

204

BY MR. RAMSEY:

Q      Let me ask you this way.  Did you see your
       grandfather burn any of these?

A      No, sir.

Q      But, you know that they were gone after this
       second time you looked at them?

A      Yes, sir.

Q      Were they gone right after that?

A      I don't know.

Q      Did you go look for them again?

A      No, sir.

Q      Then how did you know they were gone?

A      They were − − − I don't know.

Q      Okay.  Now, you have told us that your grandfather
       took you by the dog pen, you and Amanda, on this
       day?

A      Yes.

Q      You can't remember when it was and that you then
       went down to the hog barn, as you call it, right?

A      Right.

Q      Do you remember there ever being hogs in the barn?

A      No.

Q      You know it has to be the hog barn, because that
       is what you heard it called?

A    Yes.

Q    In fact, there was nothing in the barn on this
     day?

A    Well, no.  There aren't no animals.

Q    Let me ask you about the shingles.  How many were
     in there?  Was it a stack of shingles?

A    Yes, sir.

Q    In fact, it was stacked about this high, wasn't
     it?  (Indicating.)

A    Yes.

Q    And, it was a bunch of them, wasn't it?

A    Yes, sir.

Q    And, it was down there because somebody, at one
     time, intended to put them on the roof and never
     got around to it?  Is that right?

A    Yes, sir.

Q    Now, before you went to the hog barn, you told
     us that you went to this tool box?  Is that right?

A    Yes, sir.

Q    And, you told us that your grandfather opened up
     this tool box?

A    Yes, sir.

Q    You don't remember that tool box being already
     open when you first saw it?

A    I do.

Q     Okay.  It was already opened when you first saw it, wasn't it?

A     Yeah.

Q     In fact, you didn't see your grandfather open that box, did you?

A     Well, I did see him open it.

Q     When did you see him open it?

A     He — — — I don't exactly know when, but he opened it and got some magazines out.

Q     Is it not true that it was already open when you saw the tool box?

A     Right.

Q     Okay.  So, your grandfather got these magazines out and brought them to show you?

A     And Amanda.

Q     Where were you and Amanda then?

A     He closed the box and we sat on top of the box.

Q     What do you mean by box;  in the back of the truck?

A     The tool box.

Q     The tool box in the back of the truck?

A     No.  That red one.

Q     Okay.  So, you were already right by the tool box then and what were you doing there, do you remember?

A    Looking at those books.

Q    Did your grandfather say anything to you when he showed you those magazines?

A    No, sir.

Q    Just showed them to you and didn't say a word?

A    Right.

Q    Did you say anything to him?

A    No.

Q    Now, you knew you weren't supposed to be looking at these—type magazines?  Is that right?

A    Right.

Q    Why didn't you say anything to him then?

A    I don't know.

Q    Do you know whether or not Amanda said anything to him?

A    No.

Q    What happened next?

A    Coming back, we got off the red tool box and he lifted the lid and put them back in there.  And then we got on the back of the truck and rode down to the hog barn.

Q    Okay.  How far was that?  Wasn't far, was it?

A    No.

Q    Do you know whether your granddaddy locked the box back up?

208

A    He did.

Q    What type of lock was it?  Do you know?

A    (No response.)

Q    Was it a padlock on the box or did it have a
     combination lock or − − −

A    It was a padlock.

Q    Padlock?  Then he went on in to the, to this room
     on the side of the hog barn, actually?

A    Yes, sir.

Q    And, you told us that it had one or two windows?

A    Right.

Q    And, the door entrance way to this room doesn't
     have a door on it, does it?

A    No, sir.

Q    What type of floor was in this room?

A    Dirt.

Q    Where were the shingles in relation to the room?

A    The other room down, the last room on the other
     side.

Q    How far was it?

A    Oh, not much.

Q    You told us that you went and got some shingles?

A    Yes, sir.

Q    How many times did you walk over and get shingles
     and put them down on the ground?

A    I don't know.

Q    More than once?

A    Yes, sir.

Q    Okay.  What did you do that for?

A    After he got the shingles, me and Amanda laid down, laid them down on the ground.

Q    Why did you do that?

A    Granddaddy told us to.

Q    He told you to?

A    Yes.

Q    What happened next?

A    Granddaddy asked Amanda to lay down on one.

Q    He asked her to lay down?

A    (Witness nods her head to the affirmative.)

Q    Did she lay down?

A    Yes, sir.

Q    What happened next?

A    He pulled down her pants.

Q    Okay.  Did he pull down her pants before she was laying down or after she was laying down?

A    After.

Q    Okay.  Did she have panties on?

A    Yes, sir.

Q    Did your granddaddy pull down her panties?

A    Yes, sir.

Q    Now, are you sure you saw your granddaddy pull
     down Amanda's pants and panties?

A    Yes, sir.

Q    Are you sure she was laying down when you saw
     your granddaddy do this?

A    Yes, sir.

Q    So, if Amanda said she was standing up and
     she — — — strike that.  Did you ever hear your
     granddaddy say anything to Amanda?

A    No, sir.

Q    Nothing at all?

A    No, sir.

Q    He just pulled her pants down and pulled her
     panties down?  Is that right?

A    Yes, sir.

Q    You are sure about that?

A    Yes, sir.

Q    And, you were watching this standing right there,
     weren't you?

A    Yes, sir.

Q    And, you didn't like what you were seeing, I guess,
     or did you?

A    I didn't.

Q    So, if Amanda said that while she was standing up
     your granddaddy told her to take her pants down

and take her panties down, then your recollection
is completely different from that?  Is that right?

A    Yes, sir.

Q    Okay.  Have you ever been to Amanda's house when
Jimmy and Kevin were there?

A    Yes, sir.

Q    Has either one of them ever messed with you?

         MR. VALESKA:  Objection.

         THE COURT:  Sustained.

BY MR. RAMSEY:

Q    Have you been at the house when Jimmy and Kevin
were there and no parents were there, no adults
there?

A    Yes, sir.

Q    How many times?

A    Once.

Q    Just one?

A    Yes.

Q    Now, what did you do when you watched this
happening to Amanda?

A    I was standing there.

Q    Did you close your eyes?

A    No, sir.

Q    You watched it?

A    Yes, sir.

Q    How far away were you?

A    About — — — I don't know how far I was.

Q    Tell us what you saw.

A    I saw granddaddy stick his penis in Amanda.

Q    Did you ever see anything else happen?

A    No, sir.

Q    That was it?

A    Yes, sir.

Q    Did your grandfather pull his pants down?

A    No, sir.  He unzipped his pants.

Q    Unzipped his pants and — — —

A    And unbuttoned his boxer shorts.

Q    If Amanda told us that your grandfather pulled his pants down to his knees, that is not what you remember?

A    No.

Q    Did he ever touch her?

A    Yes, sir.

Q    Okay.  Did he touch her before or after he put his penis in?

A    Before.

Q    Okay.  You saw this?

A    Yes, sir.

Q    So, when you just said that you didn't see
     anything else but him sticking his penis in her,
     you just didn't remember him touching her?  Is
     that right?

          MR. VALESKA:  That is not what she said.

          THE COURT:  Okay.  Sustained.

BY MR. RAMSEY:

Q    Why didn't you leave?

A    I don't know.

Q    Do you know why you didn't just run out of the
     door?

A    Yes, sir.

Q    I mean, there was nothing to prevent you from
     doing that, was there?

A    Well, he was close to the door.

Q    But, he was on top of Amanda, according to you,
     at that time?  Is that right?

A    Right.

Q    Was there anything stopping you from running out
     the door?

A    Yeah.

Q       You knew your grandmother was up at the house,
        didn't you?

A       Right.

Q       Did you know what you were seeing was a bad
        thing?

A       Yes.

Q       Did you know it then?

A       Yes, sir.

Q       And, you know it now, don't you?

A       Yeah.

Q       And, you saw your mother right after this, didn't
        you?

A       Yes, sir.

Q       And, you had already told your mother about your
        grandfather hitting you, didn't you?

A       (No response.)

Q       Whipping you with the belt?

A       Yes, sir.

Q       But, you didn't tell your mother about this, did
        you?

A       No, sir.

Q       And, you are, you have told us that it was because
        you were scared?  Is that right?

A       Yes, sir.

Q       Okay.  Why weren't you too scared to tell your

mother about the whipping and you were too scared to tell her about this?

A    I don't know.  I was afraid that they wouldn't believe me, because my granny didn't.

Q    Because your granny didn't?

A    Yes, sir.

Q    Okay.  Did you ever tell your grandmother about this?

A    Yes, sir.

Q    But, this incident with Amanda or about what?

A    I told her about him rubbing me on my private part.

Q    That is what you told us about when he touched you on the outside, you said?

A    Yes, sir.

Q    You told your grandmother about that?

A    Yes, sir.

Q    You don't remember when that happened, though?

A    No.

Q    Did you tell her right after it happened?

A    No, sir.

Q    Now, you told us that your grandfather molested you on five different occasions?  Is that right?

A    Yes, sir.

Q    Okay.  Now, you told us that four of them happened at the branch?  Right?

A    Yes, sir.

Q    And, that is the branch behind the house?  Is that correct?

A    Yes, sir.

Q    And, you told us that one of them happened in the house?  Right?

A    Right.

Q    Where are the falls?

A    There is not a fall.

Q    But, you didn't originally tell - - - do you remember talking to Mr. Clyde about this?

A    Yes, sir.

Q    Clyde Hornsby, the Investigator Hornsby?

A    Yes, sir.

Q    Didn't you originally tell Mr. Clyde that one of these occasions happened at the fall?

A    It was not really a fall, it looked like a fall.

Q    Okay.  But, now, is that another time?

A    No, sir.

Q    Okay.  That is different from the branch, isn't it?

A    Yes, sir.

Q    Okay.  So, try to straighten me out on this, if you can.  You say four happened at the branch?

A    Yes, sir.

Q    And one at the house?

A    Yes, sir.

Q    That is a total of five times that this happened
     and you are sure about that?  Right?

A    Right.

Q    Okay.  What about the falls, what about the times
     you told Investigator Hornsby about this time it
     happened at the falls;  is that another time?

A    We didn't go to no falls.

Q    I understand.  But, didn't you tell Mr. Clyde that
     this happened at the falls one time?  Didn't you
     tell him that?

A    I don't think so.

Q    You don't remember that?

A    No.

Q    Okay.  The first time was when you were six?

A    Yes.

Q    Where did that happen?

A    I was at the branch.

Q    Was this before or after the whipping?


          MR. VALESKA:  Objection asked and answered.
               She said all the sex acts occurred
               after the whipping.
          MR. RAMSEY:  But, she said that the whipping

took place when she was about six and
a half.

THE COURT: Okay. Overrule. Go ahead.

THE WITNESS: I was six when the whipping
happened and about six and a half — — —

BY MR. RAMSEY:

Q    I wanted to make sure. I thought you said it, but
it was after. Did your grandfather ever talk with
you about sex?

A    Yes, sir.

Q    Okay. When did he do this?

A    I don't remember.

Q    Okay. What did you talk about?

A    He told me how people had babies.

Q    Was it because you asked him?

A    No, sir.

Q    Just came out and told you?

A    Yes.

Q    I know these questions are personal and again, I
don't mean to embarrass you. If I do, please
forgive me. The first time this happened, did he
stick his penis inside you?

A    Yes, sir.

Q       And, did he stick it in all the way?

A       No, sir.

Q       Just a little bit?

A       Yes, sir.

Q       Did it hurt you?

A       Not really.

Q       Didn't hurt very much?

A       No.

Q       Did it scare you?

A       Not really.

Q       Okay.  So, you weren't really hurt, weren't really scared?

A       No, sir.

Q       And, you didn't tell anybody about it?

A       No, sir.

Q       Amanda is your best friend, isn't she?

A       Yes, sir.

Q       Did you talk to her about it?

A       Well, I told her what he had done, but she didn't say nothing.

Q       You told her before she ever went over to your grandfather's house?

A       No, sir.

Q       Okay.  You told her after she went to your grandfather's house?

A     I told her when we were there.

Q     Told her that very day?

A     Yes, sir.

Q     Did you and Amanda talk about what had happened, what you had seen happen that day? Did you talk about it with her?

A     Not after it. No, sir.

Q     And, you are best friends with her?

A     Yes, sir.

Q     Was what you saw upsetting to you?

            MR. VALESKA: Objection. Asked and answered. She has testified to it and that was about twenty-five questions back.

            THE COURT: Sustained.

BY MR. RAMSEY:

Q     Did Amanda appear to be upset?

A     No.

Q     But, you never talked with her about it?

A     No, sir.

Q     Why not?

A     We just never think to talk about it.

Q     Now, the second time this happened between you

and your grandfather, where did that happen?

A    At the branch.

Q    How long was this after the first time?

A    I think the day after.

Q    The next day, as best you can remember?

A    Yes, sir.

Q    Were you in school then or do you remember if it was in the summer time?

A    Sometimes I was in school.

Q    Okay.  And, that was the same place, at the branch?

A    Yes, sir.

Q    What about the third time?

A    It happened at the branch.  Four times at the branch and one at the house.

Q    I am trying, if I can and if you can remember, I am trying to take them in order, if you can?

A    Uh-huh.  (Affirmative response.)

Q    You say the second time was the day after the first time and the third time, do you recall how long it was after the second time?

A    No, sir.

Q    Okay.  What about, what about the fourth time?  Do you remember how long it was after the third time?

A    No.

Q    Was it at the branch, also?

A    Yes, sir.

Q    Was the last time it happened, it happened in the trailer?

A    Yes, sir.

Q    You don't recall how long it was after the fourth time?

A    No, sir.

Q    Did he stick his penis inside you on the second time?

A    Yes, sir.

Q    All the way?

A    No, sir.

Q    Okay.  What about on the third time?

A    Yes.

Q    All the way?

A    No, sir.

Q    Did he ever hurt you when he was doing this to you?

A    No, sir.

Q    Never hurt you?

A    No, sir.

Q    Never felt any pain?

A    No, sir.

Q    Ever get scared?

A    No, sir.

Q    Never got scared?

A    No, sir.

Q    The first time it happened, did he ask you to pull your pants and panties off?

A    No, sir.

Q    Did he do that every time?

A    Yes, sir.

Q    Pardon?

A    Yes, sir.

Q    Okay.  Did he ask you to lie down?

A    No, sir.

Q    What would you do, just stand up?

A    Yes, sir.

Q    Every time you were never asked to lie down?

A    No, sir.

Q    And, he would try to stick his penis in you while you were standing up?

A    Yes, sir.

Q    Was he also standing up?

A    Yes, sir.

        MR. RAMSEY:  Your Honor, if I may - - -

        THE COURT:  Okay.  Sure.

                                    (Thereupon, an off the
                                    Record discussion was held
                                    between the Defendant and
                                    his Attorney of Record,
                                    the Honorable Richard H.
                                    Ramsey, IV.  After that,
                                    the following proceedings
                                    were had, to—wit:)

BY MR. RAMSEY:

Q    Amber, have you ever asked your grandfather about
     sex?

A    No, sir.

Q    Okay.  Have you ever told him that you would tell
     him something if he promised not to tell?

A    Yes, sir.

Q    What was that?

A    I told him about me and Jamey having sex and me
     and Kevin, my cousin.

Q    And, you made him promise not to tell before you
     told him that, didn't you?

A    Yes, sir.

Q    And, he got upset when he heard that, didn't he?

A    I don't know.  But, I told when he was messing with

me, during this time, that he was messing with me.

Q    So, you told your grandfather about this?

A    Yes, sir.

Q    But, you never told anybody else?

A    No, sir.

Q    What did your grandfather do when you told him
     that?

A    I don't remember.

Q    Didn't he say:

          Where did you hear about that kind of stuff?

          Where did you learn to talk that way?

A    I don't remember what he said.


          MR. RAMSEY:  That is all I have.  Thank you.

          MR. VALESKA:  I have a few questions.


                    REDIRECT EXAMINATION


BY MR. VALESKA:


Q    Would you tell the Jury when you said the four
     times at the branch that he had sex with you — — —

A    Uh-huh.  (Affirmative response.)

Q    — — — who is taller?  Tell the Jury, your grandfather
     or you?

A    My grandfather.

Q    You are shorter than he is?

A    Yes, sir.

Q    Tell them how he would try to have sex with you or had sex with you down at the branch.  How did that occur when you were standing up?

A    He would bend down a little bit.

Q    Okay.  And, when he bent down a little bit, did he put his private part inside your vagina?

A    Yes, sir.

Q    Are you sure?

A    Yes, sir.  A little bit.

Q    Now, could you tell the Ladies and Gentlemen of the Jury, Mr. Ramsey asked you every time that he had sex he put his penis inside your vagina at the branch where you were standing up.  Do you remember him asking that question?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury did it ever occur at another location where he was not standing up?

A    No, sir.

Q    What about at the house?

A    Well, he was standing, he was - - - I don't know how.

Q    Tell us at the house how the sex occurred at the house, the trailer; was that standing up or on something?

A    On something.

Q    What? Tell the Jury.

A    The bed.

Q    Once again, did you lay completely down and he get on top of you or were you on the bed and he would stand at the foot of the bed or the front of the bed?

A    Front of the bed.

Q    Once again, did he put his penis inside your vagina when you were under twelve in Henry County, at that trailer?

A    Yes, sir.

Q    You are sure about it?

A    Yes, sir.

Q    Let's talk about the other boys that you told your grandfather, you said when he was having sex with you, about they had messed with you? Is that correct?

A    Correct.

Q    When you told your grandfather that, would you tell the Ladies and Gentlemen of the Jury, that night, the next day, you went home and saw your mother,

didn't you?

A    Yes, sir.

Q    And, many days went by and you came and visited
     with your grandfather and your grandmother and your
     mother came to the house and saw you and picked you
     up?  Correct?

A    Correct.

Q    Now, can you tell me when your grandfather promised
     not to tell, you asked him not to tell, right?

A    Right.

Q    Who was older, you or your grandfather?

A    My grandfather.


          MR. RAMSEY:  Judge, we will stipulate − − − Mr.
               Valeska keeps asking these questions he's
               older, he's bigger, he's stronger, and we
               will stipulate.

          THE COURT:  Overruled.

          MR. VALESKA:  Thank you.


BY MR. VALESKA:


Q    Would you tell the Ladies and Gentlemen of the
     Jury when you told your granny that he had touched
     you, did she believe you?

A       No, sir.

Q       Did you tell your mother that he had touched you?

A       No.

Q       Did you tell your father that your grandfather had touched you?

A       No, sir.

Q       Let me ask you this, if I could?  You told the Jury, under oath, these other boys that messed with you, were they adults or juveniles, children?

A       Children.

Q       Now, would you tell the Ladies and Gentlemen of the Jury the time that your mother, this lady right here, or your father came to get you, in your presence, when you were there and this man right over here, B. C. Money that I am pointing out was with you and them, at one time did he ever tell your parents anything about what Mr. Ramsey just asked you about you talking about sex?  Did he do that?

A       No, sir.

Q       At any time when you were with your mother and father and that man right over there or your grandmother when they came to pick you up and you were all together, at any time did B. C. Money ever tell your mother or father, in your presence,

230

what Mr. Ramsey asked you that he said you were

talking about sex or someone was messing with you?

Did he ever do that?

A    No, sir.

Q    When you went to your grandfather's to visit or

your grandmother's to play, spend the night, to be

down there, who was responsible for looking out for

you and protecting you?

A    My granny and my grandfather.

Q    Now, let me ask you this, if I could?  Do you recall

Amanda ever coming back, getting off of that

school bus and going to your grandfather's house,

the best that you can remember, ever after that

time, what occurred in the pig barn, hog barn, shed,

ever again?

A    No, sir.

Q    Now, where was it when your grandfather touched

you?  What location on your body, with his hand on

your private part, where was that?

A    I don't remember.

Q    Was it at the house, the branch, was it in Henry

County?

A    Yes, sir.

Q    Was that before any sexual intercourse, any putting

of his penis in your vagina?

A    No, sir.

Q    Now, let's talk about the whipping your grandfather gave you.  Did your mother come to pick you up?

A    Yes, sir.

Q    Did you tell her that he had whipped you?

A    Yes, sir.

Q    Did you point out the marks on your body?

A    Yes.

Q    Did your mother, not what was said, but did she have a conversation with you or to your grandfather then or the next day when she took you back down there?

A    Yes, sir.

Q    Did he ever whip you again?

A    No, sir.

Q    Now, I want to ask you if that box Mr. Ramsey asked about when those magazines were taken out of the box, did you ever pull the chain that caused the box to fall down on granddad's head and bruise his skin or cut him in any way?

A    No, sir.

Q    I want you to tell the Jury, one final question; it has been a long time since all this occurred? Is that correct?

A    Right.

Q     Can you tell the Jury that day down at the hog

      barn, the day that Amanda was with you, Amber;

      once again, you told us I want to ask you one last

      time, do you remember what kind of clothing you had

      on?

A     No, sir.

Q     One final question.  I'm sorry.  Look at this

      Jury and tell them are you saying your grandfather

      did these things sexually to you, that he raped

      you on these four occasions and touched you,

      sexual abuse, touched you, are you saying that he

      did that, are you making it up because he whipped

      you one time or because it really happened?

A     Because it really happened.

Q     One final question.  When you were asked about

      these other boys that had done something to you,

      these juveniles, did you tell what they had done

      to you then?  When you asked about that, did you

      tell what they did to you, also?

A     Yes, sir.


            MR. VALESKA:  That is all.

            THE COURT:  Mr. Ramsey?

            MR. RAMSEY:  Nothing further.

            MR. VALESKA:  May she step down?

THE COURT:  Okay.

(Witness excused.)

MR. VALESKA:  I need Clyde Hornsby please,
Sheriff.  This will be my last witness,
Your Honor.

Thereupon,

CLYDE HORNSBY

was recalled as a witness in behalf of the
State of Alabama, and after having been first
duly sworn to testify to the truth, the whole truth,
and nothing but the truth, took the stand and
testified as follows, to-wit:

DIRECT EXAMINATION

BY MR. VALESKA:

Q    Tell us your name.

A    Clyde Hornsby.

Q    Where do you work?

A    Henry County Sheriff's Department.

Q    What position do you work in with them?

A    Investigator.

Q    Did you work the cases of the State of Alabama

Versus B. C. Money, Sr., the man I am pointing to over here in the brown suit?  (Indicating toward the Defendant.)

A    Yes.

Q    Did you interview Amanda?

A    Yes.

Q    Did you interview Amber?

A    Yes, sir.  I did.

Q    How many times did you talk to them, in your best recollection;  interview them or talk to them?

A    I talked to Amber twice and Amanda Hadden, part of the time she was upset and the DHR worker more or less did that interview.

Q    Okay.  And, do you know Beth Rushing and did she talk to them also?

A    Beth Rushing talked to Amber Money and this other DHR worker − − −

Q    Was there another DHR worker?

A    Right.  She talked to Amanda Hadden.

Q    Now, would you tell us, Investigator Hornsby, when you talked − − − you were present and talked to Amber as well as the partial discussion or talking with Amanda and the first time did she carry on a conversation like I am asking you questions right

now?

A    Amber, she did real well talking to me and was more open.  But, she was upset, but still open with me.

Q    All right.  What about Amanda?

A    Amanda was extremely upset and she sat in the DHR worker's lap.  She was extremely upset and crying.

Q    Would you tell us when you talked to Amanda or tried to talk to her originally, you and Beth Rushing, did you leave the room?

A    Yes, sir.  I did.

Q    Did she conduct the interview?

A    It wasn't Beth, it was the other worker.

Q    Okay.  Just for the Record, the other workers, were they male or female?

A    Female.

Q    Now, I want you to tell the Ladies and Gentlemen of the Jury have you interviewed hundreds of children of allegations of sexual abuse, sodomy, rape? Excuse me, not sodomy, but rape and sexual abuse?

A    Yes, sir.

Q    Are children easy to talk to about those things?

A    Most of them it is real hard.

Q    Would you tell the Jury as an investigator investigating many, many of those children, do they write down or keep specific dates when the

sexual acts are committed against them?

A    No.  It is hard to get a time period with a kid.

Q    Would you tell in this case, Amanda and Amber, both under twelve years of age at the time of your interview?

A    Excuse me?

Q    Were they under twelve years of age?

A    Yes, sir.

Q    As a matter of fact, they were under ten when you interviewed them, weren't they?

A    Yes, sir.

Q    In fact, they were under nine, weren't they?

A    Yes, sir.

Q    Now, would you tell the Ladies and Gentlemen of the Jury, you recorded their interviews?  Right?

A    Yes, sir.

Q    You wrote down everything they said?

A    Recorded it and transcribed.

Q    The Department of Human Resources made reports?

A    Yes, sir.

Q    You made those reports and furnished them to the District Attorney?

A    Yes, sir.

Q    What is my file and my policy on discovery for the defense?

COURT OF CRIMINAL APPEALS NO. __95-0268__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

### CIRCUIT COURT OF HENRY COUNTY, ALABAMA

CIRCUIT COURT NO. CC-94-065 thru CC-94-070

CIRCUIT JUDGE LAWSON LITTLE

Type of Conviction / Order Appealed From: Rape 1st on CC-94-065,066,067, & 069
Sexual Abuse on CC-94-068 & 070

Sentence Imposed: 99 yrs on CC-94-065; 99 yrs on 066; 99 yrs on 067; 99 yrs on 069;
10 yrs on CC-94-068; 10 yrs on CC-94-070

Defendant Indigent: [X] YES [ ] NO

B. C. MONEY

NAME OF APPELLANT

William Christian Maddox          334 793-6493
(Appellant's Attorney)                    (Telephone No.)
P. O. Box 738
(Address)
Dothan           AL           36302
(City)          (State)         (Zip Code)

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)





EXHIBIT

A

A    It is open.

Q    Give them everything we have? Correct?

A    Yes, sir.

Q    And, would you tell the Ladies and Gentlemen of the Jury, did you sign the warrants in this case?

A    I believe I did.

Q    I understand. I want you to refresh your recollection and look and see - - - here is what I want to ask you. Look on the warrant where you signed where you were working the case of the State Versus B. C. Money, Sr., was a time frame put on those warrants as to the time range when the alleged, at that time, now the Indictment, the Rape Charges and the Sexual Abuse Charges, was that made known to Mr. B. C. Money, Sr., when he was arrested?

A    I don't think the exact time period was known. It was a wide time period.

Q    Look at the warrants, if you have got them.

A    Yes, sir. They should be here. (Witness refers to his records.) One was in October -

Q    When you say one, I want you to tell me the Defendant, the charge, who signed it, when the allegation time frame, what was the offense.

A    Okay, sir. This is signed by myself and the

charge was Rape, First Degree.

Q    Who was the victim?

A    The victim was Amber Money.

Q    Okay.

A    From October through December 31, 1993.

Q    When was that in relation to, Mr. Hornsby?  Tell
the Jury what that time frame is?

A    That is during the time frame one of the rapes
occurred.

Q    So, when the Defendant was arrested, he was given
a time frame, like you said, from October to
December on Rape, First Degree Charge when you
signed the warrant on probable cause, per the
victim, when one of the rapes occurred?  Is that
correct?

A    Yes, sir.

Q    So, it was not too or three years ago, date
unknown, time unknown?

A    No.

Q    The other warrants, I don't want to go through
all of them, but don't they list specifically a
time frame and a month or two of the year when
these alleged, at that time, when they were
signed, the alleged rapes and sexual abuse, they
were signed?  Correct?

A     Yes, sir.

Q     So, the Defendant was given a time?

A     Yes.

Q     Now, could you tell the Ladies and Gentlemen of the Jury you interviewed both girls?  Correct?

A     Yes, sir.

Q     Did any of the girls tell you about anything physical, like paper items that B. C. Money, Sr. showed them at any time?

A     Yes, sir.  Some books.

Q     What kind of books?

A     With nude males and females in it.

Q     Doing what?

A     I believe it was Amber said one of the males was trying to stick his penis into a female.  Also, some cards.

Q     Did Amber or Amanda give you a location, specifically, as to where those items were, where they had seen them?

A     Yes, sir.  The cards were in the house in the bedroom and the books were in, out by the barn.

Q     Cards?  What kind of cards?

A     Playing cards with nude females on the front, sir.

Q     And, would you tell the Ladies and Gentlemen of the Jury, did Amanda tell you about the cards?

A     Yes, sir.

Q     Or, was it Amber?

A     Amber Money, I get them confused.

Q     I understand.  Did Amber and/or Amanda tell you about the magazines?

A     Yes, sir.

Q     Which one or both?

A     I believe both told me.

Q     Did they tell you about the location, where they had seen them or where they were shown the pictures?

A     Yes, sir.

Q     Would you tell the Ladies and Gentlemen of the Jury, did Amber Money tell you there was any other physical evidence in relationship to her grandfather showing her anything else in relationship to a sexual nature?  Any other physical evidence that you went and looked for and checked for?

A     The two books, the cards, and also in the barn, there was some roofing material.

Q     Anything else, Investigator Hornsby, that you can recall?

A     (Witness referring to his records.)

Q     Let me ask you this.  You have worked a lot of

cases since then?

A    Yes, sir.

Q    You have worked a lot of rape, sodomy, sexual
abuse cases with children and adult females?
Is that correct?

A    Yes.

Q    Can you remember everything and be sure about
everything that these girls told you about the
physical evidence?

A    No, sir.

Q    Let me refresh your memory, if I could.  Was
there a VCR movie that the girls told you about?

A    Yes, sir.

Q    Who was that?

A    Amber Money told me about it.  It was called
Screwballs.

Q    And, at my request, did you go to Columbia in
relationship to whether B. C. Money, Sr. ever
rented the movie Screwballs?

A    Yes, sir.

Q    You did document that and find out, if you did?

A    Yes, sir.  He had rented it.

Q    Where did he rent it from?

A    Columbia Movie Rentals in Columbia.

Q    Now, then did you also at our request get a copy

of that movie?

A     Yes, sir.

Q     And, is there — — — never mind.  I will withdraw
that.  Would you tell the Ladies and Gentlemen
of the Jury based on what the little girls told
you, about the physical evidence, did you then go
and obtain or get a search warrant from the
District Judge in Henry County or a circuit judge
in Henry County?

A     District Judge.

Q     Who did that?

A     Charles Woodham.

Q     The honorable Charles Woodham?

A     Yes, sir.

Q     Did you give the information that you had about
what the little girls told you about looking for
any physical evidence to corroborate or back
up what they said occurred?

A     Yes, sir.

Q     Did you get the search warrant?

A     Yes.

Q     When you got the search warrant from Judge Woodham,
where did you execute that, whose residence?

A     B. C. Money, Sr.

Q     Is he in the Court Room?

A      Yes, sir.

Q      Point him out.

A      Over there in the brown suit.  (Witness indicating
       toward the Defendant as requested.)


              MR. VALESKA:  Let the Record reflect that he
                 has pointed out the Defendant.


BY MR. VALESKA:


Q      What did you find at Mr. B. C. Money, Sr.'s
       residence?

A      Inside the residence was two sets of cards.

Q      Let me show you, if I could, State's Exhibit
       Number 4, two items placed in front of you.  The
       top was torn by me out in the Court Room.  What
       are those?  (Produces the exhibit in question
       for examination.)

A      Two decks of cards that I seized.

Q      For the first card that you hold in your hand,
       what does it say on the outside?

A      Lips.

Q      So, what does it say on the yellow?

A      Taste me.

Q      Where was that found?

A    In the top drawer, chest of drawers in Mr. B. C. Money's bedroom.

Q    Place that one over here on the left and pick up the other cards. What are those?

A    Playing cards with partially clothed or nude females on it.

Q    Okay. Put that one down and let me ask you the one that says taste me and lips, does it show pictures of, that I am showing you, of women showing their private parts; their breasts, their vaginas, on the bed, with a hose on, things like that in those cards?

A    Yes, sir. It does.

Q    Based on what Amber told you, did you find those at his residence at Henry County?

A    Yes, I did.

Q    Pursuant to what both Amber and Amanda told you, did you go looking on any other property belonging to any other Money not related to B. C. Money, Sr.?

A    Yes, sir.

Q    Whose property did you go on?

A    It is another man, another son, that joins the property in the back.

Q    Can you tell the Ladies and Gentlemen of the Jury when you went to that property, what object,

        items, physical things around, did you go through

        on that property?  Describe that.

A     I went to a barn and also removed two magazines

        from the red tool box.

Q     Now, let's go back, if we could;  you say that you

        went to a barn and you mentioned that the little

        girls had told you about physical items, they

        testified about some shingles.

A     Yes, sir.

Q     Did you find those shingles?

A     Yes, I did.

Q     Where did you find them?

A     In a stall on the far end of the hog barn where

        they told me they would be.

Q     Were the shingles all stacked up in a neat little

        pile?

A     They were laying on the ground, just inside the

        door, just a little pile.

Q     You took pictures of those?

A     Yes, sir.

Q     How did you get to that location?  Why did you

        know in all of Henry County, with all of the

        farmers that we have to go to that location?

A     Amber Money told me where it was at.

Q     Let me show you some pictures.  I want to make

sure that they are in.  State's Exhibit

Number 8 – – – no, State's Exhibit Number 8 for

identification purposes, what is Exhibit 8?

(Produces the exhibit in question for

examination.)

A   (Witness studies the exhibit in question as

requested.)  It is roofing materials, shingles.

Q   Did you take that picture?

A   Yes, I did.

Q   Appear to be marked, altered, changed in any way?

A   No, sir.

Q   Here in Henry County?

A   Yes, sir.  It is.

Q   How far is this house where the shingles were

in close proximity, if any, to B. C. Money, Sr.'s

trailer?

A   Well – – –

Q   Use something as you are sitting right here.  Look

out toward that window if you can see outside this

Court House – – –

A   I would say approximately to the other side of

the street, maybe a couple of hundred meters or

so.

      MR. VALESKA:  I offer State's Exhibit Number 8

in evidence.

MR. RAMSEY:  No objections.

THE COURT:  Let it be admitted.

(Thereupon, State's Exhibit
Number 8 was received in
evidence.  After that, the
following proceedings
were had, to-wit:)

BY MR. VALESKA:

Q    State's Exhibit Number 7, which is in evidence,
     what is Number 7?  (Produces the exhibit in
     question for examination.)

A    (Witness studies the exhibit in question as
     requested.)  That is the hog barn.

Q    Okay.  Based on what they told you, is that
     where you went?

A    Yes, it is.

Q    Went inside and took the pictures in Exhibit 8?
     Is that correct?

A    Yes, sir.

Q    State's Exhibit Number 11, which is in evidence,
     what is Exhibit 11?  (Produces the exhibit in

question for examination.)

A    (Witness studies the exhibit in question as requested.) Just another view of the hog barn.

Q    State's Exhibit Number 6? (Produces the exhibit in question for examination.)

A    (Witness studies the exhibit in question as requested.) Also the hog barn.

Q    State's Exhibit Number 5, which is in evidence. (Produces the exhibit in question for examination.)

A    (Witness studies the exhibit in question as requested.) The roofing material in stacks.

Q    Then State's Exhibit Number 10, over here, if I could show you - - - State's Exhibit 10 - - - (Holding the Exhibit in question.)

A    (Witness studies the exhibit in question as requested.) That is one of the pieces of roofing material that I removed off of the top of the stack in the hog barn.

Q    Did you collect that for physical evidence?

A    Yes, I did.

Q    Let me show you State's Exhibit Number 3, which is in evidence and Number 9, which is marked for identification purposes and not in. Number 3 is in and Exhibit 9 is not at this point. Tell me

what Exhibit 3 is, first of all.  (Produces the
exhibits in question for examination.)

A    (Witness studies the exhibits in question as

requested.)  This is the tool box where the two

magazines were seized from.

Q    And, Number 9?

A    This is a different view of the barn and the

tool box.

Q    Does it show any other items around the tool box

as to what that area was as compared to the hog

barn?

A    There are pens around here.

Q    Is that the way it looked when you took the

pictures?

A    Yes, sir.

Q    Marked, altered, changed in any way on Exhibit 9?

A    No.


          MR. VALESKA:  I offer Number 9.

          MR. RAMSEY:  No objections, for what it is

               worth.

          THE COURT:  Let it be admitted.


                    (Thereupon, State's

                    Exhibit Number 9 was

received in evidence.
After that, the following
proceedings were had,
to-wit:)

MR. VALESKA:  Could I have one second,
judge?

THE COURT:  Yes, sir.


BY MR. VALESKA:


Q    State's Exhibit Number 4, the cards, do they appear
to be marked, altered, changed in any way from
the time that you took those into your custody?

A    No.

Q    All right.  Except for the Court's number and the
top part being torn off?

A    Yes, sir.


MR. VALESKA:  I offer Exhibit Number 4 in
evidence.

THE COURT:  Okay.  Any objection to that?

MR. RAMSEY:  I thought they were already in.

THE COURT:  Let it be admitted.

BY MR. VALESKA:

Q      Let's talk about the red box.  Can you tell the
       Jury when you went to where the red box was, was
       it locked or unlocked?

A      Locked.

Q      Did you have a search warrant?

A      I had a consent search.

Q      From who?

A      Mrs. Money.

Q      Is that the Mrs. Money that is married to B. C.
       Money, Sr.?

A      No, sir.  Not the same one that is sitting here.

Q      Is that Tommy Lee Money's wife?

A      Yes.  I guess it is.

Q      Not this Mrs. Money?

A      The other Patricia Money.  The one that owned the
       land.

Q      I understand.  Was that red box on the property of
       B. C. Money, Sr.?

A      No, sir.  I was told it was on their property.

Q      Now, how did you gain access to the box?

A      We broke into it.

Q      How did you break into that box?

A      I believe we used a crow bar.

Q    Was it locked when you got there?

A    Yes, sir.  It was locked.

Q    Once again, what were you looking for inside that red box?

A    Magazines.

Q    Can you tell the Ladies and Gentlemen of the Jury when you went looking for those magazines?

A    I would have to look back.

Q    Just your best judgement.  Was it after you signed the warrants or before, within a day or two or just give us a date on the first warrant.

A    I believe it was the next day or a day or two after the search warrant.

Q    That would be on or about June of '94?

A    Yes, sir.

Q    When you forced the lock and got into the box and took the pictures, what did you find inside?

A    All kinds of dog collars, stuff like that, and two magazines that are laying there on the table.

Q    These two, State's Exhibit Number 1, the two magazines?  If I am wrong, you tell me, Mr. Hornsby;  Swank on the outside is the brand. Entertainment strictly for adults only, is that what it says?

A    Yes.

Q    Have you looked through these as a part of the
     evidence in this case?

A    Yes.

Q    Can you tell this Jury in those two magazines
     entered in evidence, are there pictures of females
     or males having sexual intercourse?

          MR. RAMSEY:  Judge, at this point, I know
               that Mr. Valeska is doing this for
               show, but the Jury has already seen
               those magazines and I think they know
               what it is.

          MR. VALESKA:  I object to his comment about
               a show.  I have a right to illicit the
               evidence and — — —

          THE COURT:  He is identifying what he
               found and I will allow it.  Overruled.

          THE WITNESS:  Yes, sir.  A male and female
               on the center of the magazine with
               the male with an erect penis and — — —

BY MR. VALESKA:

Q    What about the other magazine;  same thing, other
     details of private parts of males and females in

that magazine? Would you tell us?

A    Yes, sir. One male performing oral sex on a female and also basically the same thing as in the other magazine.

Q    Now, would you tell us, Investigator Hornsby, are you familiar as a part of the investigation as to whether or not that Amber Money and Amanda Hadden, at the request of Human Resources, were seen or examined by Dr. Ted Williams in Dothan?

A    Yes, sir. They were seen by a doctor, I don't know who it was. The Department of Human Resources handled that part of the investigation.

         MR. VALESKA:  That is all I have. Pass
            the witness. Thank you, Investigator
            Hornsby.
         THE COURT:  Mr. Ramsey.
         MR. RAMSEY:  Thank you, judge.


                 CROSS EXAMINATION


BY MR. RAMSEY:


Q    Clyde, do you know who owned that box?

A    The box itself? I don't know. No, sir.

Q    Never found that out, did you?

A    Pardon?

Q    You never really found that out, did you?

A    No, sir.

Q    You don't know if B. C. owned it?

A    He told me he had a key to it.  I don't know if he owned it or not.

Q    Who brought Amber and Amanda to see you or where did you first talk to them?

A    (No response.)

Q    How did that come about?

A    It was late at night when I first got the complaint and since the age of the children was young, we interviewed them the following morning. And, I don't recall how - - - I assume their mother did.

Q    You don't remember?

A    No, sir.  I don't.

Q    Do you recall who you received the complaint from?

A    Deputy Culpepper is the one that notified me.

Q    With the Henry County Sheriff's Department?

A    Yes, sir.

Q    And, you don't know how Deputy Culpepper was aware of this, do you?

256

A    I guess somebody called the police department, evidently, and they dispatched him.

Q    Okay.  They called and do you recall what night it was?

A    It was on June the 8th.  I believe it was June the 8th.  Let me look on the records. (Witness referring to his records.)  June 6.  That is when I received the complaint.

Q    Okay.  And then you went and signed the warrant on June 8, didn't you?

A    I will have to look at the date.

Q    I have got it right here, if you want to see it.

A    Yes, sir.  Save me the time digging through the file.

Q    (Produces the document in question for examination.)

A    (Witness refers to the document in question.)

Q    Looks like they are dated.

A    Here is one dated 6-8-94, 6-9-94, 6-8-94, 6-8-94, 6-8-94, 6-8-94.

Q    All but one are dated the 8th and one is not?

A    Yes, sir.

Q    The one that is dated the 9th is Amanda Hadden. Does that appear to be correct?

A    Yes, sir.  Amanda Hadden.

Q    And, that would be probably because - - - did you talk to Amber and Amanda at the same time or do you remember?

A    I don't remember which one was interviewed first, but I can look back at the taped transcripts and give you the time and date.

Q    Well, do you have any explanation as to why Amanda, and it is not a big deal, but why Amanda's warrant would be dated the 9th and all of Amber's on the 8th?

A    No, sir. I don't know. I don't recall.

Q    Would that indicate that maybe you talked to them on separate occasions?

A    I don't recall. But, I can look back and tell you the exact dates and times they was interviewed.

Q    If you would, please?

A    Okay. (Witness refers to his records.) Amanda was interviewed on June 8 at 11:01. Let's see - - - okay. Amanda was June 8 at 11:00 and let's see - - -

       MR. RAMSEY: While we are waiting, mark those please, separately.

       (Thereupon, Defendant's

Exhibit Numbers 1 through 6
were marked for identification
by the Court Reporter.
After that, the following
proceedings were had,
to—wit:)


THE WITNESS:  She was interviewed, both were
interviewed on June 8.


BY MR. RAMSEY:


Q     Both were interviewed on the 8th?

A     Yes, sir.

Q     Interviewed together or separate?

A     Separate.

Q     This was June 8, '94?  Is that correct?

A     Yes, sir.

Q     Not this year?

A     '94.

Q     Now, at that time, both Amber and Amanda told
you about certain events that they alleged that
Amber's grandfather did to them?  Is that correct?

A     That is correct.

Q     Now, how many instances did Amanda tell you about?

A    I believe it was only one Amanda told.

Q    Only one?

A    At the barn.  Yes, sir.

Q    And, in fact, this is the warrant on which Amanda
     was – – – excuse me, on which B. C. Money was
     arrested, alleging that he had sexually abused
     Amanda?  Is that correct?

A    Yes, sir.

Q    That is the only count we have, to your knowledge,
     today, against B. C. Money regarding Amanda Hadden?

A    Only one occasion, for Amanda Hadden.

Q    That is what I am talking about.  Now, does that
     warrant allege any specific time that this
     incident supposedly occurred?

A    Between September of 1993 and December of 1993.

Q    September of '93 and December of '93?

A    Yes, sir.

Q    All right.  Now, why is that?  Why is September
     of '93 and December of '93 in that warrant?  You
     put that in there, didn't you?

A    Let me look at her file and I will tell you the
     date here.  (Witness refers to his records.)
     Yes, sir.  That is the time period that she more
     or less indicated.

Q    That is what I am getting at.  You put that in

there, because that is what you were told by Amanda
Hadden, at the time that you interviewed her on
July 8, 1994?  Is that correct?

A    Yes, sir.

Q    Now, did she just automatically know that time
frame or was that time period narrowed down
because of the questions that you asked?

A    Because of the questions, a child can't really
give you a date.

Q    She didn't remember anything about anything when
you first started asking?  I mean – – – strike
that.  That is not a proper question.  She didn't
remember specific details about this incident
when you started questioning her?

A    The DHR worker started interviewing her and she
was crying and she told her the details.

Q    Was she calmed down by the time that you talked
to her, a little bit?

A    Yes, sir.  A little bit.

Q    Was it the same day?

A    I believe the DHR worker talked to her prior to
me.

Q    Within a day or so?

A    Yes, sir.

Q    Where do you recall talking to her?

A    At the office here on the second floor.

Q    Here in the sheriff's office or the District
     Attorney's Office?

A    She was at the sheriff's office.

Q    And, she told you that some time between
     September and December of 1993, that B. C. Money
     sexually abused her?

A    Yes, sir.

Q    Did she describe in any detail the incident
     itself?

A    I will have to look back on my thing and read
     to you what she said.

Q    Okay.  I want you to do that, if you would, please,
     sir.  I know it is time consuming, but I want to
     do that.

A    (Witness refers to his records.)  Beth Rushing
     asked her what Mr. Money had done.  And, she told
     her that he pulled her pants down.  And then,
     Beth Rushing was questioning and it goes on.

          MR. VALESKA:  I want to object at this
               point.  He has answered somewhat and I
               have no problem, but is this the
               interview that he was present with?
          THE WITNESS:  Part of it.

MR. VALESKA:  Go ahead.  Go ahead.

THE WITNESS:  I left at that point.

MR. VALESKA:  Go ahead and tell him.  I
don't mind.

THE WITNESS:  I am not in the room during
this questioning, right here.


BY MR. RAMSEY:


Q     Did she say what Mr. Money specifically did to
her?

A     It is a long statement, let me pick through it
here.

Q     Okay.

A     (Witness referring to his records.)  It says:
He pulled down his underwear and tried to
get on top of me and Amber.
Then Beth starts asking a question:
Were y'all standing up or what?
And, Amanda said:
Lying down.
She asked was she lying on the floor;  was it
like dirt or wood?  And she said:
There was some black stuff out there and
we got some of that and laid it down.

(Question.)  Like plastic, you mean?

(Answer.)  No.  That stuff that you put on top of houses.

Then she said she was lying on her back.  Then Beth asked her:

Where did Mr. Money touch her?

And then she said:

Hand.

(Question.)  Where?

(Answer.)  Right here.

(Question.)  Show me.

Then Beth said:

Between your legs?  Is that where you are pointing?

And, Amanda answered:

My private part.

(Question.)  Tried to put his hand in your private part?

And, Amanda said:

His finger.

She said that he rubbed her and said he showed her his private part.

Q    Does it say whether or not B. C. Money pulled his pants down?

A    Yes, it did.

Q    Does she indicate that he did?

A    Yes, sir.  She did.

Q    Now, she said that – – –

A    It continues on here.

Q    Okay.  Go ahead.

A    She asked her about the shape of his penis and
she told the shape.  I think she showed her ink pen
and it was shaped like that.  She asked her what
color it was and she said:

        Same color of your skin.

Q    Did she – – –

A    Wait a minute.  I will finish up here.

Q    Does she say whether or not Amanda was there?

A    Amber and Amanda were both present.

Q    You previously read where she stated B. C. Money
tried to get on top of both her and Amber?  Is
that correct?

A    Right.

Q    Okay.  She said that back in June of '94?  Is
that right?

A    '93.

Q    Well, this statement was taken in June of '94.

A    Let me see.  Okay.  The incident happened in '93
and the statement was '94.  Right.

Q    What I am saying is she told you this back in

June of '94 that Mr. Money had tried to get on
top of both her and Amber?  Is that correct?

A     That is correct.

Q     Now, where did you find those cards?

A     Okay.  In the bedroom of Mr. Money.

Q     They were under a bunch of socks or underwear or
some type of apparel, were they not?

A     Yes, sir.

Q     They were not out in the open in any shape, form,
or fashion?

A     No, sir.

Q     Now, those magazines, there is nothing illegal
about those magazines, is there?

A     No, sir.

Q     Do you know whether or not Swank magazine is sold
in convenience stores in Henry County?

A     I am not sure.  I never paid no attention.

Q     It wouldn't be illegal if it was?

A     I believe there is regulations that they have to
be behind the counter of that sort.

         MR. RAMSEY:  Let me introduce Exhibit 5.  Do
            you have any objection to that?

         MR. VALESKA:  Those are the warrants?

         MR. RAMSEY:  Right.

266

MR. VALESKA:  I have no objections.

MR. RAMSEY:  I am going to have six, all six.

MR. VALESKA:  Every one is fine.

MR. RAMSEY:  We will go ahead and offer
Defendant's Exhibit Numbers 1 through 6,
Your Honor.

THE COURT:  Let them be admitted.

(Thereupon, Defendant's
Exhibit Numbers 1, 2, 3, 4,
5, and 6 were received in
evidence.  After that,
the following proceedings
were had, to-wit:)

BY MR. RAMSEY:

Q     Let me show you what has been marked and admitted
as Defendant's Exhibit Number 1.  And, I will ask
you to tell the Ladies and Gentlemen of the Jury
what that is.  (Produces the exhibit in question
for examination.)

A     (Witness studies the exhibit in question as
requested.)  It is a complaint for Rape, First
Degree, Amber Celest Money.

Q    Okay.  Does it have a date on it?

A    October to December 31, '93.

Q    Okay.  Now, that is not quite as broad as
     September?

A    No, sir.

Q    To December of '93;  can you tell us why?

A    Probably the child's problem of narrowing it down
     to a certain month.

Q    Okay.  Was Amber able to narrow it down or strike
     out September where Amanda was not?

A    I am not sure about that.

Q    But, you didn't allege September '93 through
     December '93 in that one, did you?

A    No, sir.  Not that one.

Q    Same thing about Exhibit 2.  Tell the Ladies and
     Gentlemen of the Jury what that is.  (Produces
     the exhibit in question for examination.)

A    (Witness studies the exhibit in question as
     requested.)  It is Rape, First, Amber Celest Money,
     October to December, '93.

Q    Okay.  Now, I want you to look at Exhibit 3.  I
     want you to read that to the Ladies and Gentlemen
     of the Jury.  (Produces the exhibit in question
     for examination.)

A    (Witness studies the exhibit in question as

requested.)  Okay.  Rape, First, Amber Celest Money,

March '94 through April '94.

Q    Okay.  But, go on further.  Where does that

allegedly occur?

A    It says behind the residence of B. C. Money.

Q    Says where behind the residence?  Read the whole

thing, Clyde.  You know what I am talking about.

Read the whole complaint.

A    All right.  (Reading from the exhibit in question

as requested.)

 Before me, the undersigned

 judge/clerk/magistrate of the District Court,

 Henry County, Alabama, personally appeared,

 being duly sworn, deposes and says that he,

 she has probable cause for believing and does

 believe that B. C. Money, Sr., whose name is

 otherwise unknown to the complainant, on or

 about March '94 through April '94, B. C.

 Money, Sr., a male, did engage in sexual

 intercourse with Amber Celest Money, a female,

 by forcible compulsion, at the falls located

 behind the residence of B. C. Money, Sr., a

 violation of 13A-6-61 of the Code of Alabama,

 against the peace and dignity of the State

 of Alabama.

Q    That is the falls, behind the residence?

A    She talked about the fish pond or whatever, the
     branch.

Q    All right.  Now, she told you about the falls in
     June of '94, didn't she?

A    Do you mean the date of the interview?

Q    Yes, sir.  The warrant is dated June 8, so I
     assume she told you about it before that.

A    Yes, sir.  That is when I interviewed her.

Q    And, at that time, she specified that it happened
     in March or April of '94 and happened at the
     falls?

A    I will have to read back over the statement
     word-for-word.

Q    Okay.  Is there any reason that you would doubt
     that is what she told you from that complaint?

A    I will have to go back and compare the complaints.

Q    All right.  That is fine.  Go back and look at
     your notes, if you would.

A    (Witness referring to his records.)


          THE COURT:  Let's take about a ten minute
               break, at this time.  If y'all would
               like to get a coke or something, that
               is fine.

(Thereupon, a recess was
called and taken by the
Trial Jury and all parties.
Upon completion of said
recess, all parties
returned to the presence
and hearing of the Court
Room and the following
proceedings were held out
of the presence and hearing
of said Trial Jury, to-wit:)

THE COURT:  Is all of the Jury back?

THE BAILIFF:  Yes, sir.

THE COURT:  Okay.  Bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings
were held in the presence
and hearing of said Trial
Jury, to-wit:)

THE COURT:  Go ahead, Mr. Ramsey.

MR. RAMSEY:  Okay.

BY MR. RAMSEY:

Q     Clyde, before we took a break, we were talking

      about what I showed you as Defendant's Exhibit

      Number 3 and that was — — —

A     The date?

Q     — — — the complaint alleging B. C. Money

      had — — — was that a rape or sexual abuse?

A     Rape.

Q     Had raped Amber on or about March or April of '94

      at the falls?

A     Yes, sir.

Q     And, I asked you wouldn't that information have

      come from Amber at the time of the interview.

      And, you said that you would have to see.  Have

      you had an occasion to see?

A     I looked over it on the statement and she names

      the three locations as the branch, the barn, and

      the spare bedroom of grandmother and grandfather's

      house.  But, I couldn't find the date.

Q     So, you don't know where that came from?

A     No, sir.  I sure don't.

Q     But, you signed that warrant?

A Yes, I did.

Q Okay.  And, is it fair to say that you filled that information in  there?

A I gave it to the clerk.

Q You gave it to the clerk?  I am not saying that you actually typed it, but she typed in what you told her to type?

A Yes.

Q You told her that?

A Yes, sir.

Q Although you are telling me that you don't recall where it came from, but it came from somewhere?

A Yes, sir.  It did.

Q Is it fair to say that that came from Amber?

A I am not sure where it came from.

Q Okay.  That is fine.  B. C. came in and gave a statement to you, didn't he?

A Yes, sir.  He did.

Q And, you asked him about those magazines, didn't you?

A Yes, sir.

Q And, he told you, admitted that they were his, didn't he?

A Yes, sir.

Q And, he told you why he had them, didn't he?

A    Yes, sir.

Q    Do you recall what he told you?

       MR. VALESKA:  I object.  I object.  Let him
            put Mr. Money up.

       MR. RAMSEY:  He will take the stand.  That
            is fine.

       MR. VALESKA:  I object at this point.

       THE COURT:  Okay.  Sustained.

BY MR. RAMSEY:

Q    But, he gave you an explanation as to why he had
them, didn't he?

A    Yes, sir.

Q    Did he also – – – strike that.  At that time, did
he deny that he had ever sexually abused or raped
or in any fashion sexually molested Amber or
Amanda?

       MR. VALESKA:  Objection.  Objection.  Let
            him put him on the stand so I can
            Cross Examine.

       THE COURT:  Sustained.

BY MR. RAMSEY:

Q      You picked up what has been entered as State's
       Exhibit 10.   That is some kind of shingle, roofing
       material?   Is that right?

A      Yes, sir.

Q      You found that on the floor of the room located
       beside the hog barn adjacent to the hog barn?

A      In the hog barn.

Q      In this hog barn itself?

A      Yes.

Q      The room separate and aside from the hog barn?

A      It is all one building, just different sections.

Q      Different sections of the hog barn?   Okay.   Now,
       there has been a picture of the shingles -- -- -- State's
       Exhibit Number 5.   That shows them laying there on
       the ground?   (Produces the exhibit in question for
       examination.)

A      (Witness studies the exhibit in question as
       requested.)   Yes, sir.

Q      And, that appears to be just apparently, one sheet
       like that?   Is that correct?

A      There was several in the stack here and I just
       took the top sheet.

Q      You took the top sheet?

A    Yes, sir.

Q    Is this just a stack or a pile?

A    Yes, sir.  That is where it was found.

Q    Okay.  Were any others lying on the ground, other than this one particular stack or pile?

A    I recall just that one pile there.

Q    Did you find any portion of the hog barn where say four or five or several of these were laid down and placed side-by-side anywhere?

A    No.  Just that stack.

Q    Just that stack?  How many would you say, do you have any idea how many of these sheets were in that stack?

A    Can I see the photograph, again?

Q    I think it is right here.  Do you recall?

A    I didn't count them.  No, sir.

Q    Was it several?

A    Several.  Yes, sir.  That could be anywhere from maybe ten to twenty-five.  That is just an estimate.

Q    Okay.


        MR. RAMSEY:  That is all I have.

        MR. VALESKA:  Just a few questions, if I

            could?

<u>REDIRECT EXAMINATION</u>

BY MR. VALESKA:

Q    Investigator Hornsby, when you talked to Amber
     Celest Money, how old was she?

A    At that time, she was seven years old.

Q    Correct me if I am wrong;  once again, refresh
     your recollection, you took, you and Beth, took
     a twenty-six page typed interview from her at
     that time?  Is that correct?

A    Yes.

Q    There was another supplement where you interviewed
     her again?

A    Yes, sir.

Q    Now, let's talk to you about the warrant.  I won't
     show them to you, but to particularly the warrant
     you went before a magistrate in Henry County Court
     House, right over here, was the District Attorney's
     Office, myself as the District Attorney, were we
     present with you when you got the warrant?

A    No.

Q    Was Amber Celest Money, one of the victims, was
     she sitting here like her mother is with me now,
     at the time you told the magistrate what you

believe the evidence to be, the probable cause,
as to what occurred when it was given to the
magistrate?  Was she present to tell you exactly,
correct you, as to whether it was written up,
typed up, at that time?

A    No, sir.

Q    The term falls, was that your term or her term,
if you remember?  The best you can, I know it has
been a while.

A    I believe it might have been her term.

Q    Before we took the recess and went out, Mr. Ramsey
asked you about the term the falls.  I will ask
you to go back and your response was, you said the
falls or described it what other manner or fashion?
What other words did you use beside falls?

A    Branch.

Q    Is this the branch down in that area close to
the hog barn?

A    Yes, sir.

Q    Now, if I could, would you tell the Ladies and
Gentlemen of the Jury, you have worked many cases?

A    Yes.

Q    You have interviewed many children?

A    Yes.

Q    Many female adults?  Is that right?

A Yes, sir.

Q Would you tell the Ladies and Gentlemen of the Jury in this case, I'm sorry, how many investigators in the Henry County Sheriff's Office, this big county?

A One.

Q You are the only one?

A Yes.

Q There is a felony, no matter whether it is a car theft, if it is a burglary, a two hundred and fifty-one dollar shoplifting, rape, sexual abuse, you are called to investigate it?

A Yes, sir.

Q All going on at one time and there is only one of you?  Is that right?

A Yes, sir.

Q Would you tell the Ladies and Gentlemen of the Jury, in this case, looking for other physical evidence, did you ask either one of the victims, Amber or Amanda, to draw a picture of the penis of B. C. Money, Sr.?

A Yes, sir.

Q Did either one of the two girls ever draw what the penis looked like of B. C. Money, Sr.?

A I remember Amber Money drawing it.

Q       She drew it in your presence and you saw it?

A       Yes.

Q       Do you still have that picture with you?

A       No.  It was in the case file, but not in this
        case file.

Q       But, you watched her draw it, did you not?

A       Yes, sir.  I did.

Q       Now, one final question.  I will ask you the time
        frames, investigator Hornsby, on Defendant's
        Exhibit Number, I believe it is 1 through 6, is
        that correct, Moe?  On the warrants, the ones you
        obtained from the magistrate to arrest the
        Defendant, B. C. Money, Sr., the time frames
        September through December and March through
        whenever, would you tell the Ladies and Gentlemen
        of the Jury for Rape, First Degree against a child,
        is there any particular statute of limitations or
        a time period in relationship to months, weeks,
        even years, that has to be placed on a warrant to
        get a warrant?

A       No, sir.

Q       No time period if the evidence is true?  Is that
        correct?

A       That is correct.

MR. VALESKA:  That is all.

THE COURT:  Mr. Ramsey?

MR. RAMSEY:  No, sir.

THE COURT:  Anything else?

MR. VALESKA:  No, sir.

THE COURT:  Can he be excused?

MR. VALESKA:  Yes, sir.

THE COURT:  You may be excused.

(Witness excused.)

MR. VALESKA:  All of the exhibits are in, right, Moe?  At this time, the State of Alabama rests.

## STATE RESTS

THE COURT:  Okay.  Ladies and Gentlemen of the Jury, at this time, there are matters that the attorneys need to take up with me and we will recess for lunch. If you will, be back at 1:30 and again, keep in mind the instructions I gave you yesterday.  Do not discuss this case among yourselves, do not let anyone discuss this case with you.  If you are

going home to lunch or whatever, do not

discuss this case with family members

and keep those particular instructions

in mind.  Also don't read any newspaper

accounts of this particular trial.

There has been, in fact this morning,

reports and don't read those and don't

look at any TV or radio, I don't think

there has been, but in case there is,

don't turn on the TV if you go home for

lunch.  With that, you may recess until

1:30.

> (Thereupon, the Trial Jury
>
> proceeded to their lunch
>
> with the above instructions
>
> from the Court and the
>
> following proceedings were
>
> held out of the presence
>
> and hearing of the said
>
> Trial Jury, to—wit:)

THE COURT:  Mr. Ramsey, do you have any

   motions for the Court?

MR. RAMSEY:  Yes, sir.

THE COURT:  Go ahead.

MR. RAMSEY:  For the Record, the State of
Alabama has rested and we move for a
judgement of acquittal on the basis
that the State failed to prove a
prima facie case.

THE COURT:  Okay.  That motion is denied.
I believe we have Dr. Williams coming
at 1:30.

MR. RAMSEY:  That is my understanding.  I
will verify it, Your Honor.

THE COURT:  I think you said you anticipate
your client testifying?  Is that correct?

MR. RAMSEY:  I suspect to have possibly six
to eight witnesses and maybe more.

THE COURT:  Would these be in the nature of
character witnesses?

MR. RAMSEY:  Three to four will be.  One
rebuttal witness and Dr. Williams and
Mr. and Mrs. Money.

THE COURT:  Okay.  Okay.  Do y'all anticipate
maybe finishing this case today and
have Closing Argument and charge or not?

MR. VALESKA:  I have got to testify in
Federal Court tomorrow at 10:00 o'clock

before the Honorable Judge Myron
Thompson.  I don't particularly care to
go to jail, so we need to go forward
today.

MR. RAMSEY:  We will go – – – I mean, if we
finish it today, we will go well into
the night.

MR. VALESKA:  That is fine.

MR. RAMSEY:  I mean I have got, it depends
on your Cross Examination.

MR. VALESKA:  Judge, all I can tell you is
that I will be here at your calling.
But, tomorrow morning at 10:00 o'clock,
I have got to be at the Federal Court
House in Dothan.  It is a 1987 Robbery
Case that I tried with Don Grimes on a
motion, a case eight years ago.  I have
been subpoenaed and instructed to be
there.  I have to be there.  I have
informed the Court and we can go
tonight or I am telling you tomorrow,
I will be on the Federal Witness Stand
and it will take time.  It could be
two, three hours.  We need to either go
forward today or we will have to start

after that tomorrow. So, I think we
should go ahead, if we can.

THE COURT: I agree with that. Maybe we can
finish. We will see.

MR. RAMSEY: We'll see. 1:30?

THE COURT: 1:30.

(Thereupon, a recess was
called and taken by all
parties for lunch. Upon
completion of said recess,
all parties returned to
the presence and hearing of
the Court Room and the
following proceedings were
held outside the presence
and hearing of the Trial
Jury, to-wit:)

THE COURT: All right. Bring the Jury.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings

were held in the presence
and hearing of said Trial
Jury, to-wit:)


THE COURT:  Mr. Ramsey, you may go ahead.

MR. RAMSEY:  We will call Dr. Ted Williams
to the stand, Your Honor.


DEFENDANT'S EVIDENCE

Thereupon,

TED A. WILLIAMS, M.D.

was called as a witness in behalf of the
Defendant, and after having been first duly sworn
to testify to the truth, the whole truth, and
nothing but the truth, took the stand and testified
as follows, to-wit:


DIRECT EXAMINATION


BY MR. RAMSEY:


Q    Dr. Williams, tell the Ladies and Gentlemen of the
Jury your name.

A    Ted A. Williams.

Q    What is your occupation?

286

A     I am a Pediatrician.

Q     Would you, for the benefit of the Jury, give us
your educational background, please?

A     Yes, sir.  I have a BS in Pre-Med from Auburn
University;  an M. D. Degree from the University
of Alabama at Birmingham.  I did a Pediatric
Residency at Children's Hospital of Alabama.  I
have been in private practice in Dothan,
Southeastern Pediatrics, for almost nineteen
years.

Q     What is your area of practice?

A     Pediatrics and Adolescent Medicine.

Q     And, are you board certified?

A     Yes, sir.

          MR. RAMSEY:  Your Honor, at this time we
             offer Dr. Williams to be qualified as
             an expert witness.

          THE COURT:  Any objections?

          MR. VALESKA:  No, sir.

          THE COURT:  Let him be qualified.

BY MR. RAMSEY:

Q     Dr. Williams, have you had an occasion, specifically

back on June 17 of 1994, to examine both Amber

Money and Amanda Hadden?

A    Yes, sir.  I did.

Q    Okay.  If we can, let's take them one at a time.

First of all, let's deal with Amanda Hadden and

your examination of her, if we may?  I am looking

at a copy — — —

       MR. RAMSEY:  Mark that for me as the next

          one.

               (Thereupon, Defendant's

               Exhibit Number 7 was marked

               for identification by the

               Court Reporter.  After that,

               the following proceedings

               were had, to—wit:)

BY MR. RAMSEY:

Q    I have a report and I will ask you to look at it

and see if you recognize that.  (Produces the

exhibit in question for examination.)

A    (Witness studies the exhibit in question as

requested.)  Yes, sir.

Q     And, is that your signature on the second page?

A     Yes, sir.  It is.

Q     Of this report?  All right, sir.  Now, if I may,
      I will ask you do you recall this specific
      examination?

A     I recall the general details of the examination.
      I don't recall the specific details of that
      particular afternoon over a year ago.

Q     Now, you are looking at the original of the report?
      Is that correct?

              MR. VALESKA:  I certainly have no objection
                  to refreshing his recollection.  I
                  realize he sees thousands of children.

BY MR. RAMSEY:

Q     That is what I am getting at.  You are looking at
      the original of your report from your file?  Is
      that correct?

A     That is correct.

Q     Does that refresh your recollection of this
      examination?

A     Yes, it does.

Q     All right, sir.  Now, in this first paragraph, it

       is a rather lengthy paragraph; you relate some of

       the history that Amanda is personally telling you.

       Is that correct?

A      That is correct.

Q      Now, what basically did she tell you?

A      What she told me was that initially, she didn't

       want to speak and that is not unusual.

Q      All right.

A      So, we tried to give her time to collect her

       thoughts, because it is somewhat intimidating to

       be in a doctor's office and I gave her time to

       talk.  And, she told me that about a month before

       the end of school, that she had gone home with a

       friend, Amber, Amber Money, and they stopped at

       Amber's grandmother and grandfather's house to get

       something to eat and drink.  Apparently, they had

       something to eat and something to drink.

Q      Okay.

A      And, at that time, her grandfather took them

       outside to a shed in the back of the property.  She

       then related what happened in the shed.  She stated,

       per my records, that he had put something that

       she described as what you put on a roof or tar paper

       and put it down on the floor of the shed.  She then

       told me that he pulled her underpants

down – – – pulled her pants down and then her underpants and asked her to lie down on the black paper. Again, she said this was like paper you put on a roof when you put a roof on a house.

Q   Okay.

A   Amanda said then that he got on top of her and tried to put his hand on her private part.

Q   Let me ask you this, if I may, doctor. Now, this interview and this examination was taken on June 17 of 1994? Is that correct?

A   That is correct.

Q   She told you at that time that this incident happened about a month before the end of school? Is that correct?

A   That is correct.

Q   Now, was she talking about that same year, end of school, in the year 1994?

A   That is what I was taken to understand.

Q   That was your understanding of what she told you? Is that correct?

A   Yes, sir.

Q   Now, as a result of what she was telling you and as a result of some other things, you did an examination on Amanda? Is that correct?

A   Yes, sir.

Q    Now, if you will skip down to the bottom of that
     first page, where it says physical examination.
     In the first portion of that, it is just the
     general examination of her body signs regarding
     weight, height, et cetera?  Is that correct?

A    That is correct.

Q    Now, you also did an examination of the genitalia,
     did you not?

A    That is correct.

Q    What did that examination reveal, if anything?

A    The examination revealed she had what we consider
     to be pre-pubital genitalia, canotate zero to one.
     She had not developed any secondary sexual
     characteristics.  When I looked at her labia,
     and we examined all aspects of the genitalia,
     there was no redness of the labia at that point.
     The labia majora and minora were normal.  There
     was no abrasion in the area, no lacerations.
     The area around the urethra looked normal and
     I did not see any enlargement of the hymenal
     area.

Q    Did you see any evidence, whatsoever, of sexual
     abuse?

A    I think that sexual abuse takes different forms.
     I saw an intact hymen and intact normal genitalia.

Q       Did you see any physical evidence of sexual abuse?

A       I did not see any physical evidence of deep

        penetration.  I saw an intact hymen and normal labia.

Q       All right.  Now, you also said that there was no

        abrasion of the labia.  In layman's

        terms - - - strike that.  You stated there was no

        abrasion of the labia.  In addition, two sentences

        later, you said there is no pararectal abrasion.

        What does that mean, in layman's terms?

A       In layman's terms, there was no evidence of any

        irritation, redness, interruption of tissue, none

        of the skin had been rubbed off, no evidence of

        any trauma at that time to the tissue, no damage

        to those vaginal tissues in that area.

Q       Had there been any previous penetration, would

        there have been any evidence of that?

A       If there had been deep penetration at any point

        in time, then there would be changes in the hymen

        that we are used to looking for in a child of this

        age who has a virginal hymen.

Q       Was there any evidence there had been any deep

        penetration?

A       No.  I did not find any.

Q       Now, the last sentence you state in there that

        you are going to proceed with a wet prep and with

a gram stain for CG.

A    GC.

Q    Excuse me.  GC.  What is that, in layman's terms?

A    Those are sexually transmitted infections.

Q    Do you have the result of those tests?

A    Yes, I do.

Q    Okay.  Were they negative?

A    They were negative.

Q    All right.  Now, let's move on, if we can, to the report on Miss Amber Money.  And there again, apparently, you had a conversation with Amber on June 17 of 1994?  Is that correct?

A    That is correct.

Q    And, that was in your office?  Is that correct?

A    That is correct.

Q    Now, tell the Ladies and Gentlemen of the Jury, if you will, basically what Amber told you, at that time?

A    Well, I asked Amber what she had come in to today, what she was there for.  And, she said that she was there on that day, because her granddaddy tried to have sex with her.  I try to relate exactly what they tell me.  I asked her to describe the situation where this occurred.  She stated that the first time it happened was before the past

November that was in question.  She stated she was
laying in a hammock on the front porch of his
house where she apparently visited often.  He asked
her to come over to the hammock and he took his
pants down.  She said that he tried to put his
private part in her private part.  I asked her at
that time if she felt any pain or discomfort and
she said she did not.  She stated that she told
him not to do it and he apparently walked away.
She then stated that a second episode happened a
few months later.  She stated that she was down at
the branch, which she indicated was a creek that
ran behind the grandparent's property.  She stated
that he took down his pants and underpants and
took down her pants and tried to put his private
part into hers while they were both standing up.
The third episode that she related to me occurred
while she was staying with the grandparents.  She
stated that the grandmother left and that he took
her in a small room and again took his pants and
underwear down and took her pants and underwear
down.  She stated that while he was sitting on the
bed, he had her come stand next to him and again
tried to put his private part into hers.

Q      Was Amber reluctant to talk to you in the

beginning?

A     Initially.

Q     Did she loosen up somewhat?

A     She did.

Q     And, the first occasion she told you about, as you have already testified to and as is stated in your report, is, according to your report, sometime before the past November and that would have been November of '93.  Is that your understanding?

A     That would be my understanding.

Q     And then, that happened while Mr. B. C. Money was lying in the hammock on the front porch of the house?  Is that correct?

A     She identified him as granddaddy.

Q     Granddaddy?  If I told you that is B. C. Money — — —

A     She said granddaddy.

Q     Granddaddy was lying in the hammock on the front porch of the house?  Is that correct?

A     She said he was lying in the hammock.  Yes, sir.

Q     Is that where she told you that the sexual relations or whatever occurred?

A     That is apparently where he was.  Yes.

Q     Now, as a result of these allegations and as a result of your discussions with Amber, did you do a physical examination?

A    Yes, sir.

Q    Was that basically the same-type physical exam as you performed on Amanda Hadden?

A    Exactly.

Q    Exactly the same examination?

A    As far as procedure, yes, sir.

Q    Was there any, in your diagnosis, so to speak, did you find anything different from the results of her exam?

A    Her examination, as noted on the record, again revealed normal external genitalia, normal internal genitalia.

Q    And, there again, there was no or was there any evidence, physical evidence of any type of sexual contact or abuse?

A    There was no evidence of any change or abrasion as we discussed before, to the labia and no evidence of any interruption of the hymen; which is the entrance to the vaginal area.

Q    Was there any redness?

A    None.

Q    Now, the last sentence in this report, you state neurologic is appropriate.  In layman's terms, what does that mean?

A    That is part of the complete exam.  I also did a

neurologic examination on her on the motor,

sensory, and cerebellum function; that the

brain and nerve functions were normal. That

was just part of a complete physical examination

of a child and had nothing to do with the

genitalia exam.

Q    You also did a wet test and gram test on her?

A    Yes.

Q    And, were the results of those tests also

negative?

A    That is correct.

Q    All right.


MR. RAMSEY:  Mark that as Number 8.


(Thereupon, Defendant's

Exhibit Number 8 was marked

for identification by the

Court Reporter.  After that,

the following proceedings

were had, to-wit:)


BY MR. RAMSEY:


Q    Doctor, I will ask you to look at what has been

marked as Defendant's Exhibit 8 and ask you if

that is a true and correct copy of the original

that you have in your file there?  (Produces

the exhibit in question for examination.)

A    (Witness studies the exhibit in question as

requested.)  Yes, sir.

Q    Appear to be altered or changed in any way?

A    No, sir.  I don't see any changes.

Q    Likewise, I didn't ask you about Defendant's

Exhibit 7, but does it appear to be altered

substantially in any way from the original that

you have in your file?

A    (Witness refers to the exhibit in question as

requested.)  No, sir.  Does not.

        MR. RAMSEY:  Judge, with that predicate laid,

            we offer copies of Dr. Williams' reports

            as Defendant's Exhibit Numbers 7 and 8

            in lieu of the originals.

        MR. VALESKA:  That is on Amanda Hadden, both

            pages, and Amber?

        THE WITNESS:  Correct.

        MR. VALESKA:  No objection.

        THE COURT:  Let it be admitted.

                                        (Thereupon, Defendant's
Exhibit Numbers 7 and 8
were received in evidence.
After that, the following
proceedings were had,
to-wit:)

        MR. RAMSEY:  That is all I have.  Thank you,
           doctor.

        MR. VALESKA:  I have just a few questions,
           if I could please, Dr. Williams?


                    CROSS EXAMINATION


BY MR. VALESKA:


Q    Let's just go ahead and do Amber's since we were
doing her last and you have the report in front of
you.

A    Okay.

Q    Dr. Williams, can you tell in the report, Amber
also told you that she didn't tell anyone until
this past Tuesday, which was election day, as you
indicate?  Is that correct?

A    That is the way I remember it and that is the way

it is written.  Yes, sir.

Q    Doctor, you have seen thousands and thousands of
     children with alleged rape and sexual abuse and
     when you do examinations and take the histories
     and do an impression just like this?  Is that
     correct?

A    I don't know the exact number, but innumerable.

Q    Many.  Many.  Would that be fair to say?

A    Yes.

Q    Dr. Williams, would you tell the Ladies and
     Gentlemen of the Jury, you have an opinion
     that is it not consistent that most times when
     children are raped or sexually abused, they
     don't yell and tell right away, do they?

A    That has been my impression.  Yes, sir.

          MR. RAMSEY:  Judge, at this point, until he
               can be qualified as an expert in child
               psychology, I don't know that he is
               qualified to - - -

          MR. VALESKA:  I will go on to another
               question.  That is all I will ask.

          THE COURT:  First of all, it was asked and
               answered with no objection.  And second,
               I think he is qualified to state that,

so overruled.

BY MR. VALESKA:

Q     Dr. Williams, would you tell us that Amber did,
      you found out in taking the history and the report
      that she finally told a thirteen year old cousin
      and then told her mother and notified DHR the
      following day about the grandfather?  Is that
      correct?

A     That is how I understand it.  Yes, sir.

Q     Let me ask you, if I could, when you examined
      Amber and you did the physical exam on June 17,
      1994, she was seven and a half years old?  Is
      that correct?

A     Yes.  That is correct.

Q     Fifty-five pounds is what she weighed at that point?
      Is that correct?

A     Correct.

Q     Now, could you tell the Ladies and Gentlemen of
      the Jury, I want to go back to the time you did
      the examination on her, when you looked at her
      vaginal area.  Did she lay down and you examined
      her — — — she laid down on the table and you
      examined her vagina?

A       The examination was done in two positions.

Q       One was lying down?

A       On your back.

Q       Knees up?

A       Knees to the side.

Q       The second way that you did the exam would be in what position?

A       It is called the knee—chest position;  over on the knees with the head down to give us better visualization of the genitalia.

Q       I want you to tell the Ladies and Gentlemen of the Jury, you indicated on Amber that you saw no redness, abrasions or lacerations of the labia?  Is that correct?

A       That is correct.

Q       And, you said in the knee—chest position, the hymen appears intact?

A       Yes, sir.

Q       Now, you are not telling the Jury there could not have been penetration some time previous to that examination to Amber Money, in relationship to sexual abuse or even a slight penetration of an alleged or a rape with a male penis, are you?

A       I am not sure I understand the question completely.

Q       Okay.  Let me ask it this way.  As far as any

abrasions, redness, lacerations inside the vaginal
area itself, correct, you saw none?

A     I did not.  I did not see any.

Q     Hymen intact?

A     Correct.

Q     You are not telling the Jury it is not consistent
that someone could have put their finger inside
her, touched her hymen and did not tear it?  That
can occur, also, can it not?

A     There can be penetration into the labial area
without penetration of the hymen.

Q     Without damaging or tearing the hymen?  Is that
fair to say?

A     Yes.

Q     There could also be penetration inside the labia,
would it be consistent with your opinion that the
male penis, if there was not deep penetration or
just the slightest penetration without tearing the
hymen?

A     If there is deep penetration by a penis in through
the hymen, the hymen is very, very fragile, very
fragile tissue.  Any penetration through that
area will tear it.  If you look at little girls for
a number of years, as I have, you can see an intact
hymen versus a hymen that is not intact.  But,

there can be intrusion of a penis into the labia

area without penetration through the hymen and

into the vault of the vaginal area.

Q    And correct me, Dr. Williams, if I am wrong, help

me, the outer covering of the vaginal, the fatty

tissue, the protection of the opening, what is

that called?  The labia?

A    It starts with the mons on top and comes down to

be the labia majora and on the inside we have

the more minor labia, the labia minora.

Q    That is all before the hymen?  Is that correct?

A    That is correct.

Q    As we go through, if I could refer to it like a

cylinder entrance to the vagina itself, if you

spread the legs, open the labia up as we gain

entrance into the vaginal canal?

A    Correct.

Q    So, in response to Mr. Ramsey asking you if there

was no physical evidence of alleged sexual abuse

or an alleged rape, it is your testimony that you

saw no tearing of the hymen?

A    I saw a normal, intact genitalia.  Yes, sir.

Q    Now, let me ask you this, if I could?  Let's go

to − − − if we could, Amanda Hadden, the other

report, Dr. Williams, if we could?

A    Yes.

Q    June of 1994, she was seven and three quarters years old? Is that correct?

A    Correct.

Q    You said that she weighed seventy pounds?

A    Correct.

Q    Now, Mr. Ramsey was asking some questions that I understand were on the report, but I want to refer to about twelve lines down where it states took them outside to a shed on the back of his property. Do you see that?

A    Yes, sir.

Q    Where it says Amanda says that Mr. Money took some tar paper out - - - what I want you to go into on the report, she said she put his hand on her private part. Excuse me, she said that he put his hand on her private part before he got on top of her? Correct?

A    That is what she related to me.

Q    That is what she related to you with Amanda, in relationship to what occurred? And, she goes on to say that she told me it hurt and doesn't know how long he stayed on top of her. Stated that her friend Amanda was there and she had to watch him. After Amanda got off, got off the top of her, that

he told both her and Amber not to tell anybody about this. Then they all left the shed and Amanda and Amber went back to the house and Amanda states that she and Amber went to Amber's home. Then it says I asked Amanda had anything like this ever happened to her before and she said it had not. She stated nothing had happened since then. And, Amanda's mother went on to tell you that when this episode became known, Amber told an older friend who was thirteen about this episode who related three other episodes where Mr. Money had, by history, sexually molested her? Is that correct?

A    That is what she told me, yes.

Q    Now, I want to go on about the physical exam and I will come back, Dr. Williams, to the history, if I could. Once again, when you examined Amanda Hadden, in reference to any injuries, there was no redness of the labia. There would have been touching, Dr. Williams, inside that would cause some redness, would that disappear over a period of time, if there was no scratching or tearing?

A    Yes, sir. It would have improved.

Q    Thirty, sixty, ninety, one hundred and twenty, one hundred and fifty days, that would go away?

Is that correct?

A    Correct.

Q    That is the tears and scratches itself?  The same with any redness on the outer area of the labia itself?  Correct?

A    Correct.

Q    Now, as far as the impressions on both cases, your impression as a physician or doctor, your treating her for medical purposes, you published in your report, it says alleged sexual abuse, on both?  Is that correct?

A    That was the diagnosis.

Q    Do you go into specifics like Rape or Sodomy, you don't, do you?

A    No, sir.

Q    You do general characterizations in reference to treatment, as her doctor?  Is that correct?

A    That is a medical opinion, based on history and based on physical examination.

Q    Now, I want to ask you, if I could, look at Defendant's Exhibit Number 7 on Amanda K. Hadden, do you have that?  I will show you this, Dr. Williams, I know you have a lot of records.  I will refer to where I want to ask you some questions.

A    All right.

308

Q    In the history and medical treatment and diagnosis

that you took of Amanda K. Hadden, does it

indicate that:  (Reading from the exhibit in

question.)

          Miss Hadden tells me that she understood

          that Mr. Money's daughter was sexually abused

          by Mr. Money and she had admitted that at

          this point?  Is that true?


          MR. RAMSEY:  Judge, judge, judge — — —

          THE COURT:  Just a minute.

          MR. VALESKA:  Can I finish my question?

          THE COURT:  Just a minute.  Let him finish

                the question and then you have the

                objection.


BY MR. VALESKA:


Q    I will go back and read it according to the report.

Is it indicated in the report, Defendant's Exhibit

Number 7, that has been admitted into evidence and

that I had no objection to, it says, reported in

your report to you, as the physician:

          Miss Hadden tells me that she understood that

          Mr. Money's daughter was sexually abused by

Mr. Money, or at least she has admitted that
to this point.

Is that not true?  And, before you answer, there
was an objection.

MR. RAMSEY:  Are you asking him that is what
it says in the report?

MR. VALESKA:  That is what it says.

MR. RAMSEY:  I will withdraw the objection.

THE COURT:  All right.

THE WITNESS:  (Studies the exhibit in question
as requested.)  That is what it says in
the report.  Yes.

MR. VALESKA:  That is all.  Thank you, Dr.
Williams.

THE COURT:  Mr. Ramsey?

MR. RAMSEY:  Yes, sir.


REDIRECT EXAMINATION


BY MR. RAMSEY:


Q    Dr. Williams, I want to ask you a couple of
followup questions.  You had occasions to
examine numerous six year olds for alleged sexual

310

abuse, have you not?

A Yes, sir.

Q Now, can you have penetration of the labia of a six year old and, as a result, see physical evidence of that penetration?

A You can.

Q Okay. Can you not have penetration of the labia and not see physical evidence of that penetration?

A Again, I use the word intrusion, because if the penis is pushed into the labia area but does not enter into the hymen, then that can be done without causing any tear or injury to that hymenal tissue.

Q All right, sir. And, I know it is my lack of knowledge or expertise in being able to ask the question any more proficiently, but the only way I know how to do is that you answered that you can have penetration and see that? Is that correct?

A Yes, I did.

Q I am going to try to ask you and I think that it can be answered yes or no; can you not have penetration − − − excuse me. Can you have penetration and not have physical evidence of that penetration?

A Penetration through the hymen?

Q The labia?

311

A    You can have penetration of the labia

and not have penetration of the hymen.  Yes.

Q    I understand that.  Can you have penetration of

the labia without creating some physical evidence

of it in an eight year old?

A    Yes.

Q    That can be, that is possible?

A    The labia part, yes, sir.

Q    All right.  Now, can you have penetration of both,

as you called it, the labia majora and the labia

minora without seeing some physical evidence?

A    A yes or no answer, the answer would be no.

Q    Okay.  So, if there is some penetration of the

labia majora as well as the labia minora, then

in your professional opinion, there will be some

physical evidence of penetration?

A    At the time of penetration, yes.


        MR. RAMSEY:  That is all.  Thank you.

        MR. VALESKA:  Let me ask you this, if I

            could, Dr. Williams.

<u>RECROSS EXAMINATION</u>

BY MR. VALESKA:

Q    I would like to read to you something and ask you

     your opinion, based on that physical examination

     when you examined these little girls or other

     examinations that Mr. Ramsey asked you about your

     seeing numerous six year olds.  The term sexual

     intercourse has its ordinary meaning and occurs

     upon any penetration, however slight.  Now, based

     on that hypothetical proposed to you, would you

     say it is fair that there is no doubt in physical

     exams that you looked at those little girls when

     you examined them, it could have been possible

     penetration, however slight, inside in relationship

     to the labia on the outside without it tearing the

     hymen?  Is that not true, Dr. Williams?

A    Yes.

Q    Dr. Williams, one final question.  Would you tell

     the Ladies and Gentlemen of the Jury as a physician,

     doctor, examining children, in your opinion, would

     a little girl, a six year old, seven year old,

     eight year old, all the way up to adult female,

     would she be able to feel, in reference to her

vaginal area, in relationship to the labia, if
there was any penetration, however slight, with a
finger or penis if it went inside in any manner or
fashion, the slightest bit?

A    Yes, sir.


     MR. VALESKA:  That is all.  Thank you, Dr.
       Williams.

     THE COURT:  Anything else?

     MR. RAMSEY:  No, sir.

     MR. VALESKA:  Can he be excused?

     THE COURT:  You may go, doctor.

     THE WITNESS:  Thank you.

          (Witness excused.)


     THE COURT:  Call your next witness.

     MR. RAMSEY:  We will call Patricia Ann Money
       as an adverse witness.

     MR. VALESKA:  He can't call her as adverse.
       He hasn't proved anything as to her
       being adverse or untruthful.

     MR. RAMSEY:  Well, she is on the witness list.

     MR. VALESKA:  No problem as a witness.

     THE COURT:  I don't know if she is adverse or
       not.  That is only an assumption, but I

can gather from the answers whether she
would be.

    MR. RAMSEY:  All right.  Well, we will call
Mrs. Money to the stand.

    THE COURT:  Okay.

Thereupon,

### PATRICIA ANN MONEY

was called as a witness in behalf of the
Defendant, and after having been first duly sworn
to testify to the truth, the whole truth, and
nothing but the truth, took the stand and testified
as follows, to-wit:

### DIRECT EXAMINATION

BY MR. RAMSEY:

Q    Tell us, for the Record, your full name please,
ma'am.

A    Patricia Ann Money.

Q    Where do you live, Mrs. Money?

A    Haleburg.

Q    You are the mother of Amber Money?  Is that correct?

A    Yes, sir.

Q    And, B. C. Money, that man sitting right there,

is your father-in-law?  Is that correct?

(Indicating toward the Defendant.)

A    Yes, sir.

Q    Your husband is Comer Money?  Is that right?

A    Yes, sir.

Q    That is B. C.'s son?

A    Right.

Q    I will show you what is part of Defendant's

Exhibit Number 4 and ask you if you have ever seen

those cards before?  (Produces the exhibit in

question for examination.)

A    (Witness studies the exhibit in question as

requested.)  No, sir.

Q    Your testimony is that you never gave those cards

to — — —

A    I never gave him any cards.

Q    Okay.  That is fine.

        MR. RAMSEY:  Thank you.  That is all I have.

CROSS EXAMINATION

BY MR. VALESKA:

Q    Can you tell us how those cards came into the

```
        possession of B. C. Money, Sr., that man over there

        in the brown suit, if you know?

A       My sister-in-law's husband give them to him, Earl

        Robertson.

Q       So, if B. C. Money, Sr. told Clyde Hornsby that

        you gave them to him, would that be true or untrue?

A       Untrue.

Q       Your daughter, Amber, been your daughter all your

        life?

A       Yes.

Q       Has she ever told you a story?

A       Little fibs.

Q       Did you ever spank her or discipline her?

A       Oh, yeah.

Q       When she told you, where were you when you found

        out what she said B. C. Money, Sr. had done to

        her?

A       She had spent the night with a friend of ours and

        when I went to pick her up, she didn't want to

        come home.  So, then she told us why she didn't

        want to go back to his house.

Q       Did she say what B. C. Money, Sr. did to her?

A       He tried to have sex with her.

Q       Now, when she told you that, was your husband with

        you?  Excuse me, was your husband, Comer Money,
```

B. C. Money, Sr.'s son, was he with you?

A    He was in the house.

Q    Did you go discuss it with him?

A    I got him in the car and I told him what was
     happening.

Q    And, where did you go next?  Tell the Jury.

A    I went to my sister-in-law's house.

Q    Tell me your sister-in-law's name?

A    Ruby Robertson.

Q    How is Ruby Robertson related to B. C. Money, Sr.?

A    His daughter.

Q    Now, would you tell the Ladies and Gentlemen of
     the Jury did you take your daughter to see
     Dr. Ted Williams?

A    Yes, sir.

Q    Were you present, just a few minutes ago, when I
     read what Dr. Williams put in his report?

A    Yes, sir.

Q    You are the one that told him that?

A    No.

Q    Would you tell the Ladies and Gentlemen of the
     Jury where did you go next, with your daughter
     and husband, after you went to Ruby's?

A    We called the sheriff's office up here in Henry
     County.

Q    Who was present at the house then?

A    There was Mr. B. C. Money, Sr.'s nephew, Frank.

Q    B. C. Money, Sr.'s nephew, Frank who?

A    Frank Money.

Q    Okay. And — — —

A    His brother, James Otis Money.

Q    James Otis Money?

A    His daughter, Ruby Robertson.

Q    Okay. Anybody else?

A    I think her daughter's were, Tammy and Beth.

Q    Now, was James Otis Money present when there was a conversation about what had happened to your daughter by B. C. Money?

A    Yes, sir.

Q    Can you describe, not what he said, but how he reacted in relationship to physical movement, what he did with his body?

A    He walked around and shook his head.

Q    Now, let's go back. Would you tell the Ladies and Gentlemen of the Jury when your daughter related to you what B. C. Money, Sr., had done to her, did you talk to any other parents or any other children?

A    I went to my sister-in-law's house Ruby Robertson and got a friend of ours to go find Vaneva.

Q    Wait a minute, now, who is Vaneva?

A    Vaneva, we had to go find Vaneva Hadden, Amanda's mama.

Q    Did you talk with her, yourself?  Yes or no?

A    Yes.  When she got to the house, we talked to her.

Q    Was her daughter present when she told her mother what had occurred?

A    Yes.

Q    Were you with them?

A    Yes, sir.

Q    Now, would you tell the Ladies and Gentlemen of the Jury, let's go back – – – would you tell the Ladies and Gentlemen of the Jury did you live on a dirt road behind B. C. Money, Sr.'s trailer on the property of Tommy Lee Money?

A    Yes, sir.

Q    In Henry County, Alabama?  Is that correct?

A    Yes, sir.

Q    You heard your daughter testify in the Court Room, hog barn, shed, house with a roof;  do you know what she is talking about?

A    Yes, sir.

Q    Would you tell the Ladies and Gentlemen of the Jury is there anything close to that on the other side of the dirt road?

A    There is a pond out there.

Q    Any creeks out there?

A    There is a branch behind his house.

Q    Would you tell the Ladies and Gentlemen of the Jury where the hog barn or shed is, is there something else between there and B. C. Money, Sr.'s trailer?

A    A dog pen where he keeps his dogs.

Q    Now, tell the Ladies and Gentlemen of the Jury, during the time that your daughter has testified to, as well as you heard Amanda testify during the time period we are talking about when they were six and a half, seven, eight, did you have an occasion to leave your trailer or B. C. Money, Sr.'s trailer to walk down looking for your daughter?

A    Yes, sir.

Q    Now, would you tell the Ladies and Gentlemen of the Jury, particularly when you walked down looking for your daughter, was anybody there visiting with her?

A    When I got home from work, I stopped and asked Miss Ruby where are the young'uns.

Q    Not what Miss Ruby said, but after you talked to her, where did you go?

A    I went out to the hog barn.

Q    When you got out to the hog barn, how many people did you see out there?

A    Mr. B. C., Amanda Hadden and Amber Money.

Q    Now, you say Mr. B. C., is that B. C. Money, Sr.?

A    B. C. Sr., in the brown suit there. (Witness indicating toward the Defendant.)

Q    And, would you tell the Ladies and Gentlemen of the Jury, where did you see him when you got out there? Where were they?

A    Coming out of the hog barn.

Q    Can you describe how B. C. Money, Sr., the man sitting at the table, how he looked, physically, when you saw him?

A    He was sweating, he was tired.

Q    What did you say to him with your daughter in his presence?

A    I asked him what were they doing.

Q    What did B. C. Money, Sr. say, if anything?

A    He was just out there with the girls.

Q    Did you go inside the hog barn then?

A    No, sir.

Q    Now, would you tell the Ladies and Gentlemen of the Jury what did Amanda and Amber do when they came out of the hog barn with B. C. Money, Sr.?

A    They jumped on the back of the truck and rode

back to the house with him.

Q     Do you remember how they were dressed at that time, the type of clothing?

A     It was hot weather, because both of them had shorts on.

Q     Do you recall the exact color of the shorts?

A     No.

Q     Do you remember the exact date, yourself?

A     No.

Q     Did you then go — — — where did you go next please, ma'am?

A     Picked them up and went to my house.

Q     Would you tell the Ladies and Gentlemen of the Jury from that point, from that day, do you have any recollection as to whether or not Amanda Hadden came regularly to visit or stay or see your daughter after school on the bus in the close proximity of B. C. Money, Sr.'s trailer?

A     Not regularly. It wasn't a regular basis. She would just come to visit some times.

Q     You work until what time?

A     I get off at 3:30, sometimes 4:00, depends on whether I have to work over.

Q     Where were you working?

A     Columbia Glass.

Q    Then you would leave Columbia to go where?

A    If I had to stop by the store, I would stop.  If not, I would go on home.

Q    How much time did it take you to go from where you worked back to the trailer where you lived?

A    Fifteen minutes.

Q    Whose property did you and your husband have a trailer on?

A    Tommy Lee Money's.

Q    Is he related to B. C. Money, Sr.?

A    His son.

Q    Now, tell the Ladies and Gentlemen of the Jury from the time that you saw B. C. Money, Sr. at the hog barn, the shed, however you describe it, across from the pond by the dirt road;  your daughter, Amber, was there and Amanda Hadden; from that point until the day that your daughter told you what occurred and you called the sheriff's department, one time, did this man, B. C. Money, Sr., ever discuss with you anything that your daughter had any type of discussions about sexual intercourse, sex, magazines, the term cum in any manner or fashion ever?

A    I never heard her use that term until she told me about B. C., Sr.

Q    Would you tell the Ladies and Gentlemen of the
     Jury, when you went to pick up your daughter and
     saw B. C., Sr., as well as his wife, your daughter's
     grandmother, did she ever discuss it with you?

A    No, sir.

Q    You heard your daughter testify about, and give
     names of other individuals who had done things,
     touched her sexually and you sat here and heard
     that?  Is that correct?

A    Uh-huh.  (Affirmative response.)

Q    Would you tell those Ladies and Gentlemen of the
     Jury, the individuals that she named, both boys,
     are they adults or juveniles?

A    Juveniles.

Q    Were they under sixteen years of age?

A    Yes, sir.

Q    Comer Money, your husband, prior to today, had
     your husband, to your knowledge, from your daughter
     or yourself, ever been told about the other
     episodes with the juveniles?

A    No, sir.

Q    Comer Money, your husband, does he work?

A    Yes.

Q    What does he do for a living?

A    Drives a truck.

Q    Would you tell the Ladies and Gentlemen of the
Jury how long, your best recollection, until you
moved off that property of Tommy Lee Money in
the close proximity of B. C. Money, Sr.'s trailer,
until you moved from that location to another
location in relationship to when your daughter told
you about these things that happened to her,
what was the time frame?

A    We moved before she told us.

Q    I understand.  Do you remember approximately when
you moved, your best judgement?

A    November of '94.

Q    Until November of '94 when you moved to where?

A    It is in Haleburg, about a mile down the street.

Q    From November of '94 until your daughter told
you in June of '94, is that correct, or you
learned of it?

A    Must have been '93 we moved.  November of '93.

Q    From that point in time, November of '93 until
June of '94, did your daughter continue to go and
stay after school with B. C. Money, Sr.?

A    Yes, sir.

Q    Let's talk about, would you tell the Jury, there
was some time when you came to pick up your
daughter after work, after school, did she ever

discuss with you whether B. C. Money, Sr. had
ever struck her or hit her?

A    She told me that he had spanked her and I seen
the bruises on her leg.

Q    Did you have any discussions with B. C. Money
sitting over here about whether or not he was
to discipline your child?

A    I told him and his wife not to leave marks on my
young'un.  They didn't have to whup her like
that.

Q    Would you tell the Ladies and Gentlemen of the Jury,
did your daughter ever come home after that with any
marks, in any manner or fashion, from any spanking?
She did not?  Correct?

A    No.  I told them that I would find another baby
sitter.


        MR. VALESKA:  That is all I have.  Thank you
           very much.
        THE COURT:  Mr. Ramsey, anything else?
        MR. RAMSEY:  Yes, sir.

327

<u>REDIRECT EXAMINATION</u>

BY MR. RAMSEY:


Q     Mrs. Money, when was it that you recall that B. C.
      whipped Amber?

A     I can't recall.  I didn't write down the date.

Q     Okay.  Can you remember what year?

A     No.

Q     Can't remember what year?

A     We moved up there in '90 and they started keeping
      Amber for me while I worked after we moved up
      there in '90.

Q     It upset you enough to get in the car and talk
      to B. C. and Ruby about it, didn't it?

A     They were right there.

Q     But, it upset you enough that you went and talked
      to them?

A     I did.

Q     And, had anything like this ever happened before?

A     No.

Q     And, you can't even remember what year it was?

A     No.

Q     Was it before or after Amber started school?

A     I can't think.  I don't remember.

Q    Well, she started school in August or September of '93.  Isn't that correct?

A    The way it was after she started school, she was starting kindergarten when we moved up there.

Q    So, it was after she started school?

A    Yeah.

Q    She started school in August or September of '93, didn't she?

A    I would have to think.

Q    If I told you she did, would you have any reason to differ with me?

A    Yeah.  Until I knew for sure.

Q    Could you tell me why you would differ if I told you that it was a fact that she started the first grade in either August or September of '93.

A    I have no reason to believe you.

Q    I am not asking you to believe me, I am asking you if you have any reason to differ with me?

A    No.

Q    So, this whipping took place some time after that?

A    It took place after they started baby sitting her for me to work.

Q    Okay.  Did Amber tell you that she was upset by it, it made her mad?

A    She told me that granddaddy had spanked her and

she showed me the bruises on her leg because she
would not dance for them.

Q    What would you say your relationship with Amber
is at the present time?  Is it a good one?

A    It is a good one.

Q    What would you say your relationship was with
Amber back in the fall of '93?

A    We have always been close.

Q    Always been very close?

A    Uh-huh.  (Affirmative response.)

Q    Has she always confided in you?

A    She talked to me a lot.

Q    Tell you things, tell you about what is happening
at school?

A    Yeah.

Q    Did she tell you about the good things that
happened to her?

A    Yeah.

Q    Would she tell you about some of the not so good
things that happened to her?

A    I don't recall any not so good things.

Q    You don't remember her telling you anything that
was not too good?

A    No.

Q    Okay.  What kind of grades does Amber make?

A    Straight A student.

Q    Straight A's?  Good.  When did you first learn of
      all of this?

A    All what?

Q    What we are here about today?

A    The sexual abuse?

Q    Yes, ma'am.

A    June 7.  It was election day.  I went by and voted
      that evening.

Q    June of '94?

A    This year would be a year, so – – –

Q    June 7 of '94?

A    Yes.

Q    Okay.  Tell us how and what you heard?

A    Amber come out there and said that she had to tell
      me something.  She did not want to go home, she
      was begging not to go home and told me that her
      granddaddy was trying to have sex with her.

Q    Okay.  She told you this in June of '94?

A    Uh–huh.  (Affirmative response.)

Q    Where were you?

A    At a friend's house.

Q    What friend's house?

A    J. D.

Q    J. D. who?

A    Hobbs, Jr.

Q    And, she told you that her grandfather was trying
     to have sex with her?

A    Uh-huh.  (Affirmative response.)

Q    Is that what she told you?

A    She said that he was trying to put his penis in
     her.

Q    Okay.  Did she tell you when this happened?

A    She couldn't give me no dates.

Q    Did she tell you that it had happened recently?

A    Told me the last time he had touched her was
     that Monday when they kept her.

Q    When would that have been?

A    That would be the 6th.

Q    Of June?

A    Uh-huh.  (Affirmative response.)

Q    She told you at that time that up until June of
     '94 that he was still trying to have sex with her?
     Trying to have sex with Amber, excuse me.

A    He was watching a movie, Screwballs, sitting in
     his lap and he was touching her private part.

Q    She said that this happened on June 6?

A    Uh-huh.  (Affirmative response.)

Q    You have been in the Court Room throughout these
     entire proceedings and you heard Amber take the

stand.  Did she tell you about any of those other
incidents that happened at that time?

A    She never talked to me about it.

Q    She never told you anything about it?

A    Never told me anything until this come out.

Q    When did she first tell you?  Did she ever talk to
you about it?

A    It was in June.

Q    The only thing she ever told you was that he
touched her private parts?

A    And was – – –

Q    On that Monday, June 6, while watching a movie?
Is that right?

A    Uh-huh.  (Affirmative response.)

Q    Did she tell you whether or not anybody else was
there?

A    Her brother, Jamie and Aunt Ruby.

Q    Ruby was there, B. C.'s wife?

A    Yes.  She said that granny had went to the mail box.

Q    How many times have you taken Amanda Hadden home
from school?

A    I haven't counted them.

Q    Quite a few?

A    I wouldn't say quite a few.  She would come visit
with Amber some times and I had a stepdaughter

that kept her and Amanda and Chuck.  Then her
mother would come pick them up after school.

Q    Can you give me an idea of how many visits it
was?

A    No.

Q    Where would you take her when you took her to the
house?

A    I would take her to her home.

Q    Do you know whether or not anybody was there
when you left her?

A    I wouldn't leave her if there wasn't.

Q    Who was there when you would leave her?

A    Her mother.

Q    Where would you pick her up from?

A    She rode the school bus home with Amber and I
would pick her up at her granny's.

Q    Okay.  Did you do that more than one time?

A    Probably.

Q    On the date that you walked down to the hog barn,
you don't remember when that was, do you?

A    No.

Q    You went to see Dr. Williams with Amber in June
and Amber told you about this on June 7?  Is that
right?

A    Uh-huh.  (Affirmative response.)

Q       '94, you remember that date, don't you?

A       Yeah.  How well.

Q       You remember that well?

A       Uh-huh.  (Affirmative response.)

Q       Now, how long before that was it that you went
        down to the hog barn?

A       I can't tell you that.

Q       Well, could it have been in March of '94?

A       I don't know.

Q       Could have been?

A       I don't know.

Q       If you don't know, then it could have been in
        March?

A       Could be.


                MR. VALESKA: I object.  This is arguing.
                    She said that she doesn't know.  She
                    has answered that three times.
                THE COURT: Okay.  Sustained.


BY MR. RAMSEY:


Q       What was your relationship to B. C. Money prior
        to June of '94?

A       B. C., Sr.?

Q    B. C., Sr., the Defendant, the man on trial here?

A    Yes, sir.  Just as close as we could be.

Q    All right.  Now, that wasn't necessarily the case
     to Comer, was it?

A    Yeah.

Q    Comer and B. C. were, had no problems at all?

A    No.  His daddy was fighting for us to stay on
     the land we was on.

Q    And, Comer never went over to B. C.'s house with
     a gun and threatened him?

A    No.  B. C. pulled a gun on Comer.  And, he hit
     him on the head with a walking stick.

Q    Okay.  But, Comer didn't have a gun?

A    No.

Q    But, there was some dispute, at least, on that
     occasion, wasn't it?

A    Oh, yeah.

Q    As a matter of fact, there was quite a tussal and
     a fight, wasn't it?

A    When he pulled the gun, Comer tried to take it
     away from him.

Q    Did they have a scuffle?

A    The gun went off and went through the ceiling.

Q    Sounds like they had a scuffle to me.  And, that
     was Comer, this man's son?

336

A       It was that man that pulled the gun on his son.

Q       The two that were tussling was Comer and B. C.?
        Is that right?

A       Uh-huh.  (Affirmative response.)

Q       Is that the only time they ever had any altercation
        of any kind?

A       That is the only time I know about.

Q       The only one that you know about?  When you walked
        down to the hog barn on that day, where was Amber
        when you first saw her?

A       I really - - - that has been a while ago.  I cannot
        really picture where she was at.

Q       You don't remember at all where she was?

A       I remember them coming out of the barn and I
        can't even tell you who come out first.

Q       Did you get a close look at Amber and Amanda?
        Did you see them?

A       They was red faced.

Q       Okay.  You didn't tell Mr. Valeska that earlier,
        did you?


               MR. VALESKA:  Objection.  I didn't ask her.

               THE WITNESS:  He asked about Mr. B. C.

               THE COURT:  This is Cross.

               MR. VALESKA:  I withdraw.

THE WITNESS:  He asked how Mr. B. C. looked
and I told him that he was sweating
and looked tired.  Said he was tired of
messing with them girls.

BY MR. RAMSEY:

Q    Did you think anything about it, at that time?

A    That was her granddaddy.  No.

Q    But, you now can remember they were red faced?

A    Yeah.

Q    You remember that?

A    Just like I remember he was sweating when he
come out.

Q    But, you don't remember what they were wearing
and what the date was?

A    I know they had shorts on, it was hot weather.

Q    Did you see any redness or abrasion that — — — strike
that.  Did you get a chance to observe Amanda
Hadden?

A    Observe her?

Q    Observe her.  Did you see her?  Did you get a
chance to look at her?

A    I just said they both come out red faced.

Q    Then is the answer to my question yes?

A       Yes.

Q       Okay.  How close were you to Amanda when you saw
        her?

A       I went right to where they were at.

Q       In fact, you took her home, didn't you?

A       Yes.  That evening.

Q       She got in the car with you?

A       Yes.

Q       Did you notice any redness or abrasions or any
        type of markings on the back of Amanda's legs or
        the back of her arms?

A       I didn't examine her.

Q       Did you notice anything?  The answer is yes or no?

A       No.


            MR. RAMSEY:  That is all.

            MR. VALESKA:  No questions.

            THE COURT:  Let me ask just a couple of
                questions here.  When was it that you
                first learned of the allegations in
                regard to Amanda?

            THE WITNESS:  To Amanda?  The evening Amber
                told me, said he messed with her and
                Amanda.

            THE COURT:  Okay.  That is what I thought.

And, thereupon, you went and told Mrs.
Hadden?  Is that correct?

THE WITNESS:  That is true.

THE COURT:  And, was Amber present, at that
conversation?

THE WITNESS:  No.  We left Amber at a friend's
house until we had a chance to ask
Amanda.

THE COURT:  Have you ever heard Amanda tell
anyone after that particular incident
what happened?

THE WITNESS:  Have I ever heard?  Hu-huh.
(Negative response.)

THE COURT:  Okay.  Let me ask you this.
After you learned of these particular
instances, did you have an occasion to
confront your daddy?

THE WITNESS:  My father-in-law?

THE COURT:  I mean your father-in-law.  Excuse
me.

THE WITNESS:  No.

THE COURT:  Do you know whether or not your
husband had an opportunity to confront
him?

THE WITNESS:  He has not talked to him.

THE COURT:  You had no contact whatsoever
         about what, stating to him what happened
         and then his reaction?

THE WITNESS:  No.

THE COURT:  Let me ask you this.  This has
         become relevant about this scuffle.
         What was the cause of this scuffle
         between your husband and his daddy?

THE WITNESS:  I really can't recall.  I
         know at the time that Tommy Lee was
         trying to get us, wanted us to move off
         of his property and there was a big
         scuffle.

THE COURT:  Let me ask you this.  Your
         daughter related two events that
         happened to Amanda on that particular
         occasion?  Is that correct?

THE WITNESS:  Uh-huh.  (Affirmative response.)

THE COURT:  How long has that been?

THE WITNESS:  How long has what been?

THE COURT:  When she first talked about it?

THE WITNESS:  June of last year.

THE COURT:  Okay.  You heard the testimony,
         I believe, of Amanda today?

THE WITNESS:  Yes, sir.

THE COURT:  Yesterday, I am sorry.  Is that the first time that you heard of her actually telling about the allegations?  Is that correct?

THE WITNESS:  Yes.

THE COURT:  Are they any different from the time you heard them yesterday from the time your daughter told you in June of 1993?

THE WITNESS:  There might have been a couple of little things, but nothing – – – from what I have heard both of them saying is basically about the same thing they told us before.

THE COURT:  Okay.  That is all I have.  Anything else?

MR. RAMSEY:  (Shakes his head to the negative.)

THE COURT:  All right.  You may step down.

(Witness excused.)


THE COURT:  Call your next witness.

MR. RAMSEY:  Call Ruby Money.

Thereupon,

<u>RUBY MONEY</u>

was called as a witness in behalf of the

Defendant, and after having been first duly sworn

to testify to the truth, the whole truth, and

nothing but the truth, took the stand and testified

as follows, to-wit:


<u>DIRECT EXAMINATION</u>


BY MR. RAMSEY:


Q    Ruby, for the Record, tell the Ladies and Gentlemen

     of the Jury your name, please.

A    Ruby Money.

Q    And, you are B. C.'s wife?  Is that correct?

A    Yeah.

Q    How long have you and B. C. been married?

A    Fifty-two years.

Q    Where do you live?

A    I live at, down below Haleburg on the River Road.

Q    You have a Route 1, Columbia address;  but you

     live in Henry County?

A    Yes.

Q    Down around Haleburg?

A        Yeah.

Q        Right about the Houston—Henry County Line?

A        Yes, sir.

Q        How long have you been living there?

A        How long have I been living there?

Q        Yeah.

A        About forty-five years.

Q        Been living at the same place for forty-five years?

A        Uh-huh.   (Affirmative response.)

Q        Now, who is James Ernest Amos?

A        That is my grandson.

Q        He lived with you a while, didn't he?

A        Yeah.   He did.

Q        How long did he live with you?

A        Oh, about three months.

Q        Okay.   Where had he come from when he came to
         live with you?

A        Shorterville.

Q        How old was he, at the time he was living with
         you?

A        About, I guess he was seventeen, eighteen.

Q        Eighteen?

A        (Witness nods her head to the affirmative.)

Q        Okay.   He lived with you about three months?

A        Yeah.

Q     And then why did he move on?

A     Well, we wanted him to move on out, because he
      was, you know, doing things that we couldn't,
      didn't approve.

Q     Such as?

A     Drinking.

Q     All right.  Anything else?

A     Well, I found some magazines that he put under the
      bed.

Q     Let's talk about those magazines.  When did you
      find those magazines?

A     Oh, it was, I guess it was a month or two about
      after he had left.

Q     He had already moved out when you found the
      magazines?

A     Uh-huh.  (Affirmative response.)

Q     Tell the Ladies and Gentlemen of the Jury what
      you found.

A     Well,  it was what you call Playboy Magazines.

Q     Where were they?

A     They was under the bed on a locker where, I guess
      where I couldn't find them.

Q     Were any in the closet in a box?

A     Hu-huh.  (Negative response.)

Q     What did you do with them when you found them

345

under the bed?

A    I took them to my husband and told him to get rid of them.

Q    Did you ever catch Amber looking at these magazines?

A    One time. Her and one of my grandsons.

Q    Okay. Where was she when you caught her looking at them?

A    In this room.

Q    Where had she gotten the magazines from?

A    They is the ones that found them.

Q    Okay. They found them before you actually found them? Is that right?

A    Uh-huh. (Affirmative response.)

Q    So, when you saw them with the magazines, you didn't know anything about them before that? Is that correct?

A    No. I sure didn't.

Q    What did you do when you caught them? What did you tell them?

A    I told them that is not for y'all to look at. I said that is something ugly. So, I took them and gave them to my husband.

Q    And, you told him to burn them and throw them away?

A    Yeah.

Q        Was it a lot of magazines?

A        Oh, there was about five or six.

Q        It was more than two?

A        Yeah.

Q        Okay.  Amber comes to you or used to come to your
         house just about everyday after school, didn't she?

A        Yeah.

Q        And, how long would she stay there after school
         before she went to her house?

A        She would get there about 3:30 and stay until 4:00
         until her mama picked her up.

Q        What time would her mother pick her up?

A        Sometimes 4:00 and sometimes it was after.

Q        What would be the latest that they would be there,
         if you know?

A        Well, 4:30, if she was late or something.

Q        Okay.  Do you know Amanda Hadden?

A        Well, yeah.  I know her.  It is, well, I guess
         kinfolks.

Q        She and Amber are cousins?  Is that right?

A        Yeah.

Q        Has Amanda ever been to your house?

A        She has been there some, not much.

Q        Do you know how many times that she has been
         there?

A       Well, no, I don't.

Q       Do you know about that she and Amber came over there

        and got some cookies to eat and some tea and then

        went with B. C. down to the hog barn?

A       Yeah, I remember that.

Q       Okay.  Did that happen more than one time or did

        that just happen one time?

A       Yeah.

Q       Which one?  Do you know?

A       That was the time they always went out to the

        barn with him and I gave them some cookies and

        milk.

Q       How many times did they do that, to your

        knowledge?

A       I don't know.

Q       Do you recall a date back in March of '94 when they

        did that?

A       (No response.)

Q       You just don't remember that?

A       I don't remember.

Q       All right.  Had Amber ever confided in you, tell

        you secrets and things?

A       Not much.  Hu—huh.  (Negative response.)

Q       Has Amber ever come up to you and made a statement

        to you that her granddaddy was touching her on her

private parts?

A    Not me.

Q    She never made that statement to you?

A    (Witness shakes her head to the negative.)

Q    Okay.  Would you have done anything if she had?

A    I sure would have.

Q    Okay.


        MR. RAMSEY:  That is all I have.  Answer
          Mr. Valeska's questions.

        THE COURT:  Okay.  Mr. Valeska.

        MR. VALESKA:  Just a few questions, if I
          could, please?


### CROSS EXAMINATION


BY MR. VALESKA:


Q    First of all, Mrs. Money, you were telling the

Jury you remember the one time Amanda came from

school with Amber, you gave them some cookies and

milk and they went out with your husband to the

barn?  Is that correct?

A    Yes.  That is right.

Q    You don't remember but one time?

A    No, I don't.

Q    All right.  Now, can you tell me – – – you don't
     know the day of the week, either, do you?

A    Unless it was on a Friday.

Q    Okay.  But, to be sure, you really don't know, do
     you?

A    No, I don't.

Q    I understand.  Now, you said that your nephew,
     Ernest Amos, lived with you?

A    Yeah.

Q    When did he live with you?  This is 1995, can you
     tell me when he lived there?  Can you tell me,
     please?

A    It was in '94.

Q    1994?  You are sure?

A    Yeah.

Q    And, he lived with you how long?

A    I would say three, four months.

Q    If your husband told Clyde Hornsby that it was
     more than six months, could have been a year, about
     a year, would he be mistaken or do you know?

A    I don't know.

Q    Let's talk about Mr. Amos, your grandson who lived
     with you.  Are you telling the Jury, under oath,
     that B. C. Money, Sr., your husband, he doesn't

drink beer?

A    No.

Q    He does, doesn't he?

A    He has drank it.

Q    He kept beer in the house in the icebox, doesn't he?

A    Yeah.  A little.

Q    I understand that he is of adult age and I understand.  But, my question is there was beer in the house when Amber would come to stay after school?  Is that correct?

A    (No response.)

Q    That is true, isn't it?


        MR. RAMSEY:  Judge, what is the relevancy of that, whether or not there was beer in the house?

        THE WITNESS:  I don't remember that.

        THE COURT:  Ma'am?

        THE WITNESS:  I can't remember that.  Honest I can't.

        THE COURT:  Just a minute.

        THE WITNESS:  Okay.

        MR. RAMSEY:  What is the relevancy?

        THE COURT:  You have an objection?

MR. RAMSEY:  Yes, sir.  I object on the grounds

of relevancy.

THE COURT:  Okay.  Overruled.  Go ahead.

BY MR. VALESKA:

Q    You don't remember?  Correct?  I understand.  The

magazines you said that Amber found, Amanda wasn't

there, was she?

A    Hu-huh.  (Negative response.)

Q    And, the grandson that was with Amber, his name

was - - -

A    Kevin Money.  He was from Texas.

Q    Comer Money's son?  Right?

A    Right.  Yeah.  Yeah.

Q    You and Comer Money get along real good, don't

you?

A    Yeah.  Most of the time.

Q    My question is you knew Amber was his daughter?

A    Yeah.

Q    You know Miss Pat here, right?

A    Yeah.

Q    You have never had any problem with Miss Pat, have

you?

A    No.

Q    You get along well with her?  Is that correct?

A    I would say yeah.

Q    She let you keep your grandchild and you did
     that?

A    Yeah.

Q    They were working and you wanted to look after
     Amber for her?  True?

A    Yeah.

Q    Now, it is also true that B. C. Money, Sr., your
     husband, never told you at any time that he had
     discussed with Amber about sex, did he?

A    Hu-huh.  (Negative response.)

Q    He never told you that Amber, according to him,
     used the term cum, C-U-M, did he?

A    Yeah.  He told me that.

Q    When did he tell you that?

A    I guess it was just some time she told him that
     that was what it was.

Q    Did your husband, B. C. Money, Sr., ever tell you
     that Amber told him a secret and not to tell
     anybody, but that little boys had touched her and
     done things to her?

A    Yeah.  He told me that.

Q    When did he do that?

A    I think it was last year, some time.

353

Q    You care about your granddaughter, Amber, don't you?

A    Yeah.  I love her.  I helped raise her.

Q    But, my question is, you wanted to make sure that she was safe and secure, didn't you?

A    I sure did.  I watched her.

Q    You never told your son, Comer Money or Amber's mother, Pat, about these things that B. C. Money, Sr. told you that this little six or seven year old girl was talking about, did you, ma'am?

A    No.  I – – – hu-huh.  (Negative response.)

Q    And, you know, of your own personal knowledge, that B. C. Money, Sr., the Defendant in this case, never told his own son or daughter-in-law about these things that she said about sex?  Is that correct?

A    Yeah.

Q    And, you also know when you saw her looking at those magazines, you never told her mother or father, did you?

A    I don't think so.  I don't remember.

Q    I understand.  It has been a while?  Is that correct?

A    Uh-huh.  (Affirmative response.)

Q    And, I understand.  Now, let's talk about, if I

could, please tell me B. C. Money, Sr., the day
you gave Amanda and Amber cookies, did in fact go
out and go to the hog barn or the dog pen, driving
his truck, and they rode with him on the back,
didn't they?

A     Yeah, they did.

Q     And, would you agree from your house or trailer
to the hog barn or shed out by that pond, it is
a good ways?  Is that correct?

A     Yeah.

Q     Would you say that is fair?  And, would you agree
that if someone was in that hog barn or pen and
yelled out for help and you were inside your
trailer — — —

A     No.  I didn't hear that.

Q     I understand.  But, you wouldn't have heard it
even if they did, if you were inside of the
trailer?  Is that correct?

A     No.

Q     And, there is a dirt road on the side of your
trailer that runs up to the property where Comer
and Pat were living with Amber?  Is that right?

A     Yeah.

Q     Now, Amber is your granddaughter?

A     Yeah.

355

Q    Never had any problems with Amber, have you?

A    No.

Q    Typical little girl, isn't she?

A    Yeah.  I just petted her.

Q    I understand.  She didn't tell you crazy stories
     or lie, did she, ma'am?

A    No.

Q    She never came to you, is that what you are
     saying, never told you one time that granddaddy,
     your husband, had touched her?

A    No.  I don't think so.

Q    Are you sure?

A    Yes.  I am sure.

Q    What is your daughter's name?  What is one of
     your daughter's name?

A    Ruby.

Q    Ruby Money who is now Ruby Robertson?

A    Yeah.

Q    Did Ruby ever talk with you about Comer, excuse me,
     B. C. Money, Sr.?

A    Well, I don't remember.  That has been so long — — —

Q    You are not saying that she didn't?

A    Hu—huh.  (Negative response.)

Q    Now, let me ask you, if I could, Amanda, you said
     was in fact related to you, cousin, niece, some

356

blood line?  Is that correct?

A    Yes.

Q    Now, the magazines, were they found under the bed

or up in the closet?  Do you remember?

A    Under the bed.

Q    Under the bed.  Did you find them or did Amber find

them?

A    Well, I told you I went in there and they done

had them alooking at them and alaughing.

Q    And, you got them?  Right?

A    Yeah.

Q    And, you gave them to your husband?

A    Yeah.

Q    Right then or later?

A    I gave them to him when he come in the house.

Q    In your best recollection, there were five?  Is

that true, the best you can remember?

A    Four, five.

Q    Okay.  You told him to burn them, get rid of them?

A    Yeah, I did.

Q    Did B. C. Money, Sr., tell you that he kept two

of them?

A    No, he didn't.

Q    Did he ever tell you that he kept them because he

wanted to order something out of those sex magazines?

He didn't, did he?

A  (No response.)

Q  The playing cards, you knew that B. C., your husband, had playing cards, two sets of playing cards with pictures of women exposing their private parts, didn't you?

A  Yeah.  I knew it.

Q  Where did he keep them?

A  He kept them in the chest of drawers, you know, back behind our other letters and things.

Q  Can you tell me in your trailer, ma'am, how many bedrooms do you have?

A  Three.

Q  Okay.  If I am not being too personal, ma'am, did you have an injury with your leg or hip or knee a while back and had to have some surgery?

A  Yeah.

Q  At that time, when that occurred, were you sleeping in one of the other bedrooms other than the bedroom that you and Mr. Money normally slept in?

A  Yeah.

Q  And, there is a smaller bedroom in there?  Is that correct?

A  That is where I slept.

Q  You had a hammock down there at the trailer?  Is

358

      that true?  Do you know what I mean by a hammock

      or a swing?

A     Did have one.

Q     And, your husband had the right to use, go on the

      hog barn property?  Where the dog pens were, that

      property belonged to Tommy Lee Money?

A     Yeah.

Q     He would take care of his dogs?  Is that correct?

A     Yeah.

Q     Did your husband tell you that he kept two of those

      nasty magazines?

A     Uh-huh.  (Affirmative response.)


        MR. RAMSEY:  Asked and answered, judge.

        MR. VALESKA:  I didn't ask her did he tell

            her.  I didn't ask that question.

        MR. RAMSEY:  You did, too.

        THE COURT:  Overruled.  Go ahead.


BY MR. VALESKA:


Q     I am not going to show you the magazines at this

      time, but I am going to ask about two sets of

      cards.  I will just leave them like that, turn

      them over.  Did your husband get them out and play

|   | |
|---|---|
| | with those two sets of cards or did he keep them in the drawer, if you know? |
| A | I never seen him playing with them. |
| Q | Did you ever see them out in the house, though? |
| A | No. Hu-huh. (Negative response.) |
| Q | You never caught Amber with those, did you? |
| A | No. |
| Q | Or any other grandsons? Is that right? |
| A | (Witness shakes her head to the negative.) |
| Q | Do you know how your husband got those cards? |
| A | My grandson come from the Bahamas and give him. And, my son-in-law give them to Pat and she brought them to the house, she brought them to him. |
| Q | Okay. Your son-in-law Earl? |
| A | Yeah. |
| Q | And, then the grandson, Todd Money? Is that right? |
| A | Yeah. |
| Q | Can you tell the Ladies and Gentlemen of the Jury from the time - - - when did you first become aware your husband was arrested and charged with Rape and Sexual Abuse of your granddaughter, Amber and also with Amanda Hadden? When did you learn that, if you remember? |
| A | (No response.) |

360

Q    I mean the best you can remember, I am not trying

to trick you.  Would it have been June, would that

be fair, of 1994?

A    Yeah.  It was in June.

Q    Would that help you?  Your husband, B. C. Money, Sr.,

would you say that he is in better health than you

are?  Would that be fair?

A    Uh—huh.  (Affirmative response.)

Q    He is stronger, in relationship to get around, walk

around, do physical things, drive a truck, go out in

the yard.  And, he is in much better health than

you?  Would that be fair, Mrs. Money?

A    Yeah.

Q    And, from June the 8th, 1994 or 7th, when you

became aware that he was arrested and charged, isn't

it true that your granddaughter, Amanda Money, has

not one time come back to your house since then?

Is that not true?

A    Yes.  She hasn't.


          MR. VALESKA:  That is all.  Thank you, Mrs.

               Money.

          THE COURT:  All right.  Anything else for

               Mrs. Money?

          MR. RAMSEY:  Judge, may I approach?

THE COURT:  Sure.

> (Thereupon, an off the
> Record discussion was held
> between the Court and the
> Attorneys of Record.  Upon
> completion of said discussion,
> the following proceedings
> were had, to-wit:)

### REDIRECT EXAMINATION

BY MR. RAMSEY:

Q    Mrs. Money, have you ever seen your husband and
     Comer get into an argument or fight?

A    Yeah.

Q    All right.  Tell the Ladies and Gentlemen of the
     Jury about that.

A    Well, one night they got into it.

Q    What happened?

A    Well, my husband hit him with his walking stick.

Q    Tell us from the start to finish what happened.

A    He come down there raising sand at us that Tommy
     Lee was going to make him move.

Q Okay.  Did he appear he had been drinking?

A I couldn't tell.

Q Was he being loud and boisterous?

A He was loud with it.

Q All right.  What happened next?

A Well, let's see what happened next.  Oh, they, he got a gun and my husband knocked it out.

Q Comer went and got a gun, left and come back with a gun?

A No.  He got it out of the truck in the yard.

Q I mean he left the trailer, went to his truck and got the gun, didn't he?

A Uh-huh.  (Affirmative response.)

Q He came back to the trailer with a gun?  Is that right?

A Right.

Q It was a rifle, wasn't it?


   MR. VALESKA:  I don't think he needs to lead her quite so much.


BY MR. RAMSEY:


Q It wasn't a hand gun, was it?

THE COURT:  Go ahead.

THE WITNESS:  Hu-huh.  (Negative response.)

BY MR. RAMSEY:

Q    It was a rifle, was it not?

A    Yeah.

Q    Did he come inside the trailer with that gun?

A    I think he was standing at the door and got as far as the door.

Q    Got as far as the door?  What happened when he got to the door?

A    Well, I can't remember that, now.  But, I know that I was abegging them to quit.

Q    In fact, B. C. went and got a shotgun, didn't he?

A    Yes, he did.

Q    Comer knocked that shotgun out of his hand, didn't he?

A    No, sir.  It was me.

Q    You knocked the shotgun out of B. C.'s hands? And then, didn't Comer and B. C. get in a struggle over the rifle?

A    I wasn't there.  I run.

Q    You ran after that?

A    Yeah.

Q    Do you remember a shot going off?

A    Yeah, I do.

Q    Did you see B. C. hit Comer with a cain?

A    Yeah, I did.

Q    He knocked the stew out of him, didn't he?

A    He hit him hard.

Q    His head was bleeding and all, wasn't it?

A    Uh—huh.  (Affirmative response.)

Q    What happened after that?  Comer got up and left?

A    Yeah, he did.

Q    Okay.


         MR. RAMSEY:  That is all.

         MR. VALESKA:  Just a couple of questions

              about what took place then.


                RECROSS EXAMINATION


BY MR. VALESKA:


Q    What I want to ask you is did your husband, B. C.

     Money, Sr., who hit Comer, put a big gash on his

     head;  he didn't get a warrant to have his son

     arrested though, did he?

A    (No response.)

Q    That is true, isn't it?

A    No.

Q    And, his son did not have his father arrested,
did he?

A    No.

Q    What I want to ask you, after that occurred, Amber,
your granddaughter, still came down to visit and
to stay?  That is true, isn't it?

A    Yeah.

Q    And, Pat and Comer, your son, came down to visit
the father and father-in-law during this time?  Is
that right?

A    Yeah.

Q    Did your daughter, Ruby Money, Ruby Robertson, tell
you — — —

A    Yeah.

Q    — — — tell you that your husband used to touch and
feel and grab her on her — — —

          MR. RAMSEY:  We object to what Ruby Robertson
               said.

          THE WITNESS:  I don't remember that.

          MR. RAMSEY:  Don't — — — we object to that.

          THE COURT:  Don't object until the question
               is out.  I can't listen to three people

566

at the same time.  What was your

question, Mr. Valeska?

MR. VALESKA:  The question was:  Did her

daughter, Ruby Money, Ruby Robertson,

tell her that B. C. Money, Sr., her

father, had touched, felt, or grabbed

her sexually.

MR. RAMSEY:  We object to that.

THE WITNESS:  I don't remember.

MR. RAMSEY:  He can put her on the stand.

THE COURT:  Just a minute.  Y'all approach

the Bench just a minute.


(Thereupon, an off the

Record discussion was held

between the Court and the

Attorneys of Record.  Upon

completion of said

discussion, the following

proceedings were had,

to—wit:)


MR. VALESKA:  If it is stipulated she was

asked that question and said she didn't

remember, then I withdraw.

MR. RAMSEY:  I will stipulate that.

MR. VALESKA:  Then I will withdraw that and
ask her a second time.

THE COURT:  Okay.

BY MR. VALESKA:

Q    The question I would now like to ask you please,
ma'am, is it your testimony, under oath, that
Amber Money, your granddaughter, never told you
that B. C. had touched, felt, or grabbed her or
you just don't remember?

MR. RAMSEY:  This has been asked and answered
twice.

THE COURT:  Overruled.

BY MR. VALESKA:

Q    You stated that you don't remember that, either?
A    No, I don't.

MR. VALESKA:  That is all I have, ma'am.  Be
careful getting down the stairs.

THE COURT:  Just a minute, Mrs. Money.

Is there any further Redirect?

MR. RAMSEY:  Yes, sir.


FURTHER REDIRECT EXAMINATION


BY MR. RAMSEY:


Q    Mrs. Money, I have one more.  Would you remember that, if she ever came and told you that?

A    No.  I ain't got the best of minds here.

Q    Nor certainly do I, Mrs. Money.

A    I forget things.  I forget things.

Q    That is something serious, isn't it?

A    Yes, it is.

Q    And, isn't that something that you would remember?

A    No, I don't.

Q    Okay.  You just honestly don't remember?

A    Don't remember.


MR. RAMSEY:  That is all, ma'am.

369

## FURTHER RECROSS EXAMINATION

BY MR. VALESKA:

Q    You don't remember if your own granddaughter, Amber,

     who you love and care about, ever came to you and

     told you that her grandfather, B. C. Money, did

     these things?

A    No.  I don't remember.

Q    You honestly don't remember?

A    No, I don't.

Q    Okay.

          MR. VALESKA:  Thank you.  Be careful on the

               stairs.

                    (Witness excused.)

          THE COURT:  Okay.  Let's take about a five

               minute, ten minute break at this time.

                         (Thereupon, a recess was

                         called and taken by all

                         parties.  Upon completion

                         of said recess, all parties

                         returned to the presence

and hearing of the Court Room and the following proceedings were held out of the presence and hearing of the Trial Jury, to—wit:)

THE COURT: Okay. You can bring them in.

(Thereupon, the Trial Jury was returned to their places in the Jury Box and the following proceedings were held in the presence and hearing of said Trial Jury, to—wit:)

THE COURT: Before we get started again, I will ask the Jury like I did yesterday if they have any commitments past 4:30.

A JUROR: I do.

THE COURT: What do you have?

A JUROR: A ball game in Eufaula.

THE COURT: What time is it?

A JUROR: 5:30.

THE COURT:  And, you still have your

commitment at 5:00?

A JUROR:  Yes.

THE COURT:  Anybody else?

(No response.)

THE COURT:  Okay.  How long does it take

you to get to Eufaula, about thirty,

thirty, forty minutes?

A JUROR:  I have to get dressed.

THE COURT:  That is at 6:00, you said?

A JUROR:  5:30.

THE COURT:  5:30.  Okay.  All right.

Gentlemen, it looks like we will quit

about like we did last time.  Y'all have

any objections to that?

MR. RAMSEY:  No, sir.

THE COURT:  Mr. Valeska?

MR. VALESKA:  I have to testify in Federal

Court tomorrow.

THE COURT:  I understand that.

MR. RAMSEY:  Come up here.

(Thereupon, an off the

Record discussion was held

between the Court and the

Attorneys of Record. Upon
completion of said
discussion, the following
proceedings were had,
to-wit:)


THE COURT: Okay. We are going to try to
recess about 4:30. We have some
problems about starting tomorrow morning
and it is not anybody's fault, it can't
be helped. So, what we will do is start
tomorrow afternoon about 1:30. I would
hate to try to finish this case tonight,
from what the attorneys tell me. If we
did, it would be kind of late and I don't
see any need of doing that. But, we
cannot do this tomorrow morning, because
of the previous commitments. One of the
attorneys has to be in Federal Court as
a witness tomorrow morning and hopefully
by 1:30 we can get started back. But,
I don't see how in the world we can
finish with testimony, Closing Arguments
and Oral Charge unless we went to 10:00
tonight and I don't think anybody wants

573

to do that.  I certainly don't.  Unless
y'all make me stay here, I am not going
to do it.  So, let's go ahead and get as
much as we can and then we will recess
about 4:30 and that will give you time
to get to Eufaula.  Go ahead and call
your next witness.

      MR. RAMSEY:  Elbert Bristow.

Thereupon,

ELBERT BRISTOW

was called as a witness in behalf of the
Defendant, and after having been first duly sworn
to testify to the truth, the whole truth, and
nothing but the truth, took the stand and
testified as follows, to-wit:


DIRECT EXAMINATION


BY MR. RAMSEY:


Q    Mr. Bristow, tell the Ladies and Gentlemen of the
    Jury your name please, sir.

A    Elbert Bristow.

Q    Where do you live, Mr. Bristow?

A    Route 1, Box 32B, Columbia, Alabama.

Q     That is in the Haleburg Community?

A     The Haleburg Community.

Q     That is in Henry County?

A     Henry County.

Q     How long have you lived there?

A     About forty-five years.

Q     You know Mr. B. C. Money — — —

A     Yes.

Q     — — — sitting here in the brown jacket?

A     Yes, sir.  I do.

Q     And, do you live in the same community — — —

A     Yes, sir, I do.

Q     — — — with Mr. Money?  How far do you live from
      B. C.?

A     About, probably a little better than a quarter of
      a mile.

Q     How long have you known him?

A     Forty-five years.

Q     Do you know his wife, Ruby?

A     Yes, I do.

Q     Do you know all the family?

A     I know all of the family.  I am married to his
      sister.

Q     You are married to B. C. Money's sister?

A     Right.

Q     What is her name?

A     Retter Beatrice.

Q     Beatrice Bristow?

A     Beatrice Bristow.

Q     To your knowledge, how long has B. C. been living
      in the same community?

A     When I first got married, he was living there and
      then moved off and then came back, so right in
      the immediate area, I would say forty years.

Q     Do you have — — —

A     Or more, beside his growing up years.

Q     Do you have an opinion as to B. C. Money's
      reputation for truthfulness and veracity in
      the community?

A     As far as I am — — —

Q     Do you have an opinion?

A     Yes, sir.  I have an opinion.

Q     Tell the Ladies and Gentlemen of the Jury what
      that opinion is, please.

A     He has never lied to me.


              MR. VALESKA:  Objection.  That is not proper.

              THE COURT:  Okay.  Sustained.

BY MR. RAMSEY:

Q    Just what is his reputation for truthfulness and
     veracity in the community, as you know?

A    As I know it, it is good.

Q    All right.

          MR. RAMSEY:  That is all I have.  Thank you.


                    CROSS EXAMINATION


BY MR. VALESKA:

Q    Let me ask you this, if I could, Mr. Bristow.  Have
     you heard rumors and reports that if he had talked
     to Clyde Hornsby about this case and what he said
     in those interviews with Clyde Hornsby was not true
     and could be proven to you it was not true, would
     that change your opinion?

A    Could you come back with that again?  I don't
     quite understand it?

Q    I apologize.  I am sorry.  If he was interviewed
     by Clyde Hornsby and asked questions - - -

A    See, I didn't know that he was interviewed by Clyde.

Q    I understand, Mr. Bristow.  I am not trying to

377

trick you. I am trying to make it simple for me, okay, to ask it to you. But, if he was interviewed by you, if that was true and if he gave responses, whatever he said to Clyde Hornsby, what he said to him was not true, okay, and it could be proven to you that it was not true, would that change your opinion? It would, wouldn't it?

A  I can't answer that, because I have never been confronted with that question. Until I am confronted with that question and know that question did happen, then I would have to answer it to the best of my ability.

Q  Did you help make his appearance bond?

A  No, sir. My wife did.

Q  Okay. Your wife? With your property and her property together?

A  Well, it is like you and your wife, I imagine; what is yours is what's mine and the rest of it is my wife's.

Q  Everything I have is hers, I assure you. Yes, sir. Whole-heartedly. Have you talked to him about this case?

A  From time to time, yes, I have.

Q  Do you know his granddaughter, Amber?

A  Yes, I do.

Q     You have seen her?

A     Yes, I do.

Q     Her reputation is good, isn't it?

A     As far as I know.


          MR. VALESKA:  That is all.  Thank you, Mr.

             Bristow.

          THE COURT:  Anything else?

          MR. RAMSEY:  No, sir.

          THE COURT:  Okay.  You may step down.

                        (Witness excused.)


          THE COURT:  Call your next witness.

          MR. RAMSEY:  Cynthia Chambers.

Thereupon,

<u>CYNTHIA CHAMBERS</u>

was called as a witness in behalf of the

Defendant, and after having been first duly sworn

to testify to the truth, the whole truth, and

nothing but the truth, took the stand and testified

as follows, to-wit:


<u>DIRECT EXAMINATION</u>


BY MR. RAMSEY:


Q      Tell us your name please, ma'am.

A      Cynthia Chambers.

Q      Where do you live, Mrs. Chambers?

A      I live close to Haleburg.

Q      On Route 1, Columbia?

A      No.   Route 1, Shorterville.

Q      Route 1, Shorterville?  Okay.  How far do you

live from — — — strike that.  Do you know B. C.

Money?

A      Yes, I do.

Q      How long have you known him?

A      About thirty years.

Q      Thirty years?

A        (Witness nods her head to the affirmative.)

Q        How far do you live from him, now?

A        About three quarters of a mile.

Q        How do you know B. C.?

A        Well, we are neighbors.

Q        Do you do things together?

A        No, not really.  Just visit every once in a while.

Q        Pretty much everybody in that community knows
         everybody else?  Is that correct?

A        Sure.  Uh-huh.  (Affirmative response.)

Q        Do you know the family, B. C.'s family?

A        Yes, I do.

Q        Do you know his wife, Ruby?

A        Yes, I do.

Q        Do you know all five children?

A        Yes, I do.

Q        And, you know his grandchild, Amber?

A        No, I don't.

Q        You don't know Amber?

A        No.

Q        Do you know Amanda Hadden?

A        No.

Q        Do you have an opinion as to the reputation of
         B. C. for truthfulness and veracity in the
         community?

381

A     I have never heard – – –

Q     No, ma'am.  Do you have an opinion as to B. C.'s truthfulness and veracity in the community?

A     As far as I know, he always tells the truth.

Q     Do you have an opinion?  Yes or no?

A     Yes.

Q     Okay.  Now, tell the Ladies and Gentlemen of the Jury what that opinion is?

A     I believe him to be a truthful person.  I never heard him tell a lie.

        MR. VALESKA:  Objection.  This is unresponsive to the question.  The question is good or bad, not specifics.

        THE WITNESS:  It is good.

        THE COURT:  Yes.

BY MR. RAMSEY:

Q     The reputation for B. C. in the community for truth and veracity is good?

A     Yes.

        MR. RAMSEY:  That is all I have.  If you will, answer Mr. Valeska's questions,

please.

MR. VALESKA:  I have just a few questions, if

I could please, ma'am?


CROSS EXAMINATION


BY MR. VALESKA:


Q    You know his children, Comer Money?

A    Yes.

Q    Do you know Ruby Robertson, his daughter?

A    Yes, I do.

Q    Would you agree, it is fair to say, that they would

know better the reputation of their father than

maybe even you would?  Would that be fair to say

to you?

A    Well, I don't know that they can be more objective.

Q    You are saying they couldn't be more objective?

A    That is what I would think.

Q    Why would Ruby Robertson, can you tell me why she

wouldn't be more objective?

A    I don't know.

Q    I am not trying to trick you, ma'am, I am just

asking.  Are you saying that Ruby Robertson then,

would it be fair to say, you have no reason to

believe that she could be objective, like you
would?  Would that be fair or unfair?

A    Unfair.

Q    Why?

A    I don't think she could be fair to, would be
objective with maybe the problems that they have
had in the past.

Q    Problems between Ruby Robertson and her father?
Correct?

A    Uh—huh.  (Affirmative response.)

Q    What about B. C., Jr., Comer Money?

A    Basically the same thing.

Q    What about — — — I am sorry.  I withdraw that.
Would you tell the Ladies and Gentlemen of the Jury,
you say the reputation in the community for
truthfulness was good;  who was the last person you
heard say that B. C. Money's reputation for
truth and veracity was good in Henry County?  Who
was the last person?

A    I have never talked to people about him.

Q    I am not trying to trick you, ma'am.  Okay?  I want
to ask you some questions.  Then, it is your
testimony to the Jury then, that it is like
everybody in this room, right here, would it be
fair to say you never heard anybody else say

anything about his reputation for truth and veracity?
I am not trying to trick you, just what you,
yourself, know.  Right?

A     Right.

Q     So, that is your personal opinion?

A     That is my personal opinion.

Q     You never heard one other person say good or bad
about his opinion?

A     No.

Q     Ma'am, do you know under the laws of the State of
Alabama, reputation testimony – – – I am not trying
to trick you, Mr. Ramsey is here;  it is not what
you personally think, it is what other people say.
If that is the case then, you couldn't give an
opinion, could you, ma'am?  You have not heard
other people talk about it?

A     I guess you are right.


          MR. VALESKA:  Okay.  Thank you very much for
               the answers.  I move to strike her
               testimony.

          THE COURT:  Okay.  Any objection or anything
               else?

          MR. RAMSEY:  No, sir.  I have got more
               questions to follow up.

                    THE COURT:  Okay.  I will make a ruling after

                  the next questions.


                        REDIRECT EXAMINATION


BY MR. RAMSEY:


Q     Mrs. Chambers, you stated something to the effect

      you know about some problems between B. C. and

      Comer?  Is that right?

A     Uh-huh.  (Affirmative response.)

Q     What kind of problems?

A     Well, mostly hearsay, just hearsay as far as this;

      like rumors in the community.

Q     Do you know Pat Money sitting here?

A     No, I don't.

Q     Do you know that is Comer Money's wife?

A     I guess I do.

Q     Okay.  Do you?

A     Yes.  I know that.

Q     Are you personally aware of any problems between

      Comer and B. C.?

A     Personally?

Q     Yes, ma'am.  Do you have personal knowledge of

      any problems, not what somebody told you or what

you have heard?

A    No.  I have never been in any of it and I have

never – – –

Q    Same question for, with regard to Ruby, his

daughter?

A    Same thing.

Q    You don't have any personal knowledge?

A    (Witness shakes her head to the negative.)


MR. RAMSEY:  That is all I have.

MR. VALESKA:  I renew the motion to strike

her testimony.  It is not her personal

opinion.  Reputation for truth and

veracity is what other people say.  He

did not illicit any other questions about

what other people said.  If I am wrong,

I am not trying to trick her, that is

her opinion.

THE COURT:  Her testimony is stricken as far

as reputation is concerned.  You may

step down.

(Witness excused.)


THE COURT:  Who will you have?

MR. RAMSEY:  We call Dora Money.

THE COURT:  Let me say this before we start.
If the Jury is not aware of what I did
in that particular case, that is for
you to disregard any testimony as far as
what she said as to what the general
reputation in the community was as
relating to B. C. Money.  You have heard
testimony to certain matters, but that
would be not for you to consider.  Even
though you heard it, you need to wipe
that from your mind and not consider it.

MR. VALESKA:  I have no problem about
problems between B. C. Money, Comer,
and/or Ruby.  I have no problem with not
striking that, they can consider that.

THE COURT:  Well, that is what I told the
Jury as to the reputation only.  Is
there any other questions that were not
objected to and was allowed in evidence
and you can consider that.  Okay.  Go
ahead.

Thereupon,

DORA MONEY

was called as a witness in behalf of the

Defendant, and after having been first duly sworn to

testify to the truth, the whole truth, and nothing

but the truth, took the stand and testified as

follows, to—wit:

DIRECT EXAMINATION

BY MR. RAMSEY:

Q      Mrs. Money, tell us your name and address, please.

A      Dora Money.  Route 1, Columbia, Box 33.

Q      Do you live in the Haleburg Community?

A      I live outside the city limits.

Q      Do you know B. C. Money?

A      Yes.

Q      Sitting right there?

A      Yes.

Q      How long have you known him?

A      Been knowing him about fifty—seven years.

Q      Okay.

A      That was when I first moved up here.

Q      Are you related to B. C.?

A    Brother—in—law.

Q    He is your brother—in—law?  And, you are married
     to his brother and what is his name?

A    Frank.

Q    You are Frank Money's wife?

A    Right.

Q    And, you know all the Money's family?

A    I sure do.

Q    And, you have known them about thirty years, you
     said?

A    Fifty—seven.

Q    Fifty—seven?  I am sorry.  Fifty—seven years.

A    I went to school with him.

Q    Okay.  Does B. C. have a reputation for truthfulness
     and veracity in the community where he lives?
     What is that reputation, if you know?

A    All I know is what, my savings.

Q    Do you know anything about what anybody in the
     community has told you?

A    No.  No.  I don't listen to the gossip.

Q    Okay.  Well, I am not talking about the gossip,
     I am talking about have you ever had any
     conversations with anybody — — —

A    That has never come up.

Q    Okay.

MR. RAMSEY:  That is all.  Thank you, ma'am.


CROSS EXAMINATION


BY MR. VALESKA:


Q     So, you don't?

A     That has never come up.

Q     Okay.  That is fine.  Thank you.


          THE COURT:  Thank you, ma'am.  You may step

               down.

          THE WITNESS:  Are you through with me, now?

          THE COURT:  Yes.

                    (Witness excused.)


          MR. RAMSEY:  Judge, if I may approach — — —


                    (Thereupon, an off the

                    Record discussion was held

                    between the Court and the

                    Attorneys of Record.  Upon

                    completion of said

                    discussion, the following

                    proceedings were had, to—wit:)

391

THE COURT:  We will be in recess for about

five minutes.  Or, would you rather

just sit there?

THE JURORS:  Yeah.

THE COURT:  All right.  Go ahead, Mr. Ramsey.

(Thereupon, Mr. Ramsey

left the presence and

hearing of the Court Room

in order to check on his

next witness and returned

shortly thereafter.  During

that period of time, a

Juror asked to speak to

the Court and the

following proceedings were

had, to-wit:)

MR. RAMSEY:  Judge, what he tells has to be

in the presence of the Attorneys.

THE COURT:  Let's go to a Witness Room.

(Thereupon, the Juror, the

Attorneys of Record, the

Court and the Court

392

Reporter proceeded to a

Witness Room and the

following proceedings were

held out of the presence

and hearing of the Trial

Jury, to-wit:)


THE COURT:  For the Record, this is a Juror

that asked to speak to me.  And, let

the Record reflect that Mr. Ramsey,

representing Mr. Money, is here, Mr.

Money is here, and the District Attorney

is also here.  What is it that you would

like to say?

A JUROR:  I am nervous about this.  You know

yourself, I don't want to be doing no

harm or no wrong.  But — — —

THE COURT:  I understand.

A JUROR:  But, if I am correct, let me know.

If I am incorrect, also let me know.

But, Tyler Money, Todd — — —

MR. RAMSEY:  That is his grandson.

THE WITNESS:  I do know him.  I started

putting it all together and a lot of

Moneys around here are kinfolks and I

wanted to say something a little earlier,
but I didn't know how to go about doing
it.  And - - -

THE COURT:  You know him?

A JUROR:  I was sitting kind of uneasy - - -
I have worked with him a few months, but
don't know him personally.

THE COURT:  The fact you know him, would
that tend to bias your particular opinion,
as far as the evidence is concerned,
concerning B. C. Money?  That would be
his granddaddy, I assume.  Would that
affect you?

A JUROR:  I have worked with him off and on,
but not personally.  Don't know him
personally.

THE COURT:  Do you feel that in any manner
that would make you biased in this
particular case?

A JUROR:  I really don't know what to say.

THE COURT:  I will let the attorneys ask
questions.

MR. VALESKA:  I didn't get your name.

A JUROR:  Robert Kerns.

MR. VALESKA:  Mr. Kerns, would you tell where

you worked with Todd Money?

A JUROR:  Westpoint-Stevens.  It was Westpoint

Pepperill, at that time.

MR. VALESKA:  How many months?

A JUROR:  I don't even remember when that was.

MR. VALESKA:  When we asked questions, the names

were read out, did you hear that name, Todd

Money, as a possible witness?

A JUROR:  Well, I heard that there when we had

to come back for, at 1:30.

MR. VALESKA:  You didn't hear earlier in the

trial?

MR. RAMSEY:  He was in the bathroom.

MR. VALESKA:  So, you came in and weren't in

on that part of Voir Dire?

A JUROR:  No.  I wasn't.  I couldn't hear

and that is why I tried to move forward,

where I could hear what was going on.

MR. VALESKA:  I am not trying to trick you,

but I want to ask this question, some

questions that were asked on Voir Dire

that you might have missed them, because

you were outside?  Correct?

A JUROR:  It is possible.

MR. VALESKA:  I am not trying to trick you.

But we asked questions, Mr. Ramsey and
the Court, and until you moved up, you
moved up, you might have missed some of
it?

A JUROR:  Yes.  That is possible.

MR. VALESKA:  Thank you for being honest.

A JUROR:  I was raised up to be honest.

MR. VALESKA:  The State thanks you for being
honest.

MR. RAMSEY:  We are satisfied.  We have no
problem with you telling us.  I appreciate
that.

A JUROR:  I feel bad.  I wished I could have
said something earlier.

THE COURT:  That is fine.

A JUROR:  I understand when there is order
in the Court, it is supposed to be
that way.

MR. RAMSEY:  We appreciate that.

THE COURT:  If you will go on back out, we
will discuss this.  And, thank you for
coming forward.

A JUROR:  I am sorry.

THE COURT:  No problem.  I am glad you came
forward.

                    (Thereupon, the Juror

                    returned to the Court Room

                    and the following

                    proceedings were had,

                    to-wit:)

THE COURT:  All right.

MR. RAMSEY:  We have an alternate, but I am

      satisfied.

THE COURT:  Well, I am not so sure I am,

      since he was not here for all of the

      questioning.  I don't know, does the

      State have any objections?

MR. VALESKA:  I challenge him.  The problem

      I have, with all due respect, he came

      in the Court Room and I didn't see it

      and I am sure that the Court didn't see

      it.  I am trying to put Mr. Money in the

      penitentiary and if it is raised on

      appeal and is reversed on appeal, even

      though they waived, I would like to

      challenge him.  We have an alternate and

      he could have missed some more questions.

      I think it is very - - - the jurors are

      being honest and the question was asked

397

would he be biased because of that
relationship.  He said that he didn't
know Todd Money as the Defendant's
grandson that I prosecuted and sent to
the penitentiary for Manslaughter and
Assault.  He is doing state time now
and was in a prison uniform when he was
brought to testify.  So, I am concerned.

THE COURT:  The real reason the Court is
concerned is because he missed some
Voir Dire and obviously, there may have
been other questions that could have
been answered and the State could make
a strike of this particular Juror.  I
will grant the challenge.  I don't know
if he is the alternate or not.

MR. RAMSEY:  No, sir.  He is not.  Mr. Knight
is the alternate.  I know that.

THE COURT:  We will use him and — — —

MR. VALESKA:  We will go forward with the
twelve we have.

MR. RAMSEY:  It is good we have an alternate.

THE COURT:  You ain't kidding.  Back to the
Court Room.

598

                    (Thereupon, all the above

                    named parties returned to

                    the presence and hearing

                    of the Court Room and the

                    Trial Jury and the

                    following proceedings were

                    had in the presence and

                    hearing of said Trial Jury,

                    to-wit:)


        MR. RAMSEY:  We will call B. C. Money to

            the Witness Stand.

        THE COURT:  Okay.  Before we get started with

            that - - - well, as to the Juror that

            just talked to me back there and the

            attorneys, you are excused from this

            particular Jury.  And, I thank, I am

            not sure, the clerk is not here, but

            I believe the rest of the Jury needs to

            report back at 9:00 tomorrow.  If you

            could, report back tomorrow at 9:00.

            You are excused and we appreciate your

            honesty in coming forward and talking to

            me in the back and you are excused from

            this Jury.

                          (Thereupon, the Juror in
                          question, Mr. Kerns, was
                          excused and the following
                          proceedings were had,
                          to-wit:)

Thereupon,

### B. C. MONEY, SR.

the Defendant, was called as a witness in his own behalf, and after having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth, took the stand and testified as follows, to-wit:


### DIRECT EXAMINATION


BY MR. RAMSEY:


Q     Tell the Ladies and Gentlemen of the Jury your name, please.

A     (No response.)

Q     Tell the Ladies and Gentlemen of the Jury your name, B. C.

A     B. C. Money.

Q     Where do you live?

A     Columbia, Route 1.

400

Q    How long have you lived there?

A    Forty years.

Q    Forty years?

A    Yes.

Q    Are you retired, at the present?

A    Yeah.

Q    Where did you used to work?

A    I farmed and I was in carpenter work, construction work.

Q    Were you self employed most of your working career?

A    Most of it.  Yeah.

Q    Now, have you ever lived anywhere other than the Haleburg Community?

A    Well, not over seven miles from Haleburg.

Q    You heard previous testimony that you lived here and left and came back?

A    Uh-huh.  (Affirmative response.)

Q    Did you hear that?

A    Yes.

Q    Where did you go?

A    That was − − − well, you know, I went to the Army, to start with.

Q    Okay.

Q    Three years in the service.  I come back home and

started farming and moved over to, we call it
Love's Cross Roads;  still on Columbia Route,
about seven miles from Haleburg.

Q    Other than your stint in the military, you have
lived either in the Haleburg Community or within
seven miles of Haleburg?

A    Yes.  That is correct.

Q    How many children do you have?

A    Five.

Q    Tell us their names and where they live.

A    (No response.)

Q    Can you hear me okay?

A    Yeah.  I can hear you.  Comer Money, he lives about
three quarters of a mile from me.

Q    Comer is Amber's mother?

A    Comer is Amber's daddy.

Q    Amber's mother's husband and Amber's daddy?  Is
that right?  Excuse me.  And Pat's — — — Pat's
husband and Amber's daddy?

A    That's right.

Q    Where does Comer live?

A    Well, I reckon you call it Abby Creek Park Road.

Q    How far is that from you?

A    About three quarters of a mile.

Q    How long has he lived there?

A    I imagine about two years.

Q    Did Amber live there when these alleged incidents occurred we are talking about now?

A    No.

Q    They moved since then?

A    Yeah.

Q    Okay.  Where did they live two years ago?

A    Back up behind my house.

Q    All right.  Who are your other children?

A    Billy Gene Money.

Q    Where doe Billy Gene live?

A    He lives in Longview, Texas.

Q    All right.

A    Tommy Lee Money.  He lives just a little piece from me, there in the Haleburg Community.

Q    He lives in the area?

A    Right.

Q    Who else?

A    Ruby Robertson.  She lives over in Shorterville.

Q    Shorterville?

A    Yeah.  And, Joe, he lives in Dallas, Texas.

Q    Now, does Comer have any other children besides Amber?

A    Yeah.

Q    Okay.  Tell us who they are.

403

A    He has got three, four, five besides Amber.

Q    Do any of them live around here, around the Haleburg Community?

A    No, sir.  One lives at Ashford.

Q    Is Amber the youngest child of Comer?

A    Yeah.

Q    And, Amber is your granddaughter?

A    That is right.

Q    How old are you?

A    Seventy-three.

Q    What is your birthday?

A    March 3rd.  I mean March the 22nd of 1922.

Q    Do you remember when Amber was born?

A    Yes, sir.

Q    Where was she born?

A    Dothan, I think it was.  Flowers Hospital.

Q    And, have you — — —

A    I am not for sure.  I didn't go to see her when she was born.

Q    Have you had regular contact with Amber?

A    Yeah.

Q    Up until June of '94, have you had regular contact with Amber since she was born?

A    Yeah.

Q    Have you ever touched Amber in a sexual way?

A     In a what?

Q     Have you ever touched Amber in a sexual way, on her private parts?

A     No.  No, sir.

Q     You heard the testimony that four times you took Amber to the branch and had sexual relations with her, did you not?

A     Yes, sir.  I heard it.

Q     Is it your testimony that none of those occasions actually occurred?

A     Didn't any of them occur.

Q     All right.  Now, you heard her further testify that you either sexually abused or raped her in the trailer.  Do you remember that testimony?

A     Yes, sir.  I remember.

Q     Did that ever happen?

A     No, sir.

Q     Do you have any idea why she would get on the stand and claim that you did that?

A     I have no idea on the – – –

Q     Have you ever mistreated Amber in any way?

A     No, sir.

Q     How many times has Amanda Hadden been to your trailer out in Haleburg?

A     I don't know.  She has been several times.  She

would come with her mama a few time and she had

gotten off from the bus down there in the

afternoon with her brother and Amber and Amber's

sister.

Q     Now, you have heard the testimony about the

incident down in the hog barn?

A     Yeah.

Q     Did you ever take Amber and Amanda down to the

hog barn?

A     I didn't take they, they went.

Q     How did they get there?

A     They walked.

Q     All right.  Did they ever get on the truck and

go down to the hog barn with you?

A     No.

Q     Did you ever walk with them down to the hog barn?

A     Yes.  I followed them down there.

Q     Did you stop by the dog pen on the way?

A     No.  Not then.  No.

Q     On this particular occasion?

A     Naw.

Q     You heard the testimony about the magazines, have

you not?

A     Yes.

Q     Now, where did you first see those magazines?

406

A    When my wife told me that, to go get them, get

them out of the house, carry them out and do

something with them.

Q    Did she tell you to burn them?

A    She told me to burn them.

Q    What did you do with them?

A    I carried them out to the barn and set them out

there on the shelf until I could get me enough

dog feed sacks to burn them.  I had to finish

burning them with a tire, old car tire.

Q    All right.  Did you burn any of the magazines?

A    All but two.

Q    All but those two that we have seen here the last

couple of days?  Is that right?

A    That is right.

Q    Now, do you know where those magazines came from?

A    My wife said them young'uns – – –

Q    No.  Not what she said.  Do you know where they

came from?

A    No, sir.

Q    Didn't your grandson live there in that room?

A    Yeah.

Q    What is his name?

A    James Ernest Amos.

Q    You had to kick him out of the house, didn't you?

407

A    Right.

Q    Because why?

A    Because I had told him that he could live there
     as long as he stayed straight and acted like
     somebody and kept his room clean.  I wasn't having
     no drinking and parties being pitched there.

Q    Uh-huh.  (Affirmative response.)

A    So, me and my wife went to Texas on vacation and
     come back and when I come back, the room was all
     messed up, clothes throwed all over the floor and
     beer sitting around in the floor and a bottle of
     some kind of alcohol sitting on the desk.  When he
     come in, I told him he would have to get his stuff
     and get out.

Q    Did he do that?

A    Yes, sir.

Q    Did you do any kind of inventory of the room, go
     through the room to see what was there or wasn't
     there?

A    No, I didn't.

Q    You didn't look any further into it?

A    I thought he had everything.  I didn't look
     around.

Q    Why did you keep those two particular magazines?

A    Well, I got to looking at them and I found a

408

couple of ads in there that I thought maybe would

help me, you know, build my — — —

Q    Well now, I want you to tell the Ladies and

Gentlemen of the Jury, I know this is some intimate

testimony, but I want you to tell them specifically

what type of ads you are talking about and why you

kept those magazines.

A    I call it courage ads, is what it was.

Q    What were the — — —

A    Help me build my courage up, sexual.

Q    Okay.  Were you having any kind of sexual problem?

A    Well, it was no problem, just didn't have none.

Q    You didn't have any sexual drive at all?

A    No.

Q    Was that because of your age or do you know?

A    I don't know.

Q    Okay.  So, you kept these magazines because of

the ads in the back of them?  Is that right?

A    Right.  Right.

Q    Now, what did you do with these two magazines?

A    Put them in the tool box, locked them down.

Q    All right.  Now, you heard the testimony from

Amber and from Amanda?

A    Right.

Q    And, they have told everything in the Court Room

409

and those twelve Ladies and Gentlemen of the Jury
that you went over and unlocked that box, pulled
these magazines out and showed them to them.  Is
that true?

A    No, sir.  That is not true.

Q    Did they ever see those magazines?

A    Amber had.  She saw them when they was at the
house.  Amanda had never seen them.

Q    Did they get them out of that tool box, these
particular two magazines?

A    Amber did.

Q    All right.  How did she get them out of the tool
box if it was locked?

A    I went and fed my dogs.  They got on the tailgate
of my truck and rode out to the dog pen with me.
They rode on top of the dog box.  They got on
the tailgate and got up there.  When I got out
there, I put the feed in the drum and got my
bucket and carried it and fed my dogs.  There was
one of them that didn't have a collar on and I
come back, set the bucket on the drum and went
around to the tool box to get me a collar.

Q    So, you unlocked the tool box yourself?

A    I unlocked the tool box myself.

Q    To get a dog collar?

A    Sure did.

Q    Did you walk back to the dog pen?

A    Not for a few minutes I didn't.

Q    Okay.  Did you walk away from the tool box?

A    Yeah.

Q    Left it unlocked?

A    No.  No.  No.

Q    You locked it back?

A    I locked it back when I got the magazine and put
     it back in there and got the dog collar out.

Q    How did Amber and Amanda ever come to see these
     magazines out there by the tool box?

A    Well, they had started out toward my puppy brooder
     from the truck.  They was going out toward the
     puppy brooder.  And, well, I went to the tool box
     to unlock the tool box to get my dog collar and
     Amanda was on the right side, right end of the tool
     box and Amber was on the left end of the tool box.
     When I unlocked it and raised the lid up, Amber
     spied those magazines laying there.  She had a hold
     of the chain that held the lid to keep it from
     going back and when she saw those magazines, she
     gave it, gave the chain a jerk.  That is when the
     lid of the tool box hit me on top of the head.  It
     knocked my cap off and it was bleeding.  I was

411

wiping and Amber got the magazines and went to the tailgate of the truck and had it open on the tailgate of the truck. Her and Amanda were looking at it.

Q    Were they giggling or acting silly?

A    They were acting like little girls usually do, laughing, going-on.

Q    Okay. Did you know those magazines were in that tool box when you opened it up or had you forgotten?

A    Yeah. I knew they were in there.

Q    You knew they were still there?

A    But, I was there after a dog collar out of the tool box. And, when Amber saw the magazine, undoubtedly she recognized it.

Q    Did you ever pick the magazine up and hand it to either Amanda or – – –

A    No. No. I did not.

Q    Did you ever say anything to them after Amber grabbed the magazine and went to the tailgate of the truck?

A    I asked her to bring me the magazine back. And, she wouldn't do it. I had to go and take it away from her and put it back in the tool box.

Q    Did she have one or two?

412

A       One.

Q       One was still in the tool box?  Is that right?

A       That is right.

Q       You took it away from her and put it back in the
        tool box?

A       When I got it away, I put it back in the tool box.

Q       What happened after that?

A       I locked the tool box back.

Q       Did you ever go down in the hog barn?

A       Not then.  No.

Q       Did you go later?

A       I went and put the collar on the dog, come back to
        get in the truck, and Amber and Amanda — — — Amber
        had done got over in the brooder where the puppies
        was.  Amanda was standing on a five gallon can
        holding the brooder trying to get up in there.
        And, she was standing there shaking and I told her
        to get down before it turned over.  I told Amber
        to get out of the brooder.  She didn't do it so
        I reached over and took the puppy down off of her
        shoulder, she had the puppy on her shoulder petting
        it, rubbing it, and I took the puppy away from her
        and lifted her up, brought her out of the brooder
        and gave her a spank with my hand on the rump.  I
        told her now, mind me from now on.

Q    All right.

A    So, they started toward the house while I went

and got in the truck.  I come back to the house

and they caught on to the tailgate and rode back

to the house.

Q    Now, did they ever go in the hog barn and start

playing with some shingles?

A    Not then.

Q    Okay.  That was a different occasion?

A    No.  Same occasion, but when I got to the yard

and switched off, they was going down across the

yard to the branch.  I asked them where were they

going and they said:

            We are going to the branch.  Come on.  Come

            on, granddaddy, go with us.

I said no, I ain't going down there.  It is thick,

might get on a snake.  That didn't slow them down,

they kept going.  I asked them two or three times

to come back.  No.  Well, I knew there was snakes

in that branch, around that branch, so I didn't

go down in there.  But, I went down to the edge of

the woods out toward the road, where the water

washed sand in there where it was almost to the

branch.  And, they had done crossed over the branch

and started up the hill.  I told them don't y'all

go up there.  Come on.  We are going back to the house.  And, we – – – I walked up the branch and found a place where I could cross and I crossed the branch.  Well, Amanda wasn't too far behind me.  She come up and jumped and hit in the water and I caught her hand and helped her on out.  Amber jumped and I caught her, put her across the branch.  Well, they come on out, come on up through the yard and I followed.  By the time I got to the yard, they had done got past the road that turns to go down to my hog pen and I asked them where they was going.

>     We are going on down here to the barn.  Come on and go with us.

I said no, I ain't going.

>     Granddaddy, come on.

They kept going.  They didn't slow down.

Q    All right.

A    I told them, I said there is wasp nests and could be some snakes out there under some of that old lumber.

Q    This is old lumber in the hog barn?  Is that correct?

A    Old lumber in the hog barn.

Q    All right, sir.

A    Then we went on out there.  Well, I followed them

on out there in case they got hurt, I would be

the fault;  they was with me.

Q    Okay.

A    I got there and they was all over the barn, going,

running around in there.  And, Amber said something

about granddaddy build us a play house or something.

I said I don't know nothing about building no

play house.

     Come on, you know you can build a play house.

I said no, I don't know nothing about building no

play house.  She said:

     Take some of these old shingles here.

There was a pile of shingles that one come off of.

It was laying there, about, a little over half a

bundle, I imagine.  I got some of it and she said:

     Take these and make a floor, build a floor

     out of them.

Q    Did you help Amber and Amanda laying the shingles

down?

A    They didn't narie one lay one down.

Q    Why not?

A    They was playing.  And they told me, Amber told

me:

     Granddaddy, lay them on the ground for a

          floor.

          I started laying them and I said, I imagine that

          I had five or six of them laying out and Pat

          called Amber and Amber answered her.

Q     Where had Pat called from?

A     Just outside the barn.

Q     Did she holler Amber's name or call out loud

      or — — —

A     She called Amber's name loud.

Q     Where were you and Amber and Amanda, at that time?

A     I was in there laying them shingles on the ground

      and Amanda was in about mid ways the barn, up in

      one of them pens and Amber was at the other end of

      the lane when Pat called her.

Q     Did you ever ask Amanda to pull down her pants?

A     No, sir.

Q     Did you ever at any time get on top of Amanda and

      pull her pants down?

A     No, sir.  No.  No.  Not no other occasion.  No.

      But, when Pat called, I said well, maybe I can get

      some rest, now.  They had been running me and I

      had been trying to keep up with them all the

      evening.  When Pat called, I said well, I might as

      well start picking these shingles up and put them

      back on the pile.

Q    Did you pick them up and put them back on the pile?

A    I picked them up and laid them on top of the pile there where I was at.  She saw me putting them on the pile and the young'uns was done out of the barn, going toward the house.

Q    Okay.

A    They went on to the house and me and Pat walked to the house together.

Q    Has Amber ever told you that she had a secret and she would tell you the secret if you promised not to tell anybody else?

A    She did.

Q    All right.  When was that?

A    I can't remember the date, but it was before, it was before this date that I was talking about when she got off the bus, that Amber had something to tell me.

Q    Okay.  Who was with you when she told you this?

A    Nobody.  Just me and her.

Q    Where were you?

A    Walking out toward the dog pen.

Q    Was it one day after school?

A    After school.  Yeah.

Q    Did she come home just about every, by home, did she come to your house about every afternoon?

A    She stopped there just about everyday when she
     got off of the bus.  She stopped there just about
     everyday when she got off of the bus.  She stopped
     at my house.

Q    So, you and she got out and walked toward the back
     of the house?

A    She rode with me out to the dog pen just about
     every time I went out there, if she was home.

Q    Okay.  On this specific occasion when she told you
     about this secret, where were you going?

A    Going to the dog pen.  Going to feed the dogs.
     Yeah.

Q    Were you walking or in the truck?

A    Walking.  Yeah.

Q    What did she tell you?

A    Her secret?

Q    Yeah.  What did she tell you?

A    She said:

          Granddaddy, I have got something to tell you
          if you won't tell mama.

     I said what is it, Amber?  She said:

          You promise me you won't tell mama.

     I said okay.  Well, that is when she told me that
     her and Jimmy had sex.  I said Amber, you better
     go talk to your mama.  Did you ever say anything

to her mother or anybody about that?

A    No.

Q    Why?

A    Because I had made her a promise I wouldn't tell anybody and I let it go at that.

Q    You promised her that you wouldn't tell?  Is that right?

A    That is right.  I did.

Q    And, you didn't?

A    No, sir.  I didn't.

Q    Did you ever mention this to your wife, later?

A    No.  I don't think I did.  I did way later, after this all come up.  Yeah, I did.

Q    After these allegations came to the front, then you told your wife about it?

A    Right.  Right.

Q    But, not prior to that?

A    No.  No.

Q    Those are your cards?  (Produces an exhibit for examination.)

A    (Witness studies the exhibit in question as requested.)  Yeah.  They look like them.

Q    Who gave them to you?

A    Pat.

Q    When did she give them to you?

A   I went down to her house one evening and she met
    me there in the dining room and said:

        Here.  I got something for you.

    I said what is it?

Q   Was there any special occasion, was it your
    birthday or anniversary or anything?

A   No.  Hu-huh.  (Negative response.)

Q   Did she call you down there to give them to you
    or you just happened to be there?

A   I was walking in through the dining room and she,
    about the time I got to the end of the cabinet or
    counter, she said:

        I got something here.

    Seems like she said somebody had given them to
    her to give to me.  But, she is the one that give
    them to me.

Q   That was my next question.  Do you know where she
    got them from?

A   Earl Robertson.  I believe she said Earl Robertson.

Q   If you remember?

A   Earl Robertson, the best I can remember.

Q   There is no doubt in your mind that Amber's mother
    gave you those cards?

A   Right.

Q   Now, where did you get the other deck of cards?

A    Todd brought them to me.

Q    Todd, your grandson?  Is that right?

A    Right.

Q    Where did you keep those cards?

A    The top chest of drawers in my bedroom, behind
     some books and letters and some socks and underwear.

Q    Did you consider them hidden?

A    I sure did.

Q    Did you ever show those cards to Amber?

A    No.

Q    Did you ever show those cards to Amanda?

A    No.

Q    Do you have any idea how Amber would have known
     those cards were in that drawer?

A    Yeah.  Well, let me drop back just a minute.  I
     first, whenever I first got them from Todd, I put
     them in a drawer in the back bedroom desk drawer.
     And, she got to rambling around in there, looking
     and I don't know what she was looking for, she is
     always looking for something another.  And, she
     found that deck of cards.

Q    In a different drawer?

A    Yeah.  Uh-huh.  (Affirmative response.)

Q    So, you moved them from there?

A    I moved them from there and called myself hiding

them.  I put them in the chest of drawers then.

Q   How do you know she found them the first time?

A   My wife found her with them.

Q   She told you?

A   Yeah.  I had to do something with them.

Q   So, you don't really know how she knew they were in this other drawer, other than perhaps — — —

A   I don't.  The only thing that I can figure out is we had band aids in there in the same drawer and she got up there to get a band aid and started racking around in there, I reckon, and found them.

Q   You never saw her with the cards, did you?

A   No.  No.

                    (Thereupon, an off the Record discussion was held between the Attorneys of Record.  Upon completion of said discussion, the following proceedings were had, to-wit:)

        MR. VALESKA:  Jackie, bring the movie in; Mr. Ramsey wants to see it.  Do you want the TV?

MR. RAMSEY: No. Just the movie itself.

(Thereupon, the above mentioned VCR movie was brought into the Court Room and the following proceedings were had, to-wit:)

BY MR. RAMSEY:

Q    Now, you have heard a lot of mention about the movie Screwballs, haven't you?

A    In fact, I rented one.

Q    All right. Look at that. Does that look — — — (Produces the VCR movie in question for examination.)

A    (Witness studies the VCR movie in question as requested.) I can't look at it on the outside and tell that.

Q    Can you see that? Can you see the name of the movie there on the front, written right there?

A    Screwballs. Yeah.

Q    Okay. Does that appear to be the movie that you rented?

A    Probably one like it.

Q    You rented the movie Screwballs, didn't you?

A    I did.  Yeah.

       MR. RAMSEY:  Mark that.

                 (Thereupon, Defendant's
                 Exhibit Number 9 was marked
                 for identification by the
                 Court Reporter.  After that,
                 the following proceedings
                 were had, to-wit:)

       MR. RAMSEY:  Judge, I subpoenaed all the
          video rentals of Mr. Money from Mrs.
          Duke, who runs the place where this
          movie came from.  Now, if he doesn't
          want me to use it as his exhibit, I will
          get her in here and take — — —

       MR. VALESKA:  He is marking my exhibit.  This
          did not come from where Mr. Ramsey said.
          This is from the Movie Gallery, because
          the movie Mr. Ramsey is talking about was
          sold.  All I am asking is he marking my
          exhibit.

25

MR. RAMSEY:  Yes.  Yes, sir.  Yes.  I intend
     to.

MR. VALESKA:  You plan to offer my exhibit?

MR. RAMSEY:  Yes.

MR. VALESKA:  Go ahead.  No objections.

THE COURT:  Let me ask this.  What is the
     purpose of this?

MR. RAMSEY:  Just to show that it is an
     R Movie, not an X rated movie like they
     contended.  As a matter of fact, it is
     marked on the category of comedy.

THE COURT:  What if the Jury wants to look
     at it?

MR. RAMSEY:  They are certainly free to.  We
     have no problem with that.

THE COURT:  All right.


BY MR. RAMSEY:


Q     Does that appear to be — — —


MR. VALESKA:  Whoa.  Whoa.  Whoa.  Judge,
     that is Movie Gallery's property.  The
     District Attorney's Office is not going
     to pay for that.  I have no problem

with Mr. Ramsey wanting to submit a copy
that was made of that movie as long as
Movie Gallery can have the original. I
am not paying eighty or one hundred and
twenty bucks for that movie.

THE COURT: Why don't y'all just stipulate
to the fact that, in fact, the movie is
rated R and then we don't have to
introduce it. Do you want to do that?

MR. RAMSEY: I will stipulate that it is a
R and it is categorized as a comedy.

MR. VALESKA: I don't want to do that. I
will pay for the movie if I have to.
Let the Jury see it.

THE COURT: Well, if it is going to be
brought in for one purpose, maybe it
needs to be brought in for all purposes.

MR. RAMSEY: If I may, they are the ones that
have been screaming the movie Screwballs,
Screwballs, Screwballs. I want the Jury
to see what they are talking about.

MR. VALESKA: I will be glad to pay for it
so they get to watch it and make their
own opinion. Go ahead. Let it in.

THE COURT: Okay. Is there any objection to

it coming in?

MR. VALESKA:  No, sir.

THE COURT:  Let it be admitted.

(Thereupon, Defendant's Exhibit Number 9 was received in evidence. After that, the following proceedings were had, to-wit:)

BY MR. RAMSEY:

Q    Does that appear to be the movie you rented; Screwballs?

A    I rented one, a Screwballs, but whether or not that is the same one or not, it might be a different chapter.

Q    Okay.  I understand.  You don't know if that is the same one?

A    It could be two or three chapters of it.

Q    That is fine.

THE COURT:  Just a minute.  Y'all approach.

(Thereupon, an off the
Record discussion was
held between the Court and
the Attorneys of Record.
Upon completion of said
discussion, the following
proceedings were had,
to—wit:)

MR. VALESKA:  Judge, for the Record, the
Record will show what he rented from
this place in Columbia, they sold their
copy.  As far as I know, there is only
one copy of Screwballs, there is not
different—type ratings.  I have no
problem.  I plan — — — when it is my
turn to show them some of the parts and
ask some questions — — —

THE COURT:  If it is, in fact, the same movie
with the same rating that he bought at
Movie Gallery, fine.  I just want to
know.  Sometimes they put out several
ratings on several movies that may be cut
or uncut or so forth.  But, if it is the
same and y'all stipulate it is the same,

Case 1:08-cv-00228-WKW-TFM    Document 16-5    Filed 05/09/2008    Page 194 of 202

                    then let it be entered.

          MR. VALESKA:  I have no objections.  Let it

              in.

          THE COURT:  Okay.


BY MR. RAMSEY:


Q     Now, who did you watch this movie with, if you

      remember?

A     Yeah.  My wife, Amber, and James;  Pat's son.

Q     Okay.  Now, did you know what this movie was about

      before you put it in the VCR?

A     No.

Q     Now, you heard Amber testify that this movie has

      depictions of a man and a woman having sex, to

      paraphrase.  You heard her say that, didn't you?

A     Uh-huh.  (Affirmative response.)  Yeah.

Q     Do you recall that being in that movie?

A     No.

Q     Do you recall any — — —

A     There was some naked women come up in it.  Yes.

Q     Do you think that is something that Amber ought

      to be looking at?

A     Well, I will tell you what she said.  My wife was

      sitting there and said:

      Turn it off.

Amber said:

      I have seen worse than that.

So – – –

Q     Watching the movie Screwballs?  Is that right?

A     Right.

Q     Had you ever watched any other videos with Amber?

A     No.  Hu–huh.  (Negative response.)

Q     This is the only one that you watched with her,

ever?

A     Yeah.  I think she had been down there when I had

some others, but there wouldn't be no sex or nothing

in it.

Q     Did you know what was going to be in this video

before you put it in?

A     No.  No.

Q     Why did you rent the movie?

A     I had never seen it.

Q     You just rented it to watch?

A     Right.

Q     Had somebody recommended the movie to you or had

you heard about it anywhere?

A     Ain't nobody said nothing.  I didn't ask nobody

about it, I just looked at the name Screwballs and

I rented it.

Q    All right.  You see on the outside of this cover
     that it says Category comedy, do you not?

A    (Witness studies the exhibit in question as
     requested.)

Q    Can you read that?

A    Yeah.

Q    Would you — — — you watched the movie.  Would you
     consider that movie a comedy?

A    It was to me.

Q    Okay.  Okay.  After this conversation about the
     secret Amber had with you, did she ever bring up
     sex in your presence again?

A    No.  Only — — — well, I ain't going to
     mention — — — she did ask me, she did ask me if me
     and granny have sex.

Q    All right.  She asked you about that?

A    She did.

Q    When was that?

A    That was after she told me about her and Jimmy.  In
     fact, we was going back to the house;  we had been
     to the dog pen and were going back to the house.
     She asked me did me and granny ever have sex.  I
     told her that wasn't none of her business.

Q    Do you obtain an erection?

A    Do what, now?

Q    Can you obtain an erection?  Right now, can you?

A    I don't know.

Q    Can you obtain an erection?

A    Obtain an erection?

Q    An erection?  Can you get an erection?

A    I don't fully understand what the word means.

Q    Now, you were telling the Ladies and Gentlemen of
     the Jury that you were looking at these magazines
     because of the ads, right?  What were the ads for?

A    It was for some pills.

Q    Some pills?

A    Yeah.

Q    What were the pills supposed to do?

A    Build courage.

Q    To help you get an erection?  Isn't that correct?

A    That is right.

Q    So, you were having trouble, is that not correct?

A    Right.  Right.  Right.

Q    Are you still having trouble?

A    Sure.

Q    Did you ever touch Amanda in her vagina area?

A    No.

Q    Have you ever?

A    No.

Q    Have you ever told Amanda to lay down in the hog

barn on this roofing material?

A    No.

Q    Have you ever attempted to put your penis into Amanda's vagina?

A    No.

Q    Do you have any idea why she would say that?

A    I have no idea.

Q    Have you ever attempted to have sex with Amber?

A    No.

Q    On five separate occasions?

A    No.

Q    Have you ever done it on even one occasion?

A    No.

Q    Do you love Amber?

A    I love her to death.

Q    She is your grandchild?

A    Right.

Q    Would you ever do anything to hurt her?

A    No, sir. I never have and I never will.

Q    Do you have any explanation or idea whatsoever as to why she would come in and take the Witness Stand and swear to this Jury that you have attempted to sexually molest her or rape her on five separate occasions?

A    I don't have no idea.

Q     Okay.

            MR. RAMSEY:  That is all I have.  Thank you.

            THE COURT:  Okay.

            MR. VALESKA:  Do you want to go forward or
                stop?

            THE COURT:  Let's go ahead and stop, this
                would be a good time to stop.  Mr.
                Money, you may step down, at this time.
                          (Witness excused.)


            THE COURT:  Ladies and Gentlemen of the Jury,
                at this time, we will recess until 1:30
                tomorrow afternoon.  Again, remember the
                instructions I gave you before about
                listening to any, looking at any TV
                accounts or listening to any radio
                accounts or reading the newspaper or
                anything like that.  And, do not discuss
                this case among yourselves or with any
                members of your family or friends and
                do not let anybody discuss this case
                with you.  With that, you may be recessed
                until 1:30 tomorrow afternoon.  Thank
                you.

(Thereupon, the Trial Jury proceeded to their homes for the evening with the above instructions from the Court and a recess was called and taken by all parties.  During said recess, Hurricane Opal arrived and court was delayed until approximately 1:50 on Friday, October 6, 1995.  At that time, all parties returned to the presence and hearing of the Court Room and the following proceedings were held out of the presence and hearing of the Trial Jury, to-wit:)

THE COURT:  Okay.  Bring them in.

(Thereupon, the Trial Jury was returned to their places in the Jury Box and

the following proceedings
were held in the presence
and hearing of said Trial
Jury, to—wit:)

THE COURT:  Ladies and Gentlemen of the Jury,
I appreciate your patience here since we
have had the hurricane and we have all
had to kind of readjust the schedules.  I
appreciate the District Attorney and also
Mr. Ramsey in doing this this afternoon.
We originally thought about doing it
tomorrow morning, but I know that creates
a hardship on you and I am sorry that I
am a little late.  I had to readjust
things I had coming from Dothan, but I
am ready to proceed at this time.  Mr.
Money, I believe you were on the Stand.
Is that correct?

THE DEFENDANT:  Yes, sir.

(Thereupon, the Defendant,
B. C. Money, Sr., took the
Witness Stand and the
following proceedings were

had, to-wit:)

THE COURT:  Mr. Ramsey, I believe you were

through?

MR. RAMSEY:  Yes, sir.

THE COURT:  Mr. Valeska.

MR. VALESKA:  Thank you very much, Judge

Little.


CROSS EXAMINATION


BY MR. VALESKA:


Q    Mr. Money, when you talked to Clyde Hornsby and

you talked to one of the social workers at the

same time, did you tell the truth in the statement

that you gave them?

A    Yes, sir.

Q    Now, I want to ask you in the statement, did you

tell them whether you drank alcohol or not?

A    I drank a bottle of beer every once in a while.  I

used to, I don't – – –

Q    Did you tell them that you don't drink?  You did,

didn't you?  In this statement, didn't you tell

them:

COURT OF CRIMINAL APPEALS No. __95-0268__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF <u>HENRY</u> COUNTY, ALABAMA

CIRCUIT COURT NO. CC-94-065 thru CC-94-070

CIRCUIT JUDGE   LAWSON LITTLE

Type of Conviction / Order Appealed From: Rape 1st on CC-94-065,066,067., & 069

Sexual Abuse on CC-94-068 & 070

Sentence Imposed: 99 yrs on CC-94-065; 99 yrs on 066; 99 yrs on 067; 99 yrs on 069;

Defendant Indigent: [X] YES  [ ] NO 10 yrs on CC-94-068; 10 yrs on CC-94-070

B. C. MONEY

NAME OF APPELLANT

| William Christian Maddox | 334 793-6493 |
|---|---|
| (Appellant's Attorney) | (Telephone No.) |

P. O. Box 738

(Address)

| Dothan | AL | 36302 |
|---|---|---|
| (City) | (State) | (Zip Code) |

V.

## STATE OF ALABAMA

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

(For Court of Criminal Appeals Use Only)





EXHIBIT

A

I do not drink.

That is true, isn't it?

A    If you call touching about a teaspoonful at night

drinking, well, I did.

Q    Okay.  But, my question is, please answer it;

did you tell them you did not drink?  Is that what

you told them?

A    (No response.)

Q    You did, didn't you?

A    I don't remember what I told them if I drank or

not.

Q    Let me show you on page twenty − − −

A    I drink a bottle of beer along.

Q    Are you telling me now you remember you told them

that you don't drink and that is not true?  Which

is it?

A    Well, the way I look at it, whenever you are

drinking, you just turn up a pint of whiskey and

drink three or four swallows out of it and when you

are drinking beer, you drink about a six pack.  I

call that drinking.

Q    Okay.

A    But, taking about a teaspoonful just every once in

a while of whiskey, I don't call that drinking.

Q    But, isn't − − −

A    And, drinking one beer about once or twice a week,
     I don't call that drinking.

Q    In your statement, you said:

          I don't drink.

     Didn't you?

A    Probably did.

Q    I will show you on page twenty, to refresh your
     memory, and I underlined it.  You were asked by
     Beth and Clyde and your response was:  (Reading
     from the statement in question.)

          I don't drink.

     That was your response?  Correct?

A    (Witness studies the statement in question.)

Q    In fact, you said I don't drink two times.  Take a
     look at it.

A    I can't see - - - (Putting on glasses.)  Do what?

Q    It says:

          I never do.  I don't drink.

     Is that correct, Mr. Money?

A    (No response.)

Q    I will circle it.  Right?  That is what it says?
     Right?

A    One time.

Q    I will go down four more lines on the same page and
     you say again, is it not true:

I do not drink.

That is the second time, correct?

A    I don't.

Q    Please keep your glasses on, if you need them.

Do you deny that?

A    As far as being an alcoholic or something like that,

no, I don't drink.

Q    But, what you responded to, Mr. Money, you didn't

say I am not an alcoholic, you said I don't drink,

I don't drink, is what you told Beth and Clyde

Hornsby?  Is that correct?

A    Probably is.  I don't drink like an alcoholic or

something like that.

Q    How long have you been drinking?

A    (No response.)

Q    A long time?

A    No.  Hu-huh.  (Negative response.)

Q    Let's talk about the red tool box.  Remember the

red tool box?

A    Yes, sir.  I do.

Q    In fact, let me show you some pictures, if I

could?  State's Exhibit Number 3, State's Exhibit

Number 9, that is the red tool box?  Correct?

(Produces the exhibits in question for examination.)

A    (Witness studies the exhibits in question as

requested.)  Yeah.  That is the tool box.

Q    You would agree that was locked, you kept it
     locked and had the only key?  Is that correct?

A    Well, my wife had one, I am pretty sure.

Q    What else was in the red tool box besides what
     you said were dog collars and the two Swank
     magazines?  What else did you keep in there,
     Mr. Money?

A    There was, I reckon – – –

Q    Moonshine?

          MR. RAMSEY:  Judge, he is trying to answer
             the question.

          THE WITNESS:  It was about, I imagine there
             was a little over a pint of moonshine
             in there.  Yeah.

BY MR. VALESKA:

Q    You said you drank the moonshine for medical
     purposes, you and your wife?  Is that correct?

A    Right.  Right.

Q    So, the beer you drank, was that for medical
     purposes, too?

A    That was refreshment.

Q     Now, I want you to tell the Ladies and Gentlemen of the Jury, it is true this red box right here, State's Exhibit Number 3 and Exhibit 9, you would agree when Amber and Amanda both said that red box was down at the dog pens in Henry County on Tommy Lee Money's property, that is true, was it not?

A     Sitting right where it was.  Yes.

Q     That would be correct?  Is that true?

A     That is right.

Q     And, you would agree that you went down there to the red box with Amanda and Amber?  Is that correct?

A     No.

Q     Would you agree that they were down there with you?

A     They were down there with me.

Q     Would you agree that you unlocked the red box?  Yes or no?

A     Yeah.  Yeah.  I unlocked it.

Q     And, would you agree that when you went down there, both of those little girls were under twelve years old when you took them down there?  Is that correct?

A     Yeah.

Q     How old are you, Mr. Money?

A     Seventy-three.

Q    How old were you, at that time?

A    Seventy-two.

Q    Now, let's go back.  You heard Amanda testify,
     would you say that it is true that she watched the
     movie Screwballs with you and your wife, that was
     true, wasn't it?

A    No.

Q    That is not true?

A    No.

Q    Mr. Money, when you testified, I believe it was
     not quite two days ago now, on Direct Examination,
     did you watch with Amber?

A    Amber.  Yeah.

Q    Amber Money?

A    Yeah.

Q    The question is you did watch the movie Screwballs
     with her?

A    Yeah.

Q    The whole movie?

A    Yeah.

Q    You called it a comedy?  Is that correct?

A    Exactly.

Q    Now, would you agree, if I show you a picture, I
     mean a signature of the movie Screwballs, would you
     agree - - - you need to put your glasses back on.

Go ahead.  I am going to circle it and ask you if
that is your signature where it says B. C. Money,
the movie Screwballs, rented from Columbia Video
on June 5, 1994?  That would be true?  Is that
correct?  (Produces the document in question for
examination.)

A    (Witness studies the document in question as
requested.)  That is my signature.  Yes.

Q    That is the same thing that Amber said, that you
rented it and watched it with her just before
election day, which would be on or about June 6th
or 7th.  Would you say that was fair?  Is that
correct?

A    I don't remember just exactly what day it was.  It
was around the time we voted.  I don't remember if
it was before the date or after the date.

Q    Let's go back to your nephew.  You said that you
went to Texas with your wife and your nephew was
living there?  Is that correct?

A    Yes, sir.

Q    What is your nephew's name?

A    James Ernest Amos.

Q    How old was Mr. Amos then?

A    He was about nineteen.

Q    Okay.  Nineteen years old, when would that have

been?  Could you tell me what year that was,

Mr. Money?

A    '93, I think it was.

Q    1993?  Mr. Amos would have been how old, you said

nineteen?

A    (Witness nods his head to the affirmative.)

Q    Nineteen.

A    About that.  I don't know exactly how old he was.

He was about that.

Q    1986, that was in 1993, 1986, that would be seven

years before 1993, looking at that figure.  Would

you agree with that?  Seven years difference

between 1986 and 1993?  Correct?

A    (No response.)

Q    I am not trying to trick you.  Do you agree that

is fair, 1993 — — —

A    Six from thirteen is seven.

Q    And, if Mr. Amos was nineteen, in your best

recollection, if you subtracted seven from that,

that would make him about twelve years old in

1986.  Would that be fair to say?  Close?

A    (No response.)

Q    You don't see any reason to disagree?  Twelve,

thirteen, would you agree that is fair?

A    You mean to say he wasn't but twelve years old?

Is that what you are trying to make me say?

Q   No, sir.  I am not trying to make you say that,
    I am just asking questions.  I am saying in 1986,
    would it be fair to say — — —

A   I would say he was nineteen years old, regardless
    of what you are trying to figure out.

Q   Yes, sir.  Just answer my questions, please.  Would
    you tell the Jury, he stayed in your house for how
    long?

A   Two, three months.

Q   Did you tell Beth or Clyde it was at least a year?
    You did, didn't you?

A   No, I didn't.

Q   You didn't?

A   No, sir.

Q   Now, you say six months?  Is that correct?

A   I didn't say six months.

Q   Yes, sir.  I want to show you what you told Beth
    or Clyde.  Your answer was it was about a year,
    might have been over a year ago.  Is that what you
    said?  Is that right?

A   It was in '93.

Q   Okay.  Now, my question is, you mentioned, you
    told the Jury on Direct Examination when you came
    home from Texas with your wife, you came in and

there was magazines all over the place and beer?

Is that what you said?

A    No.  I didn't say magazines.

Q    What was all over the place?

A    Clothes.

Q    No magazines?

A    No.

Q    Would you agree there was beer sitting out there,

beer and some kind of drinks all over the table?

A    No.  I said there was beer sitting beside the bed

and one bottle of some kind of drink sitting on

the desk.

Q    And then you also said in your statement:

I don't have no drinking or nothing like that

in my house.

A    Right.  Right.  I did say that.

Q    But, you admit that you kept beer and drank it in

there, also?

A    Well, that was my house.

Q    Yes, sir.  But, my question was, you told them that

you had no drinking in your house or any beer and

you had beer in your house, didn't you?

A    Sure.  I have had beer in my house.

Q    Let's go to the lock on the red box.  You had the

key and your wife had a key and you went down

there and unlocked the locked box, what you said
the collars?  Is that correct?

A    Dog collars.

Q    Anybody see that injury to your head?

A    Yes.

Q    Who?

A    Pat's husband saw it and I imagine Pat saw it.

Q    That is what you are saying?  Is that correct?

A    Right.

Q    The cards, let's talk about the cards, if we could?
One set of cards, two sets of cards marked as
State's Exhibit Number 4?  Is that correct, Moe?
Those are the only two sets of cards that you ever
had or were talked about?  Is that fair to say?

A    That is exactly right.

Q    Who gave you the cards?  I want you to tell me.

A    Todd Money gave me this deck of cards here.

Q    These, just for the record, the ones that say – – –

A    They – – –

Q    Excuse me just a minute.  They – – –

A    If you hadn't changed them, I don't know what
y'all done since you had them up here.  But, if
they haven't been changed, these are the ones that
Pat give me, Pat, sitting right there.  (Witness
indicating.)

Q    Yes, sir.  I see her.

A    And, those are the ones that Todd gave me.

Q    Now, I want you to take a look at the pictures
     of these women showing their private parts and
     tell me how I have changed them in any manner or
     fashion.

A    Well, I don't know.

Q    Take a look and tell me if they are changed.

A    Well, I don't know.

Q    They have not been changed in any way, are they?

A    I don't know.

Q    You don't want to look at them?

A    I ain't never looked all the way through them.

Q    Pat give you these?  You are sure?

A    No.  Pat gave me these.

Q    And, Todd Money gave you these?

A    That is right.

Q    You are sure that nobody else gave them to you?

A    Sure I'm sure.

Q    Just like you are sure that you didn't rape Amber?
     Is that correct?

A    That's right.  I did not.

Q    Just like you are sure that you didn't rape
     Amanda?

A    Right.

Q    Just like you didn't sexually abuse either one of
     them?

A    No, sir.  I did not.

Q    Now, did you tell something different to Clyde or
     Beth as to who gave you the cards?

A    No, sir.

Q    You are sure?  Are you sure, Mr. Money?

A    I told them Pat give me these, Amanda's mother.  I
     mean Amber, Amber's mother.

Q    Who is Joe?

A    Joe?

Q    Someone in your family is named Joe, related to
     you, who is it?

A    Joe Money, my son.

Q    Okay.  Did you tell Clyde that Joe gave you those
     cards?

A    No, sir.

Q    Let's look at the statement on page give.  When
     Clyde asked you the question:
          What about the deck of cards with the rubber
          band around it with the red backs?
     I think we are talking about those;  would you say
     that is correct?

A    (No response.)

Q    I want you to see what your answer was.  If I am

wrong, before you read it, you told me, you said
Pat gave you those?

A   Right.

Q   And, Todd Money gave you these? Correct? The ones
that say Lips?

A   The ones in the box.

Q   Look on page five of your statement when you were
asked about the cards. I am going to read it to
you and I want you to put your glasses on. I will
read it to you word-for-word.

A   I know what I told them.

Q   Did you say that Joe gave you some cards?

A   No, I did not.

Q   Let's look at it together and see. (Reading from
the statement in question.)

      Response. B. C. Comer and Pat. Well, Pat
      gave them to me.

That is what it says?

A   Right.

Q   (Continues reading.)

      They went somewhere and found them and told
      me we want to give you these.

A   No. I didn't say that.

Q   Not on the tape?

A   No, sir.

Q    Let's go forward and we will play the tape.

(Continues reading.)

    I told her, I said I already had some that
Joe gave me.

A    Well, I said Joe, but I meant Todd.

Q    Well, did you say Todd or did you say Joe?

A    I don't remember.  But, if I said Joe, I meant Todd.

Q    But, it says Joe gave them to me?  Is that right?

A    I have got a son named Joe and a grandson named
Todd, but Todd is the one that gave me the cards.

Q    I will ask you again.  Anything else in the
statement that you told Clyde or Beth that is not
true that you are mistaken?  Do you know of
anything else?

A    I don't know what you got, all you got in there.

Q    You have not read your statement and gone over it
with your lawyer, Mr. Ramsey, not one time?  You
have, haven't you?


    MR. RAMSEY:  Judge, that is not relevant
       whether he has gone over the statement.

    MR. VALESKA:  Sure, it is.  It is Cross
       Examination.

    THE COURT:  I overrule.

BY MR. VALESKA:

Q    Have you gone over what you told Beth or Clyde
     in your statement?  Didn't you, Mr. Money?

A    No.

Q    Not one time?

A    No.

Q    Now, let's talk about, it is true there is a
     branch down there behind your house?  Correct?

A    Yeah.

Q    And, there is a pond down there?  Correct?

A    Not behind my house.

Q    Across from the hog barn, the shed?  Right?

A    Right.

Q    Just like Amber and Amanda said?  Correct?  It is
     true, isn't it?

A    After you told them, I heard them say it.

Q    Okay.  Thank you.  Your answer would be yes, sir
     or no, sir?

A    There is a pond there.

Q    Would you also agree that the road that comes off
     of the paved road by your trailer goes back up
     there behind the hog barn, the dog pens where the
     red box was and the pond and all the way up there
     to where Amber was living;  that is a dirt road,

is it not, on Tommy Lee Money's property?  Is that
true?

A    Yes, sir.

Q    You would also agree that you went in the hog shed
with Amanda and Amber, didn't you?

A    Yes, sir.

Q    And, it is also true that the shingles were placed
on the ground inside the shed, in the hog barn?
That is true, isn't it?

A    I put them down them.  Yes, sir.

Q    And, you agree State's Exhibit Number 10, this
shingle, you would agree that is one of the
shingles, would you not?

A    Looks like one of them.  Probably come off of the
same pile.  Hornsby and them went down there and
looked around and I reckon that is where he got
it.

Q    Amber is your granddaughter?  Right?

A    Right.

Q    You love her, don't you?

A    Yes.

Q    When Clyde or Beth asked you about whether they
would tell the truth, do you remember that
question?

A    Beth ain't asked me anything.

Q    Clyde Hornsby?

A    Right.

Q    Did you tell Clyde Hornsby that either Amber or
     Amanda would not tell the truth, they would
     tell stories?  You didn't, did you?

A    No.  I didn't tell them that.

Q    In fact, you described them, as you described,
     as mouthy, didn't you?

A    Well, they are.

Q    You love Amber with all your heart?  Right?

A    Right.

Q    You care about her welfare?  Right?

A    Sure.

Q    Want to make sure that nothing happens to her?

A    You better believe it.

Q    You want her to grow up safe and secure?  Is that
     right?

A    Right.

Q    Now, you spanked her, didn't you?

A    Yes, I spanked her.

Q    You spanked her because she wouldn't dance for
     your wife?

A    No.  No.  That is not correct.

Q    Did you leave a mark on her?  That is true, isn't
     it?

A    I didn't pay no attention to it.

Q    You didn't pay any attention to the mark, but my question to you, Mr. Money, is after you spanked your granddaughter that time, she cried, didn't she?

A    I don't remember if she cried or not.

Q    Do you remember when her mother came home and her mother came to discuss with you about you hitting or striking her daughter?  You remember that, don't you?

A    Well, if she ever mentioned anything about striking her daughter, I don't remember it.

Q    Now, I want you to tell the Ladies and Gentlemen of the Jury that you said you needed some courage? Is that correct?  That is what you had the magazine for, courage?

A    Yeah.

Q    Your wife told you to burn them and get rid of all of them, didn't she?

A    Yeah.

Q    Is it your testimony, under oath, at this time, you are having a normal sexual relationship, weekly, every two weeks with your wife?  Is that what you are telling this Jury during this time?

A    No, sir.  I don't.

Q    Would you agree that you are in better physical
     condition than your wife?

A    Well, health wise.

Q    Yes, sir.  Health wise.

A    I really don't know what her health is, nor mine
     either.

Q    Now, she has lived with you for fifty-two years?
     Is that right?

A    I haven't had a checkup in several years.

Q    I want you to tell — — —

A    I don't know what is wrong with me and what is
     not.

Q    Yes, sir.  But, your wife, would you say you don't
     know what her health is, either?

A    Really and truly, I don't.  She goes to the doctor
     every month — — —

Q    Does she have a poor memory?  She doesn't, does
     she?

A    What?

Q    Does she have a poor memory?

A    Well, it is pretty good.

Q    Now, I want you to tell the Ladies and Gentlemen
     of the Jury, the movie, Screwballs, you watched
     it?  Is that right?

A    Yeah.  I watched it.

Q    And, when you were testifying earlier this week,
     you said when the movie came on, Mr. Ramsey asked
     you why you would let your little granddaughter,
     who was seven years old, watch a movie like that?
     Do you remember that question?

A    No.

Q    Do you remember what your answer was?

A    (No response.)

Q    Do you remember what you said — — —

A    He never asked me that question.

Q    Why did you let your granddaughter watch that
     movie?

A    It wasn't no bad movie, I didn't think.

Q    Are you telling the Ladies and Gentlemen of the
     Jury there is nothing sexually explicit about that
     movie for a seven year old?

A    It was not an X rated movie.

Q    Well, is it only if it is X rated that you don't
     want your granddaughter to see it?

A    If it had been X rated, I wouldn't have showed it.

Q    Are there women in there without their clothes on?

A    Yes.

Q    Are there people in that movie showing that they
     are having sexual intercourse?  Yes or no?

A    I didn't see it.

Q    Is there a young girl that sits on a bed with a
     teddy bear and hunches it on her vagina area, is
     that on that movie?

A    I don't remember.

Q    Does the movie start off with two girls standing
     between a giant hot dog while it bumps them in the
     buttocks and they make remarks?  Do you remember
     that?

A    No.

Q    Does the movie show a man and a woman on a bed
     having sexual intercourse and making animal sounds,
     going meow?  Do you remember that?

A    No.  I don't.  In fact, I don't care that much
     about remembering things that is on a movie.

Q    You watched the whole movie with her though,
     didn't you?

A    I watched it and it went out.  That was it.

Q    The one time - - - go ahead.  I don't want to
     interrupt you.

A    When I watch it like that, it is out and I don't
     have nothing else to think about it.  Ain't nothing
     but something to look at and then forget.

Q    Did you rent Girls From Starship Venus?  You did,
     didn't you?

A    I don't know.

Q    Well, let me show you if this is your signature.
     If you need your glasses, put them on.  Is that
     your signature?  (Produces a document for
     examination.)

A    (Witnes studies the document in question as
     requested.)  Yeah.

Q    Romeo and Julia?  Is that your signature, B. C.
     Money?

A    Yeah.

Q    Made To Order, B. C. Money?

A    Hu-huh.  (Negative response.)

Q    That is not your signature?

A    No.

Q    Sex Appeal.  B. C. Money?

A    No.  That one is mine.

Q    Blaze is yours?

A    Yeah.  That is my signature.

Q    Playboy Video Centerfield.

A    Yeah.

Q    B. C. Money?

A    Yeah.

Q    Screwballs is yours, correct?

A    Yes, sir.

Q    Loose Screws?

A    No.

Q    Truck Stop?  That is yours, isn't it?

A    That is mine?  No.

Q    The Hit List is not yours?

A    No.

Q    Dream Babies?  Is that yours?

A    Yeah.

Q    Joe Kid?

A    Where is the signature?

Q    Okay.  How about Intimate Strangers?  Is that
     yours?

A    I don't see it.

Q    What about right here, Intimate Strangers, B. C.
     Money.  That is yours, isn't it?

A    That is mine.

Q    You said there was no sex in your statement to
     Clyde on Screwballs?  Is that correct?

A    Not to my remembrance, it was not.

Q    Okay.


          MR. VALESKA:  Judge, I want to play some of
             the movie, with the Court's permission.
             It has been entered as a Defense Exhibit.
          MR. RAMSEY:  Judge, I would object to playing
             any portion.  If he wants to play the
             whole tape, then let him show the whole

tape.

MR. VALESKA:  This is Cross.  I have the
right to show him the sexual parts and I
want to ask questions.

THE COURT:  I will allow it to the extent that
Mr. Valeska asked questions about portions
of the tape.

MR. VALESKA:  I am going to show three.

THE COURT:  Which Mr. Money denied seeing.
So, those portions would be relevant.

MR. RAMSEY:  For the Record, I object on the
grounds − − −

THE WITNESS:  I didn't deny seeing it, I said
I don't − − −

THE COURT:  Mr. Money − − −

MR. RAMSEY:  Wait a minute, B. C.

THE COURT:  Look;  I can't hear two or three
people at the same time.  You will not
speak in this Court until you are asked
a question.  Do you understand me?

THE DEFENDANT:  Okay.

THE COURT:  Okay.

MR. RAMSEY:  Judge, for the Record, I would
object to showing a portion of the
grounds that it is inflammatory to the

Jury.  It has been entered in evidence and if the Jury wants to view it, then they can view whatever or the whole portion that they want to in the Jury Room.  But, to show a portion that Mr. Valeska talked about which he knows are possibly the highly inflammatory portions of the tape.  I feel like it is improper.

THE COURT:  I think he has the right to show those portions he has denied seeing as a matter of testing his credibility in this trial.  And, I overrule you.

BY MR. VALESKA:

Q    I want to refer you specifically to page eleven when they talked to you about the movie.  Clyde says:  (Reading from the statement in question.)

What was she doing in the movie?

You said:

They wasn't having sex.  No.

That was your response, wasn't it?

A    Well, I reckon so.

Q    That is what it says, isn't it, Mr. Money?

A     That is what he wrote down there, somebody did.

                THE COURT:  Now, I will say this, also.  Mr.
                    Valeska can play portions and — — —
                MR. VALESKA:  They can watch it all.
                THE COURT:   — — — if the Jury wants to see
                    the whole thing, they are welcome to
                    see it in the Deliberation Room.  It is
                    a matter of evidence.
                MR. VALESKA:  We will be glad for them to
                    watch it.
                THE COURT:  Go ahead.

                            (Thereupon, the TV and VCR
                            were set up by the District
                            Attorney and the following
                            proceedings were had,
                            to—wit:)


BY MR. VALESKA:


Q     Can you see it from there, Mr. Money?
A     Yeah.
Q     You don't need your glasses on?
A     I couldn't see it with my glasses on, if I was

to put them on.

> (Thereupon, the VCR tape,
> Screwballs, was played in
> open Court.  During the
> playing of said tape, a
> Juror asked for a break
> and the following proceedings
> were had, to-wit:)

THE COURT:  Do you need to go to the
bathroom?

MR. VALESKA:  (Stops the tape.)

> (Thereupon, a Juror left
> the presence and hearing
> of the Court Room and
> returned shortly thereafter.
> After that, the following
> proceedings were had,
> to-wit:)

MR. VALESKA:  Just for the Record, I am
almost through with the video.  There
is not even a couple of minutes and I

will be finished.

THE COURT:   Okay.

(Thereupon, the remaining
portion of the video was
played in open Court.
After that, the following
proceedings were had,
to-wit:)

BY MR. VALESKA:

Q     Now, you watched the video, didn't you, Mr. Money?

A     Yes.

Q     Now, could you tell the Ladies and Gentlemen of
      the Jury if the girl lying on the bed with the
      teddy bear, what was she doing with the teddy bear?

A     I didn't see no teddy bear.

Q     Just like you didn't rape Amber or Amanda?
      Correct?

A     I didn't see no teddy bear on there.

Q     What was the boy and the woman doing the meowing,
      what were they doing on the bed?  Can you tell the
      Jury?

A     Well, I didn't see anything, but just a man and a

woman.

Q    Now, you were married, did you have any daughters?

A    Yeah.  I have a daughter.

Q    What is your daughter's name?

A    Ruby.

Q    Ruby Money Robertson?  Is that correct?

A    Right.

Q    And, you would agree that she would know your
general reputation in the community for truth and
veracity, would she not?

A    (No response.)

Q    Would you say that is fair, she would know what
your reputation is in the community for truth and
veracity?  Yes or no?

A    I doubt it.

Q    Would you let Ruby, at six or seven years old,
watch the movie Screwballs, your own daughter?

A    Well, at six years old, she would not know about
what they were trying to do.

Q    But, you told this Jury that Amber knew all about
sex, didn't you?

A    Well, whenever I started the film off and it
showed that naked woman, my wife said:

         B. C., turn that off.

And, Amber said:

           Oh, granny, I have seen worse than that.

Q    Yes, sir.  That is what I want to ask you.

A    Yes, sir.

Q    You didn't have Amber leave then, did you?

A    No, I didn't.

Q    You let her watch that movie just as – – –

A    Watched it all the way through.

Q    You told the Jury under oath that she talked
about having sex with juveniles?  Yes or no?

A    Yes, sir.

Q    You didn't tell her mother, did you?

A    No, I didn't.

Q    You didn't tell your own flesh and blood, your
own son, about his daughter, did you, not one
time?

A    No.  I didn't tell him.  I told her to tell him.

Q    Is it not – – – who was the adult, you or her?

A    I was the adult.

Q    Who was the person responsible for her welfare
and being when you had custody of her?  You were,
correct?  True?

A    I didn't have custody of her.

Q    When she was in your custody, baby sitting, watching
her when she came home from school, when you took
her out there to the dog pen and rode with her and

did things with her, when you watched that movie,

who had custody of her right then and there,

watching out for her welfare?  You did, didn't you,

Mr. Money?

A    Yeah.

Q    When her parents came to pick her up, her mother

or your own son, Comer Money, not one time,

looking after the welfare of your own granddaughter,

did you tell the parents that you need to talk

to your daughter about these things, did you?

A    No.

Q    When you said to Clyde that she used the term cum,

C—U—M, you never discussed that with her parents,

did you?

A    No, I did not.

Q    You heard cum on there, on the movie, didn't you?

A    Yeah.

Q    Aren't you the one that told her about that, Mr.

Money?

A    I didn't tell her.

Q    Did you tell her — — —

A    No, sir.  I asked her.

Q    Can you tell the Ladies and Gentlemen of the Jury

when she pulled down her pants, like you said that

day out there at the dog pen or the hog pen, she

pulled her pants down and when you saw her mother
walk up that very day, you didn't say:

> Your daughter pulled her pants down. You
> need to talk with her.

You didn't, did you?

A   She didn't pull her pants down.

Q   Mr. Money, you told Clyde Hornsby that when she
was standing, she pulled her pants down. I didn't
say her panties, I said her pants.

A   She was standing up on the tail gate of my truck,
jumping up and down and had her hands – – –

Q   And pulled her shorts down?

A   No. She just pulled the outside pants down as
she jumped up and come down. Yes, sir. I told
him that.

Q   Now, you have never had a problem with Pat before
you got arrested, have you?

A   Do what?

Q   Before you got arrested, you never had a problem
with Pat?

A   No.

Q   You didn't have a problem with your son, did you?

A   Yes, sir.

Q   Well, let's talk about that fight. You hit him
with a cane, didn't you?

A       Yes, sir.

Q       You split his skull open, didn't you?

A       No.

Q       Shot at him, didn't you?

A       I split the hide on his head.

Q       You shot at him, too, didn't you?

A       Yeah.  I shot at him.

Q       My question is to you, he didn't get a warrant for
        you, did he?

A       I was in my house and he was, too.  And, he brought
        a gun with him.

Q       Did you get a warrant for him, Mr. Money, for him
        trying to hurt you?  You didn't, did you?

A       No, I didn't.

Q       In fact, after that episode, he still came to your
        house to see you and visit?  Is that correct?

A       Yeah.  He come down and begged me to forgive him
        for what he done.  Yes, sir.

Q       And, my question to you is his wife and your
        granddaughter, his daughter, came and still stayed
        with you after that, didn't they?  Correct?

A       The granddaughter did.

Q       Came to visit?  Is that right?

A       Yeah.  I was in the right.  I had a right to
        protect my house.

Q    You were in the right when you wouldn't tell her

     parents, Amber, about what you say she was doing?

     Were you in the right then and not looking out

     for - - -

A    I told Amber to tell them.  And, I promised Amber

     that I wouldn't tell if she told me what she did.

     She asked me not to tell.

Q    How many months did this go on that she did these

     things and talked with you about this?

A    Oh, not many.

Q    One month, two months?  Just one time, Mr. Money?

     It was more than one?  Right?

A    No.  Twice.  Twice she - - -

Q    She asked you about you and granny having sex?

A    Right.  That was the same.

Q    You didn't tell her mother about that?

A    No.

Q    You have never had a problem with Amanda Hadden

     before, have you?

A    No.

Q    In fact, she is related to you by blood?  Correct?

A    Right.

Q    Never had a problem with her parents, have you?

A    No.

Q    Now, let's talk about Amanda.  She has never come

       to you and discussed anything sexual with you, has she?

A    No.

Q    Would you agree the day that you went down to the hog barn or shed, they were both wearing shorts that day?  That would be true?

A    Oh, they had on shorts.

Q    Yes, sir.  Would you agree when you came out of the barn, you were sweating and tired?

A    Yes, sir.  I was.  That is right.

Q    And, you would agree that Amber's mother, Pat, at one point, came and was looking for y'all?  Is that right?

A    She come and hollered.

Q    Would you agree that you got in your truck and the girls were already in the back of the truck and you went back to the house?  Is that true?

A    No.  No.

Q    What kind of ad did you need for courage?  What kind of ad were you using?  Tell us.

A    (No response.)

Q    What kind of ad in those magazines?  Tell me.

A    I was looking − − − I found an ad in there to build my courage, if you know what I mean?

Q    I want you to tell me what I mean.

A       Get up a hard.

Q       Get up a hard for who, two little girls?

A       For me.

Q       For you?

A       For me.

Q       And, your wife?

A       My wife and I — — —

Q       Why would you have to get up a hard, Mr. Money,
        if you were not having a relationship sexually
        with your wife, what was the hard for?  Was it for
        Amanda and Amber?

A       I hadn't had one for Amber and Amanda.  I didn't
        even have one for my wife.

Q       Yes, sir.  And, you were seventy-two or seventy-three,
        at that time?

A       That is right.

Q       Let's look at the magazines.  Swank.  That is one
        of them, isn't it?

A       I don't know.

Q       Take a look at it.  That is your magazine.

A       No, it ain't.

Q       Mr. Money, do you want to look these Jurors in the
        face and tell them these two magazines, with people
        having sexual intercourse, licking people's private
        parts and doing sex were not your magazines?

A    No, sir.  They are not my magazines.  They were

     found in my house, but they weren't brought in

     there by me.

Q    They were found in your house?

A    Right.

Q    Would you agree that one of the articles says:

          Blow job school for wives.

     Is that what it says?  Sex acts?  Correct?

A    I didn't read all that.

Q    Did you look through the pictures?

A    I looked through the ads, is what I looked through.

Q    Okay.  Look this Jury in the face and tell them,

     Mr. Money, these were not your magazines.

A    They was not my magazines.

Q    Who owned them at the time, when you say Amanda

     and Amber saw them?  Who owned them?

A    I did.  They was in my tool box.

Q    You had already gotten rid of your grandson's

     and burned all except you kept these two?

A    Kept them two.

Q    You kept them in this red tool box?

A    Right.

Q    And, you kept the key?  Right?

A    Right.

Q    When did you place them in there?

A       When I burned the others.

Q       When was that?

A       I don't know.

Q       Give me a guess, your best judgement.

A       It wasn't but a day or two after my wife told me
        to get them out of there.  I don't know what day.

Q       Do you want to look through here and show me in
        either magazine your courage ad, which one you
        used?

A       I didn't use nary one.  I said I found some in
        there that I might want to use.

Q       You didn't order anything?

A       No, I did not.

Q       Okay.  And, you admit that you kept them in the
        red box for many months?

A       Not many months, several months.

Q       And, you go out and look at them?  Right?

A       Once in a while.

Q       Was this one of the ads:

                Add three inches to your penis.

        Is the one that you wanted?

A       No.  No.

Q       How many times did you go out and look at them?

A       I didn't need that.

Q       How many times did you go out and look at them in

the box?

A I don't know.  There wasn't nobody with me when I went out there and looked at them.

Q You didn't want anybody to see you with these? Right?

A That is right.

Q Because you knew that they were nasty magazines? Correct?

A That is the reason I had them in the tool box and had it locked.

Q But, you let two little girls go out there that were six and seven years old, you unlocked that tool box to get a dog collar out knowing those little girls were out there by you?  Right?

A No.  They come up, one come up on the right side of me when I went down to unlock the tool box. The other one was on the left.  When I raised up, the tool box lid, well the one on the left, which was Amber, she caught the chain that held the tool box lid from going back and give it a jerk and it come across my head there.  She went around to the other side where Amanda was and got the one magazine.

Q One magazine?

A Right.

Q    Now, you would agree that the tool box is kind of
     deep?  That red box?  Correct?

A    It is.  Yeah.

Q    How tall would you say it was?

A    About twenty-four inches.

Q    At least longer than the arm length of a seven
     year old girl?

A    Yeah.  It is deeper than that.

Q    Deeper than an arm?

A    Yeah.

Q    You unlocked the box and opened it up?

A    Right.

Q    There was a tray on the top of it, wasn't there?

A    No.

Q    No tray?

A    One right at the end, about that wide, but it was
     stationary.

Q    That helped block what is on the bottom underneath
     the box, wouldn't it?  Would you say that is fair?
     There is a tray on the top and you open it up — — —

A    Amanda was standing on my right.

Q    Yes, sir.

A    She did not see the magazine.  Amber was on my
     left and the magazine was kindly under that tray
     on the right side and she saw it from that side.

Q     Okay.

A     But, she knew what it was where she had seen them before.

Q     That is what you say?  Right?

A     You right.

Q     My question is to you, there is a box with a chain on it and you say that she pulled the chain and hit you on the head with it?  Is that right?

A     When she went around behind me to get to the magazine, she pulled that chain.

Q     And, it went down, didn't it?

A     The lid come down.

Q     Hit you in the head, didn't it?

A     Right.

Q     Then when it hit you on the head, the box closed, didn't it?

A     No, it didn't.

Q     The box stayed open, this big heavy box hit you on the head and didn't go back down when she pulled the chain?

A     That is right.  Because I was – – –

Q     Isn't what really happened, Mr. Money, is – – –

A     I was up over the box, getting a dog collar out when that box come over and hit me.  That lid come over and hit me on the head.

Q    Did it bounce back up when it hit you on the head
     and lock?  Can you tell me that?

A    No.  It didn't bounce up and come back and lock.

Q    It went back down?

A    No.  I held it until I got the collar out and then
     I took the magazine away from the child.  They had
     it on the tail gate of my truck.

Q    Okay.

A    I asked them to bring it to me and they didn't do
     it.  And, I had to go and take it away from them,
     bring it back and put it in the box.

Q    Would you agree that this picture right here, two
     women and one man doing sexual acts, would you want
     your daughter, at seven years old, to look at
     these?

A    No, I wouldn't.

Q    And, would you agree that if your father and your
     grandfather knew about that, you would want him to
     tell you if your little seven year old Ruby was
     looking at these so you could talk with her?  You
     would agree that is fair, wouldn't you, Mr. Money?
     Yes or no?

A    Well, after he seen her, after if he seen her with
     it, there wasn't nothing he could do.  Wouldn't
     have been nothing I could have done, because she

had done seen it.

Q     You said on the tape that she said that she had
      seen worse than that?  Correct?

A     Right.  She did say that she had seen worse than
      that.

Q     Did you discuss with her, right then and there,
      what was worse than that?  You didn't, did you?


              MR. RAMSEY:  Judge, we have already been
                  through this.

              MR. VALESKA:  I asked what was discussed at
                  that point.

              THE COURT:  Overruled.


BY MR. VALESKA:


Q     Did you discuss what she had seen that was worse
      than that?

A     No.  I didn't discuss it.  If she had already seen
      it, there is nothing for me to discuss with her.

Q     Did you tell your own wife about the magazines out
      at the hog barn?  You didn't, did you?

A     No.  I had them locked up.  You know, there was
      no need to tell her.

Q     You didn't want your wife to know you still had

them and that is why you didn't tell her?  Right?

A    Really and truly, I didn't want her to know I was
     going to order anything to help me.

Q    Yes, sir.  But, my question was to you, you didn't
     tell your own wife that your own granddaughter saw
     those Swank Magazines with that sex stuff in them
     that day, did you?

A    No.

Q    You didn't, did you?

A    No, I didn't.

Q    Can you tell the Ladies and Gentlemen of the Jury,
     the last question I have for you, Mr. Money;  when
     you saw your granddaughter Amber, as well as
     Amanda, have the chance to look at those magazines
     again, again that day, after you locked them back
     in the box, you still didn't destroy or burn them
     to get rid of those magazines, did you?

A    They never did see them no more.

Q    That is not the question.  After two little seven
     year old girls looked at them again and saw those
     nasty pictures and you an adult, you still didn't
     destroy them or get rid of them, did you?  You
     locked them back in the box?

A    I locked them in my box.  Yes, sir.  I did.

MR. VALESKA:  That is all.

THE COURT:  Okay.  Mr. Ramsey.


REDIRECT EXAMINATION


BY MR. RAMSEY:


Q    B. C., why did you spank Amber on the time we have
     been talking about?

A    Why did — — —

Q    Why did you have to spank Amber?  You heard Amber
     tell us that you spanked her because she wouldn't
     dance for her grandmother.  Is that right?

A    That was just a tale.

Q    Why did you spank her?

A    She was getting up on the stool to the counter,
     me telling her to stay down.  My wife was fixing
     dinner.

Q    And, you spanked her because she kept climbing up
     on the stool?

A    Right.  Right.


        MR. RAMSEY:  That is all.

        THE COURT:  Anything else.

<u>RECROSS EXAMINATION</u>

BY MR. VALESKA:


Q    Did you save those two magazines to show them two

     girls for another day?  Is that what you did?

A    Man, are you crazy?  No.


          MR. VALESKA:  No more questions, Your Honor.

          THE COURT:  Anything else?

          MR. RAMSEY:  No, sir.

          THE COURT:  Okay.  You may step down.  Mr.

             Money, you may step down.

          THE DEFENDANT:  Okay.

                    (Witness excused.)


          THE COURT:  Anything else?

          MR. RAMSEY:  I don't think so, but let me

             make sure.

          THE COURT:  Okay.


                         (Thereupon, an off the

                         Record discussion was held

                         between the Defendant and

                         his Attorney of record, the

Honorable Richard H. Ramsey,
IV.  After that, the
following proceedings were
had, to—wit:)

MR. RAMSEY:  No, sir.  The Defendant rests,
Your Honor.


DEFENDANT RESTS


MR. VALESKA:  I have a rebuttal witness,
Ruby Money Robertson.

MR. RAMSEY:  Your Honor, it is my understanding
that this witness has been in the Court
Room all the first two days.  She has
heard all the testimony that has been
presented and now Mr. Valeska wants to
call her to the Witness Stand.

THE COURT:  Okay.  Is that true or not?

MR. VALESKA:  I can't tell you, I have surely
not been watching the — — —

MR. RAMSEY:  My client informed me, judge.
I don't know.

THE COURT:  Well, I know who has been in
here.  Where is she?

MR. VALESKA:  She is coming.

THE COURT:  Well, I can tell.

MR. VALESKA:  I can also point out that when
they put on their character witnesses,
he had been in the Court Room and
testified about character.  I let that
go.  All she is going to testify to is
about character, not facts at the
trial.  That is still within your
discretion, whether you allow her, if
she was in or not, and I am not saying
she was.  I can't answer that.

THE COURT:  Again, I am not sure if character
is the only reason for the testimony
and no other questions that would be,
probably permissible.  Let me see her.
I am not sure who she is.

MR. VALESKA:  Here she comes.

THE COURT:  This is who, now?

MR. VALESKA:  Ruby Money Robertson, his
daughter.

THE COURT:  Okay.

MR. VALESKA:  One of my witnesses told me
that she did come in the Court Room
for a short time and went right back out,

                    judge.

THE COURT:  Yes.  She was in here, they were

          sitting right back over there with a

          blond headed lady.

MRS. ROBERTSON:  Yes, sir.

THE COURT:  Who was the blond headed lady?

MRS. ROBERTSON:  A friend of mine.

THE COURT:  I believe a gentleman was sitting

          next to her.  Is that correct?

MRS. ROBERTSON:  I don't remember.

THE COURT:  I do remember her being in the

          Court Room for a short period of time.

          I am not sure how long.

MRS. ROBERTSON:  I was up here when Mr.

          Hornsby was on the stand.

THE COURT:  You were not even here - - - how

          many days have we been doing this?

MR. VALESKA:  Judge, I will make a preoffer

          on the two questions I wish to ask her.

THE COURT:  At the first of the trial, I don't

          think you were here.

MRS. ROBERTSON:  No, sir.

THE COURT:  All right.

MR. VALESKA:  Judge, the questions I would

          ask her is, after I qualify her as to

who she is, does she know B. C. Money,
Sr.'s general reputation for truth and
veracity in the community.  If she does,
is it good or bad.  Then, I will ask her
would she believe B. C. Money, Sr.,
under oath.  Then the last question is
does she know Amber Money and would she
believe Amber Money, under oath.  That
is not any facts, but general character
that they have already interjected.
That would be the limited purpose for
Rebuttal on her.

THE COURT:  Let me ask you this.  When you
were in the Court Room, who was
testifying, if you know?

MRS. ROBERTSON:  Mr. Hornsby.

THE COURT:  Okay.  And, would the fact that
you heard Mr. Hornsby testify as to
facts in this particular trial, affect
whether or not you could answer the
questions of whether or not you know
the general reputation of B. C. Money
in the community for truth and veracity?

MRS. ROBERTSON:  No.

THE COURT:  Or, the other two questions that

the District Attorney proposed to use, does that matter what you heard Mr. Hornsby, the Investigator in this case, say?

MRS. ROBERTSON:  Really, all I heard him say was something about some shingles.

THE COURT:  All right.  Go ahead.


STATE'S REBUTTAL EVIDENCE

Thereupon,


RUBY MONEY ROBERTSON

was called as a witness in behalf of the State of Alabama, and after having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth, took the stand and testified as follows, to-wit:


DIRECT EXAMINATION


BY MR. VALESKA:


Q    For the Record, tell the Jury your name please, ma'am.

A    Ruby Robertson.

Q    B. C. Money, Sr., are you related to him?

A    Yes, sir.

Q    How are you related to him?

A    He is my father.

Q    Do you see him in the Court Room?

A    Yes.

Q    What color of coat does he have on?

A    Brown.  (Witness indicating toward the Defendant.)


        MR. VALESKA:  Let the Record reflect that she

            has indicated the Defendant.


BY MR. VALESKA:


Q    I don't want to be personal, but how old are you,

     ma'am?

A    Forty-four.

Q    Of the forty-three or forty-four years of your

     lifetime, have you come to know the general

     reputation for B. C. Money, Sr., your father,

     in the community where you live and he lives as

     for truth and veracity?  That is a yes or no.

A    Truth?  No, sir.

Q    Okay.  Would you believe him under oath, if he

     testified?

A    No, sir.

Q    Now, are you related in any fashion to Amber Money?

A    She is my niece.

Q    Yes, ma'am.  Would you tell the Ladies and Gentlemen

of the Jury her general reputation in the community

for truth and veracity?  Is it good or bad?

A    Very good.

Q    Would you believe her under oath, if she testified?

A    Yes, sir.


          MR. VALESKA:  That is all I have.  Pass the

               witness.

          MR. RAMSEY:  We have no questions.

          MR. VALESKA:  She can step down.

          MR. RAMSEY:  Your Honor, if I might - - -


                    (Thereupon, an off the

                    Record discussion was held

                    between the Defendant and

                    his Attorney of Record,

                    the Honorable Richard H.

                    Ramsey, IV.  After that,

                    the following proceedings

                    were had, to-wit:)


          MR. RAMSEY:  No, sir.  We don't have anything.

THE COURT:  You may step down.

(Witness  excused.)


MR. VALESKA:  The State rests.

### STATE RESTS


THE COURT:  Anything for the Defendant?

MR. RAMSEY:  No, sir.


### TESTIMONY CONCLUDED


THE COURT:  Okay.  Let's take a five or ten
minute break.  Ladies and Gentlemen, you
are excused for five or ten minutes.
Thank you.

(Thereupon, a recess was
called and taken by all
parties.  Upon completion
of said recess, all parties
returned to the presence
and hearing of the Court
Room and the following
proceedings were held out

of the presence and hearing

of the Trial Jury, to—wit:)

THE COURT:  Okay.  You can bring them in.

(Thereupon, the Trial Jury

was returned to their places

in the Jury Box and the

following proceedings were

held in the presence and

hearing of said Trial Jury,

to—wit:)

THE COURT:  Okay.  Mr. Valeska, you may state

your case to the Jury.

MR. VALESKA:  Thank you.  (States the State's

Closing Argument to the Jury.)

THE COURT:  Okay.  Mr. Ramsey.

MR. RAMSEY:  Thank you, judge.  (States the

Defendant's Closing Argument to the Jury.)

THE COURT:  Thank you, Mr. Ramsey.  Mr.

Valeska.

MR. VALESKA:  (States the State's final

Closing Argument to the Jury.)

THE COURT:  Okay.  Gentlemen, do y'all need a

break or do you want me to charge?

MR. VALESKA:  I will do what the Jury wants.

MR. RAMSEY:  I am ready.

THE COURT:  Okay.  Ladies and Gentlemen, you
have heard the conclusion of the Closing
Arguments and now is the time where the
Court charges you on the law in the case.
I will give the general instructions I
give in most cases and will be specific
in giving the law in each particular
Indictment and what the evidence is that
you need to look for.  I won't read the
Indictments to you again, but there are
four charges of Rape, First Degree and
two charges of Sexual Abuse in the First
Degree and we will go over that in just
a minute.  Now, the Indictment in this
case is not evidence and I think I
explained that to you before in this
case.  And, the fact that the Defendant
is charged with the offenses by these
Indictments, and I have read those
Indictments to you, is not to be
considered by you, the Jury, as a
circumstance against the Defendant.  But,

the Indictment is merely a formal method
by which the charges are brought when
the Defendant is placed on trial.  The
Defendant has entered pleas of not
guilty to each of these charges and he
is simply saying to you that he is simply
not guilty of the charges found in the
Indictments.  Now, the Defendant, as I
told you before, is presumed to be
innocent until he is proven guilty,
beyond a reasonable doubt, by the
evidence in this case.  He comes into
Court clothed with this presumption and
this presumption follows him throughout
the proceedings of this trial until the
evidence produced by the State convinces
each of you beyond a reasonable doubt of
his guilt.  The presumption of innocence
is to be regarded by you, the Jury, as
a matter of evidence to which the
accused is entitled.  In the Defendant's
case and in all cases where the
Defendant pleads not guilty, the burden
is on the State to convince each member
of the Jury, beyond a reasonable doubt,

as to the truth of the material
allegations contained in the Indictment.
Reasonable doubt.  It is a doubt which
would justify an acquittal and it must
be a doubt for which you have a reason,
arising from the evidence or any part
thereof, or any lack of evidence, and
remaining after a careful consideration
of the testimony such as reasonable,
fair-minded and conscientious men and
women would entertain under all of the
circumstances.  The State is not
required to prove guilt beyond all doubt,
but beyond reasonable doubt.  If there
is a conflict in inferences that may be
drawn from the evidence or some fact in
the case, the Jury should draw an
inference consistent with the innocence
of the Defendant.  You base your
decision only on the evidence submitted
in the Court Room.  Not everything you
saw or heard in the Court Room is
evidence.  Testimony, writings, objects,
and other things presented during a
trial are evidence.  Statements made

by the lawyers are not evidence and should not be used as evidence in this trial. Once the evidence is admitted, only the Jury can determine two essential things about it. First, whether or not it should be believed. And second, how important it is. You should make these two decisions about each part of the evidence by using your own common sense as reasonable men and women. You should not imagine things that cannot be proved by the evidence submitted in the trial. You must consider all the evidence submitted in the trial by bias, prejudice, or sympathy to each side and you must be equally just to both sides and your verdict must not be based on suspicion, conjecture or speculation. You are the sole judges of the evidence in this case and the credibility of the witnesses. You may accept or reject any part of the testimony you consider worthy of belief. In determining the weight to be accorded the testimony of any witness, you may

consider the demeanor of the witness on the Witness Stand, his or her apparent candor or evasion or the existence or nonexistence of any bias or interest in the case. You may take into consideration any matter you would consider in your own every day affairs in passing upon the truthfulness and the accuracy of the testimony in this case. You should weigh the testimony in the light of your common observation and every day experiences and reach a verdict based upon the truth, as you determine it, from all of the evidence in this case. It is your duty, as Jurors, to follow the law as stated to you by the Court. Now, the guilt of the Defendant may be proved by circumstantial evidence as well as by direct evidence or by a combination of both types of evidence. Circumstantial evidence means it is not any direct, positive eye witness evidence of any person who saw the commission of a crime. But, it is the events that happen and the circumstances surrounding

it. And, when the State relies on
circumstantial evidence, either in whole
or in part to convict a party charged
with the commission of the crime, the
degree of proof must be the same. This
does not mean, however, because the
testimony is circumstantial, that you
should disregard it and not consider it
because it is circumstantial. But, it
does mean you must be satisfied, beyond
a reasonable doubt, as to the guilt of
the party on trial regardless of what
kind of evidence is relied upon by the
State to establish the guilt of the
Defendant in this case. If you believe
that any witness has testified willfully
and falsely about any material matter
in this case, you may completely
disregard the testimony of that witness
and refuse to believe anything he or
she has told you. Or, you could take
what you believe to be the truthful
part of the testimony and give it what
credit and weight you feel it should
have. Or, you can disregard the testimony

that you find to be willfully false in
this case.  Now, in this particular case,
the Defendant has taken the Witness
Stand in his own behalf.  The law gives
him that right and that priviledge.
When he does so testify, you would not
be justified in rejecting his testimony
and setting it aside and saying you will
not believe it because he is the
Defendant and is interested in the result
of your verdict.  But, when you weigh
and consider his testimony, you can take
into consideration the fact that he is
interested in the result of your verdict
and you can give to his testimony such
weight and credit as you deem it
entitled to.  Now, those are the general
instructions in the case that you need
to pay attention to.  They are
instructions given in almost every case
and at this time, the Court will
actually instruct you as to the law in
the case.  In CC94—1065, the Indictment
reads B. C. Money, Sr., whose name is
otherwise unknown to the Grand Jury, a

male, did engage in sexual intercourse with Amber Celest Money, a female, by forcible compulsion in violation of Title 13A-6-61 of the Code of Alabama, against the peace and dignity of the State of Alabama.  There are three similar indictments and I won't read them all to you.  I have read them to you before, but there are three Rape First Degree Indictments in this case involving Amber Celest Money.  Each of those has the same wording that I read to you previously.  Then we have one Rape, First Degree in this particular case, this particular Indictment in Case Number CC94-069 that says:  The Grand Jury of said county charged, before the finding of this Indictment, B. C. Money, Sr., whose name is otherwise unknown to the Grand Jury, a male, did engage in sexual intercourse with Amanda Hadden, a female, by forcible compulsion in violation of 13A-6-61 of the Code of Alabama, against the peace and dignity of the State of

Alabama.  So, we have three Indictments
alleging B. C. Money, Sr., a male, did
engage in sexual intercourse with
Amber Celest Money, a female, by forcible
compulsion.  And, we have one Indictment
stating the same thing, that B. C. Money,
Sr., a male, engaged in sexual intercourse
with Amanda Hadden, a female, by forcible
compulsion.  So, let me define the law
as far as what is Rape in the First
Degree is concerned.  Each of those
Indictments, except for the name change
in one, have the same elements.  That
is B. C. Money, a male, did engage in
sexual intercourse with the victim, a
female, by forcible compulsion.  This
is what the law says, as far as Rape in
the First Degree:  A male commits the
crime of Rape in the First Degree, if he
engages in sexual intercourse with a
female and does so by forcible compulsion.
To convict, the State must prove, beyond
a reasonable doubt, each of the
following elements of Rape in the First
Degree.  Number one, that the Defendant

in this case, B. C. Money, Sr., a male,
engaged in sexual intercourse with, in
three Indictments with Amber Money and
one Indictment with Amanda Hadden, a
female.  And, the Defendant did so by
forcible compulsion.  And, in number
three, the Defendant acted intentionally
and knowingly.  Now, sexual intercourse
has it's ordinary meaning and occurs
upon any penetration, however slight.
And, emission is not required under the
law of Alabama.  Forcible compulsion,
what does that mean?  It is the physical
force that overcomes earnest resistance
or it is a threat, expressed or implied,
that places a person in fear of death
or serious physical injury to himself
or another person.  If you find, from
the evidence, that the State proved
beyond a reasonable doubt each of the
following elements of Rape, First Degree
as charged in the Indictment, then you
should find the Defendant guilty of
Rape, First Degree.  If you feel like
the State failed to prove any of the

elements of the Indictments of Rape,
First Degree, beyond a reasonable doubt,
then you cannot find the Defendant
guilty of Rape, First Degree. Now, I
said the third element first, is that
B. C. Money, a male, engaged in sexual
intercourse with a female. Number two,
that he did so by forcible compulsion,
and we defined what that was. And
number three, he acted knowingly and
intentionally. Under the law,
knowingly and intentionally is defined
as follows: A person acts intentionally
with respect to a result or to conduct
when his or her purpose is to cause the
result or to engage in that conduct.
A person acts knowingly with respect
to conduct or to a circumstance when he
is aware that his or her conduct is of
that nature or that the circumstance
exists. Now, that is what Rape in the
First Degree is. Again, these terms,
if you do not understand these terms
after you have deliberated and you need
to ask the Court any questions, I will

be glad to come back in and we will go
over these again, also.  Two of these
Indictments are for Sexual Abuse in the
First Degree where the victim is less
than twelve years old.  In Case Number
CC94-70, the Grand Jury of said county
charged that B. C. Money, Sr., whose
name is otherwise unknown to the Grand
Jury, he being sixteen years of age or
older, did subject to sexual contact,
Amber Money, who is less than twelve
years of age, in violation of 13A-6-66
of the Code of Alabama against the
peace and dignity of the State of Alabama.
In the other Indictment in the case,
CC94-67, the same allegations are
alleged in this particular case, that
B. C. Money, Sr., a male, whose name is
otherwise to the Grand Jury unknown, a
male, did engage in sexual abuse with
Amber Celest Money, a female - - - excuse
me.  I am sorry.  In that particular
case, B. C. Money, Sr., whose name is
otherwise unknown to the Grand Jury, he
being sixteen years of age or older did

subject to sexual contact, Amanda Celest

Money – – – Mr. D. A. – – –

MR. VALESKA:  That is Amber.

THE COURT:  Come up here just a minute.

(Thereupon, an off the
Record discussion was held
between the Court and the
Attorneys of Record.  Upon
completion of said
discussion, the following
proceedings were had,
to–wit:)

THE COURT:  Okay.  In that particular case,
it is actually the same Indictment,
except in this particular case, Amber
Celest Money in one indictment she is
named that way and in the other Sexual
Abuse Case, it is just Amber Money.  The
Court tells you they are the same person.
It is just the middle name is used in
one Indictment.  The two Sexual Abuse
Cases, in the First Degree, in this
particular case, CC94–68 and CC94–70,

in which two allegations of B. C. Money, Sr., him being sixteen years of age or older did subject to sexual contact, Amber Celest Money in one Indictment and Amber Money in another Indictment, who is less than twelve years of age, in violation of 13A-6-66 of the Code of Alabama.  Now, what is Sexual Abuse in the First Degree?  How is that defined under the law of the State of Alabama? A person sixteen years of age or older commits the crime of Sexual Abuse, First Degree, if he subjects another person less than twelve years old to sexual contact.  To convict, the State must prove, beyond a reasonable doubt, each of the following elements of Sexual Abuse in the First Degree:  That the Defendant in this case, B. C. Money, Sr., subjected Amber Money in one Indictment and Amber Celest Money in the other Indictment to sexual contact.  And, that in this particular case, Amber Money and Amber Celest Money being the same in both Indictments, was less than

twelve years old, at that time. And,
the Defendant was sixteen years of age
or older at that time and that the
Defendant acted knowingly and
intentionally. What does sexual contact
mean? It means any touching of the
sexual or other intimate parts of a
person done for the purpose of
gratifying the sexual desire of either
party. If you find, from the evidence,
that the state proved beyond a reasonable
doubt each of the elements in those
particular two Indictments that I read
to you of Sexual Abuse, First Degree
as charged, then you should find the
Defendant guilty of Sexual Abuse in the
First Degree. If you find that the
State has failed to prove, beyond a
reasonable doubt, any one or more of
the elements of the offense of Sexual
Abuse, First Degree as charged, then
you should find the Defendant not
guilty of Sexual Abuse, First Degree.
Now, again, I gave you the elements
that it must be knowingly and

intentionally and it is the same
definition I gave you under Rape,
First Degree and I won't give you that
particular instruction again.  I have
prepared verdict forms for you;  there
are actually, in this case, ten verdict
forms.  In each case there will be
three Rape Cases and there is a verdict
form in each case that you can find
the Defendant guilty or not guilty.
There are verdict forms for the two
Sexual Abuse in the First Degree cases,
I am sorry, there are four Rape Cases
for the verdict forms and two verdict
forms in both Sexual Abuse in the First
Degree Cases where you can find the
Defendant guilty or not guilty.  And, I
will give these forms to you at this
time.  The first thing you need to go
back and deliberate and choose a
Foreperson.  This verdict must be
unanimous.  That means all twelve of
you must agree upon your verdict,
whether or not it is guilty or not
guilty.  It has to be unanimous,

either way.  The Court will be happy

to explain to you any of the things

I have just gone over with you about

these things.  If there is any question

about any definition under the law

that I need to go over with you again,

I will be glad to.  Sometimes we do

that mighty quick and sometimes it is

confusing.  Sometimes it is confusing

to me.  The terms are sometimes general

and you may not understand those.  But,

if you have any doubt whatsoever, just

knock on the door, tell my Bailiff you

need further instructions in the case

and tell him what you need.  He will

come talk to me and we will bring you

back in and I will be happy to do this

again with you.  So, with that, I will

give you the verdict forms and you will

take with you the evidence submitted in

this case and you can consider that.

At this time, you my go deliberate

your verdict.

MR. VALESKA:  Did you have any charges?

THE COURT;  Oh yeah.  I am sorry.  I am

glad you informed me of that. The state
requested some charges in the case. And,
the parties are able to do that and the
Court has the option of granting certain
charges or rejecting certain charges or
granting some and rejecting some. It
is up to the Court. In this particular
case, the State has requested some
charges. I am going to allow them to
give those particular charges to you and
you are to take these particular charges
as if the Court will be giving these
charges to you. They are correct
propositions of law, under the State of
Alabama, and you are to take this as a
part of the Court's Oral Charge. Mr.
Valeska, I have the charges here that I
have marked given if you would like to
read them to the Jury.

MR. VALESKA: Yes, sir. Thank you. (Reads
the State's Requested Charges to the
Jury as allowed by the Court.) Thank
you, judge.

THE COURT: Yes, sir. Are the attorneys
satisfied with the Court's Oral Charge

at this time?

MR. VALESKA:  The State is satisfied.

MR. RAMSEY:  The Defendant is satisfied.

MR. VALESKA:  I want to make sure there are twelve verdict forms.

THE COURT:  Right.  Right.  Ladies and Gentlemen of the Jury, just before I send you out and just from me to you, I appreciate your attention to the case. You have been an attentive Jury, I can tell that.  I appreciate it.  I know we have had problems in this case about getting everybody here, but really, nobody could help it, actually.  Thanks for your patience.  This was an important case in this community, both to the State of Alabama and to the Defendant and we appreciate your consideration of this matter and hopefully we can conclude this as soon as you look at the evidence and make your deliberation and decide your verdict in this case.  But, from me, I personally appreciate it. Thank you.

(Thereupon, the Trial Jury
proceeded to the Jury Room
to commence their
deliberation and a recess
was called and taken by all
parties.  After a period of
time of deliberations, the
Trial Jury notified the
Court they had a question
and all parties were
returned to the presence
and hearing of the Court
Room and the following
proceedings were held out
of the presence and hearing
of the Trial Jury, to-wit:)

THE COURT:  Okay.  You can bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings
were held in the presence
and hearing of said Trial

Jury, to-wit:)

THE COURT: Okay. Who is the Foreperson?

THE FOREPERSON: (Raises her hand.)

THE COURT: Okay. Y'all have some questions?

THE FOREPERSON: Yes. Right now we have some
        questions before we can go any further,
        about some of the differences of opinion
        about what has come out in the testimony.
        The mother's testimony and they were
        asking, there was something about Mrs.
        Ruby Robertson of being molested. They
        say that there is nothing back there in
        the evidence to support this. Does this
        exist?

THE COURT: First of all — — —

THE FOREPERSON: She found it.

THE COURT: Before we get into that, first of
        all, let me tell you this. You are the
        triers of fact. That is what you are
        to determine, what the facts are from
        what you have heard. I believe there was
        evidence introduced in Dr. Williams'
        report — — — is this the daughter you
        are referring to?

THE FOREPERSON:  I believe it was in the
    report.

MR. VALESKA:  She said they found it in the
    report.

THE COURT:  Okay.  Okay.  That was in there.
    As I remember the testimony, again, you
    are the people that should judge the facts
    in this case and what you heard, rather
    than me, because I may have heard
    different from what you did.

THE FOREPERSON:  Also, there is concern that
    is there a possibility of us hearing the
    investigator's and the social worker's
    tape that was taken of the children?  The
    very first thing it was spoke of and
    bits was give to us, you know, in
    testimony, by the investigator.  This has
    been brought up back there.

THE COURT:  Yes, ma'am.

THE FOREPERSON:  Also, the child's testimony.

THE COURT:  Let's just take them one at a
    time.  The investigator's tapes, you are
    talking about – – –

THE FOREPERSON:  The tapes they took of the
    children, the very first tape with the

social worker.

THE COURT:  Okay.  Ma'am, what you need to
do is consider what is in evidence and
that is all you can take in consideration.
That is what has been introduced at trial
and the attorneys try the case according
to the best way they can and what is
favorable to one side or the other.  In
every trial, you will not get a complete
picture of what is going on.  Sometimes
because the attorneys did not submit
that to you and sometimes the Court may
not let you hear that.  In this
particular case, it wasn't the case of
the Court not allowing you to hear, but
it is not in evidence, that particular
tape.  And, you are not to consider
that, only what you have heard in regard
to the testimony concerning that
particular interview.

THE FOREPERSON:  Also, the testimony of Amber
on the position of the sexual act.  Is
there any tapes we can hear or written
of the exact words of that conversation
of what was said when Amber talked about

that, the position?

THE COURT:  Well, of course, as I understand

that testimony, that was given was quite

extensive to the extent she described

those in pretty good detail, as I

remember.  We had her on the stand about

two hours, I think.  She was the second

child that testified.  I believe the

first child's testimony was about three

hours and the second child did not

testify quite as long.  But, as I

remember, that was gone in pretty good

detail as far as what the testimony

concerned.  Now, for you to hear that

particular testimony, it would probably,

since it was given in different parts of

her testimony, it would probably entail

reading her whole testimony back.  Would

you say that is true from the attorneys?

I don't think that the − − −

THE FOREPERSON:  We are asking about the

part where there was a discussion

of − − − they asked her what, how did

this sex act take place, the position of

Mr. B. C. and her and the position.

THE COURT:  I am not sure we can get that to
you unless we actually let the Court
Reporter read the whole testimony back.
I can again tell you what I think the
evidence was said in the case.  But then,
I may not have heard it all and I would
hate to do that at this point.  If the
attorneys want me to try to recap what
I think I have heard and you can object
and put in what you heard, that is fine.

MR. RAMSEY:  No, sir.  We would object to
the Court reading back portions of the
testimony.

THE COURT:  But, as I remember the testimony,
it was pretty much in detail what the
sexual positions were.  As I
understand - - - let's see, three alleged
rapes as far as concerning Amber.  Is
that right, Mr. Valeska?

MR. VALESKA:  I think they are asking about
positions, judge.

MR. RAMSEY:  That is my understanding.

MR. VALESKA:  I am not going to say anything.
Mr. Ramsey objected, but once again,
there was testimony elicited and given

and he objected.  I think that is as far

as we can go.  That is it.

MR. RAMSEY:  That would be my position, the

testimony has been given.

THE COURT:  Yes, sir.  That is what I am

saying.  I don't know, you know, to do

that would almost be to redo her whole

testimony.  Because, all I can say is

what I heard and I thought it was given

in pretty specific details.  I remember

what the positions were at each instance.

Again, for me to comment on the evidence

would be unfair to you, because I am not

the one that has to decide that.  The

law says I can't.  That is for you to

determine what the true facts in the

case are and for me to express an

opinion at this point might inject

something I shouldn't say or inject

something I heard or didn't hear.  And,

I would hate to do that on behalf of each

side.  So, at this point, I would say

that is just a little hard to do.  You

need to go back and try to remember what

exactly was said from her testimony

and — — — because, I remember the
testimony.  I mean, I remember it.  And,
I thought it was brought out several
times, if I remember correctly, what the
positions were, in fact, on each occasion,
as I remember.  So, I would say that it
would just be, at this point, probably
too difficult to redo that.  Unless the
Jury insists on that, that would — — — I
don't think you could — — — William, I
don't think — — — I think it would be
probably pretty difficult to glean and
pull from that, because it was not given
at any one particular time.  I think the
questions were asked sporadically,
different times over the testimony.  Now,
I think it would be probably too hard for
the court reporter to pull out to give
that to you.  I think you will have to
rely on your recollection as best you
can and resolve that.  That is a good
point, though.  Okay.  Is that it?

THE FOREPERSON:  You know, the mother's
testimony of the occurrence when they
first found out, when she first found

521

out.  The testimony that she gave.

THE COURT:  I don't think that was a conflict.

Is that correct?  When the mother first

found out, the date, or is it?

MR. RAMSEY:  There might be some conflicting

testimony there.  There again, I don't

know that there is anything we can do

to clear up the facts.  If Your Honor

has a question about the law, I think

you are entitled to an answer.  But, they

simply asked about the facts and my

understanding is that is the Jury's job

to sort out the facts.

THE COURT:  I will say this.  Again, I don't

know the specific date that the

particular testimony was when the mother

first was aware of this.  And, I am not

sure if there is a conflict in the

evidence either way.  But, I think both

sides would pretty readily agree that it

did come some time after.  I mean, that

was - - - is that correct?  Anything

y'all have?

MR. RAMSEY:  Your Honor, I don't know that

there is anything really needs to be said

about that, is our position.  It happened

whenever they decided it happened.

THE COURT:  Okay.  Mr. Valeska?

MR. VALESKA:  Judge, I can't say anything

else.  He has objected.  I am limited

if he is objecting.  I can't say a word.

THE COURT:  Again, there was testimony again,

as I remember, on several occasions, when

she was told.  I cannot remember whether

there was actually a conflict in the

testimony or not.  But, be that as it

may, again, that is for you to decide.

And, again, not for me.  My job up here

is to conduct the trial as orderly as

possible and to rule on the points of

evidence the attorneys bring up to me

and instruct you as to the law in the

case.  That is my job.  I am not here

to express any opinions as to the

evidence.  Basically before the trial

started, I really didn't know anything

about the facts in the case and that is

the way it should be.  Other than a

few things I heard in pre-trial motions.

So, basically the evidence you heard is

the evidence I heard for the first time.
It is not really up to me to express an
opinion one way or the other about the
case.  That is up to you.  So, that is
for you to sort out.  Anything else?

THE FOREPERSON:  (Shakes her head to the
negative.)

THE COURT:  With that, if you have any more
questions, basically it is facts in the
case and I cannot recount to you what the
facts might be.  So, it is for you to
decide and remember.  Anything as to
law in the case or a definition what it
takes in this particular case or what is
in the Indictment, I can do that.
Because, I am charged to do that;  that
is my job.  But, the facts are for you
to sort out in this case.  I know it is
difficult, because you heard a lot of
testimony.

THE FOREPERSON:  That is where we are at.
The testimony that we heard one way and
another way.

THE COURT:  I appreciate what you are doing.
Apparently you are trying to sift through

the best way you can.  If you have any
more questions, let me know.

(Thereupon, the Trial Jury
proceeded to the Jury Room
in order to continue their
deliberations and the
following proceedings were
held out of the presence
and hearing of the said
Trial Jury, to—wit:)

THE COURT:  Mr. Ramsey, do you have any
objection to anything that the Court did
talk about or explain to the Jury?
MR. RAMSEY:  No, sir.  I have no objections.
MR. VALESKA:  I have no objections.
THE COURT:  Okay.

(Thereupon, a recess was
called and taken by all
parties to await the verdict
of the Trial Jury.  After a
period of time of
deliberations, a juror came

                                    to the Court Room where all

                                    parties were assembled and

                                    the following proceedings

                                    were had, to—wit:)


THE COURT:  Okay.  Yes, sir.

A JUROR:  I was, I wanted to let you know

          that I have been diagnosed with

          hypoglycemia.

THE COURT:  Okay.

A JUROR:  And, every once in a while, my sugar

          drops and I get real weak and I need

          something to eat.

THE COURT:  Okay.  What do you need?

A JUROR:  A candy bar and coke or something

          like that.

THE COURT:  Oh, yeah.

A JUROR:  Wasn't no big problem, I was just

          starting to feel a little jumpy.

THE COURT:  Okay.  Will you go get it for

          him?  Tell him what you need.

A JUROR:  Dr. Pepper and a Snickers will be

          fine.

THE COURT:  What is your name?

A JUROR:  Jason Lisenby.

THE COURT:  Okay.  Let the Record reflect that
           this Juror requested a conference and all
           the parties are present and we will get
           you something to eat.  Okay?

A JUROR:  Okay.

THE COURT:  That is it.  We will bring it
           back to you.

A JUROR:  Thanks.

                              (Thereupon, another recess
                              was called and taken by
                              all parties as the Trial
                              Jury continued their
                              deliberations.  After a
                              period of time of additional
                              deliberations, all parties
                              returned to the presence
                              and hearing of the Court
                              Room and the following
                              proceedings were held out
                              of the presence and hearing
                              of the said Trial Jury,
                              to-wit:)

THE COURT:  Bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings
were held in the presence
and hearing of said Trial
Jury, to—wit:)

THE COURT:  Ladies and Gentlemen of the Jury,
it has come to the Court's attention that
you are deadlocked.  Is that correct?

THE FOREPERSON:  Yes, sir.

THE COURT:  Okay.  I think the Jury retired a
little after 4:00 o'clock and it is now
7:15 and I appreciate your attention to
this case.  I know that y'all have
deliberated and expressed your opinions
to each other and I do appreciate that.
However, let me give you this charge at
this time.  If you would, please listen
very carefully to this.  The Court
cannot release you at this time.  You
should make further effort to reach a
verdict in this case.  Each Juror is
entitled to his or her opinion about the

evidence, but I do not wish to put the
State to the expense of another trial, if
it can be avoided in this case.  If you
cannot agree, a mistrial will be
declared and this case will have to be
tried again.  There is no reason to
believe that another Jury would have
better or clearer evidence than that
presented to you today.  This does not
mean, however, that you should surrender
an honest conviction as to the weight or
effect of any evidence solely because
of the opinion of other Jurors or
because of the importance of arriving at
a decision.  But, you should give
careful consideration and respectful
consideration to each other's views and
talk over any differences of opinion
in a spirit of fairness and candor.  If
possible, you should resolve any
differences and come to a common conclusion
so this case can be completed.  I will be
happy to give you further instructions
on the law on any matter other than the
facts in this case.  It is natural that

differences of opinion will arise.
When they do, each Juror should not only
express his opinion or her opinion, but
the facts and reason upon which he or
she basis that opinion.  By reasoning
that matter out, it may be possible for
all Jurors to agree in this case.  What
I have said to you must not be taken as
an attempt on the part of the Court to
require or force you to surrender your
honest and reasonable convictions founded
upon the law and evidence in this case.
My sole purpose is to impress upon you
your duty and desirability and the
importance of reaching a verdict, if
you can conscientiously do so.  With
that, you may retire again and
continue your deliberations.

                    (Thereupon, the Trial Jury
                    proceeded to the Jury Room
                    to continue their
                    deliberations with the
                    above further instructions
                    from the Court.  The

following proceedings were
held outside the presence
and hearing of the said
Trial Jury, to—wit:)

THE COURT:  Mr. Ramsey, is there any
     objection to the charge as given?
MR. RAMSEY:  No, sir.
MR. VALESKA:  No, sir.
THE COURT:  Okay.

(Thereupon, a recess was
called and taken by all
parties to await the verdict
of the Trial Jury.  At
approximately 8:20 o'clock
P. M., the Trial Jury
notified the Court that they
had a question and all
parties were returned to
the presence and hearing of
the Court Room and the
following proceedings
were held out of the
presence and hearing of the

said Trial Jury, to—wit:)

THE COURT:  Bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings
were held in the presence
and hearing of said Trial
Jury, to—wit:)

THE COURT:  Okay.  Ladies and Gentlemen of the
Jury, Mrs. Gibbs, I believe you are the
Foreperson?

THE FOREPERSON:  (Nods her head to the
affirmative.)

THE COURT:  First, let me say this:  We are
here to seek justice in this matter and
not only to give Mr. Money, the Defendant
on trial, a fair trial.  We are also here
to give the State a fair trial and both
parties should be afforded that
opportunity.  If there is information
that needs to be related to the Court

that will show that that is not what the
case is in this particular matter, then
I must know that and you must tell me
that, because that is what we are here
to find out.  If that is the case, Mrs.
Gibbs, you need to relate to the Court
the information that you know.

THE FOREPERSON:  Just say it here?

THE COURT:  Ma'am?

THE FOREPERSON:  When we were deliberating or
discussing, we came to a deadlock and a
lot of the conversation was going on and
two jurors starting saying, started
discussing about this case and what they
knew about this case, according to the
paper, before this case ever happened.
And, I want to know if this is right.

THE COURT:  Okay.  Are you saying then - - -

THE FOREPERSON:  They knew that - - -

THE COURT:  They knew during their time as
Jurors that - - -

THE FOREPERSON:  Before this happened, before
this trial ever happened.

THE COURT:  Okay.  Mr. Valeska?

MR. VALESKA:  I don't know what was said.  I

have no idea. I am not asking anybody on the Jury Panel and I am sure that Mr. Ramsey would not, either. But, my question would be any Juror that came down this week and I think Mr. Ramsey would agree there was pre-trial publicity of some kind on this case. That is not a crime, as far as pre-trial publicity or it would not deprive the Defendant or the State of a fair trial, unless someone made a judgement or opinion as to someone's guilt or innocence before the trial and could not be open and unbiased on either side. Would you agree with that, Mr. Ramsey?

MR. RAMSEY: I agree with that.

MR. VALESKA: I don't know, and I am not asking anybody to tell the State. Mr. Ramsey could say anything that he likes, but because somebody knows something, unless they have formed an opinion. Now, the question that the State would have and I know Mr. Ramsey will, I am not saying that anybody did this, but it was related to the Court, the District

Attorney, and Mr. Ramsey here in open

Court, that if someone has gone against

an order you have given by reading the

paper since, then that is something you

have to inquire.  But, before hand,

unless it is something that has been in

the paper since then or the media, that

is my only question.  Would you agree

with that?

MR. RAMSEY:  I concur with that.

THE COURT:  I agree to a certain extent, also.

However, the question was asked of the

Jury when they were being selected, one

of my questions was:  Does anybody know

anything about the facts of this case.

THE FOREPERSON:  Yes.

THE COURT:  I did not ask that question merely

to ask it.  I asked it for an answer.

THE FOREPERSON:  And, they didn't.

THE COURT:  The fact somebody knew something

about this case, that is fine.  If it is,

if it has not tainted you to the extent

that at the time you came to this Court

House - - - now, if you had an opinion

about a, if you had pre-judged this

particular case because you had an

opinion at the time or because of what

you read, then I think I need to know

about that. If there are Jurors that

have that pre-judgement opinion, I need

to talk with them now. Now, that is

the first thing. Now, of course, like

Mr. Valeska said, every case has got

some pre-trial publicity and just

because you read that does not necessarily,

would affect you in one way or the

other. So, that is the first step,

whether or not, in fact, it did bias

you as to whether or not you had

pre-judged this particular case or had

an opinion as to the guilt or innocence

of the Defendant because of that. Now,

if you are talking about, and I will

state for the Record, like I told you

before, there was an article in the

Dothan Eagle that was done after y'all

were selected. And, I mentioned that

and I specifically mentioned to you the

fact to let you know that there was

publicity out there. If we are talking

about that particular newspaper article,
that some of you read, then we have got
problems.

MR. VALESKA:  We need to know.

THE COURT:  You certainly do need to know
that.  If anybody did see that, then they
need to let me know, because this is too
serious a matter in this Court House
for me to overlook anything like that.
Now, is there anybody that saw that
particular newspaper article?

MR. VALESKA:  Correct me if I'm wrong, but
isn't it correct that there has been
two articles.

MR. RAMSEY:  One Tuesday and one Wednesday.

MR. VALESKA:  I am not saying anybody on the
Jury did, but the question is if there
was something in the paper, did they look
at it and read it or listen if there
was anything, and I am not saying there
was, on any other media, I have no
personal knowledge.  But, that would be
my question if they actually read the
article.  I am not saying they did,
judge, it is a catch 22 here.  I am

looking out for the victims and Mr.

Ramsey is looking out for the Defendant.

THE COURT:  The first article was Monday

when you came and Tuesday, the second

article was run on Wednesday and of

course, I didn't see you since the time

I dismissed you.  So, that is, I am

referring to both articles then, I

guess.  Is there any information that

you have?

THE FOREPERSON:  A lot of pre, before the

trial, before we came here, knowing a lot

about what was in the paper and I

thought we were not supposed to have

known a lot about this case.

MR. VALESKA:  There are cases that say, there

are cases that say there is nothing

wrong with any Juror of any kind that

comes to Court, they don't have to be

immune from any story.  The question is

if any Juror willfully - - - judge, I

am not saying that they did, I am

seeking a fair trial for the victims and

my job is to seek a fair trial for

Mr. Money, too.  The question would be

if they misinformed or didn't tell the
Court or they had a biased opinion for
the State or against the State.  I am
not saying that they have that, but I
think we need to inquire.  Just because
they read an article or knew something,
nothing says they have to come in here
completely, one hundred percent knowing
nothing.  That would not exist in a
county the size of Henry or Houston.  It
is not big enough.

THE COURT:  Oh, I agree with that.

MR. VALESKA:  I want to clarify, if that is
the question?  Once again, I don't know
what has taken place, but just because
someone knew something, as long as they
have answered the questions truthfully
and they don't have any predetermined
opinion, either side, for or against the
State or for or against the Defendant.
Don't you agree, Mr. Ramsey?

MR. RAMSEY:  Yes, sir.

THE COURT:  That is a correct statement, what
Mr. Valeska said.  And, obviously it
would be hard to find, in a lot of cases,

juries that didn't know anything about the case, to a certain extent. But, the question is whether or not those that may have had some opportunity to see this case before it came to trial, whether or not, in fact, you had a predetermined opinion in the case and whether or not it biased or prejudiced your opinion in any manner. The only way I know to find that out is first ask if, in fact, did any Juror know anything about the facts of this case, either through pre-trial publicity or through any conversations with neighbors or friends or anything you knew about the facts of this case. That is the first question I need to determine; if anybody knew anything about the facts in the case. Anybody?

A JUROR: I vaguely remember some pre-trial articles about it. But — — — because I married a Money and I asked my wife if she was kin to them and she said no.

THE COURT: Okay. All right.

A JUROR: I vaguely remember.

340

THE COURT:  Why don't y'all state your names.

Yes, sir, what was your name?

A JUROR:  Billy Mooring.

THE COURT:  Okay.  I thought so.  And, what

was your name?

A JUROR:  Kathy Blankenship.

THE COURT:  Okay.  What did you know about it,

Mrs. Blankenship?

A JUROR:  I work at the doctor's office here

in town and Mr. Money had been in before.

I don't know what he was in about.  I

remembered the fact of some of them

saying that he had a trial coming up.

THE COURT:  But, you don't know anything?

A JUROR:  Not specific.

THE COURT:  Nothing about the facts or

anything?  Does anybody else know

anything about this case?

(No response.)

MR. VALESKA:  Just for the Record, once again,

I don't know what is occurring, but I

would ask the Court and I am sure that

Mr. Ramsey would agree with this, go

back to the other question.  I know

you asked it, but I am not implying

and I am sure that Mr. Ramsey wouldn't
either, but I think that we need to
poll them individually about any
pre-trial publicity after the trial
began.  I am not trying to offend anybody
or make them mad, but I have got an
appellant record that I have got to try
to protect, just like Mr. Ramsey.  So,
we need to do that, if we could?

THE COURT:  I can do that.

MR. VALESKA:  I am not implying that they
did that and I don't want them to think
that and I don't want to offend anybody.

THE COURT:  Okay.  Okay.  Anybody else after
Mrs. Blankenship that saw anything as
far as knowing anything about the facts
of this case before it came to trial?
Anybody else?

(No response.)

THE COURT:  Second question, then.  Has
anybody seen either of the two Dothan
Eagle articles or any type of publicity
after the start of this trial?  I can't
think of any others, except for those
two articles.  Did anybody see those and

what we need to do is go ahead and poll

the Jury again.  We are not trying to

embarrass anybody or anything, but again,

if, in fact, this goes to an Appellant

Court, this is, these-type matters have

to be reviewed;  that is just the way

it is.  When information comes to the

Court that something is happening in a

trial, I just can't say that I didn't

hear it, because it has to be reviewed,

if, in fact, that is the case.  I don't

know if it is or not, but let me just

poll the Jury, the various members, to

that question.  Mr. Mooring, have you

read those articles or know anything

since the trial began?

MR. MOORING:  No.

THE COURT:  Yes, sir.  How about you?

A JUROR:  No.

THE COURT:  Okay.  Let's go to the back and

then come to the front.  Okay.

A JUROR:  No, sir.

THE COURT:  You?

A JUROR:  No, sir.

A JUROR:  No, sir.

A JUROR:  No, sir.

THE COURT:  And, you?

A JUROR:  No, sir.

THE COURT:  Okay.

A JUROR:  No, sir.

THE COURT:  Okay.

A JUROR:  No, sir.

THE COURT:  You?

A JUROR:  (Shakes their head to the negative.)

THE COURT:  And, you?

A JUROR:  (Shakes their head to the negative.)

THE COURT:  And, you?

A JUROR:  (Shakes their head to the negative.)

THE COURT:  Well, good.

MR. VALESKA:  I am not implying that they did,
     but since the question was raised, once
     again, they will go back to deliberations
     and I am concerned, whole heartedly, if
     anything occurs for the appellant record,
     if there is an appellant record;  I am
     not trying to make anybody mad or offend
     them.  I hope they will understand that.

THE COURT:  Oh, yeah.  I think they know, as
     reasonable men and women, we have to do
     things like this and conduct it the way

we should. Okay. Let the Record reflect
then that the Jury was polled and all
twelve members stated that they did not
read the two Dothan Eagle articles after
this trial was started. Okay. Is there
anything else that needs to be brought
up, at this time?

MR. VALESKA: The State is satisfied for
them to continue.

MR. RAMSEY: The Defendant is satisfied, Your
Honor.

MR. VALESKA: Whole heartedly.

THE COURT: Okay. Ladies and Gentlemen of the
Jury, with that, you may begin or resume
your deliberations again.

(Thereupon, the Trial Jury
returned to the Deliberation
Room in order to continue
their deliberations and
the following proceedings
were held out of the
presence and hearing of the
Trial Jury, to-wit:)

THE COURT:  Mr. Ramsey, is there any exception
   for the Record?

MR. RAMSEY:  No, sir.

MR. VALESKA:  We are satisfied, judge.

THE COURT:  Okay.

(Thereupon, a recess was
called and taken by all
parties.  After a period
of time of additional
deliberations, all parties
returned to the presence
and hearing of the Court
Room and the following
proceedings were held out
of the presence and
hearing of the Trial Jury,
to-wit:)

THE COURT:  Bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings

were had, in the presence
and hearing of said
Trial Jury, to-wit:)

THE COURT:  Ladies and Gentlemen of the Jury,
have y'all had supper?

(Jurors laughing.)

THE COURT:  We are trying to make it as
comfortable as we can for you.  I know
it is hard for you, at this kind of hour,
but just remember this;  while you are
back there doing your job and doing your
duty to this community, there are others
waiting, also.  Don't feel like you are
isolated or in a position that sometimes
people do feel when they try to make an
important decision.  So, don't feel
that way.  However, let me say this,
also.  It has come to the Court's
attention from the bailiff, that y'all
have quit discussing the case.  I don't
know if that is true or not.  Mrs.
Gibbs, is that true?

THE FOREPERSON:  There has been no discussion
in the past while, really.

THE COURT: Let me say this to the Jury. We
have had many hours of testimony, many
facts presented; maybe not all of the
facts that you wanted to hear or that
could have been introduced. But, let
me say this; if you heard everything in
the world about this case, we would be
trying this thing forever. I think there
is sufficient evidence before the Jury
at this time to make a decision one way
or the other. Now, if you have come to
a situation you can't discuss the case,
then you need to rethink that position,
because there are important issues here
that you need to discuss with each other,
maybe points you need to discuss. And,
if you do not have a discussion among
yourselves, I don't want to be hard on
anybody, believe me, I know the position
you are in; but, if that is the case,
then you are not doing your duty in this
particular case. I don't want to sound
mean or mean spirited about it, but your
job, as I said, is to discuss the case
among yourselves. I am sure you have

your own opinions and that is great.  If
there are points you have that you do
have a strong opinion, then you need to
discuss those particular matters with
each other.  Because, somebody else may
have an opinion that may give you some
thoughts you have not thought about.
But, as far as I am concerned, to say
you are not discussing the case, that
is your prerogative;  you can do what
you want to do.  But, the Court is
inclined at this point to keep on
until a verdict is reached in this
case.  And, we are going to do that.
I am not forcing you one way or the
other to make up your mind either way.
I don't think anybody heard me say
anything in this particular case one
way or the other how I think about the
facts of the case or the guilt or
innocence of the Defendant.  I am not
trying to force anybody into anything.
However, I will not sit by and have you
waiting and other people waiting in this
particular matter, if you are not

discussing the case.  I will have to put
it to you like it is;  you are not doing
your job if you don't discuss the case.
I am prepared to stay here until a verdict
is reached in this case.  Y'all need to
know that.  I know it is inconvenient for
you and I hate that, because I think each
of you has done a good job, been
attentive to the evidence, but on the
other hand, this matter needs to be
concluded in any manner.  That is not up
to me, that is up to you.  But, the case
needs to be discussed.  With that, you
can retire.  As I said the Court is
going to keep on in this particular
matter until a decision is reached and
you need to know that.  I will say right
at this point, while it is out on the
table for everybody, if a decision
cannot be reached tonight, we will
deliberate tomorrow.  Any questions?

(No response.)

THE COURT:  Anything from the lawyers?

MR. VALESKA:  We are satisfied, Judge Little.

THE COURT:  Any comments from any member of

the Jury at this time or Mrs. Gibbs,

the Foreperson in this case?

A JUROR:  I have a question.

THE COURT:  As to what I mean, when I

say − − − yes sir.

A JUROR:  Can I speak to you or does it need

to be on the Record?

THE COURT:  Well, it has to be done, for me

to be fair and impartial in this case,

it has to be done in front of everybody.

A JUROR:  Okay.  I will go ahead and say it.

You know, every time we get to discussing,

you know, the verdict, then, you know, it

gets ill feelings.  People start crying

and stuff.  You know, what do we do?

THE COURT:  Now, that is one thing you are

going to have to do, even though you

have strong opinions about the matter.

That is your prerogative.  That is your

duty to have an opinion.  That is why

we have twelve of you here.  You need to

do that.  But, as far as ill will is

concerned toward any person, then that

needs to be, you need to throw that aside.

There is no room anywhere in this system

of justice for anybody to be, to take it
personally to the extent that they are
bickering, fighting, ill will between
you.  That does not need to be there.
And, I am sorry if that is the situation
that has come up.  Sometimes it does come
up, to be very frank with you, in some
Juries.  Why it comes up, I don't know,
other than people just have their own
personal opinions.  The evidence was
taken in this case, many hours was taken
and the facts are there.  Regardless of
how you rule or judge this particular
case, it is, you know, that is the way
it is.  But, I will tell you this way.
There will be a verdict in this case,
one way or the other.  That is only fair.
Not only for B. C. Money, it is also,
that is the only way it is fair for the
State of Alabama, too.  With that, we
will deliberate and we will deliberate
tomorrow, if it takes it.  Thank you.

                    (Thereupon, the Trial Jury
                    returned to the Jury Room

and the following proceedings
were held out of the
presence and hearing of the
Trial Jury, to—wit:)

THE COURT:  Any objections to the Court's

Charge?

MR. VALESKA:  I'm satisfied.

MR. RAMSEY:  Your Honor, I want for the

Record – – – you are the judge, but there

is such a thing as a hopeless deadlock.

And, I don't think that that is a proper

instruction, that you will reach a

verdict.  If they are unable to do so,

so be it.

THE COURT:  The Court will make the

determination at the appropriate time,

whether or not there is a deadlock in

the Jury.  And, that is my call and

that is my discretion.  And, I have

given the dynamite charge to this

particular jury at an earlier time and

I don't see anything inappropriate about

telling the Jury they have to reach a

verdict in this case.

MR. VALESKA:  I don't think the Foreperson
related that they were hopelessly
deadlocked at all.

THE COURT:  I don't know if they are
hopelessly deadlocked yet or not.

MR. RAMSEY:  They have not been asked that
question.

MR. VALESKA:  The Court asked them if they
had anything to say to the Court and we
have answered questions and had the
opportunity.  The Court did not poll
them or ask them because that was not
addressed and the Court did not inquire
as to what their vote, however it could
be, whatever it is.

THE COURT:  Okay.  All right.

(Thereupon, a recess was
called and taken to await
a verdict from the Jury.
At approximately 10:42
o'clock P.M. the Court
summoned all parties to
the Court Room and the
following proceedings were

held out of the presence
and hearing of the Trial
Jury, to—wit:)

THE COURT:  Okay.  Bring them in.

(Thereupon, the Trial Jury
was returned to their
places in the Jury Box and
the following proceedings
were held in the presence
and hearing of said Trial
Jury, to—wit:)

THE COURT:  Okay.  Ladies and Gentlemen of the
Jury, my bailiff has talked to me about
certain matters.  I do not want to know
and the Attorneys do not need to know
any kind of vote count in this particular
case, how you voted, how you are thinking
at this time, whether or not either way.
I don't need to know that and the
Attorneys do not need to know that, also.
But, let me put it to you this way,
also.  The verdict must be unanimous.

All twelve of you. Now, we have, in this particular case, when I say verdict, we have actually, as you know, very well, six Indictments in this case. You must return a verdict either guilty or not guilty on each particular charge in this cause. Again, I do not need to know the vote and I do not want to know the vote. It is none of my business about that, and certainly not the Attorneys business. But, it must be unanimous. Let me say this for the Jury's benefit. First of all, I appreciate y'all discussing the case. I understand that y'all are discussing the case again and I appreciate that. Of course, the Court does not know what you discussed and I don't want to know. That is up to you. That is your private deliberations. But, we will keep on deliberating in this matter. Again, I hope there is no ill will among the members of the Jury. There shouldn't be. If it is, you need to let me know. Y'all did let me know one time and I did instruct you on that.

But, if this becomes a problem, I may
just ask you what the problem is.  There
will not be any ill will among the Jury
and I will talk to you about that,
because there is no place in this
particular system of justice for
anything like that.  And, the Court
will not tolerate that.  One matter I
think we need to take up at this point,
since it is a late hour and needs to be
said.  Again, I am not trying to be
mean spirited or anything like that,
because you have got a tough job to do
and I appreciate that.  But, it has
come to my attention also, that one
particular Juror in this Jury Panel has
attempted to leave the Jury Deliberation
Room and has been told to go back in.
Now, I am going to be very frank at this
point.  As long as I run this Court Room,
that will not be tolerated.  I don't
know the person that did that, but that
will not be tolerated in this Court as
long as I say deliberate.  I am not
saying in a mean spirited manner, but

that Juror, at some point, may have to

come in this Court Room and again, I will

not talk to anybody in private, it will

be all parties present and we will

discuss that particular manner.  You are

in there for a job like I am here for a

job and Mr. Valeska for the State and

Mr. Ramsey.  And, that kind of conduct

will not be tolerated by the Court at

all.  But, the verdict must be unanimous

in this case.  That is what the Law of

Alabama says and it is not to be

coerced in any manner.  As long as you

keep frank and honest discussions among

yourselves and not let any ill will

come between y'all, then everything is

fine.  I appreciate y'all talking to

my bailiff about this and you need to

be assured that every time you talk to

him, he talks to me about this.  But, if

you do talk to him, you need to know if

he talks to me, what you say to him is

going to be discussed among all of us

in the presence of everybody.  That is

the way it should be.  With that, you

may begin your deliberations again.

(Thereupon, the Trial Jury
returned to the Jury
Deliberation Room and the
following proceedings were
held out of the presence
and hearing of the Trial
Jury, to—wit:)

THE COURT:  Any objections on the Record?

MR. VALESKA:  Satisfied.

MR. RAMSEY:  No, sir.

THE COURT:  For the Defense?

MR. RAMSEY:  No, sir.

THE COURT:  Okay.

(Thereupon, a recess was
called and taken to await
the verdict of the Jury.
At approximately 11:01
o'clock P. M., the Court
was notified that the Jury
had reached their verdict
and all parties returned

559

      to the presence and hearing

      of the Court Room and the

      following proceedings were

      held outside the presence

      and hearing of the Trial

      Jury, to-wit:)

   THE COURT:  Okay.  Bring in the Jury.

      (Thereupon, the Trial Jury

      was returned to the

      presence and hearing of

      the Court Room in order to

      render their verdict in

      the above styled and numbered

      cause and the following

      proceedings were had in

      the presence and hearing of

      said Trial Jury, to-wit:)

 THE COURT:  Mrs. Burdeshaw is not here, is

   it permissible for me to read the Verdict?

MR. VALESKA:  I have no problem with you

   reading it, Your Honor.

MR. RAMSEY:  I have no problem with that,

Your Honor.

THE COURT: Mrs. Gibbs, you are the Foreperson of this Jury?

THE FOREPERSON: Yes.

THE COURT: And, you have reached a verdict?

THE FOREPERSON: Yes, sir.

THE COURT: Let the Record reflect that Mrs. Burdeshaw, the Clerk, is not present at this time, but the parties, both parties have agreed for the Court to read the verdict in this case. In Case Number CC94-065, it says: We the Jury, find the Defendant, B. C. Money, Sr., guilty of Rape, First Degree as charged in the Indictment. In Case Number CC94-66, we the Jury, find the Defendant, B. C. Money, Sr., guilty of Rape, First Degree as charged in the Indictment. In Case Number CC94-67, the Verdict is: We the Jury, find the Defendant, B. C. Money, Sr., guilty of Rape in the First Degree as charged in the Indictment. In Case Number CC94-068, the Verdict is: We the Jury, find the Defendant, B. C. Money, Sr., guilty of Sexual Abuse, First

Degree as charged in the Indictment.   In

Case Number CC94-069, the Verdict is:

We the Jury, find the Defendant, B. C.

Money, Sr., guilty of Rape, First Degree

as charged in the Indictment.   In Case

Number CC94-070, the Verdict is:   We the

Jury, find the Defendant, B. C. Money, Sr.,

guilty of Sexual Abuse, First Degree, as

charged in the Indictment.   Okay.   At

this time, I will poll the Jury.

(Thereupon, the Trial Court

polled the Trial Jury in

order to determine whether

or not their verdict was

unanimous and the following

proceedings were had,

to-wit:)

THE COURT:   Okay.   Let the Record reflect that

each Juror has nodded in the affirmative

that they were, in fact, their verdicts

in this case.   We appreciate your

service in this case.   I know it has

been hard, but I know you have made a

conscientious and deliberate attempt to
do what you think is right in this case.
With that, you are discharged.  I will
say this;  Mrs. Burdeshaw had to leave,
she is the Clerk and — — —

THE BAILIFF:  She said that she would mail
the checks.

THE COURT:  She will mail the check to you
for your service.  We appreciate that.
And, with that, you are discharged.
Thank you.  Just a minute before y'all
leave.  I am sorry.  Is there anything
for the Defense or for the State before
the Jury goes?

MR. VALESKA:  I want to make sure, you said
verdict and verdicts, we have single and
in plural;  they agree that all of the
verdicts, collectively, every Juror,
I want to make sure, for the Record.

THE COURT:  If you would, nod as to the
verdicts in this case.  Okay.  Let the
Record reflect that all of the Jurors
nodded in the affirmative that the
verdicts in this case were their own.
Thank you.

(Thereupon, the Trial Jury
was discharged from their
services in the above
styled and numbered cause
and the following proceedings
were held out of the
presence and hearing of the
Trial Jury, to—wit:)

THE COURT:  Okay.  The Jury returned the
verdicts in these cases and it is the
judgement of the Court in these
particular cases that I have just
enumerated, that, in fact, B. C. Money,
Sr., is guilty of the charges contained
therein.  Do you have anything, Mr.
Money, to say before I pronounce sentence
of law?

MR. RAMSEY:  Yes, sir.  We request a
pre—sentence investigation in this case.

MR. VALESKA:  That is fine, judge.  Since he
has been convicted now and faces four
hundred and sixteen years in jail, we will
ask for no bond pending the Sentence
Hearing.  Each of them is a Class A,

except for the last two, which are Class C.
He faces a total of four hundred and
sixteen years and I would like no bond
pending the Sentencing Hearing.

THE COURT: Mr. Ramsey?

MR. RAMSEY: Well, Your Honor, he is under
two hundred and fifty thousand dollars
and if he can't make that, it is in
effect, no bond right now. So, it won't
make any difference if it is not reduced.

THE COURT: Okay. Due to the fact that the
maximum in this case on Rape, First
Degree, is from Life to ninety-nine years
and I believe the maximum penalty in the
Sexual Abuse Cases is twenty years — — —

MR. VALESKA: Ten years Your Honor on the
Sexual Abuse, First Degree. They are
Class Cs and the others are all Class A.

THE COURT: Okay. Ten years in the penitentiary
in that particular case then, the bond,
the Court grants the State's request in
this case and there will be no bond in
the case until sentencing. Sentencing
will be set, I believe I am up here again
on October 27th, if I am not mistaken.

MR. VALESKA:  Is that 8:30 or 9:00 o'clock.

THE COURT:  9:00 o'clock, October 27.  That

is the date set for sentencing.  Okay.

PROCEEDINGS CONCLUDED

REPORTER'S CERTIFICATE

STATE OF ALABAMA

HOUSTON COUNTY

     I, William R. Moeglin, Court Reporter in and for the Twentieth Judicial Circuit of Alabama, do hereby certify that the above styled and numbered cause was reported stenographically be me and is a true and correct transcript of the testimony, objections, motions, rulings of the Court, oral charge of the Court and the verdict of the Trial Jury and was transcribed by me or under my direction and control.

     I further certify that I have filed all exhibits offered in the trial of this cause, if any, with the Circuit Clerk of Henry County, Abbeville, Alabama, for incorporation into the Record on Appeal.

     I further certify that I have, on this day, filed with the Clerk of the Court of Criminal Appeals, the Attorney General as well as the parties here involved, a copy of the Reporter's Index to the Testimony and a Certificate of Completion of Reporter's Transcript of the said cause.

I further certify that I have filed the original and three copies of this transcript in the office of the Circuit Clerk of the Circuit Court of Henry County, Dothan, Alabama.

Done in office this the _14th_ day of _March_, 1996.

_William R. Moeglin_
COURT REPORTER

CERTIFICATE OF COMPLETION OF REPORTER'S TRANSCRIPT

B. C. MONEY, SR.
_____
Appellant

v.

XX  State of Alabama
____  Municipality of _____

TO: The Clerk of the Court of
Criminal Appeals of Alabama

On Appeal From The:
XX  Circuit Court of
____  District Court of
____  Juvenile Court of

HENRY _____ County
Case No. CC94-065-070
Date of Notice of Appeal 10-27-95

     I certify that I have this date completed and filed with the clerk of the trial court the original of a true and correct transcript of the proceedings designated in the reporter's transcript order. All pages are numbered serially, in the upper right corner of each page, prefaced by a copy of the reporter's transcript order (p. no. 1 ) and an index, and ending with the number appearing in the upper right corner of this certificate.

     I certify that a copy of this certificate is this date being served (on counsel for defendant) (defendant, if not represented), the attorney general of Alabama, and the district attorney or the municipal prosecutor in lieu of the attorney general and the district attorney if the appeal is from a municipal conviction, along with a copy of the index.

     DATED this  14th  day of  March  , 19 96.

_____
Court Reporter

(Amended October 1, 1991.)

     The clerk of the trial court is required to assemble the record on appeal (in volumes of not more than 200 pages each, and to send certified photocopies of the record on appeal to counsel for defendant and to the attorney general of Alabama as required by Rule 11(b) or to the municipal prosecutor in lieu of the attorney general if the appeal is from a municipal conviction.

1

```
 1              STATE OF ALABAMA

 2     IN THE CIRCUIT COURT FOR THE COUNTY OF HENRY

 3              TWENTIETH JUDICIAL CIRCUIT

 4                      CRIMINAL

 5   STATE OF ALABAMA,

 6        PLAINTIFF,

 7   VS.                           CASE NO. CC94-0725,
                                       94-066-070
 8

 9   B. C. MONEY,

10        DEFENDANT.

11   ------------------------/

12

13            REPORTER'S OFFICIAL TRANSCRIPT

14

15   Before:

16                 Hon. C. Lawson Little
                   Abbeville, Alabama
17                 October 27, 1995

18

19   APPEARANCES:

20                 For the State:
                   Hon. Doug Valeska,
21                 District Attorney

22                 For the Defendant:
23                 Hon. Richard Ramsey, IV

24
     Gwen Cooper,
25   Official Court Reporter
```

```
 1              P R O C E E D I N G S

 2

 3              THE COURT:  We have got the

 4                   case of B. C. Money for

 5                   sentencing at this

 6                   time.

 7                        The jury having

 8                   returned verdicts in

 9                   these particular cases,

10                   Mr. Money, do you have

11                   anything to say on your

12                   behalf?  Mr. Ramsey?

13              MR. RAMSEY:  Yes, sir, your

14                   Honor, simply the fact

15                   that Mr. Money has been

16                   tried and found guilty

17                   by the jury, he still

18                   adamantly maintains his

19                   innocence.  Nonetheless,

20                   we know he's looking at

21                   a minimum -- your Honor,

22                   knows what the minimum

23                   is.  I would simply say,

24                   your Honor, that the

25                   minimum sentence is a
```

```
 1                            sentence of life in
 2                            prison for this man.
 3                            He's 73 years old.  And
 4                            I know Mr. Valeska is
 5                            going to stand up and
 6                            ask for the maximum and
 7                            all this, and I would
 8                            simply say that the
 9                            minimum is a life in
10                            prison sentence.  This
11                            man would never serve
12                            even a third of that
13                            sentence, based on his
14                            health and his age.  So
15                            we would ask that the
16                            Court consider that.
17              THE COURT:  What says the
18                            State?
19              MR. VALESKA:  Judge, I have
20                            two letters here, one
21                            from the defendant's own
22                            daughter, who says while
23                            this defendant is her
24                            father, that he messed
25                            with her when she was a
```

```
 1              child.  No one would
 2              help or listen to her in
 3              any manner or fashion.
 4              Second, I've got a
 5              letter from Patricia
 6              Money that tells and
 7              asks this Court, B. C.
 8              Money should spend the
 9              rest of his life in
10              prison for the hurt of
11              my child.
12                   Judge, Mr. Ramsey
13              is incorrect when he
14              says if you sentence him
15              to the minimum sentence
16              in this case that it
17              will be a life sentence.
18              The State of Alabama,
19              who I represent, we want
20              Money's bones.  We want
21              him to die in jail for
22              what he has done.  I
23              would tell this Court a
24              minimum sentence is a
25              joke.  These are
```

1    children, our most

2    valuable asset.

3         In this very

4    Circuit in this very

5    courtroom another man

6    was convicted, like Mr.

7    Ramsey said, who was

8    approximately the age of

9    Money, got twenty years

10   for First Degree Rape.

11   The Pardon and Parole

12   Board let him go after a

13   year and a-half, and he

14   walks the streets of

15   Abbeville right now.

16   We ask for 419 years on

17   Money, maximum fines,

18   maximum Compensation,

19   so he will know he

20   cannot molest Henry

21   County's most valuable

22   children.  These are his

23   own flesh and blood that

24   he did these things to.

25   He deserves no mercy in

```
 1                      any manner or fashion,
 2                      your Honor.  He's ruined
 3                      these little girls'
 4                      lives.  They may never
 5                      recover.  We ask you to
 6                      sentence him to the
 7                      maximum sentences of 99
 8                      years on all cases,
 9                      except for the Sexual
10                      Abuse, ten years on
11                      those.  And as he
12                      denies his guilt, that's
13                      fine; but twelve good
14                      jurors in this Circuit
15                      found him guilty.  Let
16                      them take that up in the
17                      Appellate Court.  You
18                      shouldn't show him any
19                      mercy for hurting
20                      children, Judge.  There
21                      is no gray area.
22            THE COURT:  Okay.  Mr. Ramsey,
23                      if you could bring your
24                      client up.  Okay.  In
25                      Case No. CC-94-0725,
```

```
 1                              which is Rape First
 2                              Degree, the jury having
 3                              found you guilty of that
 4                              particular offense, the
 5                              Court sentences you to
 6                              99 years in the state
 7                              penitentiary.  In Case
 8                              No. CC-94-066, Rape
 9                              First, the jury having
10                              found you guilty of that
11                              particular offense, I
12                              sentence you to the
13                              state penitentiary for
14                              99 years.  Case No.
15                              CC-94-067, which is Rape
16                              First, the jury having
17                              found you guilty of that
18                              offense, the Court
19                              sentences you to 99
20                              years in the state
21                              penitentiary.  In Case
22                              No. CC-94-068, the jury
23                              having found you guilty
24                              of Sexual Abuse in the
25                              First Degree, the Court
```

1     imposes the sentence and

2     sentences you to the

3     state penitentiary for a

4     period of ten years.   In

5     Case No. CC-94-069,

6     which is a Rape First

7     case, the jury having

8     found you guilty of that

9     particular crime, the

10    Court sentences you to

11    99 years in the state

12    penitentiary.  In Case

13    No. CC-94-070, a Sexual

14    Abuse in the First

15    Degree case, the jury

16    having found you guilty

17    of that particular

18    charge, the Court

19    sentences you to ten

20    years in the state

21    penitentiary.

22         I think that's all the

23         cases; is that correct,

24         Mr. Valeska?

25    MR. VALESKA:  Yes, sir.

```
 1                    THE COURT:  In each of those
 2                       particular cases the
 3                       Court Imposes a fine of
 4                       five hundred dollars and
 5                       Victim Assessment fee.
 6              MR. RAMSEY:  Are those
 7                       sentences to run
 8                       concurrently, or
 9                       consecutively, your
10                       Honor?
11              THE COURT:  No, sir, no
12                       concurrent.  They are
13                       run consecutively.
14              MR. RAMSEY:  Your Honor, we
15                       would give oral notice
16                       of appeal at this time.
17                       Mr. Money had
18                       originally filed an
19                       indigent affidavit.  We
20                       would ask the Court to
21                       appoint him an attorney
22                       on appeal.  I would be
23                       glad to handle it, if
24                       the Court is willing to
25                       appoint me.  And we
```

1          would also ask the Court

2          to award him a

3          transcript.

4     THE COURT:  Okay.  That will

5          be noted on the record.

6          You have filed an oral

7          notice of appeal, and

8          the Court will appoint

9          an attorney in the case

10         for purposes of appeal.

11         And, of course,  to do

12         that he needs to show

13         the Court that he is, in

14         fact, indigent before I

15         can do that and before I

16         order a free

17         transcript.

18    MR. RAMSEY:  I understand

19         that.

20    THE COURT:  Okay.

21    MR. RAMSEY:  Thank you, your

22         Honor.

23

24    (END OF PROCEEDINGS)

25

CERTIFICATE OF REPORTER

STATE OF ALABAMA

COUNTY OF HENRY

I, Gwen Cooper, Official Court Reporter for the 20th Judicial Circuit for the State of Alabama and Notary Public, State at Large, do hereby certify that I have correctly reported in stenotype the proceedings in the above-styled cause, and I later reduced my stenotype notes into typewriting, and the foregoing beginning with the words "Proceedings" where the same appears in the center of the page, contain a true and correct transcription of the evidence, including objections, oral motions, rulings of the Court, and the oral charge of the Court, where applicable, as therein set out.

I further certify that I have filed all exhibits in the trial of this cause with the Clerk of the Circuit Court for incorporation into the record.

1    I further certify that I have on this day filed

2  with the Clerk of the Court of Criminal Appeals of

3  Alabama and the parties herein involved a Certificate

4  of Completion of Reporter's Transcript.  I further

5  certify that I have filed the original and three

6  copies of this transcript in the Office of the Clerk

7  of the Circuit of Houston County, Houston County

8  Courthouse, Dothan, Alabama.

9

10    Done this the 17th day of May, 1996.

11

12

13

14    _Gwen Cooper_

15    GWEN COOPER,

16    OFFICIAL COURT REPORTER

17    P. O. DRAWER 6406

18    DOTHAN, AL 36302

19

20

21

22

23

24

25

CERTIFICATE OF COMPLETION OF REPORTER'S TRANSCRIPT

_B. C. Money_
Appellant

v.

✓ State of Alabama
____ Municipality of _____

TO: The Clerk of the Court of
Criminal Appeals of Alabama

On Appeal From The:
✓ Circuit Court of
____ District Court of
____ Juvenile Court of

_Henry_ County
Case No. _____
Date of Notice of Appeal ____

    I certify that I have this date completed and filed with the clerk of the trial court[1] the original of a true and correct transcript of the proceedings designated in the reporter's transcript order.  All pages are numbered serially, in the upper right corner of each page, prefaced by a copy of the reporter's transcript order (p. no. ____) and an index, and ending with the number appearing in the upper right corner of this certificate.

    I certify that a copy of this certificate is this date being served (on counsel for defendant) (defendant, if not represented), the attorney general of Alabama, and the district attorney or the municipal prosecutor in lieu of the attorney general and the district attorney if the appeal is from a municipal conviction, along with a copy of the index.

    DATED this _17th_ day of _May_, 19_96_.

_Dwen Cooper_
Court Reporter

(Amended October 1, 1991.)

---

[1]The clerk of the trial court is reminded to assemble the record on appeal in volumes of not more than 200 pages each, and to send certified photocopies of the record on appeal to counsel for defendant and to the attorney general of Alabama as required by Rule 11(b) or to the municipal prosecutor in lieu of the attorney general if the appeal is from a municipal conviction.

JUN 27 1996

CLERK
ALA COURT CRIMINAL APPEALS

COURT OF CRIMINAL APPEALS
STATE OF ALABAMA
CRIMINAL APPEALS NO. 95-0268

---

ON APPEAL FROM THE
CIRCUIT COURT OF HENRY COUNTY, ALABAMA
ACTION NOS. CC 94-065, CC 94-066, CC 94-067,
CC 94-068, CC 94-069, CC 94-070

---

B. C. MONEY

(APPELLANT)

VS.

STATE OF ALABAMA

(APPELLEE)

---

BRIEF AND ARGUMENT OF APPELLANT, B. C. MONEY

---

WILLIAM C. MADDOX
ATTORNEY FOR APPELLANT
POST OFFICE BOX 1748
DOTHAN, ALABAMA  36302
(334) 793-3610



EXHIBIT

B

**TABLE OF CONTENTS**

                                                              **Page**

TABLE OF CASES AND AUTHORITIES . . . . . . . . . . . . . .    i

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . .    1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . .    2

I.   DID THE TRIAL COURT COMMIT
     ERROR BY PRESSURING THE
     DEADLOCKED JURY INTO REACHING
     A VERDICT?

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . .   3-9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .   12

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . .   13

## TABLE OF CASES AND AUTHORITIES

                                                            **Page**

Jenkins v. United States, 380 U.S. 445,
    85 s.Ct. 1059, 1060, 13 L.Ed.2d 957
    (1965) . . . . . . . . . . . . . . . . . . . . . . . .    10

Showers v. State, 407 So.2d 169, 171
    (Ala. 1981) . . . . . . . . . . . . . . . . . . . . .    10

## STATEMENT OF THE CASE

Defendant was arrested on August 12, 1994, on four counts of Rape, First Degree, and two counts of Sexual Abuse, First Degree. He was indicted on July 29, 1994 in violation of 13-A-6-61 and 13-A-6-66 of the Code of Alabama. (C.12-13). The Defendant entered a Waiver of Arraignment and Plea of Not-Guilty on August 25, 1994. (C.19).   On December 5, 1994, the State filed a Motion for Consolidation of Offenses. (C.36).  The Court granted that Motion on December 7, 1994. (C.57).  The Defendant was found guilty by a jury of four counts of Rape in the First Degree and two counts of Sexual Abuse in the First Degree.   On charge CC-94-725, the Defendant was sentenced to 99 years in the state penitentiary, a fine of Five Hundred Dollars ($500.00), and a Victim Assessment fee. On charge CC-94-066, the Defendant was sentenced to 99 years, a fine of Five Hundred Dollars ($500.00), and a Victim Assessment fee.  In CC-94-067, the Defendant was sentenced to 99 years, a fine of Five Hundred Dollars ($500.00), and a Victim Assessment fee.  In case number CC-94-068, the Defendant was sentenced to 10 years, a fine of Five Hundred Dollars ($500.00), and a Victim Assessment fee.  In case number CC-94-069, the Defendant was sentenced to 99 years, a fine of Five Hundred Dollars ($500.00), and a Victim Assessment fee.   In case number CC-94-070, the Defendant was sentenced to 10 years, a fine of Five Hundred Dollars ($500.00), and a Victim Assessment fee. (C.7-9).  All six of the Defendant's sentences were ordered to run consecutively. (C.9).  Notice of Appeal was given on the same date.

1

## STATEMENT OF THE ISSUE

ISSUE I:   DID THE TRIAL COURT COMMIT ERROR BY PRESSURING THE
           DEADLOCKED JURY INTO REACHING A VERDICT?

## STATEMENT OF THE FACTS

At the conclusion of the Appellant's trial, the jury was sent out to begin its deliberations at approximately 4:00 in the afternoon. (R.528). At approximately 7:15 p.m., a little over three hours and fifteen minutes after the jury had begun its deliberations, the jury informed the Court that it was deadlocked. (R.527). After being notified that the jury was deadlocked in its deliberations, the trial court gave the following instructions to the jury:

The Court:       "Okay. I think the jury retired a little after 4:00 and it is now 7:15, and I appreciate your attention to this case. I know that you all have deliberated and expressed your opinions to each other, and I do appreciate that. However, let me give you this charge at this time. If you would, please listen very carefully to this. The Court can not release you at this time. You should make further effort to reach a verdict in this case. Each juror is entitled to his or her opinion about the evidence, but I do not wish to put the State to the expense of another trial, if it can be avoided in this case. If you can not agree, a mistrial will be declared and this case will have to be tried again. There is no reason to believe that another jury would have better or clearer evidence than that presented to you today. This does not mean however, that you should surrender an honest conviction as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision. But, you should give careful consideration and respectful consideration to each others views and talk over any

3

> differences of opinion in a spirit
> of fairness and candor. If
> possible, you should resolve any
> differences and come to a common
> conclusion so this case can be
> completed. I will be happy to give
> you further instructions on the law
> on any matter other than the facts
> in this case. It is natural that
> differences of opinions will arise".
> (R.528-529).

The Court concluded its "Allen charge" or its "Dynamite charge" and sent the jury back to the deliberation room for further deliberation.

After further deliberations by the jury occurred, the jury returned to the courtroom and the following conversation occurred between the Court and the jury:

The Court:     "Let me say this to the jury. We
have had many hours of testimony,
many facts presented; maybe not all
of the facts that you wanted to hear
or that could have been introduced.
But, let me say this: If you had
heard everything in the world about
this case, we would be trying this
thing forever. I think there is
sufficient evidence before the jury
at this time to make a decision one
way or the other. Now, if you have
come to a situation you can't
discuss the case, then you need to
rethink that position, because there
are important issues here that you
need to discuss with each other.
Maybe points you need to discuss.
And, if you do not have a discussion
among yourselves, I don't want to be
hard on anybody, believe me, I know
the position you are in; but, if
that is the case, then you are not
doing your duty in this particular
case. I don't want to sound mean or
mean-spirited about it, but your
job, as I said, is to discuss the
case among yourselves. I am sure

4

you have your own opinions and that is great. If there are points you have that you do have a strong opinion, then you need to discuss those particular matters with each other. Because, somebody else may have an opinion that may give you some thoughts you have not thought about. But, as far as I am concerned, to say you are not discussing the case, that is your prerogative; you can do what you want to do. **But, the Court is inclined at this point to keep on until a verdict is reached in this case. And, we are going to do that.** I am not forcing you one way or the other to make up your mind either way. I don't think anybody heard me say anything in this particular case one way or the other how I think about the facts of the case or the guilt or innocence of the Defendant. I am not trying to force anybody into anything. However, I will not sit by and have you waiting and other people waiting in this particular matter, if you are not discussing the case. I will have to put it to you like it is; you are not doing your job if you don't discuss the case. **I am prepared to stay here until a verdict is reached in this case. You all need to know that. I know it is inconvenient for you, and I hate that because I think each of you has done a good job, been attentive to the evidence, but on the other hand, this matter needs to be concluded in any manner.** That is not up to me, that is up to you. But, the case needs to be discussed. With that, you can retire. **As I said, the Court is going to keep on in this particular matter until a decision is reached, and you need to know that.**" (R.548-549). (emphasis added).

Following that charge by the Court to the jury, one of the jurors mentioned to the trial judge that there was some ill

5

feelings among some of the jurors. (R.550). In response to the jurors question regarding ill feelings, the Court had the following comment:

The Court:    "...but, as far as ill will is concerned toward any person, then that needs to be, you need to throw that aside. There is no room anywhere in this system of justice for anybody to be, to take it personally to the extent that they are bickering, fighting, ill will between you. That does not need to be there. And, I am sorry if that is the situation that has come up. Sometimes it does come up, to be very frank with you, in some juries. Why it comes up, I don't know other than people just have their own personal opinions. The evidence was taken in this case, many hours was taken and the facts are there. Regardless of how you rule or judge this particular case, it is, you know, that is the way it is. But, I will tell you this way. **There will be a verdict in this case, one way or the other. That is only fair. Not only for B.C. Money, it is also that is the only way it is fair for the State of Alabama, too. With that, we will deliberate and we will deliberate tomorrow, if it takes it.**" (R.551). (emphasis added).

After that comment by the Court, the jury was returned to the jury deliberation room. (R.551). At that point in the proceedings, counsel for the Defendant objected to the Court's charge and stated:

The Court:    Any objections to the Court's charge?

Mr. Valeska:    I'm satisfied.

Mr. Ramsey:    Your Honor, I want for the record---you are the Judge, but there is such a thing as a hopeless

6

deadlock. And, I don't think that that is a proper instruction that you will reach a verdict. If they are unable to do so, so be it.

The Court:    The Court will make the determination at the appropriate time, whether or not there is a deadlock in the jury. And, that is my call and that is my discretion. And, I have given the dynamite charge to this particular jury at an earlier time, and I don't see anything inappropriate about telling the jury they have to reach a verdict in this case. (R.552).

Following even further deliberation by the jury, the jury was summoned to the courtroom by the trial court where they received the following charge:

The Court:    "Okay. Ladies and gentlemen of the jury. My bailiff has talked to me about certain matters. I do not want to know and the attorneys do not need to know any kind of vote count in this particular case, how you voted, how you are thinking at this time, whether or not either way. I do not need to know that and the attorneys do not need to know that, also. But let me put it to you this way, also. The verdict must be unanimous. All twelve of you. Now, we have, in this particular case, when I say verdict, we have actually as you know, very well, six indictments in this case. **You must return a verdict either guilty or not-guilty on each particular charge in this case.** Again, I do not need to know the vote, and I do not want to know the vote. It is none of my business about that, and certainly not the

7

attorneys' business. But, it must be unanimous. Let me say this for the jury's benefit. First of all, I appreciate you all discussing the case. I understand that you all are discussing the case again and I appreciate that. Of course, the Court does not know what you discuss and I don't want to know. That is up to you. That is your private deliberations. **But we will keep on deliberating in this matter.** Again, I hope there is no ill will among the members of the jury. There shouldn't be. If it is, you need to let me know. Y'all did let me know one time, and I did instruct you on that. But, if this becomes a problem, I may just ask you what the problem is. There will not be any ill will among the jury, and I will talk to you about that, because there is no place in this particular system of justice for anything like that. And, the Court will not tolerate that. One matter I think we need to take up at this point, since it is a late hour and needs to be said. Again, I am not trying to be mean-spirited or anything like that, because you have got a tough job to do and I appreciate that. But, it has come to my attention also, that one particular juror in this jury panel has attempted to leave the jury deliberation room and has been told to go back in. Now I am going to be very frank at this point. **As long as I run this courtroom, that will not be tolerated. I don't know the person that did that, but that will not be tolerated in this Court as long as I say deliberate.** I am not saying in a mean-spirited manner, but that juror, at some point, may have to come in this courtroom and again, I will not talk to anybody in private. It will be all parties present and we will discuss that particular manner." (R.554-556). (Emphasis added).

8

At approximately 11:01 p.m., the Court was notified that the jury had reached their verdict and all parties returned to the courtroom, some seven hours after the jury began its deliberation. (R.558).  The jury returned guilty verdicts on all six counts that the Appellant stood trial on.

9

**ARGUMENT**

<u>ISSUE I:</u>  DID THE COURT COMMIT ERROR BY PRESSURING THE DEADLOCKED JURY INTO REACHING A VERDICT?

It is a long-standing rule in the State of Alabama that a Judge may not pressure the jurors in any way to relinquish individual conclusions reached on the basis of the evidence and law presented at trial.  <u>Jenkins v. United States</u>, 380 US 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965).  The issue was also addressed by the Court of Criminal Appeals which cited <u>Showers v. State</u>, 407 So.2d 169, 171 (Ala. 1981), in which the Alabama Supreme Court said:

> "It is quite clear that under Alabama law, a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the Court does not suggest which way the verdict should be returned **and no duress or coercion is used.**" at 171. (Emphasis added).

In the present matter, the trial court was entirely too vigorous and forceful in giving its charge and instructions to a deadlocked jury, and the Court's "Allen charge" in fact did coerce a verdict.  To begin with, the Appellant's jury was forced by the trial court to deliberate from 4:00 p.m. until approximately 11:01 p.m.  The trial court was notified on three separate occasions by the foreperson of the jury that the jury was in fact deadlocked, and on all three occasions, the trial court instructed the jury that it would in fact return a verdict one way or the other.

Furthermore, in the Appellant's trial, the Court did in fact call the jury's attention to the time and expense that the State would incur due to a new trial of the Defendant, and the Court did

10

in fact censure one particular juror simply for attempting to step out of the jury deliberation room during the course of deliberations. The trial court never allowed or even offered the jury a dinner break, nor did the trial court allow the jury to go home and reassemble the next morning, when it appeared that the jury was in fact deadlocked for the evening. Appellant would respectfully point out that the trial court told the jury panel once again that it would in fact come back with a verdict in the case one way or the other. (R.551) Furthermore, the Court informed the jury that it would reconvene the next day if necessary to get a verdict in the case. Interestingly enough, this was told to the jury on a Friday evening sometime between 4:00 p.m and 11:00 p.m., and the jury was never actually offered the opportunity to reconvene the next day.

The Appellant would respectfully point out that his trial occurred during Hurricane Opal, and his trial was in fact interrupted for approximately two days due to the problems associated in Henry County with the hurricane passing through.

The Appellant contends that taking all of the Court's charges in light of the circumstances that all residents of Henry County were faced with at the time of the hurricane (i.e. getting their lives back in order following this disaster), the trial court's comments to this particular jury are indeed coercive. The trial court's comments to the jury are especially coercive when coupled with the fact that the trial court repeatedly told the jury that it would return a verdict one way or the other. (R.551)

11

**CONCLUSION**

When this Honorable Court examines all of the trial court's comments, given to the deadlocked jury in the course of the Appellant's trial, this Honorable Court can not help but find that the trial court's comments to said jury are coercive and as such, the Appellant respectfully requests this Court to reverse and remand this case to the Circuit Court of Henry County for further actions.

Respectfully submitted this the 26 day of June, 1996.

HALL & SMITH

_William C. Maddox_
WILLIAM C. MADDOX
Attorney for Appellant
Post Office Box 1748
Dothan, Alabama  36302
(334) 793-3610

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing Brief on the Honorable Jeff Sessions, Attorney General for the State of Alabama, 11 South Union Street, Montgomery, Alabama, 36130, by placing a copy of same in the United States Mail, postage prepaid and addressed to him at the address set out above.

This the 26 day of June, 1996.

_William C. Maddox_
Of Counsel

13

95-0268

# IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

B.C. MONEY,

APPELLANT,

VS.

STATE OF ALABAMA,

APPELLEE.

## ON APPEAL FROM THE CIRCUIT COURT OF HENRY COUNTY, ALABAMA

### BRIEF AND ARGUMENT

OF

**JEFF SESSIONS**
ATTORNEY GENERAL

AND

**JEAN A. THERKELSEN**
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334)242-7300



EXHIBIT
C

## TABLE OF CONTENTS

PAGE

TABLE OF CASES AND AUTHORITIES--------------- ii

STATEMENT OF THE CASE------------------------ 1

ISSUE PRESENTED FOR REVIEW------------------- 2

STATEMENT OF THE FACTS----------------------- 2

ARGUMENT

      THE TRIAL COURT'S INSTRUCTIONS TO THE
      JURY DID NOT COERCE OR COMPEL A VERDICT
      IN THIS CASE.---------------------------- 14

CONCLUSION----------------------------------- 17

CERTIFICATE OF SERVICE----------------------- 18

TABLE OF CASES AND AUTHORITIES

PAGE(S)

Daniels v. State,
     416 So.2d 760 (Ala. Cr. App. 1982)--------- 16

Edwards v. State,
     668 So.2d 167 (Ala. Cr. App. 1995)--------- 16

Lake v. State,
     390 So.2d 1088 (Ala. Cr. App. 1980),
     cert. denied, 390 So.2d 1093 (Ala. 1980),
     cert. denied, 450 U.S. 1004, 101 S.Ct.
     1715, 68 L.Ed.2d 207 (1981)--------------- 16

McHan v. State,
     508 So.2d 1108 (Ala. Cr. App. 1986)-------- 15

Murry v. State,
     455 So.2d 53 (Ala. Cr. App. 1983),
     rev'd on other grounds, 455 So.2d 72
     (Ala. 1984)------------------------------ 15

Showers v. State,
     407 So.2d 167 (Ala. Cr. App.) rev'd,
     408 So.2d 169 (Ala. 1981)----------------- 16

Strickland v. State,
     348 So.2d 1105 (Ala. Cr. App.),
     cert. denied, 348 So.2d 1113 (Ala. 1977)--- 15

Voyles v. State,
     596 So.2d 31 (Ala. Cr. App. 1991)---------- 15

## STATEMENT OF THE CASE

This is an appeal from the appellant's conviction of four counts of rape in the first degree and two counts of sexual abuse in the Circuit Court of Henry County, the Honorable Lawson Little presiding.

The appellant, B.C. Money (hereinafter "Money"), was indicted by the Henry County Grand Jury on July 29, 1994 on three counts of raping Amber Celeste Money by forcible compulsion in violation of §13A-6-61, Code of Alabama (1975) in cases CC94-065, CC94-066 and CC94-067.  (C. 12, 75, 88)  In CC94-068 Money was charged with sexual abuse in the first degree of Amber Celeste Money in violation §13A-6-66, Code of Alabama (1975).  (C. 103)  In CC94-069 Money was charged with rape in the first degree of Amanda Hadden in violation of §13A-6-61, Code of Alabama (1975).  (C. 18)  In CC94-070 Money was charged with sexual abuse in the first degree of Amber Money in violation of §13A-6-66, Code of Alabama (1975).  (C. 133)  On motion of the State made December 5, 1994 and over objection by defense counsel cases CC94-065-CC94-070 were consolidated.  (C. 36, 37, 38, 41)

The case came to trial on October 6, 1995 whereupon the the jury found the defendant guilty of four counts of rape in the degree and two counts of sexual abuse in the

first degree. (C. 54, 77, 91, 106, 121, 136)  A sentence hearing was held on October 27, 1995 whereby the defendant was sentenced as follows:  In case CC94-0725, ninety-nine years in the State penitentiary; in case CC94-066, ninety-nine years in the State penitentiary; in case CC94-067, ninety-nine years in the State penitentiary; in case CC94-068, ten years; in case CC94-069, ninety years in the State penitentiary; and in case CC94-070, ten years in the State penitentiary. (Vol. R. 6-8)  Notice of appeal was given October 27, 1995 (C. 66) and this action follows.

### ISSUE PRESENTED FOR REVIEW

THE TRIAL COURT'S INSTRUCTIONS TO THE JURY DID
NOT COERCE OR COMPEL A VERDICT IN THIS CASE.

### STATEMENT OF THE FACTS

When victim Amanda Catherine Hadden was in the second grade, she went home from school with her cousin, victim Amber Money.  The defendant in this case is Amber Money's grandfather.  Amanda went with Amber to the defendant's house after school on the afternoon in question. While there, the defendant showed both girls pornographic magazines and playing cards which he kept in a box in a dog pen near the house.  The defendant then

2

took Amanda and Amber to an old shed near his trailer where he had the girls lay shingles down on the ground. He told Amanda to pull her pants down. Amanda testified that she was very afraid of the defendant and that he had blocked the door of the shed. There was no one else around to help them. The defendant made Amanda lie down on her back on top of the shingles. He put his finger in Amanda's vagina. Then, he pulled his pants down and put his penis inside of her. Amanda testified that it hurt. While he was on top of Amanda with his penis inside of her, Amber's mother called them from outside. The defendant jumped up and told the girls not to tell anybody what he had done and left. At first, Amanda was afraid to tell anyone what had happened. A few months later, she told her mother and her aunt what the defendant had done to her. Her mother took her to a doctor who examined her. Amanda Catherine Hadden identified the defendant in court as the man who had placed his finger inside of her vagina and his penis inside of her vagina. (R. 40-89) The victim Amanda Catherine Hadden was seven years old when the defendant raped and sexually abused her.

Victim Amber Celeste Money, the defendant's granddaughter, testified that she was six years old the

3

first time her grandfather tried to stick his penis inside of her. He penetrated her slightly the first time. Altogether, the defendant penetrated her vagina with his penis five times: four times at a creek near the house and one time in one of the bedrooms of the trailer. Amanda testified that each time her grandfather forced himself on her.

When Amber was in the first grade her cousin Amanda came home with her. The defendant (Amber's grandfather) showed Amber and Amanda some pornographic magazines he kept in an old dog pen. He took them to a shed where he made them lay down shingles on the floor. He then pulled down Amanda pants and touched Amanda's vagina. He got on top of Amanda and stuck his penis in Amanda and moved up and down. Amber watched. She said she was afraid of the defendant and so had never told anyone about his abuse of her. She was also afraid on the day in question to leave the shed because her grandfather had whipped her. At one point, while the defendant was on top of Amanda they heard Amber's mother. The defendant got up and told them not to tell anyone what he had done. Amber identified the defendant in court. (R. 171) Amber also testified that in the past her grandfather had shown her

4

pornographic movies, in particular a movie called
"Screwballs." (R. 132-173, 179-181)

Clyde Hornsby of the Henry County Sheriff's
Department recovered two pornographic magazines and two
decks of cards with naked women on them from the
defendant's property. The cards were found in the
defendant's dresser. The magazines were found in a tool
box out by the barn. (R. 8-9) Hornsby also found
shingles in the hog barn. (R. 16) Hornsby testified
that he had interviewed many victims of sexual abuse
cases. In his experience, it was normal for children to
be upset and to have a hard time pinpointing dates
because of their young age. Both the victims in this
case were younger than nine years old when the acts of
abuse occurred. Amber and Amanda told Deputy Hornsby the
exact locations of the pornographic material. (R. 239)
Both girls described the contents of that material and
also described the shingles and their location. The
shingles were also found where Amanda and Amber said they
would be. (R. 245) The shingles were still laying on
the ground when Hornsby found them. Amber was seven
years old when she was interviewed by Hornsby. She drew
a picture of the defendant's penis. (R. 278-279)

At the conclusion of Hornsby's testimony the State of Alabama rested its case in chief.  (R. 280)

The defense then presented testimony through witnesses Ted A Williams, Patricia Ann Money, Ruby Money, Elbert Bristow, Cynthia Chambers, Dora Money and the defendant, B.C. Money, Sr.  The defendant testified in his behalf and denied that he ever raped or sexually abused either victim.  (R. 399-437)

Under Rule 28(a)(4), A.R.A.P. the following excerpts from the transcript are relevant to the only issue raised by the appellant on appeal, that being, that the trial judge forced the jury to reach a verdict.

> (Thereupon, the Trial Jury was returned to their places in the Jury Box and the following proceedings were held in the presence and hearing of said Trial Jury, to-wit:)
>
> THE COURT:  Ladies and Gentlemen of the Jury, it has come to the Court's attention that you are deadlocked. Is that correct?
>
> THE FOREPERSON:  Yes, sir.
>
> THE COURT:  Okay.  I think the Jury retired a little after 4:00 o'clock and it is now 7:15 and I appreciate your attention to this case.  I know that y'all have deliberated and expressed your opinions to each other and I do appreciate that.  However, let me give you this charge at this time.  If you would, please listen very carefully to this.  The Court

6

cannot release you at this time. You
should make further effort to reach a
verdict in this case. Each Juror is
entitled to his or her opinion about
the evidence, but I do not wish to
put the State to the expense of
another trial, if it can be avoided
in this case. If you cannot agree, a
mistrial will be declared and this
case will have to be tried again.
There is no reason to believe that
another Jury would have better or
clearer evidence than that presented
to you today. This does not mean,
however, that you should surrender an
honest conviction as to the weight or
effect of any evidence solely because
of the opinion of other Jurors or
because of the importance of arriving
at a decision. But, you should give
careful consideration and
respectfully consideration to each
other's views and talk over any
differences of opinion in a spirit of
fairness and candor. If possible,
you should resolve any differences
and come to a common conclusion so
this case can be completed. I will
be happy to give you further
instructions on the law on any matter
other than the facts in this case.
It is natural that differences of
opinion will arise. When they do,
each Juror should not only express
his opinion or her opinion, but the
facts and reason upon which he or she
basis that opinion. By reasoning
that matter out, it may be possible
for all Jurors to agree in this
case. What I have said to you must
not be taken as an attempt on the
part of the Court to require or force
you to surrender your honest and
reasonable convictions founded upon
the law and evidence in this case.
My sole purpose is to impress upon
you your duty and desirability and

7

> the importance of reaching a verdict,
> if you can conscientiously do so.
> With that, you may retire again and
> continue your deliberations.
>
> (Thereupon, the Trial Jury proceeded
> to the Jury Room to continue their
> deliberations with the above further
> instructions from the Court.  The
> following proceedings were held
> outside the presence and hearing of
> the said Trial Jury, to-wit:)

(R. 527-530)

After further deliberations by the jury occurred,

the jury returned to the courtroom and the following

conversation was had between the court and the jury:

> THE COURT:  ... It has come to the
> Court's attention from the bailiff,
> that y'all have quit discussing the
> case.  I don't know if that is true
> or not.  Mrs. Gibbs, is that true?
>
> THE FOREPERSON:  There has been no
> discussion in the past while, really.
>
> THE COURT:  Let me say this to the
> Jury.  We have had many hours of
> testimony, many facts presented;
> maybe not all of the facts that you
> wanted to hear or that could have
> been introduced.  But, let me say
> this; if you heard everything in the
> world about this case, we would be
> trying this thing forever.  I think
> there is sufficient evidence before
> the Jury at this time to make a
> decision one way or the other.  Now,
> if you have come to a situation you
> can't discuss the case, then you need
> to rethink that position, because
> there are important issues here that
> you need to discuss with each other,
> maybe points you need to discuss.

8

And, if you do not have a discussion among yourselves, I don't want to be hard on anybody, believe me, I know the position you are in; but, if that is the case, then you are not doing your duty in this particular case. I don't want to sound mean or mean spirited about it, but your job, as I said, is to discuss the case among yourselves. I am sure you have your own opinions and that is great. If there are points you have that you do have a strong opinion, then you need to discuss those particular matters with each other. Because, somebody else may have an opinion that may give you some thoughts you have not thought about. But, as far as I am concerned, to say you are not discussing the case, that is your prerogative; you can do what you want to do. But, the Court is inclined at this point to keep on until a verdict is reached in this case. And, we are going to do that. I am not forcing you one way or the other to make up your mind either way. I don't think anybody heard me say anything in this particular case one way or the other how I think about the facts of the case or the guilt or innocence of the Defendant. I am not trying to force anybody into anything. However, I will not sit by and have you waiting and other people waiting in this particular matter, if you are not discussing the case. I will have to put it to you like it is; you are not doing your job if you don't discuss the case. I am prepared to stay here until a verdict is reached in this case. Y'all need to know that. I know it is inconvenient for you and I hate that, because I think each of you has done a good job, been attentive to the evidence, but on the other hand, this matter needs to be

9

concluded in any manner. That is not up to me, that is up to you. But, the case needs to be discussed. With that, you can retire. As I said the Court is going to keep on in this particular matter until a decision is reached and you need to know that. I will say right at this point, while it is out on the table for everybody, if a decision cannot be reached tonight, we will deliberate tomorrow. Any questions? (No response.)

(R. 546-549)

Thereafter, one of the jurors asked the following:

A JUROR: OK. I will go ahead and say it. You know, every time we get to discussing, you know, the verdict, then, you know, it gets ill feelings. People start crying and stuff. You know, what do we do?

(R. 550)

The court responded as follows:

THE COURT: Now, that is one thing you are going to have to do, even though you have strong opinions about the matter. That is your prerogative. That is your duty to have an opinion. That is why we have twelve of you here. You need to do that. But, as far as ill will is concerned toward any person, then that needs to be, you need to throw that aside. There is no room anywhere in this system of justice for anybody to be, to take it personally to the extent that they are bickering, fighting, ill will between you. That does not need to be there. And, I am sorry if that is the situation that has come up.

10

> Sometimes it does come up, to be very
> frank with you, in some Juries.  Why
> it comes up, I don't know, other than
> people just have their own personal
> opinions.  The evidence was taken in
> this case, many hours was taken and
> the facts are there.  Regardless of
> how you rule or judge this particular
> case, it is, you know, that is the
> way it is.  But, I will tell you this
> way.  There will be a verdict in this
> case, one way or the other.  That is
> only fair.  Not only for B.C. Money,
> it is also, that is the only way it
> is fair for the State of Alabama,
> too.  With that, we will deliberate
> and we will deliberate tomorrow, if
> it takes it.  Thank you.
>
> (Thereupon, the Trial Jury returned
> to the Jury Room

(R. 550-551)

Upon suggestion by defense counsel at this point

that the jury was hopelessly deadlocked the court stated

that it would make such determination at the appropriate

time regarding whether there was deadlock.  (R. 552)  The

prosecutor pointed out that the foreperson did not relate

that their existed a hopeless deadlock at all in this

case and the court agreed.  (R. 553)  Thereafter, the

jury returned to the courtroom again and the judge

instructed to them as follows:

> THE COURT:  Okay.  Ladies and
> Gentlemen of the Jury, my bailiff has
> talked to me about certain matters.
> I do not want to know and the
> Attorneys do not need to know any

11

kind of vote count in this particular
case, how you voted, how you are
thinking at this time, whether or not
either way.  I don't need to know
that and the Attorneys do not need to
know that, also.  But, let me put it
to you this way, also.  The verdict
must be unanimous.  All twelve of
you.  Now, we have, in this
particular case, when I say verdict,
we have actually, as you know, very
well, six Indictments in this case.
You must return a verdict either
guilty or not guilty on each
particular charge in this cause.
Again, I do not need to know the vote
and I do not want to know the vote.
It is none of my business about that,
and certainly not the Attorneys
business.  But, it must be
unanimous.  Let me say this for the
Jury's benefit.  First of all, I
appreciate y'all discussing the
case.  I understand that y'all are
discussing the case again and I
appreciate that.  Of course, the
Court does not know what you
discussed and I don't want to know.
That is up to you.  That is your
private deliberations.  But, we will
keep on deliberating in this matter.
Again, I hope there is no ill will
among the members of the Jury.  There
shouldn't be.  If it is, you need to
let me know.  Y'all did let me know
one time and I did instruct you on
that.  But, if this becomes a
problem, I may just ask you what the
problem is.  There will not be any
ill will among the Jury and I will
talk to you about that, because there
is no place in this particular system
of justice for anything like that.
And, the Court will not tolerate
that.  One matter I think we need to
take up at this point, since it is a
late hour and needs to be said.

12

Again, I am not trying to be mean spirited or anything like that, because you have got a touch job to do and I appreciate that. But, it has come to my attention also, that one particular Juror in this Jury Panel has attempted to leave the Jury Deliberation Room and has been told to go back in. Now, I am going to be very frank at this point. As long as I run this Court Room, that will not be tolerated in this Court as long as I say deliberate. I am not saying in a mean spirited manner, but that Juror, at some point, may have to come in this Court Room and again, I will not talk to anybody in private, it will be all parties present and we will discuss that particular manner. You are in there for a job like I am here for a job and Mr. Valeska for the State and Mr. Ramsey. And, that kind of conduct will not be tolerated by the Court at all. But, the verdict must be unanimous in this case. That is what the Law of Alabama says and it is not to be coerced in any manner. As long as you keep frank and honest discussions among yourselves and not let any ill will come between y'all, then everything is fine. I appreciate y'all talking to my bailiff and about this and you need to be assured that every time you talk to him, he talks to me about this. But, if you do talk to him, you need to know if he talks to me, what you say to him is going to be discussed among all of us in the presence of everybody. That is the way it should be. With that, you may begin your deliberations again.

(R. 554-558)

13

Thereafter, the jury returned a verdict finding the defendant guilty of four counts of rape in the first degree and two counts of sexual abuse in the first degree as charged in the indictments. (R. 560-561) This action follows.

<u>ARGUMENT</u>

THE TRIAL COURT'S INSTRUCTIONS TO THE
JURY DID NOT COERCE OR COMPEL A
VERDICT IN THIS CASE.

Money argues on appeal that the trial court's instructions to a "deadlocked jury" coerced the verdict returned in the instant case. An examination of the record herein reveals that not only was the jury not deadlocked, the court's instructions did not coerce the verdict returned. (R. 528-529, 545-558) In fact, the judge at all times impressed upon the jurors that the decision was theirs and that they should not "surrender an honest conviction" solely because of the opinion of other jurors or because of the importance of arriving at a decision. (R. 528) Rather, the court urged the jurors to talk over their differences and if possible to resolve such differences and come to a conclusion. (R. 528) The second time the judge spoke to the jurors was to urge them to <u>continue</u> discussing the facts of the case. (R.

14

548-549) The judge urged them to set aside any ill will that may have arisen and to continue deliberating the matter. (R. 550-551) Later, the judge reminded the jurors that the verdict must be unanimous and that they should keep their discussions frank and honest. (R. 556-557) At no point did the judge indicate his opinion of the facts of the case nor did the judge exercise duress or coercion in order to compel a verdict herein.

A trial judge may urge a jury to resume deliberations so long as the judge does not use duress or coercion to compel a verdict. Strickland v. State, 348 So.2d 1105, 1112 (Ala. Cr. App.), cert. denied, 348 So.2d 1113 (Ala. 1977); Murry v. State, 455 So.2d 53, 64 (Ala. Cr. App. 1983), rev'd on other grounds, 455 So.2d 72 (Ala. 1984); Voyles v. State, 596 So.2d 31, 35 (Ala. Cr. App. 1991). In cases such as the one at bar judges may and frequently do encourage jurors to continue deliberating in the hope that some agreement will be reached. "This is never improper as long as the judge does not coerce the jury to reach a verdict or suggest to them a particular verdict. Strickland v. State, supra; McHan v. State, 508 So.2d 1108 (Ala. Cr. App. 1986). An examination of the trial court's charge to the jury herein "in the whole context of its setting" reveals that

15

it is not coercive or threatening." Daniels v. State,
416 So.2d 760, 762 (Ala. Cr. App. 1982). Rather, the
trial judge explained to the jury the desirability and
importance of reaching a verdict by giving an impartial
instruction which never indicated which way the verdict
should be returned. Herein, the trial judge instead
urged the jury to resume deliberations and discussion of
the case among each other and to cultivate a spirit of
harmony so as to reach a verdict, but the court did not
in any manner suggest which way the verdict should have
been returned. Showers v. State, 407 So.2d 167, 171
(Ala. Cr. App.) rev'd, 408 So.2d 169 (Ala. 1981). In the
case at bar the judge did not "merely [terminate] the
jury's deliberations and [force] a verdict for the mere
sake of agreement, but [instead] initiated a new
deliberative process resulting in a genuine consensus."
Voyles v. State, 596 So.2d 31, 36 (Ala. Cr. App. 1991)
citing Annot., Verdict-urging instructions in civil cases
stressing desirability and importance of agreement, 38
ALR 3rd 1281, 1287 (1971). "The duration of jury
deliberations is a matter vested entirely within the
discretion of the trial court." Edwards v. State, 668
So.2d 167 (Ala. Cr. App. 1995) citing Lake v. State, 390
So.2d 1088 (Ala. Cr. App. 1980), cert. denied, 390 So.2d

16

1093 (Ala. 1980), <u>cert. denied</u>, 450 U.S. 1004, 101 S.Ct. 1715, 68 L.Ed.2d 207 (1981).  The record herein supports no finding of an abuse of discretion by the trial court and thus Money's conviction herein should be affirmed.

<u>CONCLUSION</u>

Based on the foregoing, the decision of the trial court is due to be affirmed.

Respectfully submitted,

JEFF SESSIONS
ATTORNEY GENERAL
BY:

*Jean A. Therkelsen*

JEAN A. THERKELSEN
ASSISTANT ATTORNEY GENERAL

17

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this _25TH_ day of July, 1996, I did serve a copy of the foregoing the on the attorney for the Appellant, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

        William Christian Maddox
        P. O. Box 1748
        Dothan, Al   36302

                        _Jean A. Therkelsen_
                        JEAN A. THERKELSEN
                        ASSISTANT ATTORNEY GENERAL


ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama   36130
(334) 242-7300

3844NL

18

# COURT OF CRIMINAL APPEALS

### STATE OF ALABAMA
### JUDICIAL BUILDING, 300 DEXTER AVENUE
### P. O. BOX 301555
## MONTGOMERY, ALABAMA 36130-1555



**RELEASED**

AUG 23 1996

CLERK
ALA COURT CRIMINAL APPEALS

SAM TAYLOR
Presiding Judge
JOHN PATTERSON
H. WARD McMILLAN
FRANCIS ALLEN LONG, SR.
SUE BELL COBB
Judges

Clerk's Office
(334) 242-4590

**MEMORANDUM**

CR-95-0268

Henry Circuit Court No. CC-94-065;
CC-94-066; CC-94-067; CC-94-068;
CC-94-069; CC-94-070

B.C. Money v. State

**Affirmed by Memorandum.** The judgment of the circuit court is affirmed. Following a jury trial the appellant, B.C. Money, was convicted of four counts of rape in the first degree, violations of § 13A-6-61, Code of Alabama 1975 and two counts of sexual abuse in the first degree, violations of § 13A-6-66. He was sentenced on October 27, 1995, and this appeal followed.

The convictions stemmed from the appellant's alleged sexual contact and sexual intercourse with his six year old granddaughter and another seven year old girl.

The appellant raises one issue in this direct appeal: He contends that the trial court committed reversible error by coercing the allegedly deadlocked jury into convicting him.

The record shows that the jury was returned to the courtroom several times during their deliberations which lasted from approximately 4:00 p.m. until approximately 11:00 p.m. Each time the jury was returned, the trial judge instructed them in an impartial manner to keep deliberating.

"'The duration of jury deliberations is a matter vested entirely within the discretion of the trial court. See Lake v. State, 390 So. 2d 1088 (Ala. Cr. App. 1980), cert. denied, 390 So. 2d 1093 (Ala. 1980), cert. denied, 450 U.S. 1004, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981); Martin v. State, 29 Ala. App. 395, 196 So. 753

EXHIBIT

D

PENGAD 800-631-6989

(1940)....'

"<u>Hollis v. State</u>, 417 So. 2d 617, 620 (Ala.Crim.App. 1982)."

<u>Edwards v. State</u>, 668 So. 2d 167, 169 (Ala.Cr.App. 1995).

> "'The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned.' <u>King v. State</u>, 574 So.2d 921, 927-28 (Ala.Crim. App. 1990) (quoting <u>McMorris v. State</u>, 394 So.2d 392 (Ala. Crim.App. 1980), writ denied, 394 So.2d 404 (Ala. 1981), cert. denied, 452 U.S. 972, 101 S.Ct. 3127. 69 L.Ed. 2d 983 (1981). An <u>Allen [v. United States</u>, 164 U.S. 492, 17 S.CT. 154, 41 L.Ed. 528 (1896)] charge, also known as a 'dynamite charge,' is permissible if the language of the charge is not coercive or threatening. <u>Grayson v. State</u>, 611 So.2d 422, 425 (Ala.Crim. App. 1992); <u>King v. State</u>, 574 So.2d at 928. We find that in giving the supplemental charge, the trial court did not suggest which way the verdict should be returned, and the charge was not in any way coercive or threatening. Thus, no error occurred in the supplemental charge to the jury."

<u>Slaton v. State</u>, [Ms. CR. 89-848, Jan. 13, 1995], ___ So.2d ___, ___ (Ala.Cr.App. 1995).

> "It is error for the trial court to coerce or threaten a jury in the reaching of a verdict. <u>Orr v. State</u>, 40 Ala.App. 45, 111 So.2d 627, affirmed on cert., 269 Ala. 176, 111 So.2d 639. But the entire charge must be examined so that the suspected language is tested in the whole context of its setting in order to determine whether the jury has been coerced or threatened. <u>Whittle v. State</u>, 205 Ala. 639, 89 So. 43."

<u>Evans v. State</u>, 338 So.2d 1033, 1040 (Ala.Cr.App. 1976).
We have examined the entire record and find that the instructions given by the trial judge to the jury were not coercive or threatening. The trial judge's urging of further deliberations was proper.

# OFFICE OF THE ATTORNEY GENERAL



*Therkelsen*
*95-0268*

**JEFF SESSIONS**
ATTORNEY GENERAL
STATE OF ALABAMA

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, ALABAMA 36130
AREA (334) 242-7300

September 30, 1996

Douglas A. Valeska
DISTRICT ATTORNEY'S OFFICE
Post Office Box 1632
Dothan AL  36302

RE: B. C. MONEY
    CIRCUIT COURT#  94-065-070
    DATE COJ ISSUED:   09/10/96

Dear Mr. Valeska:

   For your information, the Court of Criminal Appeals
has issued the Certificate of Judgment on the date noted
on the above-referenced case.

   Thank you for your attention to this matter.

                              Sincerely,

                              *Rosa H. Davis*

                              ROSA H. DAVIS
                              ASSISTANT ATTORNEY GENERAL

RHD/dms



EXHIBIT
*E*